## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THOMPSON PRODUCTS, INC.,          )
                                  )
            Plaintiff,            )
                                  )
v.                                )          C.A. No.  05-11810-RGS
                                  )
GLENN THOMPSON, *et al.*,         )
                                  )
            Defendants.           )
_____    )

## MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY

Plaintiff, Thompson Products, Inc. ("TPI"), by counsel, pursuant to (i) Rule 1.9 of the Massachusetts Rules of Professional Conduct, adopted by the District of Massachusetts in Local Rule 83.6(4)(B), and (ii) Local Rule 7.1, presents this memorandum in support of its Motion to Disqualify (the "Motion") Matthew F. Medeiros, Esq. ("Medeiros") and his law firm, Little Medeiros Kinder Bulman & Whitney, P.C. ("Little Medeiros") from continuing their representation of Defendants Glenn Thompson and Thompson Enterprises, Inc. now known as Splash Creations, Inc. ("Enterprises") (together, the "Defendants") in this case.

## FACTS

TPI is a Delaware corporation engaged in the business of manufacturing, selling and importing photo albums and related products.  TPI's predecessor, Thompson Paper Box Co., Inc., was a family business started, developed and operated by defendant Glenn Thompson, his brother Mark Thompson, and other members of the Thompson family until November 24, 1997, when they sold the company's assets to TPI.

1

In the Asset Purchase Agreement, to which TPI, Glenn Thompson and Mark Thompson were parties, the sellers were obligated to deliver to TPI "a duly executed Employment Agreement from each of GT (Glenn Thompson and MT (Mark Thompson) in the form as set forth in Exhibit 3.2(c)-1 and 3.2(c)-2." Relevant portions of Asset Purchase Agreement attached as Exhibit A. Both Glenn and Mark Thompson executed the Employment Agreement in form prescribed by the Asset Purchase Agreement. Glenn Thompson's Employment Agreement is attached as Exhibit B; Mark Thompson's, as Exhibit C. Each Employment Agreement contains in paragraph 9 multiple post-termination Restrictive Covenants, including a two-year post-termination of employment covenant not to compete. The Restrictive Covenants are identical in each Employment Agreement. The same covenants were made to TPI by Glenn and Mark Thompson in the Asset Purchase Agreement. Exhibit A, paragraph 2.4.

In 2002, Mark Thompson left TPI over a dispute with his brother Glenn and the company, and Mark sued TPI and Glenn Thompson in Plymouth Superior Court in an action styled Mark Thompson v. Glenn Thompson, Thompson Box Company, Inc. and Thompson Products, Inc., alleging, among other things, breach of contract, wrongful termination and breach of fiduciary duty (the "Prior Litigation"). TPI and Glenn Thompson retained Medeiros and Little Medeiros to represent them in the Prior Litigation.[1] Medeiros undertook the representation of TPI and Glenn Thompson and filed, on behalf of TPI, an Answer and Counterclaims of Defendants Thompson Paper Box Company, Inc. and Thompson Products, Inc. ("TPI Answer and Counterclaims"), a true and accurate copy of which is attached as Exhibit D. The "Second Counterclaim" stated by Medeiros/Little Medeiros on behalf of TPI in the TPI Answer and Counterclaims was a cause of action for Mark's alleged post-termination breach of the

---

[1] At the time Medeiros's firm was Little, Bulman, Medeiros & Whitney, P.C., predecessor to Medeiros's current firm.

Restrictive Covenants contained in paragraph 9 of his Employment Agreement. Specifically, in paragraph 9 of the TPI Answer and Counterclaims, Medeiros/Little Medeiros asserted that "Paragraph 9 of that Agreement (entitled "Restrictive Covenants") contained a non-compete provision that remained effective for two years after counterclaim-defendant Mark Thompson ceased to be employed by Thompson Products, Inc." For the alleged breach of the Restrictive Covenants, Medeiros/Little Medeiros, on behalf of TPI, sought injunctive relief and damages. The case was litigated for more than two years, ending in settlement and voluntary dismissal. See Civil Docket Summary attached as Exhibit E. The validity or enforceability of the covenant not to compete at issue was never decided by the Court.

In July 2005, Glenn Thompson resigned from his position as an officer, director and employee of TPI and, immediately thereafter, he formed Enterprises, a Rhode Island corporation. Thompson is the registered agent for Enterprises and its sole shareholder.[2] Based upon its activities since its creation, Enterprises was clearly formed for the sole purpose of competing directly and immediately with TPI, and Glenn and his new company have been aggressively doing so. Accordingly, TPI has filed this action (the "Current Litigation") against Glenn Thompson, alleging that he has breached the Restrictive Covenants contained in paragraph 9 of his own Employment Agreement, including the two-year post-termination covenant not to compete—the very same Restrictive Covenants that he and TPI, by their counsel Medeiros/Little Medeiros, charged Mark with violating in the Prior Litigation.

In response to TPI's Complaint in the Current Litigation, Medeiros/Little Medeiros, on behalf of Glenn Thompson and Enterprises, filed Defendants' Amended Answer and Counterclaim. In paragraph 7 of the Answer, Medeiros/Little Medeiros denied that Glenn

---

[2] According to Defendants' Amended Answer and Counterclaim, Enterprises is now known as "Splash Creations, Inc." and is engaged in the sale of photo albums. Counterclaim ¶ 1.

entered into the Employment Agreement and denied even the existence of the Restrictive Covenants in paragraph 9 of that Agreement. In paragraph 8 of the Answer, they denied that the Restrictive Covenants were in effect for two years after termination of Glenn Thompson's employment by TPI at any time for any reason, and in paragraph 32, they expressly denied that the Restrictive Covenants were in effect for two years following termination of Glenn Thompson's employment by TPI. In other words, Medeiros/Little Medeiros have taken positions in the Current Litigation **against** TPI that are the polar opposite of positions they took **on behalf of** TPI in the Prior Litigation.

Accordingly, Medeiros/Little Medeiros have a clear conflict of interest in representing Glenn Thompson and his new company against TPI.[3] Not only are Medeiros's current clients adverse to his former client, TPI, but the Restrictive Covenants in the Employment Agreement at issue in the Current Litigation are identical in form and content to the Restrictive Covenants at issue in the Prior Litigation.

There can be no question that Medeiros reviewed and analyzed the validity and enforceability of the Restrictive Covenants binding Mark and Glenn in the Prior Litigation and asserted that the Restrictive Covenants, and in particular, the two-year, post-termination covenant not to compete, were enforceable, as evidenced by the Second Counterclaim that Medeiros/Little Medeiros filed on TPI's behalf against Mark. Yet Medeiros now asserts that the same Restrictive Covenants are unenforceable. Moreover, there can be no question that in the Prior Litigation Medeiros was privy to confidential information from TPI, including confidential information relating to the validity, enforceability and consequences to TPI of breach of the

---

[3] Counsel for TPI sent Medeiros a letter dated October 26, 2005 that raised the issue of his conflict of interest and asked him to withdraw from the case. Michael L. Chinitz, Esq. from Rose & Associates, co-counsel in this matter, responded in a letter dated November 2, 2005, disputed that Medeiros or Little Medeiros had a conflict of interest and stated that Medeiros/Little Medeiros refuses to withdraw.

Restrictive Covenants by a top management officer/director/employee, and that such confidential information could be used to TPI's disadvantage in the Current Litigation. Accordingly, TPI has notified Medeiros/Little Medeiros that it does not consent to its representation of defendants in the Current Litigation and called on the firm to withdraw voluntarily. Given the refusal of Medeiros/Little Medeiros to honor TPI's demand, TPI now moves the Court to disqualify Medeiros/Little Medeiros from continuing their representation of Glenn Thompson and Enterprises in the Current Litigation.

## ARGUMENT

"An attorney will be disqualified from representing a client if confidential or privileged information obtained during the representation of a prior client *could* be used to the prior client's disadvantage." *Smith & Nephew, Inc. v. Ethicon, Inc.*, 98 F. Supp. 2d 106, 108 (D. Mass. 2000) (citing *Freund v. Butterworth*, 117 F.3d 1543, 1574 (11th Cir. 1997)(emphasis in original)). Under Rule 1.9 of the Massachusetts Rules of Professional Conduct ("Rule 1.9"), which the District of Massachusetts has adopted in Local Rule 83.6(4)(B), an attorney "may not represent a client in a matter that is both adverse and 'substantially related' to a matter in which he represented a former client." *ebix.com v. McCracken*, 312 F. Supp. 2d 82, 88 (D. Mass. 2004) (quoting Rule 1.9). Rule 1.9 also prohibits an attorney who has formerly represented a client from using "confidential information relating to the representation to the disadvantage of the former client, to the lawyer's advantage, or to the advantage of a third person."

