**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THOMPSON PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 05-11810-RGS |
| | ) | |
| GLENN THOMPSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Thompson Products, Inc. ("TPI"), by counsel, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, moves the Court for entry of a preliminary injunction prohibiting defendants Glenn Thompson ("Thompson") and Thompson Enterprises, Inc. (now Splash Creations, Inc. by name change) ("Splash") from the following competitive activities pending trial on the merits of this action:

(a)     from divulging or using any TPI confidential information without its prior written consent;

(b)     from employing, directly or indirectly, any person who was employed by TPI or by any business in which TPI had a material interest, direct or indirect, within the six-month period preceding Thompson's July 12, 2005 resignation from TPI; and

(c)     from engaging, directly or indirectly, within the United States, in any business that is competitive with the business of TPI.

In support of its motion, TPI is filing herewith affidavits and a memorandum in Support of Motion for Preliminary Injunction.

1

## REQUEST FOR HEARING PURSUANT TO LOCAL RULE 7.1

Plaintiff believes that oral argument will assist the Court in ruling upon this motion and, therefore, requests a hearing.

THOMPSON PRODUCTS, INC.

By is attorneys,

/s/   Andrew D. Kang
Terence P. McCourt (BBO #555784)
Andrew T. Kang (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN
A Professional Corporation
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507

Dated :  November 23, 2005

## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 23rd day of November, 2005, I served a copy of the foregoing by U.S. Mail to the following counsel of record:

> Matthew F. Medeiros, Esq.
> LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
> 72 Pine Street
> Providence, RI  02903
>
> Michael L. Chinitz, Esq.
> Lisa A. Tenerowicz, Esq.
> ROSE & ASSOCIATES
> 29 Commonwealth Avenue
> Boston, MA  02116

/s/  Andrew D. Kang
Andrew D. Kang

bos-fs1\McCourtT\177416v01\11/23/05\90594.010100

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THOMPSON PRODUCTS, INC.,                    )
                                            )
                  Plaintiff,                )
                                            )
v.                                          )           CA No. 05-11810-RGS
                                            )
GLENN THOMPSON, *et al.*,                   )
                                            )
                  Defendants.               )
_____)

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Thompson Products, Inc. ("TPI"), has filed a Motion for Preliminary Injunction

seeking to enforce, pending trial on the merits, Restrictive Covenants made by defendant, Glenn

Thompson ("Thompson") in the 1997 sale of his business to TPI.  Specifically, TPI seeks entry

of a preliminary injunction prohibiting Thompson and his newly formed competitive company,

Thompson Enterprises, Inc. (now, by name change, Splash Creations, Inc.) ("Splash") from

soliciting and employing TPI personnel, engaging in direct competition with TPI and using TPI's

confidential information.  In support of its motion, TPI has filed the Affidavit of Cameron Read

(hereinafter "Read Aff.") with exhibits, and the Declaration of Emerson Talbot Briddell

(hereinafter "Briddell Decl."), as well as this memorandum.

<u>FACTS</u>

On November 24, 1997, TPI and its parent, Thompson Products Holdings, Inc., bought

all of the assets of the TPI business, which until the sale, had been operated as Thompson Paper

Box Co., Inc. (hereinafter "Thompson Paper Box").  See pertinent portions of the Asset Purchase

Agreement ("APA") attached as Ex. A to the Read Aff.  Thompson was a major shareholder of

Thompson Paper Box, and as such, he was a party to the APA.  In paragraph 2.4 of the APA

entitled "Noncompetition," Thompson agreed to abide by certain Restrictive Covenants which

were contained in Ex. 3.2(c)-1 to the APA. Ex. 3.2(c)-1 was a form Employment Agreement

that Thompson contracted to execute and deliver to TPI at closing. The Restrictive Covenants

contained in Ex. 3.2(c)-1 were expressly incorporated by reference into the APA and made an

integral part of it to bind Thompson. Significant to this action and the Motion for Preliminary

Injunction, Thompson's Restrictive Covenants provided as follows:

(a)     Employee understands and acknowledges that during his
employment with the Seller, he was, and during his employment with
Employer, he will be exposed to Confidential Information, all of which
is proprietary and which will rightfully belong to the Employer. The
Employee shall hold in a fiduciary capacity for the benefit of the
Employer such Confidential Information obtained by Employee during
his employment with the Employer and shall not, directly or indirectly,
at any time, during the Employment Term of this Agreement and for a
period of two (2) years following termination of Employee's
employment hereunder divulge or use any Confidential Information
without the prior written consent of a duly empowered officer of the
Employer . . . . Employee shall take all reasonable steps to safeguard
such Confidential Information and to protect such Confidential
Information against disclosure, misuse, loss or theft.

(b)     During the Employment Term and for a period of two (2)
years following termination of Employee's employment hereunder, the
Employee will not, directly or indirectly, solicit, employ or associate in
any business relationship with any person, who was employed within six
(6) months prior to the termination of Employee's employment by the
Employer or any business in which Employer has a material interest,
direct, or indirect, as an officer, partner, shareholder or beneficial owner.

(c)     During the Employment Term and for a period of two (2)
years following termination of Employee's employment hereunder
Employee will not within the continental United States, directly or
indirectly, assist in, engage in, have any financial interest in, or
participate in any way in, as an owner, partner, employee, agent, officer,
board member, consultant, independent contractor or shareholder, in any
business that involves, in whole or in part, activities similar to, related to
or competitive with (a) the business of the Employer or (b) the business
of any affiliate of the Employer as carried on during the term of
Executive's employment hereunder . . . .