When deciding whether disqualification of counsel is required, courts must balance two competing principles -- the right of a party to select counsel of his choosing versus the obligation of all officers of the court to maintain the highest standards of professional conduct. *See Mailer v. Mailer*, 390 Mass. 371, 373, 455 N.E.2d 1211 (1983). "Disqualification from subsequent

representations is for the protection of the former client." Comment 12 to Rule 1.9. The former client may bear the burden of proving a conflict of interest exists (*see ebix.com*, *supra*, 312 F. Supp. 2d at 90-91), but the former client is <u>not</u> charged with proving that the attorney actually misused the confidences to his disadvantage; rather, he must prove only the existence of "the tempting situation" for the attorney to breach his duty of confidentiality to his former client. *Bays v. Theran*, 418 Mass. 685, 691, 639 N.E.2d 720, 724 (1994) (citing *Masiello v. Perini Corp.*, 394 Mass. 842, 847, 477 N.E.2d 1020 (1985) (internal citation omitted)). There also is no requirement that the former client set forth the confidential information that it may have disclosed to the attorney, since it would be "self-defeating" to require a former client "to reveal in a public proceeding the particular communication or other confidential information that could be used in a subsequent representation" in order to protect that information by disqualifying the attorney. Restatement (Third) of The Law Governing Lawyers, § 132, comment d (iii) (2000).[4] In fact, when the prior matter involves litigation, "it will be conclusively presumed that the lawyer obtained confidential information about the issues involved in the litigation." *Id.*

In *Adoption of Erica*, the Supreme Judicial Court of Massachusetts adopted the "substantial relationship" test for determining whether disqualification is necessary in cases of successive representation. 426 Mass. 55, 61, 686 N.E.2d 967, 971-72 (1997). The District of Massachusetts applied this test in *ebix.com*, *supra*, noting that "[w]here the primary purpose of the 'substantially related' test is to preserve client confidences by avoiding an 'intolerably strong temptation' to betray them, the assessment of whether matters are 'substantially related' must focus on whether the overlap or similarity between the two matters would <u>potentially give rise</u> to such a 'temptation.'" 312 F. Supp. 2d at 89 (quoting *Dee v. Conference Holdings, Inc.*, No.

---

[4] The Supreme Judicial Court of Massachusetts has cited favorably to the Restatement (Third) of The Law Governing Lawyers in disqualification matters. *See Adoption of Erica*, *infra*, 426 Mass. at 65, 686 N.E.2d at 974.

976608, 1998 WL 1247926, *2 (Mass. Super. July 14, 1998)).  This review "turns on whether it is 'reasonable to assume that confidential information would have been given to the attorney in the first matter that would be helpful to the adverse client in the second matter.'"  *Id.*

Here, there is compelling justification for the Court to assume that Medeiros gained confidential information from TPI in the Prior Litigation which would be helpful to Glenn Thompson in the Current Litigation.  Both cases involve a dispute as to the validity and enforceability of the two-year, post-termination covenant not to compete contained in the Employment Agreements.  There is a significant "overlap" between the two matters, which could potentially "tempt" Medeiros to betray TPI's confidences.  Even if he were not so "tempted", in the Prior Litigation, given the issues in dispute, he must have learned information about TPI, its operations, its policies, its objectives, its personnel, its strengths and its weaknesses that could well give Medeiros/Little Medeiros an unfair advantage in this action.

In *Smith & Nephew*, *supra*, this Court determined that two matters involving the same employment contracts were "substantially related."  98 F. Supp. 2d 106 (D. Mass. 2000).  There, an attorney named Perry represented the defendants from 1984 to 1986.  The representation included drafting certain provisions for the defendants' employment contracts with the plaintiff's corporate predecessors.  *Id.* at 107.  In 1991, Perry joined plaintiff's firm as "of counsel".  *Id.* Sometime thereafter, plaintiff sued defendants under the terms of the employment contracts that Perry had drafted.  *Id.* Defendants moved to disqualify Perry's new firm.  In defense of the motion, Perry's firm represented to the court that it had set up an "ethical wall" to prevent the disclosure of any confidences by Perry to the team handling the litigation.  *Id.* at 108.  The court held that this was not enough to satisfy the Professional Rules of Conduct, in part because Perry drafted "the very contractual provisions that are at the crux of this litigation."  *Id.* at 110.

Here, Medeiros did not draft the Employment Agreements at issue, but he did file a

Counterclaim rooted in the Restrictive Covenants contained in Mark Thompson's Employment

Agreement in the Prior Litigation, and there is no question that the identical Restrictive

Covenants found in Glenn Thompson's Employment Agreement are "at the crux" of the Current

Litigation. As the *Smith & Nephew* court held, "[t]he issue ... is what [Medeiros] knows because

of the prior representation that might prove harmful to [TPI's] cause." *Id.* TPI's confidential

information about the validity and enforceability of the terms at issue come immediately to mind.

Unlike the firm in *Smith & Nephew*, Little Medeiros has made no effort to erect an "ethical wall"

around Medeiros screening him from participation to prevent the accidental disclosure of any

confidential information gained in the Prior Litigation; to the contrary, Medeiros is **lead counsel**

in this case. Under the reasoning of *Smith & Nephew*, Medeiros and his firm should be

disqualified.

The Current Litigation is easily distinguished from the *ebix.com* case cited above. That

case involved, *inter alia*, the alleged breach of various agreements, including a non-compete.

The plaintiff moved to disqualify lead defense counsel and their firm because they previously

had represented plaintiff's corporate predecessors in matters related to the non-compete at issue.

312 F. Supp. at 88. However, the attorney's billing records showed only two entries for work

purportedly done on the non-compete, and this work appeared to be general at best. "[The

defendants' attorneys] did not draft [the] non-compete or any of the non-compete agreements at

issue in this case *or offer any opinion on the enforceability of those non-competes.*" *Id.* at 92

(emphasis added). The court further noted that "[t]his simply is not a situation in which [the

defendants' attorneys] researched and drafted an agreement for [plaintiff] and are now turning

around and contesting the legality of that same agreement for the defendants." *Id.* at 94.

Here, while Medeiros did not draft the terms of the Employment Agreements, he must have inquired about and drawn conclusions about the validity and enforceability of the Restrictive Covenants contained in Mark Thompson's Employment Agreement in the Prior Litigation, and now is "turning around and contesting the legality" of the identical Restrictive Covenants in Glenn Thompson's Employment Agreement in the Current Litigation.  Unlike the attorneys in *ebix.com*, Medeiros's/Little Medeiros's work relating to the Counterclaim in the Prior Litigation was significant and specific.  They clearly asserted on behalf of TPI in the Second Counterclaim that the two-year post-termination covenant not to compete was valid and enforceable.  They now have "turned around" and argue in the Current Litigation that not only is the covenant not to compete unenforceable against Glenn, but also that none of the Restrictive Covenants are unenforceable.  This type of "switching sides" is exactly what the Rules of Professional Conduct protect against.  Permitting Medeiros and Little Medeiros to continue representing Glenn Thompson and Enterprises against TPI in this matter renders the protections of Rule 1.9 meaningless and taints the integrity of the adversary process.

The legal ethics rules exist, in part, to protect the fairness of the judicial process.  Litigants have a right to a fair trial.  There is a manifest unfairness, however, if Medeiros/Little Medeiros are permitted to advocate the unenforceability of Glenn's non-competition covenants in the Current Litigation when in the Prior Litigation they advocated the enforceability of the same Covenants on behalf of TPI.  Their switching sides surely diminishes public confidence in the judicial process.

## **CONCLUSION**

For the reasons set forth herein, Thompson Products, Inc. respectfully requests that the Court grant its Motion and disqualify Matthew F. Medeiros, Esq. and Little Medeiros Kinder

Bulman & Whitney, P.C. from any further representation of defendants Glenn Thompson and

Thompson Enterprises, Inc. in this case, and grant such other and further relief as the Court

deems necessary.