(d)     Employee represents and admits that (i) in the event of
termination of this Agreement, Employee's experience and capabilities
are such that Employee can obtain employment in a business engaged in
other lines and/or of a different nature than the business of the

Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (iii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope , area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

Prior to resigning from TPHI and TPI as of July 12, 2005, Thompson negotiated with the boards of directors of TPHI and TPI to buy TPI but was unsuccessful. He, therefore, resigned from his positions with both companies. Briddell Decl. ¶ 2. Thompson left the employ of TPI with full knowledge of every aspect of TPI's business, including its material and labor costs, other manufacturing and distribution costs, secured and unsecured debt, profit margins, customers, and customer identification numbers used to do business with customers, among

others. Briddell Decl. ¶ 3. Accordingly, on July 19, 2005, TPI, by its Clerk, Cameron Read, sent

Thompson a letter reminding him of his post-termination obligations and TPI's expectation that

he would abide by them. Read Aff. ¶ 4 and letter attached thereto as Ex. B.

Shortly after his resignation from TPHI and TPI, Thompson formed a new company

called Thompson Enterprises, Inc. and promptly began to act through that company to establish a

business in direct competition with TPI. Briddell Decl. ¶ 4. Shortly after TPI filed the

Complaint in this action, Thompson changed the name of Thompson Enterprises, Inc. to Splash

Creations, Inc. Briddell Decl. ¶ 5.

Since his resignation from TPI and his formation of Splash, Thompson has solicited at

least nine TPI or TPI affiliated employees, all of whom were in charge of various aspects of

TPI's manufacture, distribution and sale of photo boxes, albums and journals as of Thompson's

resignation date. Briddell Decl. ¶ 6. Those employees include TPI's office manager in the Hong

Kong offices of its China affiliate; the director of manufacturing of that affiliated company;

TPI's product development director; its art director; and its vice president of operations, among

others. TPI believes that all such personnel are now employed by Thompson or Splash, or if not

yet employed by them, they will be so employed soon. Briddell Decl. ¶ 6. In addition,

Thompson has taken the following actions to establish and operate his competitive business:

> (a)    to establish his U.S. competitive business, Thompson visited Hong Kong
> in the late summer and rented space for his newly created China manufacturing
> operations in the very same city, on the same street and even in the same building
> where TPI's China-affiliated company has its offices. Briddell Decl. ¶ 7.

> (b)    Thompson is using a box factory in Providence, RI to produce and sell
> photo boxes in direct competition with TPI and, specifically, to a former customer
> of TPI who was well known to Thompson while he was employed by TPI.
> Briddell Decl. ¶ 8.

> (c)    Thompson has solicited at least one of TPI's customer representatives to
> leave the employ of TPI and serve in the same position with Thompson/Splash in
> an effort to give Thompson/Splash the benefit of the representative's good

relationship with one or more TPI customers, earned over time and with much effort and expense.  Briddell Decl. ¶ 9.

(d)    Thompson has contacted one of TPI's primary independent contractor manufacturer's representatives for the purpose of soliciting his abandonment of TPI and representation of Thompson/Splash with TPI's very valuable customer. Briddell Decl. ¶ 10.

(e)    Thompson has recently used TPI's confidential customer account number to gain access to a TPI customer and solicit business from that customer.  Briddell Decl. ¶ 11.

(f)    Thompson has solicited and obtained an opportunity to submit product samples to a TPI customer, with the knowledge of every aspect of TPI's business and its relationship with the customer, in an effort to obtain an unfair competitive advantage over TPI in the marketplace.  Briddell Decl. ¶ 12.

In the incredibly short span of three to four months, Thompson has created a business directly competitive with TPI as to certain products, a business that is almost TPI's mirror-image, with the current capacity to compete head-to-head for TPI's valuable customers.  It has taken TPI years to build its business; it has taken Thompson but a few months.  Thompson's incredible feat has been made possible by his knowledge of TPI's confidential financial and customer information and by his use of that knowledge, plus the knowledge of every aspect of TPI's business, confidential and non-confidential, to TPI's competitive disadvantage.  Briddell Decl. ¶ 13.

Thompson contracted to abide by certain Restrictive Covenants set out in the November 24, 1997 Asset Purchase Agreement, and he was paid handsomely by TPHI and TPI for those personal covenants.  Briddell Decl. ¶ 14.  Yet, since his resignation from TPHI and TPI, Thompson has violated almost every one of the Restrictive Covenants contained in paragraph 2.4 of the Asset Purchase Agreement:

(a)    he has used, and he continues to use, TPI's Confidential Information, including, but not limited to, its confidential customer account numbers, to compete with TPI;

(b)     he has solicited and employed several people who were employed by TPI within six months of Thompson's July 12, 2005 resignation from TPI; and

(c)     he has been engaged, and he continues to be engaged, as an owner and officer in a business that involves activities that are directly competitive with the business of TPI.

Briddell Decl. ¶ 15.  Thompson's violations are causing, and they will continue to cause, irreparable harm to TPI unless he and Splash are enjoined from continued violations.  Briddell Decl. ¶ 16.

## ARGUMENT

A.     Standard for Issuance of Preliminary Injunction.

In accordance with the familiar standards for obtaining a preliminary injunction under Massachusetts law, the party seeking such relief must show (1) a likelihood of success on the merits; (2) that irreparable harm will result from the denial of the injunction; and (3) in light of the moving party's likelihood of success on the merits, the risk of irreparable harm to the moving party outweighs the potential harm to the non-moving party in granting the injunction.  Loyal Order of Moose, Inc. v. Board of Health of Yarmouth, 439 Mass. 597, 601, 790 N.E.2d 203 (2003) (citing Packaging Indust. Group, Inc. v. Cheney, 380 Mass 609, 615-16, 405 N.E.2d 106 (1980); Tri-Nel Mgt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219, 741 N.E.2d 37 (2001)).  "The preservation of legitimate economic expectations pending the opportunity for trial is a basis for granting preliminary injunctive relief."  Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 29, 421 N.E.2d 460 (1981) (internal citations omitted).  Furthermore, where a contract, by its terms, provides for injunctive relief in the event of a breach, "it adds contractually binding provisions that this Court is not at liberty to change or ignore."  Belkin v. Levenson, 19 Mass. L. Rptr. 621, 2005 WL 2010340, *4 (Mass. Super. Aug. 9, 2005) (J. Van Gestel).  Where such contract terms exist, a court's need to engage in ordinary irreparable harm analysis is obviated.