**THOMPSON PRODUCTS, INC.**

By its attorneys,


/s/  Andrew D. Kang
Terence P. McCourt   (BBO #555784)
Andrew D. Kang       (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax: 617.310.6001


and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN, A PROFESSIONAL CORPORATION
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507

DATED:  November 14, 2005

## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 14th day of November, 2005, I served a copy of the foregoing by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI  02903

Michael S. Chinitz, Esq.
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA  02110

/s/  Andrew D. Kang
Andrew D. Kang

bos-fs1\176729v01\11/14/05\90594.010100

ASSET PURCHASE AGREEMENT

Dated as of November 24, 1997

among

Thompson Products, Inc.

and

Thompson Paper Box Co., Inc.,

Glenn Thompson,

Mark A. Thompson,

Frederick L. Weingeroff

and

Gregg Weingeroff

**EXHIBIT A**

## EXHIBITS

Exhibit 1.23      -    Form of Subordinated Promissory Note
Exhibit 3.2(a)     -    Form of Bill of Sale
Exhibit 3.2(b)     -    Form of Assignment and Assumption on Agreement
Exhibit 3.2(c)-1   -    Form of Employment Agreement of Glenn Thompson
Exhibit 3.2(c)-2   -    Form of Employment Agreement of Mark Thompson
Exhibit 3.2(d)     -    Form of Subscription Agreement
Exhibit 3.2(j)-1   -    Form of Officer's Certificate
Exhibit 3.2(j)-2   -    Form of Stockholders Certificate
Exhibit 3.2(m)     -    Form of Net Operating Asset Certificate
Exhibit 3.2(n)     -    Form of Stockholders Letter
Exhibit 3.2(o)     -    Form of Landlord's Waiver and Estoppel Certificate
Exhibit 3.2(p)     -    Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit 3.2(q)     -    Form of Third Amendment to Lease

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") made and entered into as of the 24th day of November, 1997, by and among Thompson Products, Inc., a Delaware corporation ("Purchaser"), which is a Wholly-Owned Subsidiary of Thompson Products Holdings, Inc., a Massachusetts corporation ("Thompson Holdings"), Thompson Paper Box Co., Inc., a Massachusetts corporation (the "Company"), Glenn Thompson, an individual residing at 5 Assawompsett Court, Lakeville, MA 02347 ("GT"), Mark A. Thompson, an individual residing at 230 Grange Park, Bridgewater, MA 02324 ("MT"), Frederick L. Weingeroff, an individual residing at 3181 Monet Drive, Palm Beach Garden, FL 33410 ("FW"), and Gregg Weingeroff, an individual residing at 11 Loring Avenue, Providence, R.I. 02906 ("GW") (GT, MT, FW and GW are sometimes collectively referred to herein as the "Stockholders" and individually as a "Stockholder").

### WITNESSETH

WHEREAS, the Company is in the business of the manufacture and sales of photo albums, cardboard-based gift boxes and leasebacks for picture frames (the "Business");

WHEREAS, GT, MT, FW and GW collectively own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Company;

WHEREAS, Purchaser wishes to acquire from the Company and the Company desires to sell to the Purchaser, the Acquired Assets (as defined below), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the aforesaid and the respective warranties, representations, covenants and agreements hereinafter set forth, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I.

### DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings specified with respect thereto below.

1.1    "Acquired Assets" shall mean all of the assets and properties of the Company (other than the Excluded Assets), with such additions thereto or deletions therefrom as may be permitted by the terms of this Agreement, including the Company's goodwill and all of its concepts, plans and materials relating to the operation of the business and also including without limitation:

shall be payable by the execution and delivery of the Subordinated Note; provided, however, that the cash portion of the Purchase Price and any allocation thereof are subject to adjustment as set forth in Section 2.3.

2.3  Purchase Price Adjustment. (a)  The cash portion of the Purchase Price shall be reduced, on a dollar for dollar basis, by an amount equal to (i) the amount that the value of the Net Operating Assets of the Company on the Closing Date, as certified by an executive officer of the Company pursuant to Section 3.2(m) hereof and subject to confirmation by Arthur Andersen, Purchaser's accountant, on the Closing Date is less than $11,163,750.00, and (ii) the aggregate amount of all those liabilities, if any, set forth on Schedule 2.3 of the Company expressly assumed by the Purchaser; Schedule 2.3 shall be prepared by Purchaser and delivered to the Company no later than five (5) business days prior to the Closing.

(b)  If the value of Net Operating Assets (as determined in accordance with Section 2.3(a)(i) above) of the Company on the Closing Date exceeds $11,740,000.00 (the "Excess"), Purchaser shall deliver to the Company at the Closing a promissory note (the "Excess Note") in the principle amount equal to the Excess, due one hundred and eighty (180) days after the Closing, bearing interest at nine percent (9%) per annum and secured by a first priority lien on the accounts receivable of Purchaser pursuant to a security agreement; provided, that the principle amount of the note shall in no event be greater than the amount due on the Closing Date to First National Bank of Boston (the "Bank") by the Company under the existing loan facility with the Bank.

2.4  Noncompetition. (a)  As additional consideration for Purchaser's agreement to purchase the Acquired Assets and pay the Purchase Price, GT and MT have agreed, severally but not jointly, to the noncompetition provisions (the "Restrictive Covenants") contained in their respective Employment Agreements, which noncompetition provisions are incorporated herein by reference and made a part hereof as if restated herein.

(b)  It is agreed and understood by and among the parties to this Agreement that the Restrictive Covenants incorporated by reference in subsection (a) above are each individually essential elements of this Agreement and that, but for the agreement of GT and MT to comply with such Restrictive Covenants, Purchaser would not have agreed to enter into this Agreement. Further, each of GT and MT expressly acknowledges that the restrictions incorporated by reference into subsection (a) of this Section 2.4 are reasonable and necessary to accomplish the mutual objectives of the parties and to protect Purchaser's interests in the Business after the Closing. Each of GT and MT further acknowledges that enforcement of such restrictions will not deprive him of the ability to earn a reasonable living and that any violation of such restrictions will cause irreparable injury to Purchaser. Such Restrictive Covenants of GT and MT shall be construed as agreements independent of any other provision of this Agreement and of each other.

(c)  GT and MT hereby agree that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that the Restrictive Covenants incorporated by reference into subsection (a) of this Section 2.4 are

violated and that, in addition to any remedies or rights that may be available to Purchaser, all of which other remedies or rights shall be deemed to be cumulative, retained by Purchaser and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Purchaser shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions incorporated by reference into subsection (a) of this Section 2.4, all of which shall constitute rights and remedies to which Purchaser may be entitled.

(d)     If any court determines that the covenant not to compete incorporated by reference into subsection (a) of this Section 2.4, or any part hereof, is unenforceable because of the duration or geographic scope of such provision, such court shall reduce the duration or scope of such provisions (to the maximum duration or scope permitted by law), as the case may be, and such provision in its reduced form shall then be enforceable.

(e)     Notwithstanding anything to the contrary contained in the foregoing provisions of this Section 2.4, any other provisions of this Agreement or their respective Employment Agreements, each of GT and MT shall have liability only for his own breach of a Restrictive Covenant.

2.5     Closing.  The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at 10:00 a.m. at the offices of Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, New York 10022 on the later of (i) January 5, 1998 (with a pre-closing on December 30, 1997) or (ii) the third business day following the satisfaction or waiver of all of the conditions to Closing set forth in Article III hereof, or at such other time, date or place as the parties may mutually agree.  The actual date of the Closing is sometimes referred to herein as the "Closing Date".

## ARTICLE III.

## CONDITIONS TO CLOSING

3.1     Conditions to Purchaser's Obligations to Close.  The obligations of Purchaser to consummate the Acquisition is subject to the satisfaction at the time of the Closing of the following conditions (any or all of which may be waived by Purchaser in Purchaser's sole discretion):

(a)     The representations and warranties of the Company and the Stockholders made in this Agreement and in each of the other agreements to be delivered in connection with the Acquisition shall be true and correct in all respects as of the date of this Agreement and as of the time of Closing as though made as of such time, and the Company and the Stockholders shall have performed in all respects each and every covenant contained in this Agreement required to be performed by them by the time of the Closing.