Id. Because Thompson's post-termination competitive activities breach the Restrictive Covenants he made with TPI in the APA (and in the 1998 Employment Agreement as well), TPI is entitled to a preliminary injunction.

B.    TPI is Likely to Succeed on the Merits.

In the 1997 APA, Thompson committed to perform all of the Restrictive Covenants recited there. He further agreed that all of the Restrictive Covenants would survive his termination of employment at TPI "at any time and for any reason." He acknowledged that his own Restrictive Covenants were being made incident to sale of the TPI business and that were it not for his covenants, the sale would not have been consummated. He further agreed that upon his violation of any Restrictive Covenant, TPI "shall . . . be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to a . . . preliminary . . . injunction to enforce the provisions . . ." of the Restrictive Covenants. Moreover, Thompson agreed that "the enforcement of a remedy by way of an injunction [would] not prevent [him] from earning a livelihood."

Thompson has breached, and he continues to breach, every one of the Restrictive Covenants for which he was handsomely paid. He is using TPI's confidential information, the most recent example being his blatant use of TPI's confidential customer account number to contact that customer and solicit business for his new enterprise. He has solicited and hired several valuable TPI employees and several valuable employees of TPI's affiliated company based in China. In the short span of about four months, he has aggressively formed almost a mirror image of TPI to compete with it, and he is aggressively seeking to convert TPI's valuable customers to be his own.

Massachusetts courts traditionally enforce restrictive covenants to protect legitimate business interests. The legitimate business interests an employer may protect include trade

secrets, confidential data and goodwill. Wells v. Wells, 9 Mass. App. Ct. 321, 323, 400 N.E.2d

1317 (1980) (citing New England Canteen Serv. Inc. v. Ashley, 372 Mass. 671, 674, 363 N.E.2d

526 (1977)). The most important aspect of a company's goodwill is its dealings with its

customers. See, e.g., Kroeger v. The Stop & Shop Co., Inc., 13 Mass. App. Ct. 310, 316, 432

N.E. 2d 566 (1982) ("Good will generally applies to customer relationships."). Other legitimate

protectable interests include business strategies, research techniques, production processes,

business plans and price lists. See, e.g., Shipley Co., LLC v. Kozlowski, 926 F.Supp. 28, 29 (D.

Mass. 1996). TPI has legitimate business interests in need of protection by enforcement of

Thompson's Restrictive Covenants, and Thompson acknowledged this in the APA.

The non-competition covenant sought to be enforced is reasonable as to time, geography

and scope. The covenant binds Thompson for two years following his termination of

employment with TPI. In Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 498

N.E.2d 22 (1986) the Court found that five years was not "an unreasonably long period of time

for the covenant to run." Likewise, the bankruptcy court held in the case of In re Ward, 194 B.R.

703, 708 (Bankr. D. Mass. 1996) that a two-year restriction was valid and enforceable.

The covenant here also is reasonable as to geography. It provides for Thompson's

restrictions in the continental United States. TPI's business is nationwide, justifying the broad

geographic scope of the covenant. See, e.g., Cereva Networks, Inc. v. Lieto, 13 Mass L. Rptr.

694, 2001 WL 1228040, *6 (Mass. Super. 2001) (holding as reasonable in scope a restriction on

worldwide competition where the employer's business was conducted worldwide).

The covenant is certainly reasonable as to scope of activity covered. Pertinent to this

motion, it requires non-competition in the same business as TPI. Diet Center, Inc. v. Day

(CCH), Bus. Franchise Guide ¶ 9651 (D. Mass. Mar. 19, 1990).

Moreover, should the Court find that the scope of the non-competition covenant is unreasonable in any aspect, Thompson and TPI agreed in the APA that "reasonable maximum duration, scope, area or other restrictions may be substituted by [this] court for the stated duration, scope, area or other restrictions and upon such substitution by [this] court, this [APA] shall be automatically modified without further action by the parties hereto."

C.    TPI is Suffering Irreparable Harm by Thompson's Breach of his Restrictive Covenants.

Under Massachusetts law, where a contract by its terms provides for injunctive relief as a remedy for its breach, irreparable harm is presumed and there is no need to conduct irreparable harm analysis.  In discussing a contract with such a provision, the Massachusetts Superior Court has held:

> [t]he foregoing language not only obviates the need for the ordinary irreparable damage analysis, it adds contractually binding provisions that this Court is not at liberty to ignore.  Sophisticated parties, with advice of sophisticated counsel, chose the specific wording of their agreement.  Those words, in the absence of something illegal or violative or public policy, must be honored by the Court.

Belkin v. Levenson, 2005 WL 2010340 *4 (Mass. Super. August 9, 2005).  In addition, such contract language also constitutes an agreement by the parties on the balancing of the harms, making it unnecessary for the court to perform that analysis also.  Id.

Further, the Court should be guided by the principle that contracts are to be interpreted as a whole, giving meaning to all its parts.  Okmyansky v. Herbalife International of America, Inc., 415 F.3d 154, 159 (1st Cir. 2005); Cullen Enters., Inc. v. Mass. Prop. Ins. Underwriting Ass'n, 399 Mass. 886, 900 n. 27, 507 N.E.2d 717 (1987); see also Given v. Commerce Ins. Co., 440 Mass. 207, 209, 796 N.E.2d 1275 (2003) ("We interpret the words of [the contract] in light of their plain meaning, giving full effect to the document as a whole." (internal citations omitted)).  Because Thompson and TPI agreed in the APA that TPI would be entitled to injunctive relief to enforce the terms of the Restrictive Covenants and TPI has demonstrated that Thompson has

breached, and that he continues to breach, the Restrictive Covenants in the APA, there is no need for TPI to establish further that it will be irreparably harmed or that the balance of the equities weighs in its favor.