(b)     The Acquisition as provided in this Agreement and each of the other agreements shall not violate any applicable law or governmental regulation.

(c)     There shall be no action, suit, investigation, or proceeding pending, or to the knowledge of the Company or any Stockholder, threatened against the Company, or the Company's properties or rights, including, without limitation, the Acquired Assets or any of the Company's officers or directors, before any court, arbitrator or administrative or governmental body which (i) seeks to restrain, enjoin, prevent the consummation of the transactions contemplated by this Agreement or (ii) questions the validity or legality of any such transactions or seeks to recover damages or to obtain other relief in connection with any such transactions.

(d)     Purchaser shall have received duly executed copies of all other deeds, endorsements, assignments, consents of third parties and other instruments as, in the opinion of counsel to Purchaser, are reasonably necessary to vest in Purchaser all right, title and interest in and to any of the Acquired Assets.

(e)     The Company shall not have suffered any material adverse change in its Business, assets, financial condition or results of operations of the Company since December 31, 1996, other than any such changes which are accurately reflected on the Schedules to this Agreement and delivered on or prior to the date of this Agreement.

(f)     Stockholders and the Company shall have received the Consents and any other consents, approvals, authorizations, exemptions or waivers that are necessary for the consummation of the transactions contemplated hereby or that are required to prevent a breach of or default under, a termination or modification of, or acceleration of the terms of, any Contract, agreement, instrument or understanding identified on Schedule 4.13, in each case pursuant to instruments in form and substance reasonably satisfactory to Purchaser.

(g)     Purchaser shall have received an opinion from Chace, Ruttenberg & Freedman, counsel to the Stockholders and the Company, dated the Closing Date and in form and substance satisfactory to the Purchaser.

(h)     All applicable waiting periods, if any, under the Hart-Scott-Rodino Anti-trust Improvements Act of 1976, as amended (the "HSR Act") with respect to the transactions contemplated by this Agreement, including without limitation the Acquisition and the financing to be obtained by the Purchaser in connection therewith, shall have expired or been terminated.

(i)     Purchaser shall have received from the Company and the Stockholders all of the items to be delivered in accordance with Section 3.2 below.

(j)     The value of the Net Operating Assets shall have been confirmed by Arthur Andersen pursuant to Section 2.3(a)(i).

3.2.    Deliveries by the Company and the Stockholders.  The Company and the Stockholders agree to deliver (or cause to be delivered) to the Purchaser and at the Closing on the

Closing Date the following agreements and documents, all satisfactory in form and substance to Purchaser and their legal counsel:

(a)     a duly executed Bill of Sale for all Owned Tangible Property, substantially in the form as set forth on Exhibit 3.2(a) (the "Bill of Sale").

(b)     a duly executed Assignment and Assumption Agreement for all Contracts, substantially in the form as set forth on Exhibit 3.2(b) (the "Assignment and Assumption Agreement").

(c)     a duly executed Employment Agreement from each of GT and MT, in the form as set forth on Exhibit 3.2(c)-1 and Exhibit 3.2(c)-2, respectively (collectively, the "Employment Agreements").

(d)     a duly executed Subscription Agreement, in the form as set forth on Exhibit 3.2(d) (the "Subscription Agreement"), from each of GT and MT providing for the aggregate purchase of nineteen and one-half percent (19.5%) of the common stock (the "Thompson Shares"), $.01 par value per share ("Thompson Holdings Common Stock"), of Thompson Holdings, divided between GT and MT as set forth on <u>Schedule 3.2(d)</u>, for an aggregate purchase price of $975,000.00.

(e)     all documents of title, if any, necessary to transfer to Purchaser any of the Owned Tangible Property.

(f)     all assignments necessary to transfer to Purchaser complete rights in all Intellectual Property Rights in each case included within the Acquired Assets, and other intangible personal property owned by the Company and the Stockholders.

(g)     if deemed necessary by Purchaser, specific assignments of Contracts.

(h)     all documents, if any, containing or related to proprietary information being purchased by Purchaser pursuant hereto.

(i)     all other deeds, endorsements, assignments, consents of third parties and other instruments as, in the opinion of counsel for Purchaser, are necessary to vest in Purchaser all right, title and interest in and to any of the Acquired Assets.

(j)     a certificate dated the Closing Date and signed by an executive officer of the Company confirming the matters set forth in Section 3.1(a) and Section 3.1(e) above, in the form of Exhibit 3.2(j)-1 attached hereto; and a certificate dated the Closing Date and signed by GT, MT, FW and GW confirming the matters set forth in Section 3.1(a), in the form of Exhibit 3.1(j)-2.

(k)     the December Balance Sheet.

**IN WITNESS WHEREOF,** this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

THOMPSON PRODUCTS, INC.

By: _____
Name: ~~Sec~~ James M. Conlon
Title: Sec. + Treasurer

THOMPSON PAPER BOX CO., INC.

By: _____
Name: Glenn Thompson
Title: President

STOCKHOLDERS

_____
Glenn Thompson

_____
Mark A. Thompson

_____
Frederick L. Weingeroff

_____
Gregg Weingeroff

# EXHIBIT 3.2 (c) – 1

## TO

## ASSET PURCHASE AGREEMENT
## DATED 11/24/97

11/20/97 DRAFT

**EXHIBIT 3.2(c) - 1**

**EMPLOYMENT AGREEMENT**

This Employment Agreement ("Agreement"), effective as of January __, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

**WITNESSETH:**

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November __, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

[58205-v3]

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

-2-

3.    **Employment**

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

4.    **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the  Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    **Term**

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    **Compensation and Benefits**

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

- 3 -

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.    **Vacation**

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.    **Termination**

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

9.    **Restrictive Covenants**

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong

- 4 -

to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)    Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such

- 5 -

court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.    **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

11.    **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12.    **Miscellaneous**

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability

- 6 -

shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903,telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

- 7 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January __, 1998.

THOMPSON, INC.

By:_____
   Name:
   Title:

_____
Glenn Thompson

# EXHIBIT 3.2 (c) – 2

# TO

# ASSET PURCHASE AGREEMENT
# DATED 11/24/97

11/20/97 DRAFT

EXHIBIT 3.2(c) - 2

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January __, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Mark A. Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### WITNESSETH:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November __, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Glenn Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.      **Definitions**

[60363]

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors.  For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any

- 2 -

way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

3.    **Employment**

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

4.    **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    **Term**

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    **Compensation and Benefits**

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

- 3 -

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.    **Vacation**

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.    **Termination**

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; (iii) pay to Employee any earned but unpaid bonuses and (iv) pay to Employee $100,000 with such amount payable in equal monthly installments over a period of two (2) years following the termination of Employee's employment hereunder; provided, that

- 4 -

in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease.

(d)    If Employee's employment with the Employer is not extended by mutual agreement of the parties after the expiration of this Agreement on December 31, 2000, the Employer shall pay to Employee $100,000 with such amount payable in equal monthly installments over the period of two (2) years following the termination of Employee's employment hereunder; provided, that in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease. In the event Employee is receiving payments pursuant to Section 8(c) above, Employee shall be precluded from receiving payments under this Section 8(d).

9.    **Restrictive Covenants**

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the

- 5 -

Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)     Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)     If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)     Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)     Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.     **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies,

- 6 -

upon the termination of Employee's employment or at any time as requested by the Employer.

11.    **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12.    **Miscellaneous**

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered

to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January __, 1998.

THOMPSON, INC.

By:_____
Name:
Title:

_____
Mark A. Thompson

- 8 -

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January 5, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### W I T N E S S E T H:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November 24, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

[58205-v3]

**EXHIBIT B**

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors.  For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

3.    **Employment**

- 2 -

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

4.    Place of Employment

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the  Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    Term

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    Compensation and Benefits

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable

- 3 -

expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)     The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.     Vacation

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.     Termination

(a)     Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)     If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)     If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

9.     Restrictive Covenants

(a)     Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of

- 4 -

this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)    Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties

- 5 -

hereto.

(f)     Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)     Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.     **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

11.     **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12.     **Miscellaneous**

(a)     If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or

- 6 -

unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law.  Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery.  Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought.  Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

- 7 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January _5_, 1998.