Any harm to Thompson or Splash by the Court's enforcement of Thompson's Restrictive Covenants is entirely of Thompson's own making and entitled to little weight when balanced against the irreparable harm to TPI if the preliminary injunction is not granted.

CONCLUSION

TPI is entitled to entry of the requested preliminary injunction pending trial on the merits of this action.

**THOMPSON PRODUCTS, INC.**

By is attorneys,

/s/  Andrew D. Kang
Terence P. McCourt (BBO #555784)
Andrew T. Kang (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN
A Professional Corporation
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507

Dated :  November 23, 2005

## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 23rd day of November, 2005, I served a

copy of the foregoing by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI  02903

Michael S. Chinitz, Esq.
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA  02110

/s/ Andrew D. Kang
Andrew D. Kang

bos-fs1\McCourtT\177418v01\11/23/05\90594.010100

# EXHIBIT
# TO
# MEMORANDUM IN SUPPORT OF
# MOTION FOR PRELIMINARY
# INJUNCTION


# READ AFFIDAVIT
# ("Read Aff.")

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THOMPSON PRODUCTS, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 05-11810-RGS |
| GLENN THOMPSON, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THOMPSON ENTERPRISES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT**

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) |
| | ) to-wit |
| County of Charleston | ) |

This day came Cameron Read and upon being duly sworn, said as follows:

1.      I am an attorney admitted to practice in the Commonwealth of Massachusetts and am a partner in the firm of Choate, Hall & Stewart, LLP, Two International Place, Boston, MA 02110.

2.      I currently serve as Secretary and Clerk of Thompson Products Holdings, Inc. ("TPHI") and Thompson Products, Inc. ("TPI"), having been duly elected to that office on June 3, 2003.

3.      Attached to this Affidavit as Exhibit A are true copies of pertinent portions of the November 24, 1997 Asset Purchase Agreement by, between and among TPHI and TPI, as buyers, on the one hand, and Thompson Paper Box Co., Inc. and Glenn Thompson, plus others, as sellers,

on the other. These documents are maintained by TPHI and TPI in the ordinary course of business.

4.    Attached hereto as Exhibit B is a copy of the July 19, 2005 letter that I sent to Glenn Thompson, on behalf of the TPI and TPHI boards, upon his resignation from TPHI and TPI, effective July 12, 2005.

AND FURTHER THIS AFFIANT SAYETH NOT.

Executed this 21st day of November, 2005.

_____
CAMERON READ

Subscribed and sworn to before me, the undersigned notary public, this 21st day of November, 2005.

_____
NOTARY PUBLIC

My commission expires: August 3, 2015      .

1219750v1

2

---

## ASSET PURCHASE AGREEMENT

~~Dated as of November 24, 1997~~

among

**Thompson Products, Inc.**

and

**Thompson Paper Box Co., Inc.,**

**Glenn Thompson,**

**Mark A. Thompson,**

**Frederick L. Weingeroff**

and

**Gregg Weingeroff**

---

**EXHIBIT**

A

## EXHIBITS

Exhibit 1.23       -     Form of Subordinated Promissory Note
Exhibit 3.2(a)     -     Form of Bill of Sale
Exhibit 3.2(b)     -     Form of Assignment and Assumption on Agreement
Exhibit 3.2(c)-1   -     Form of Employment Agreement of Glenn Thompson
Exhibit 3.2(c)-2   -     Form of Employment Agreement of Mark Thompson
Exhibit 3.2(d)     -     Form of Subscription Agreement
Exhibit 3.2(j)-1   -     Form of Officer's Certificate
Exhibit 3.2(j)-2   -     Form of Stockholders Certificate
Exhibit 3.2(m)     -     Form of Net Operating Asset Certificate
Exhibit 3.2(n)     -     Form of Stockholders Letter
Exhibit 3.2(o)     -     Form of Landlord's Waiver and Estoppel Certificate
Exhibit 3.2(p)     -     Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit 3.2(q)     -     Form of Third Amendment to Lease

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") made and entered into as of the 24th day of November, 1997, by and among Thompson Products, Inc., a Delaware corporation ("Purchaser"), which is a Wholly-Owned Subsidiary of Thompson Products Holdings, Inc., a Massachusetts corporation ("Thompson Holdings"), Thompson Paper Box Co., Inc., a Massachusetts corporation (the "Company"), Glenn Thompson, an individual residing at 5 Assawompsett Court, Lakeville, MA 02347 ("GT"), Mark A. Thompson, an individual residing at 230 Grange Park, Bridgewater, MA 02324 ("MT"), Frederick L. Weingeroff, an individual residing at 3181 Monet Drive, Palm Beach Garden, FL 33410 ("FW"), and Gregg Weingeroff, an individual residing at 11 Loring Avenue, Providence, R.I. 02906 ("GW") (GT, MT, FW and GW are sometimes collectively referred to herein as the "Stockholders" and individually as a "Stockholder").

## W I T N E S S E T H

WHEREAS, the Company is in the business of the manufacture and sales of photo albums, cardboard-based gift boxes and leasebacks for picture frames (the "Business");

WHEREAS, GT, MT, FW and GW collectively own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Company;

WHEREAS, Purchaser wishes to acquire from the Company and the Company desires to sell to the Purchaser, the Acquired Assets (as defined below), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the aforesaid and the respective warranties, representations, covenants and agreements hereinafter set forth, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings specified with respect thereto below.

1.1    "Acquired Assets" shall mean all of the assets and properties of the Company (other than the Excluded Assets), with such additions thereto or deletions therefrom as may be permitted by the terms of this Agreement, including the Company's goodwill and all of its concepts, plans and materials relating to the operation of the business and also including without limitation:

shall be payable by the execution and delivery of the Subordinated Note; provided, however, that the cash portion of the Purchase Price and any allocation thereof are subject to adjustment as set forth in Section 2.3.