THOMPSON PRODUCTS, INC.

By: _____
Name: Victor Kiarsis
Title:   President

_____
Glenn Thompson

- 8 -

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January 5, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Mark A. Thompson, whose principal residence is 230 Grange Park, Bridgewater, MA 02324 ("Employee").

## WITNESSETH:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November 24, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Glenn Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

Thompson v. Thompson   0144
Defendants' Documents

**EXHIBIT C**

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any

- 2 -

Thompson v. Thompson    0145
Defendants' Documents

way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

### 3.  Employment

The Employer hereby employs Employee and Employee accepts such employment as Vice-President of the Employer.  As its Vice-President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer.  Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

### 4.  Place of Employment

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the  Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

### 5.  Term

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

### 6.  Compensation and Benefits

(a)     As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)     Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

- 3 -

Thompson v. Thompson     0146
Defendants' Documents

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.    **Vacation**

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.    **Termination**

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; (iii) pay to Employee any earned but unpaid bonuses and (iv) pay to Employee $100,000 with such amount payable in equal monthly installments over a period

- 4 -

Thompson v. Thompson    0147
Defendants' Documents

of two (2) years following the termination of Employee's employment hereunder; provided, that in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease.

(d)    If Employee's employment with the Employer is not extended by mutual agreement of the parties after the expiration of this Agreement on December 31, 2000, the Employer shall pay to Employee $100,000 with such amount payable in equal monthly installments over the period of two (2) years following the termination of Employee's employment hereunder; provided, that in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease. In the event Employee is receiving payments pursuant to Section 8(c) above, Employee shall be precluded from receiving payments under this Section 8(d).

9.    **Restrictive Covenants**

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board

- 5 -

Thompson v. Thompson    0148
Defendants' Documents

member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)    Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.    **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents

Thompson v. Thompson    0149
Defendants' Documents

including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

### 11.    Binding Effect

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

### 12.    Miscellaneous

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving

- 7 -

equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery.  Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought.  Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January 5, 1998.

THOMPSON PRODUCTS, INC.

By: *Victor Kiarsis*

Name: Victor Kiarsis
Title:  President

*Mark A. Thompson*

Mark A. Thompson

Thompson v. Thompson    0151
Defendants' Documents

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                                    SUPERIOR COURT

MARK THOMPSON,                          )
          Plaintiff,                      )
                                          )
                                          )
          v.                              )        Civil Action
                                          )        No. 02-0428
GLENN THOMPSON, THOMPSON PAPER          )
BOX COMPANY, INC., and THOMPSON         )
PRODUCTS, INC.,                         )
          Defendants.                     )

## ANSWER AND COUNTERCLAIMS OF DEFENDANTS THOMPSON PAPER BOX COMPANY, INC. AND THOMPSON PRODUCTS, INC.

Defendants Thompson Paper Box Company, Inc. and Thompson Products, Inc.

("defendants"), for their Answer and Counterclaims state as follows:

### ANSWER

#### First Defense

1.    Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 1 of the Complaint.

2 -3.  Defendants admit the allegations contained in paragraphs 2 and 3 of the

Complaint.

4.    Defendants deny the allegations contained in the first sentence of paragraph 4 of

the Complaint, but admit the remaining allegations contained in that paragraph.

5.    Defendants admit the allegations contained in the first two sentences of

paragraph 5 of the Complaint, but deny the remaining allegations contained in that paragraph.

6.    Defendants deny the allegations contained in the first sentence of paragraph 6 of

the Complaint; admit the allegations contained in the second sentence; deny the allegations

**EXHIBIT D**

contained in the third and fourth sentences; and as to the fifth and sixth sentences, respond that the document speaks for itself and that those sentences contain an incomplete and therefore incorrect statement of the contents of that agreement.

7.      Defendants admit the allegations contained in the first sentence of paragraph 7 of the Complaint. As to the second sentence, defendants admit that it became necessary from time to time for Glenn Thompson or Mark Thompson to assist LaFond's sales efforts.

8.      In response to paragraph 8 of the Complaint, defendants admit that the Company sold 10 million dollars of photo albums in 1995, but otherwise deny the allegations contained in paragraph 8.

9-10.   Defendants deny the allegations contained in paragraphs 9 and 10 of the Complaint.

11.     Defendants deny the allegations contained in the first sentence of paragraph 11 of the Complaint, but admit the allegations contained in the second sentence.

12.     Defendants admit the allegations contained in the first sentence of paragraph 12; deny the allegations contained in the second sentence; admit the allegations contained in the third sentence; and deny the allegations contained in the fourth and fifth sentences.

13.     In response to paragraph 13 of the Complaint, defendants state that the complaint in LaFond's lawsuit speaks for itself and deny the allegations contained in the second sentence of paragraph 13.

14.     Defendants admit the allegations contained in the first sentence of paragraph 14 of the Complaint. Defendants deny the allegations contained in the second and third sentences.

15.     Defendants admit the allegations contained in the third sentence of paragraph 15 of the Complaint, but deny all of the remaining allegations contained in that paragraph.

16-25.    Defendants deny the allegations contained in paragraphs 16 through 25 of the

Complaint.

### Second Defense

Plaintiff's claims are barred in whole or in part by the applicable statute of limitations.

### Third Defense

Plaintiff's claims are barred by the doctrine of laches.

### Fourth Defense

Plaintiff's claims are barred by the doctrine of estoppel.

### Fifth Defense

Plaintiff's claims are barred in whole or in part by the Contribution Agreement that he

entered into.

### Sixth Defense

Plaintiff's claims are barred in whole or in part by his written employment agreement.

### Seventh Defense

Plaintiff's claims are barred by his own fraud or unclean hands.

### Eighth Defense

Plaintiff's claims are barred in whole or in part by the parol evidence rule.

### Ninth Defense

Plaintiff's claims are barred in whole or in part by the statute of frauds.

### Tenth Defense

Plaintiff's claims under Mass. G.L. c. 93A are barred by plaintiff's noncompliance with

the procedural requirements of that statute.

### Eleventh Defense

Plaintiff has failed to mitigate his damages, if any.

WHEREFORE, defendants pray that the Complaint as against them be dismissed and that they be awarded their costs and such other and further relief as the Court deems proper.

### COUNTERCLAIMS

Defendants ("counterclaim-plaintiffs") for their counterclaims against plaintiff ("counterclaim-defendant"), state as follows:

### First Counterclaim

1.      On or about November 24, 1997, counterclaim-defendant, Mark Thompson, executed an Asset Purchase Agreement in connection with the sale of the assets of Thompson Paper Box Co., Inc.

2.      In Section 4.7 of that Agreement (entitled Absence of Undisclosed Liabilities), counterclaim-defendant Mark Thompson represented and warranted that there were no obligations or liabilities other than as set forth in Schedule 4.7.

3.      Counterclaim-defendant Mark Thompson did not disclose in Schedule 4.7 either LaFond's claim or his own alleged claim for an alleged 25% equity interest in the net profits of the photo album division.

4.      Counterclaim-defendant Mark Thompson's breach of the foregoing obligations was material to the Asset Purchase Agreement, such that if he had made the required disclosure, he never would have been paid the approximately $4 million that he personally received from the sale.

5.    Counterclaim-plaintiffs have been damaged by counterclaim-defendant Mark Thompson's breach of his representations and warranties, in the amount of the sale proceeds that were paid to him, together with interest, costs and attorneys' fees.

6.    It would be unjust and inequitable to allow counterclaim-defendant to retain his sale proceeds and simultaneously assert his damages claims against counterclaim-plaintiffs.

7.    Counterclaim-plaintiffs have also been damaged by counterclaim-defendant Mark Thompson's breach, in the amount of the sums that counterclaim-plaintiffs paid to settle the LaFond Litigation.

## Second Counterclaim

8.    On or about January 5, 1998, counterclaim-defendant Mark Thompson executed a written Employment Agreement with Thompson Products, Inc.

9.    Paragraph 9 of that Agreement (entitled "Restrictive Covenants") contained a non-compete provision that remained effective for two years after counterclaim-defendant Mark Thompson ceased to be employed by Thompson Products, Inc.

10.    Upon information and belief, counterclaim-defendant Mark Thomson has breached, and is continuing to breach, the non-compete obligation.