2.3    Purchase Price Adjustment. (a) The cash portion of the Purchase Price shall be reduced, on a dollar for dollar basis, by an amount equal to (i) the amount that the value of the Net Operating Assets of the Company on the Closing Date, as certified by an executive officer of the Company pursuant to Section 3.2(m) hereof and subject to confirmation by Arthur Andersen, Purchaser's accountant, on the Closing Date is less than $11,163,750.00, and (ii) the aggregate amount of all those liabilities, if any, set forth on Schedule 2.3 of the Company expressly assumed by the Purchaser; Schedule 2.3 shall be prepared by Purchaser and delivered to the Company no later than five (5) business days prior to the Closing.

(b)    If the value of Net Operating Assets (as determined in accordance with Section 2.3(a)(i) above) of the Company on the Closing Date exceeds $11,740,000.00 (the "Excess"), Purchaser shall deliver to the Company at the Closing a promissory note (the "Excess Note") in the principle amount equal to the Excess, due one hundred and eighty (180) days after the Closing, bearing interest at nine percent (9%) per annum and secured by a first priority lien on the accounts receivable of Purchaser pursuant to a security agreement; provided, that the principle amount of the note shall in no event be greater than the amount due on the Closing Date to First National Bank of Boston (the "Bank") by the Company under the existing loan facility with the Bank.

2.4    Noncompetition. (a) As additional consideration for Purchaser's agreement to purchase the Acquired Assets and pay the Purchase Price, GT and MT have agreed, severally but not jointly, to the noncompetition provisions (the "Restrictive Covenants") contained in their respective Employment Agreements, which noncompetition provisions are incorporated herein by reference and made a part hereof as if restated herein.

(b)    It is agreed and understood by and among the parties to this Agreement that the Restrictive Covenants incorporated by reference in subsection (a) above are each individually essential elements of this Agreement and that, but for the agreement of GT and MT to comply with such Restrictive Covenants, Purchaser would not have agreed to enter into this Agreement. Further, each of GT and MT expressly acknowledges that the restrictions incorporated by reference into subsection (a) of this Section 2.4 are reasonable and necessary to accomplish the mutual objectives of the parties and to protect Purchaser's interests in the Business after the Closing. Each of GT and MT further acknowledges that enforcement of such restrictions will not deprive him of the ability to earn a reasonable living and that any violation of such restrictions will cause irreparable injury to Purchaser. Such Restrictive Covenants of GT and MT shall be construed as agreements independent of any other provision of this Agreement and of each other.

(c)    GT and MT hereby agree that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that the Restrictive Covenants incorporated by reference into subsection (a) of this Section 2.4 are

violated and that, in addition to any remedies or rights that may be available to Purchaser, all of which other remedies or rights shall be deemed to be cumulative, retained by Purchaser and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Purchaser shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions incorporated by reference into subsection (a) of this Section 2.4, all of which shall constitute rights and remedies to which Purchaser may be entitled.

(d)      If any court determines that the covenant not to compete incorporated by reference into subsection (a) of this Section 2.4, or any part hereof, is unenforceable because of the duration or geographic scope of such provision, such court shall reduce the duration or scope of such provisions (to the maximum duration or scope permitted by law), as the case may be, and such provision in its reduced form shall then be enforceable.

(e)      Notwithstanding anything to the contrary contained in the foregoing provisions of this Section 2.4, any other provisions of this Agreement or their respective Employment Agreements, each of GT and MT shall have liability only for his own breach of a Restrictive Covenant.

2.5      Closing.  The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at 10:00 a.m. at the offices of Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, New York 10022 on the later of (i) January 5, 1998 (with a pre-closing on December 30, 1997) or (ii) the third business day following the satisfaction or waiver of all of the conditions to Closing set forth in Article III hereof, or at such other time, date or place as the parties may mutually agree.  The actual date of the Closing is sometimes referred to herein as the "Closing Date".

## ARTICLE III.

## CONDITIONS TO CLOSING

3.1      Conditions to Purchaser's Obligations to Close.  The obligations of Purchaser to consummate the Acquisition is subject to the satisfaction at the time of the Closing of the following conditions (any or all of which may be waived by Purchaser in Purchaser's sole discretion):

(a)      The representations and warranties of the Company and the Stockholders made in this Agreement and in each of the other agreements to be delivered in connection with the Acquisition shall be true and correct in all respects as of the date of this Agreement and as of the time of Closing as though made as of such time, and the Company and the Stockholders shall have performed in all respects each and every covenant contained in this Agreement required to be performed by them by the time of the Closing.

**IN WITNESS WHEREOF,** this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

THOMPSON PRODUCTS, INC.

By: _____
Name: _____
Title: _____

THOMPSON PAPER BOX CO., INC.

By: _____
Name: Glenn Thompson
Title: President

STOCKHOLDERS

_____
Glenn Thompson

_____
Mark A. Thompson

_____
Frederick L. Weingeroff

_____
Gregg Weingeroff

45

11/20/97  DRAFT

EXHIBIT 3.2(c) - 1

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January __, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### W I T N E S S E T H:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November __, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

[58205-v3]

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

- 2 -

3.    **Employment**

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer.  As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer.  Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

4.    **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the  Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    **Term**

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    **Compensation and Benefits**

(a)      As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)      Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c)      Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

- 3 -

(d)     The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)     The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

## 7.     Vacation

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

## 8.     Termination

(a)     Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)     If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)     If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

## 9.     Restrictive Covenants

(a)     Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong

- 4 -

to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)    Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such

court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

      (f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

      (g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

### 10.    Return of Documents

      Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

### 11.    Binding Effect

      This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

### 12.    Miscellaneous

      (a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability

- 6 -

shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

        (b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law.  Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

        (c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery.  Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

        (d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought.  Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January __, 1998.

THOMPSON, INC.