11.    Counterclaim-plaintiffs have been damaged by counterclaim-defendant Mark Thompson's breach of his non-compete obligations. Damages are unlikely to be an adequate remedy for that breach, thereby entitling counterclaim-plaintiffs to injunctive and other equitable relief against Mark Thompson.

WHEREFORE, counterclaim-plaintiffs pray that the Court enter judgment in their favor:

a)   on the First Counterclaim, in an amount consisting of the return of all

sums that counterclaim-defendant received in connection with the asset

sale and reimbursement of all sums that counterclaim-plaintiffs paid to

settle the LaFond Litigation;

b)   on the Second Counterclaim, for damages, an injunction and other

equitable relief;

c)   on both Counterclaims, for interest, costs and attorneys' fees; and

d)   for such other and further relief as the Court deems proper.

Matthew F. Medeiros
by JM Deacon

Matthew F. Medeiros, Esq. (#544915)
Little, Bulman, Medeiros & Whitney, P.C.
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 521-3555

**Attorneys for Defendants**

## JURY DEMAND

Counterclaim-plaintiffs demand a trial by jury on all aspects of their counterclaims that

are triable of right by a jury.

Matthew F. Medeiros
by JM Deacon

Matthew F. Medeiros, Esq. (#544915)
Little, Bulman, Medeiros & Whitney, P.C.
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 521-3555

**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July, 2002, I caused to be served by first class U.S. mail a copy of the within Answer and Counterclaims of Defendants Thompson Paper Box Company, Inc. and Thompson Products, Inc. to Nicholas J. Nesgos, Esq., Posternak, Blankstein & Lund, L.L.P., 100 Charles River Plaza, Boston, MA 02114.

*Susie DeSimone*

# Commonwealth of Massachusetts
## SUPERIOR COURT
## Case Summary
## Civil Docket

## Thompson v Thompson Paper Box Co. Inc. et al

Details for Docket: PLCV2002-00428

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | PLCV2002-00428 | **Caption:** | Thompson v Thompson Paper Box Co. Inc. et al |
| **Filing Date:** | 04/09/2002 | **Case Status:** | Disposed: by Settlement |
| **Status Date:** | 01/07/2005 | **Session:** | Civil B - CtRm 1 (Plymouth) |
| **Lead Case:** | NA | **Case Type:** | Complex |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 06/30/2003 |
| **Service Date:** | 07/08/2002 | **Disposition:** | 10/30/2003 |
| **Rule 15:** | 09/06/2002 | **Rule 12/19/20:** | 09/06/2002 |
| **Final PTC:** | 09/22/2003 | **Rule 56:** | 07/16/2003 |
| **Answer Date:** | 09/06/2002 | **Jury Trial:** | YES |

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | PLCV2002-00428 | **Caption:** | Thompson v Thompson Paper Box Co. Inc. et al |
| **Filing Date:** | 04/09/2002 | **Case Status:** | Disposed: by Settlement |
| **Status Date:** | 01/07/2005 | **Session:** | Civil B - CtRm 1 (Plymouth) |
| **Lead Case:** | NA | **Case Type:** | Misc contract |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 06/30/2003 |
| **Service Date:** | 07/08/2002 | **Disposition:** | 10/30/2003 |
| **Rule 15:** | 09/06/2002 | **Rule 12/19/20:** | 09/06/2002 |
| **Final PTC:** | 09/22/2003 | **Rule 56:** | 07/16/2003 |
| **Answer Date:** | 09/06/2002 | **Jury Trial:** | YES |

## Parties Involved

6 Parties Involved in Docket: PLCV2002-00428

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Thompson | **First Name:** | Glenn |
| **Address:** | | **Address:** | |

| | | | | |
|---|---|---|---|---|
| **City:** | Lakeville | **State:** | MA | |
| **Zip Code:** | 02347 | **Zip Ext:** | | |
| **Telephone:** | | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Thompson Paper Box Co. Inc. | **First Name:** | |
| **Address:** | 310 Kenneth Welch Dr | **Address:** | |
| **City:** | Lakeville | **State:** | MA |
| **Zip Code:** | 02347 | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Thompson Products Inc. | **First Name:** | |
| **Address:** | 310 Kenneth Welch Dr | **Address:** | |
| **City:** | Lakeville | **State:** | MA |
| **Zip Code:** | 02347 | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant/counterclaim |
| **Last Name:** | Thompson | **First Name:** | Mark |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Thompson | **First Name:** | Mark |
| **Address:** | | **Address:** | |
| **City:** | Bridgewater | **State:** | MA |
| **Zip Code:** | 02324 | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff/counterclaim |
| **Last Name:** | Thompson | **First Name:** | Glenn |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

## Attorneys Involved

4 Attorneys Involved for Docket: PLCV2002-00428

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | LITT03 |
| **Last Name:** | Medeiros | **First Name:** | Matthew F |
| **Address:** | 72 Pine Street | **Address:** | 5th Floor |
| **City:** | Providence | **State:** | RI |
| **Zip Code:** | 02903 | **Zip Ext:** | |
| **Telephone:** | 401-272-8080 | **Tel Ext:** | |
| **Fascimile:** | 401-521-3555 | **Representing:** | Thompson Products Inc., (Defendant) |

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | LITT03 |
| **Last Name:** | Medeiros | **First Name:** | Matthew F |
| **Address:** | 72 Pine Street | **Address:** | 5th Floor |
| **City:** | Providence | **State:** | RI |
| **Zip Code:** | 02903 | **Zip Ext:** | |
| **Telephone:** | 401-272-8080 | **Tel Ext:** | |
| **Fascimile:** | 401-521-3555 | **Representing:** | Thompson Paper Box Co. Inc., (Defendant) |

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | POST01 |
| **Last Name:** | Nesgos | **First Name:** | Nicholas J |
| **Address:** | Prudential Tower | **Address:** | 800 Boylston St. |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02199 | **Zip Ext:** | 8004 |
| **Telephone:** | 617-973-6100 | **Tel Ext:** | |
| **Fascimile:** | 617-367-2315 | **Representing:** | Thompson, Mark (Plaintiff) |

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | LITT03 |
| **Last Name:** | Medeiros | **First Name:** | Matthew F |
| **Address:** | 72 Pine Street | **Address:** | 5th Floor |
| **City:** | Providence | **State:** | RI |
| **Zip Code:** | 02903 | **Zip Ext:** | |
| **Telephone:** | 401-272-8080 | **Tel Ext:** | |
| **Fascimile:** | 401-521-3555 | **Representing:** | Thompson, Glenn (Defendant) |

## Calendar Events

10 Calendar Events for Docket: PLCV2002-00428

| No. | Event Date: | Event Time: | Calendar Event: | SES: | Event Status: |
|-----|-------------|-------------|-----------------|------|---------------|
| 1 | 11/07/2002 | 09:00 | Motion/Hearing: Rule12 to Dismiss | B | Event held as scheduled |
| 2 | 04/10/2003 | 14:00 | Conf: final pre-trial | B | Event rescheduled by court prior to date |
| 3 | 05/08/2003 | 14:00 | Conf: final pre-trial | B | Event canceled not re-scheduled |
| 4 | 05/13/2003 | 14:00 | Motion/Hearing: amend deadline | B | Event not held-joint request |
| 5 | 09/25/2003 | 14:00 | Conf: final pre-trial | B | Event canceled not re-scheduled |
| 6 | 12/03/2003 | 14:00 | Motion/Hearing: Rule56 | B | Event held--Under Advisement |
| 7 | 03/22/2004 | 09:00 | Status: Review Annual Fee | B | Event canceled not re-scheduled |
| 8 | 09/14/2004 | 14:00 | Conf: final pre-trial | B | Event not held-req of Plaintiff |
| 9 | 11/18/2004 | 14:00 | Conf: final pre-trial | B | Event not held-joint request |
| 10 | 01/20/2005 | 14:00 | Conf: final pre-trial | B | Event cancelled - Case Settled |