By:_____
Name:
Title:


_____
Glenn Thompson

# CHOATE, HALL & STEWART LLP

EXCHANGE PLACE

53 STATE STREET

BOSTON, MASSACHUSETTS 02109-2804

T (617) 248-5000      F (617) 248-4000
www.choate.com

July 19, 2005

**By Overnight Delivery**

Glenn Thompson
330 Rumstick Road
Barrington, R. I. 02806

Dear Glenn:

The Board has asked me to write to acknowledge your resignation as a member of the Board of Directors and as an officer of Thompson Product Holdings, Inc. ("TPHI") and each of its subsidiaries. In accordance with your email to the other Board members of TPHI dated May 22, 2005, your resignation as a director is effective as of that date and, in addition to TPHI, covers your membership on the Boards of Thompson Products, Inc. ("TPI") and Thompson Products Hong Kong Limited ("TPHKL") and your position as a Manager of Harvest Holdings, LLC. Your resignation as President of TPHI, TPI and TPHKL, which was given orally on July 12, 2005, is effective on that date.

The Board has also asked me to remind you of your continuing fiduciary obligations to TPHI and its subsidiaries (together, the "Company") as a TPHI shareholder and as well as your continuing obligation not to contact any customers, suppliers, employees or other businesses or individuals which have contractual or other business relationships with the Company for the purpose of interfering with those relationships. In addition, you are obligated not to disclose or use any Confidential Information (as hereinafter defined) of the Company without the prior written consent of TPHI. "Confidential Information" means all non-public information concerning the Company or its business including, without limitation, information relating to products, customers, pricing, trade secrets and other intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, agreements with customers, marketing and concession arrangements and other agreements.

Please feel free to contact me if you have any questions.

Sincerely yours,

Cameron Read

CR:jtm

cc:    Brian Gleason
       Adeyemi Sonuga
       Tal Briddell
       Ruth Correia

**EXHIBIT**

B

# EXHIBIT
# TO
# MEMORANDUM IN SUPPORT OF
# MOTION FOR PRELIMINARY
# INJUNCTION


# BRIDDELL DECLARATION
# ("Briddell Decl.")

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

THOMPSON PRODUCTS, INC.,       )
a Delaware corporation,        )
                               )
        Plaintiff,       )
                               )
v.                             )
                               )       Case No. 05-11810-RGS
GLENN THOMPSON,                )
                               )
and                            )
                               )
THOMPSON ENTERPRISES, INC.,    )
                               )
        Defendants.      )

## DECLARATION OF EMERSON TALBOT BRIDDELL

This day Emerson Talbot Briddell declares under penalty of perjury as follows:

1.      Following the resignation of Glenn Thompson ("Thompson") from Thompson Products Holdings, Inc. ("TPHI") and its wholly-owned subsidiary, Thompson Products, Inc. ("TPI"), effective July 12, 2005, I was hired by the companies to serve as President and interim Chief Executive Officer. I served in that capacity until November 11, 2005, when a new President was hired, but I have continued to serve TPHI and TPI since then as interim Chief Financial Officer and Chief Restructuring Officer. In those jobs I have become familiar with the post-termination competitive activities of Glenn Thompson recited herein.

2.      Prior to resigning from TPHI and TPI as of July 12, 2005, Thompson negotiated with the boards of directors of TPHI and TPI to buy TPI but was unsuccessful. He, therefore, resigned from his positions with both companies.

3.      Thompson left the employ of TPI with full knowledge of every aspect of TPI's

business, including its material and labor costs, other manufacturing and distribution costs, secured and unsecured debt, profit margins, customers, and customer identification numbers used to do business with customers, among others.

4.      Shortly after his resignation from TPHI and TPI, Thompson formed a new company called Thompson Enterprises, Inc. and promptly began to act through that company to establish a business in direct competition with TPI.

5.      Shortly after TPI filed the Complaint in this action, Thompson changed the name of Thompson Enterprises, Inc. to Splash Creations, Inc.

6.      Since his resignation from TPI and his formation of Splash, Thompson has solicited at least nine TPI or TPI affiliated employees, all in charge of various aspects of TPI's manufacture, distribution and sale of photo boxes, albums and journals as of Thompson's resignation date.  Those employees include TPI's office manager in the Hong Kong offices of its China affiliate; the director of manufacturing of that affiliated company; TPI's product development director; its art director; and its vice president of operations, among others.  TPI believes that all such personnel are now employed by Thompson or Splash, or if not yet employed by them, they will be so employed soon.

7.      To establish his U.S. competitive business, Thompson visited Hong Kong in the late summer and rented space for his newly created China manufacturing operations in the very same city, on the same street and even in the same building where TPI's China-affiliated company has its offices.

8.      Thompson is using a box factory in Providence, RI to produce and sell photo boxes in direct competition with TPI and, specifically, to a former customer of TPI who was well known to Thompson while he was employed by TPI.

9.    Thompson has solicited at least one of TPI's customer representatives to leave the employ of TPI and serve in the same position with Thompson/Splash in an effort to give Thompson/Splash the benefit of the representative's good relationship with one or more TPI customers, earned over time and with much effort and expense.

10.    Thompson has contacted one of TPI's primary independent contractor manufacturer's representatives for the purpose of soliciting his abandonment of TPI and representation of Thompson/Splash with TPI's very valuable customer.

11.    Thompson has recently used TPI's confidential customer account number to gain access to a TPI customer and solicit business from that customer.

12.    Thompson has solicited and obtained an opportunity to submit product samples to a TPI customer, with the knowledge of every aspect of TPI's business and its relationship with the customer, in an effort to obtain an unfair competitive advantage over TPI in the marketplace.

13.    In the incredibly short span of three to four months, Thompson has created a business directly competitive with TPI as to certain products, which is almost its mirror-image, and with the current capacity to compete head-to-head for TPI's valuable customers.  It has taken TPI years to build its business; it has taken Thompson but a third of a year.  Thompson's incredible feat has been made possible by his knowledge of TPI's confidential financial and customer information and by his use of that knowledge, plus the knowledge of every aspect of TPI's business, confidential and non-confidential, to TPI's competitive disadvantage.

14.    Thompson contracted to abide by certain Restrictive Covenants set out in the November 24, 1997 Asset Purchase Agreement, and he was paid handsomely by TPHI and TPI for those personal covenants.