## Full Docket Entries

177 Docket Entries for Docket: PLCV2002-00428

| Entry Date: | Paper No: | Docket Entry: |
|-------------|-----------|---------------|
| 04/09/2002 | | Origin 1, Type A99, Track F. |
| 04/09/2002 | 1 | Complaint of Mark Thompson filed with request for trial by jury |
| 04/09/2002 | 2 | Notice of 93A complaint sent to Attorney General |
| 06/05/2002 | 4 | SERVICE RETURNED: Glenn Thompson(Defendant) in hand |
| 06/06/2002 | 3 | SERVICE RETURNED: Thompson Products Inc. & Thompson Paper Box |
| 06/06/2002 | 3 | Company, Inc. (Defendants) |
| 07/29/2002 | 5 | ANSWER: Thompson Paper Box Co. Inc. and Thompson Products, Inc. |
| 07/29/2002 | 5 | (Defendants) and jury claim |
| 07/29/2002 | 6 | COUNTERCLAIM of Thompson Paper Box Co. Inc., Thompson Products Inc. v |
| 07/29/2002 | 6 | Mark Thompson and jury claim |
| 09/16/2002 | 7 | ANSWER by Mark Thompson to COUNTERCLAIM of Thompson Paper Box Co. |
| 09/16/2002 | 7 | Inc., Thompson Products Inc. |
| 09/23/2002 | 8 | Defendant Glenn Thompson's MOTION to Dismiss (MRCP 12b) Complaint of |
| 09/23/2002 | 8 | Mark Thompson;Memorandum in support;Pltff's Opposition;Affidavit of |
| 09/23/2002 | 8 | Thompson in support of opposition;Deft's request for a hearing;filed |
| 09/23/2002 | 8 | in compliance with rule 9A |

| | | |
|---|---|---|
| 09/23/2002 | 9 | Defendant Glenn Thompson's MOTION for leave to file a reply |
| 09/23/2002 | 9 | memorandum to Pltff's oppsotion to Mo.#8;no opposition filed (see |
| 09/23/2002 | 9 | cover letter attached to entry #8) |
| 09/24/2002 | 10 | Notice sent to appear on November 07, 2002 for a hearing on |
| 10/23/2002 | 11 | Defendant Glenn Thompson's motion to file reply memorandum to |
| 10/23/2002 | 11 | plaintiff's opposition to defendant's motion to dismiss, memorandum |
| 10/23/2002 | 11 | in support and affidavit of compliance pursuant to S.C. Rule 9A. (no |
| 10/23/2002 | 11 | opposition) |
| 10/28/2002 | 12 | Motion (P#11) ALLOWED (Charles J. Hely Justice) Notices mailed |
| 10/28/2002 | 12 | October 28, 2002 |
| 11/05/2002 | 13 | Plaintiff Mark Thompson's emergency MOTION for leave to file |
| 11/05/2002 | 13 | sur-reply to deft G. Thompson's reply memorandum |
| 11/25/2002 | 14 | MOTION (P#8) Because the parties relied on documents outside the |
| 11/25/2002 | 14 | pleadings, this motion is treated as one seeking summary judgment, |
| 11/25/2002 | 14 | pursuant to Mass.R.Civ.P. 12(b). After hearing, and review of the |
| 11/25/2002 | 14 | papers including the motion and opposition and reply memoranda, and |
| 11/25/2002 | 14 | using the appropriate standard when ruling on SJ motion, Fairneny v. |
| 11/25/2002 | 14 | Savogran Co. 422 Mass. 469, 470 (1996), motion denied. Any doubts |
| 11/25/2002 | 14 | about the interpretation of a release must be resolved in form of pl. |
| 11/25/2002 | 14 | Cormier v Central Mass, 416 Mass. 286, 288 (1993). After a careful |
| 11/25/2002 | 14 | review of the "Mutual Release" and the Contribution Agreement of |
| 11/25/2002 | 14 | 12/29/99 as a whole, the Court finds that the mutual release is |
| 11/25/2002 | 14 | ambiguous as to whether the pltff intended to release any claims he |
| 11/25/2002 | 14 | may have against his brother re his brother's alleged failure to form |
| 11/25/2002 | 14 | Trico. Since the release is ambiguous, the factual assertions in pl's |
| 11/25/2002 | 14 | opp don't create genuine issues of material fact that preclude SJ. |
| 11/25/2002 | 14 | Factual issues also exsists re: whether pl was fraudulently induced |
| 11/25/2002 | 14 | to enter into the Contrib Agreement and whether his brother diverted |
| 11/25/2002 | 14 | pl's bonuses improperly in order to fund the payments due under the |
| 11/25/2002 | 14 | Contribution Agreement (Paul E. Troy, Justice). Notices mailed |
| 11/25/2002 | 14 | November 27, 2002 |
| 12/18/2002 | 15 | Stipulation to extend time in which deft. Glenn Thmpson has to answer |
| 12/18/2002 | 15 | complaint and for all defendants to respond to plaintiff's |
| 12/18/2002 | 15 | outstanding discovery. |
| 01/02/2003 | 16 | ANSWER of deft. Glenn Thompson |
| 01/02/2003 | | COUNTERCLAIM of Glenn Thompson v Mark Thompson and Jury Claim |
| 01/10/2003 | 17 | ANSWER by Mark Thompson to COUNTERCLAIM of Glenn Thompson |
| 01/30/2003 | 18 | Notice sent to appear for pre-trial conference on Thursday, March 10, |
| 01/30/2003 | 18 | 2003 at 2:00 p.m. in Plymouth |
| 01/31/2003 | 19 | Pltff's Request for commission to take deposition out of state |
| 01/31/2003 | 20 | Request (P#19) Based upon the representation of pltff that there are |
| 01/31/2003 | 20 | no objections to this request, Request ALLOWED (Paul E. Troy, |
| 01/31/2003 | 20 | Justice) Notice in hand January 31, 2003 |

| Date | No. | Description |
|---|---|---|
| 01/31/2003 | 21 | Commission to take deposition out of state (Paul E. Troy, Justice) |
| 01/31/2003 | 21 | Notice in hand January 31, 2003 |
| 02/06/2003 | 22 | Defts' MOTION for extension of tracking order deadlines by six |
| 02/06/2003 | 22 | months, pltff's limited opposition |
| 02/11/2003 | 23 | MOTION (P#22) After review of the motion and limited opposition, |
| 02/11/2003 | 23 | discovery period enlarged to 5/03/03. Pretrial conference |
| 02/11/2003 | 23 | rescheduled from April 10, 2003 to May 8, 2003. New tracking order |
| 02/11/2003 | 23 | to issue. (Paul E. Troy, Justice). Notices mailed February 11, 2003 |
| 02/11/2003 | 24 | Notice sent to appear for pre-trial conference on May 08, 2003 |
| 02/12/2003 | 25 | Plaintiff Mark Thompson's emergency MOTION to file sur-reply in |
| 02/12/2003 | 25 | support of limited opposition to motion for extension of tracking |
| 02/12/2003 | 25 | order deadline (proposed brief attached) |
| 02/28/2003 | 26 | Defendant Thompson Paper Box Co. Inc., Thompson Products Inc., Glenn |
| 02/28/2003 | 26 | Thompson's emergency MOTION to clarify revised tracking order |
| 02/28/2003 | 26 | deadlines |
| 03/04/2003 | 27 | Pltff's limited opposition to defts' emergency motion to clarify |
| 03/04/2003 | 27 | revised tracking order deadlines |
| 03/04/2003 | 28 | MOTION (P#26) After review, motion Allowed. The time within which |
| 03/04/2003 | 28 | the parties may file Rule 56 motion is also extended. New tracking |
| 03/04/2003 | 28 | order to issue. (Paul E. Troy, Justice). Notices mailed March 07, |
| 03/04/2003 | 28 | 2003 |
| 03/13/2003 | 29 | Stipulated protective order governing treatment of "confidential" and |
| 03/13/2003 | 29 | " highly confidential" information obtained through discovery, brief |
| 03/13/2003 | 29 | in support. |
| 03/18/2003 | 30 | Re: (P#29) "Stipulated Protective Order"-Entered as an ORDER of the |
| 03/18/2003 | 30 | Court(see pg. 6 of this pleading) with Judge's changes. APPROVED |
| 03/18/2003 | 30 | (Troy,J.) Copies mailed March 19, 2003 |
| 03/31/2003 | 31 | Request for Commissions to take Out of State Depositions of (Keeper |
| 03/31/2003 | 31 | of Records, Piccerelli Gilstein & Co. & Tammy Duxbury of Piccerelli |
| 03/31/2003 | 31 | Gilstein & Co. & Victor Kiarsis) |
| 04/03/2003 | 32 | Request (P#31)Based upon the representation of plaintiff that there |
| 04/03/2003 | 32 | are no objections to their request, request ALLOWED (Paul E. Troy, |
| 04/03/2003 | 32 | Justice) |
| 04/03/2003 | 33 | Commission to take Out of State Depositions (3) (Paul E. Troy, |
| 04/03/2003 | 33 | Justice) - certified copies mailed this date |
| 04/28/2003 | 34 | Defts' emergency MOTION to extend tracking order deadlines pertaining |
| 04/28/2003 | 34 | to summary judgment motions and joint pre-trial memorandum 55 days |
| 04/29/2003 | 35 | Pltff's Opposition to Mo. #34 |
| 04/30/2003 | 36 | Notice sent to appear on May 13, 2003 for a hearing on motion to |
| 04/30/2003 | 36 | extend tracking order |
| 05/16/2003 | 37 | JOINT MOTION to amend tracking order (Dis-6/30/03, SJ-7/16/03/Opp. to |
| 05/16/2003 | 37 | SJ-8/15/03, PTC-9/22/03) |
| 05/20/2003 | 38 | Motion (P#37) ALLOWED (Barbara Rouse, Justice) Notices mailed May 20, |