15.    Since his resignation from TPHI and TPI, Thompson has violated almost every one

3

of the Restrictive Covenants contained in paragraph 2.4 of the Asset Purchase Agreement:

    (a)    he has used, and he continues to use, TPI's Confidential Information, including, but not limited to, its confidential customer account numbers, to compete with TPI;

    (b)    he has solicited and employed several people who were employed by TPI within six months of Thompson's July 12, 2005 resignation from TPI; and

    (c)    he has been engaged, and he continues to be engaged, as an owner and officer in a business that involves activities that are directly competitive with the business of TPI.

16.    Thompson's violations are causing, and they will continue to cause, irreparable harm to TPI unless he and Splash are enjoined from continued violations.

17.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of November, 2005.

_____
EMERSON TALBOT BRIDDELL

1219826v1

4

**21,428**    New Developments    127    8-90

of New York Authority, 222 F.2d 362 (2d Cir. 1955) (per curiam); United Artists Corp. v. Masterpiece Productions, Inc., 221 F.2d 213 (2d Cir. 1955). However, we later abandoned that view in Goldlawr, Inc. v. Heiman, 273 F.2d 729 (2d Cir. 1959) (per curiam); see also Mull v. Ackerman, 279 F.2d 25 (2d Cir. 1960) (per curiam), joining the other circuits that had refused to sustain appellate jurisdiction under the pre-1961 version of Rule 54(b) where a claim against multiple parties is dismissed against some but not all of them. See Goldlawr, Inc., v. Heiman, 273 F.2d at 730 & n.1 (collecting cases).

To remedy the consequence of this position, the 1961 amendment broadened the Rule to make it available where one party was dismissed from a multi-party suit. Fed. R. Civ. P. 54(b) advisory committee's note (1961 Amendment). The drafters of the amended rule expressly noted decisions that had construed a claim alleged against multiple parties to be a single claim, see id. Accepting the prevailing view as to the unitary nature of a claim against multiple parties, the drafters expanded the Rule to make it applicable to dismissal of a party.

But having broadened the Rule to apply where one of multiple parties is dismissed, the drafters did not take the further step of making it applicable where a claim is dismissed against one party but that claim and that party remain in the suit. We have no authority (and no inclination) to make that further expansion. Though we have located no case squarely ruling on the point, our holding appears to be supported by Professor

Moore, see 6 Moore's Federal Practice ¶ 54.34[2.—2], at 54-220-21 (2d ed. 1988).

New Steve's argues that the Franchise Law claim asserted against it is separate from the claim asserted against Old Steve's. It points out that the essence of the claim is the failure to disclose an intent to promote factory-made ice cream and then contends that since Old Steve's did not modify the system, "the claim" could not have been and was not asserted against [Old Steve's]." Letter of Robert D. Fier, Esq. (June 6, 1990). Whether the claim could validly have been asserted against Old Steve's is an issue that remains for determination on the merits, but there can be no doubt that it was asserted against both Old Steve's and New Steve's. As set forth in the Stewarts' complaint, the allegation of failing to disclose an intent to promote factory-made ice cream is explicitly made against both the old and new franchisors. Appellants' Complaint ¶ ¶ 9, 22, 23. Judge Sprizzo's ruling resolved a distinct legal issue that relieved New Steve's from liability on the Franchise Act claim, but the "claim" remains pending against Old Steve's and there is no doubt that New Steve's remains as a defendant on the other claims.

In view of our holding that Judge Sprizzo's ruling was not eligible for entry of judgment under Rule 54(b), we need not decide whether, had eligibility existed, use of the Rule in the circumstances of this case would have been a permissible exercise of discretion.

The appeal is dismissed for lack of jurisdiction.

## [¶9651] Noncompetition Agreement Enforced Against Former Franchisee

**Diet Center, Inc. v. Virginia Mary Day.**

U. S. District Court, District of Massachusetts, Civil Action No. 89-40128XX. Dated March 19, 1990.

Preliminary Injunction—Enforcement of Noncompetition Agreement—Irreparable Harm—Likelihood of Success—Public Interest.—A weight loss center franchisor was granted a preliminary injunction enforcing a noncompetition agreement against a former franchisee since continued use of the franchisor's trademark at its non-franchise weight loss clinic constituted infringement, unfair competition, and breach of contract; continued operation would cause irreparable harm to the franchisor; the franchisor had no adequate remedy at law; the franchisor was likely to succeed on the merits of its action; the balance of harm weighed in the franchisor's favor; and the public interest supported the issuance of the injunction. Back references: ¶ 810.05, 850.

Preliminary Injunction—Enforcement of Noncompetition Agreement—Trademark Infringement—Use of Confidential Methods and Procedures—Competition Within Thirty-Mile Radius.—A preliminary injunction enforcing a noncompe-

¶9651    ©1990, Commerce Clearing House, Inc.

tition agreement contained in a weight loss center franchise agreement prohibited a former franchisee from continuing to use the franchisor's trademarks, trade dress, or commercial symbol; employing the franchisor's confidential methods and procedures; and competing with the franchisor within a 30-mile radius of the former franchisee's territory. Back references: ¶ 120, 810.05.

### Preliminary Injunction

### [In full text]

SKINNER, D.J.: Upon consideration of plaintiff Diet Center, Inc.'s ("DCI") application for a preliminary injunction, the memorandum submitted in support thereof, the argument of counsel, the evidence of record and the entire record herein and it appearing that:

1. Jurisdiction is conferred upon this Court by 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1332, 1338 and by the doctrine of pendent jurisdiction.

2. Venue lies in this court pursuant to 28 U.S.C. § 1391.

3. Plaintiff Diet Center, Inc. ("DCI") is franchisor of weight loss and weight control centers.

4. Through its franchise system, DCI offers a comprehensive and effective weight loss and control program that includes recommended diets, daily weigh-ins, counseling, Diet Center supplements, including vitamins and the Diet Center supplement, to promote safe and effective weight loss and weight control for individuals.