| | | |
|---|---|---|
| 05/20/2003 | 38 | 2003 |
| 07/23/2003 | 39 | Notice sent to appear for pre-trial conference on Thursday September |
| 07/23/2003 | 39 | 25, 2003 @2:00pm in Plymouth |
| 08/20/2003 | 40 | Stipulation regarding filing of summary judgment pleadings |
| 08/20/2003 | 41 | Defts' MOTION for Summary Judgment, pursuant to Mass.R.Civ.P. 56, |
| 08/20/2003 | 41 | defts' statement of undisputed facts and legal elements, defts' |
| 08/20/2003 | 41 | memorandum in support; pltff's statement of legal elements, pltff's |
| 08/20/2003 | 41 | memorandum in opposition, pltff's response to defts' 9A(b)(5) |
| 08/20/2003 | 41 | statement of facts, affidavit of Nicholas Nesgos, Esq. (Defts' |
| 08/20/2003 | 41 | request for hearing) |
| 08/20/2003 | 42 | Defts' MOTION for leave to file a summary judgment memorandum in |
| 08/20/2003 | 42 | excess of 20 pages |
| 08/20/2003 | 43 | Plaintiff Mark Thompson's MOTION for leave to file a memorandum in |
| 08/20/2003 | 43 | excess of 20 pages |
| 08/27/2003 | 44 | Notice sent to appear on December 03, 2003 for a hearing on deft's |
| 08/27/2003 | 44 | motion for summary judgment |
| 08/29/2003 | 45 | ASSENTED TO MOTION to substitute pages in defts' memorandum in |
| 08/29/2003 | 45 | support of summary judgment |
| 09/02/2003 | 46 | MOTION (P#45) Motion Allowed (Paul Troy, Justice). Notices mailed |
| 09/02/2003 | 46 | September 05, 2003 |
| 09/15/2003 | 47 | Defts' reply memorandum in support of defts' motion for summary |
| 09/15/2003 | 47 | judgment |
| 11/17/2003 | 48 | Plaintiff's ASSENTED TO MOTION to file surreply (proposed surreply) |
| 11/17/2003 | 49 | MOTION (P#48) ALLOWED (Richard F. Connon, Justice) Notices mailed |
| 11/17/2003 | 49 | November 19, 2003 |
| 11/17/2003 | 50 | Plaintiff's Surreply in Opposition to Defendants' Motion for Summary |
| 11/17/2003 | 50 | Judgment |
| 12/03/2003 | | Hearing on motion for summary judgment held, matter taken under |
| 12/03/2003 | | advisement. (Paul E. Troy, Justice) |
| 02/03/2004 | 51 | MEMORANDUM OF DECISION AND ORDER (on Defts' Motion for Summary |
| 02/03/2004 | 51 | Judgment) "ORDERED that defendants' motion summary judgment is |
| 02/03/2004 | 51 | DENIED as to pltff's claims regarding his allegedly wrongful |
| 02/03/2004 | 51 | termination and defendant Glenn Thompson's breach of promise to pay |
| 02/03/2004 | 51 | plaintiff's share of the contribution agreement, and GRANTED as to |
| 02/03/2004 | 51 | plaintiff's claims regarding unpaid bonuses and breach of the Tricor |
| 02/03/2004 | 51 | agreement). (Paul E. Troy, Justice).dated January 28, 2004. Copies |
| 02/03/2004 | 51 | mailed 2/3/04 |
| 02/05/2004 | 52 | Notice of Annual Civil Litigation Fee mailed to plaintiff's attorney |
| 02/05/2004 | 52 | Nicholas J Nesgos on February 05, 2004. |
| 02/17/2004 | 53 | Annual Civil Litigation fee in the sum of $120.00 paid by the |
| 02/17/2004 | 53 | plaintiff's attorney Nicholas J Nesgos on February 17, 2004 |
| 03/02/2004 | 54 | Plaintiff Mark Thompson's MOTION for reconsideration of summary |
| 03/02/2004 | 54 | judgment order, pltff's memorandum in support |

| | | |
|---|---|---|
| 03/17/2004 | 55 | MOTION (P#54) defts have until April 6, 2004 to respond (Paul e Troy, |
| 03/17/2004 | 55 | Justice). Notices mailed March 17, 2004 |
| 04/06/2004 | 56 | Opposition to Pltff's. Motion for Reconsideration filed by Thompson |
| 04/06/2004 | 56 | Paper Box Co. Inc., Thompson Products Inc., Glenn Thompson |
| 04/13/2004 | | Defts'. Memorandum in Opposition sent to Justice Troy sitting in |
| 04/13/2004 | | Suffolk |
| 04/26/2004 | 57 | Plaintiff Mark Thompson's MOTION for leave to file reply in support |
| 04/26/2004 | 57 | of motion for reconsideration |
| 04/28/2004 | 58 | MOTION (P#57) Motion Allowed. (Paul E. Troy, Justice). Notices |
| 04/28/2004 | 58 | mailed April 28, 2004 |
| 04/28/2004 | 59 | Pltff's reply in support of his motion for reconsideration |
| 04/29/2004 | 60 | Defts' Motion for leave to file a Supplemental Memorandum: |
| 05/06/2004 | 61 | Pltff's Opposition and response to Deft's Mo.#60 |
| 05/26/2004 | 62 | MOTION (P#54) After review of this motion, defendants' memorandum in |
| 05/26/2004 | 62 | opposition, plaintiff's reply memorandum and defendants' supplemental |
| 05/26/2004 | 62 | memorandum, motion for reconsideration is denied. (Paul E. Troy, |
| 05/26/2004 | 62 | Justice). Notices mailed June 02, 2004 |
| 07/07/2004 | 63 | Notice of docket entry received from Appeals Court. RE#1 As a purely |
| 07/07/2004 | 63 | technical matter, the petition is untimely and is accordingly denied. |
| 07/07/2004 | 63 | Further the petitioner has not made a showing of any clear error of |
| 07/07/2004 | 63 | law or abuse of discretion. |
| 07/29/2004 | 64 | Notice sent to appear for pre-trial conference on Tuesday September |
| 07/29/2004 | 64 | 14, 2004 @2:00pm in Plymouth |
| 09/02/2004 | 65 | Notice sent to appear for pre-trial conference on Thursday November |
| 09/02/2004 | 65 | 18, 2004 @2:00pm in Plymouth |
| 11/17/2004 | 66 | JOINT MOTION to continue pre-trial conference to a date in January , |
| 11/17/2004 | 66 | 2005 |
| 11/17/2004 | 67 | MOTION (P#66) Motion Allowed. PTC 1/20/05 (Paul E. Troy, Justice). |
| 11/17/2004 | 67 | Notices mailed November 17, 2004 |
| 11/17/2004 | 68 | Notice sent to appear for pre-trial conference on January 20, 2005 |
| 01/07/2005 | 69 | Stipulation of dismissal pursuant to Rule 41(a)(i)(ii) with |
| 01/07/2005 | 69 | prejudice, without costs |