5. DCI franchisees are licensed to use certain Diet Center proprietary marks, including but not limited to, Diet Center, and "How to Win at the Losing Game" and such other trade names, trademarks and service marks as are designated in writing as part of the licensed system. DCI franchisees agree to be trained by DCI and to operate their franchised businesses using the system, method and procedures developed by DCI (the "Diet Center System").

6. Certain of DCI's License Agreements provide for sublicensing, in whole or in part, of the rights and interests acquired by franchisees under their License Agreement with DCI. Through its License Agreements, DCI controls the nature and quality of the services offered by its franchisees. Subfranchisees agree to operate in accordance with the Diet Center System and to adhere to Diet Center standards. Franchisees which subfranchise are responsible for controlling the nature and quality of the services offered by their subfranchisees and to assure that they meet the standards set by DCI for all users of the Diet Center trademarks and service marks.

7. In order to identify weight loss and control businesses that operate within the Diet Center System, DCI has employed and caused to be advertised throughout the United States its trademarks, trade names and service marks, including the trademark and service mark Diet Center, DCI's federal service mark Registration Nos. 1153518 and 1105803 are incontestable. DCI has continually used each of its registered marks in connection with the Diet Center System, including advertising, promotion and sale of goods and services in interstate commerce, including commerce within the Commonwealth of Massachusetts.

8. On September 22, 1982, DCI entered into a License Agreement with James R. Meyers ("Meyers") for five licensed territories in the city limits of Worcester, Auburn and Shrewsbury and within the county limits of Worcester County, Massachusetts. On July 10, 1984 DCI and Meyers agreed to an amendment to the Agreement, substituting for certain territories the areas of Holden, Paxton, Rutland, Princeton and West Boylston in the County of Worcester in Massachusetts.

9. On August 22, 1988, Meyers entered into a Sublicense Agreement with Day for the territory of Holden, Massachusetts.

10. Pursuant to the Sublicense Agreement, Day was required, among other things, to pay an initial fee and monthly Continuing License Fees to Meyers.

11. On September 26, 1988, Day entered into a Confidential and Non-Competition Agreement with DCI pursuant to which Day agreed to maintain the confidentiality of all company information and procedures and agreed not to compete with Diet Center following termination of her Sublicense Agreement for a period of two years within a thirty mile radius of her territory by:

a. selling or delivering products or services of the kind sold and distributed by DCI or in any other manner engaging in the sale, delivery or purchase of such products and services; and

b. engaging, directly or indirectly, in the business of weight control and diet counseling or conducting a diet and weight loss business of any kind similar to that of DCI, or in any business competitive with DCI.

12. Day has operated the Holden Diet Center since approximately September 1988.

13. Day failed to pay outstanding amounts on the initial franchise fee owed by her to Meyers and checks paid to Meyers by Day were also returned to Meyers without payment.

14. By letter dated February 9, 1989, Meyers gave Day written notice of her defaults under the Sublicense Agreement and warned that if violations were not corrected within thirty (30) days the subfranchise would be terminated.

15. Day failed to cure her defaults.

16. By letter dated August 10, 1989, Meyers notified Day that her subfranchise was terminated, and demanded that she close her business immediately and cease using the Diet Center trademarks and service marks.

17. After the effective date of termination of her subfranchise and with the full knowledge of DCI's exclusive right to use and to authorize others to use the Diet Center trademarks and service marks, Day has

a. employed and continues to employ the DCI trademarks and service marks in connection with the operation of the weight loss and weight control business in Holden, Massachusetts; and

b. refused and continues to refuse to cease operating pursuant to DCI's confidential business method; and

c. disparaged DCI and the DCI franchise system causing substantial consumer confusion.

It Further Appearing that these acts constitute trademark and service mark infringement, unfair competition and breach of contract, and that such acts are causing and will continue to cause irreparable harm to DCI; that DCI has no adequate remedy at law; that there is a likelihood that DCI will ultimately succeed on the merits of this action; that the balance of relative harm weighs in favor of DCI; and that the public interest favors the issuance of the requested injunction, it is this 19th day of March, 1990.

Ordered:

A. That until further Order of this court, defendant Day and all persons acting pursuant to her authority or in concert with her or pursuant to her direction or control, including her agents, servants, partners, employees, attorneys, successors, and assigns, are hereby enjoined from operating or doing business using the Diet Center trade name, service marks, trademarks or any other proprietary mark, trade dress, slogan, sign, symbol or device associated with Diet Center and the Diet Center System; and from operating or doing business under any name or in any manner that might tend to give the general public the impression that Day is licensed by or otherwise associated with Diet Center or from committing any other act which infringes upon DCI's service marks or trademarks or which otherwise unfairly competes with DCI.

B. That until further Order of this court, defendant Day and all persons acting in concert with her or pursuant to her authority, direction or control, including her agents, servants, partners, employees, attorneys, successors, and assigns, are hereby enjoined from using any confidential methods, procedures and techniques associated with the Diet Center System and acquired by virtue of Day's affiliation with the Diet Center System.

C. That defendant Day shall forthwith take all steps and invoke all procedures necessary to fully comply with the post-termination obligations contained in the parties' Confidential and Non-Competition Agreement and that in connection therewith, until further Order of this court, Day is hereby enjoined from competing with Diet Center within a thirty mile radius of her territory by

a. selling or delivering products or services of the kind sold and distributed by DCI or in any other manner engaging in the sale, delivery or purchase of such products and services; and

b. engaging, directly or indirectly, in the business of weight control and diet counselling or conducting a diet and weight loss business of any kind similar to that of DCI, or in any business competitive with DCI; and

D. That defendant Day shall forthwith take all steps to turn over to DCI all procedures manuals, packaging, signs, advertising, promotional materials or other materials bearing DCI's name or mark; and

E. That plaintiff DCI is hereby required to post a bond in the amount of $100.00.

©1990, Commerce Clearing House, Inc.