## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMPSON PRODUCTS, INC., <br> a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> GLENN THOMPSON, <br><br> and <br><br> THOMPSON ENTERPRISES, INC. (now <br> SPLASH CREATIONS, INC.), <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 05-11810-RGS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## AMENDED COMPLAINT

Plaintiff, Thompson Products, Inc. ("TPI"), by counsel, for its Amended Complaint
against Defendant Glenn Thompson ("Thompson") and Thompson Enterprises, Inc. (now Splash
Creations, Inc. by name change) ("Splash"), says as follows:

### PARTIES, JURISDICTION AND VENUE

1.    TPI is a Delaware corporation with its principal place of business at 310 Kenneth
W. Welch Drive, Lakeville, MA 02347. TPI is in the business of manufacturing, selling and
importing photo albums, cardboard based gift boxes, easel backs for picture frames and related
products. TPI is a wholly-owned subsidiary of Thompson Products Holdings, Inc. ("TPHI").

2.    Thompson was the President, a director and a shareholder of TPI. On July 12,
2005 he resigned as President, director and employee. Thompson's last known residential
address is 330 Rumstick Road, Barrington, RI 02806.

3.      Splash is a Rhode Island corporation with its principal place of business at 330 Rumstick Road in Barrington, RI 02806. It was formed by Thompson on July 18, 2005 for the sole purpose of serving as his operating entity to compete directly against TPI.

4.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      Venue is proper in this jurisdictional district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### A.      The Asset Purchase Agreement and the 1998 Employment Agreement

6.      Thompson, with other members of his family, started, developed and operated Thompson Paper Box Co., Inc., the predecessor to TPI, until November 24, 1997. On that date, Thompson Paper Box Co., Inc., along with Thompson, his brother Mark Thompson and two other shareholders of Thompson Paper Box Co., Inc., as sellers, executed an Asset Purchase Agreement (APA") whereby they sold all of the company's assets to TPI and TPHI. Thompson remained with TPI as its President, a director and an employee.

7.      In the APA, the sellers, including Thompson and his brother Mark, promised to deliver to TPI at closing Employment Agreements in the form attached to the APA as Exhibits 3.2(c)-1 and 3.2(c)-2. Each form Employment Agreement, in Section 9, contained identical Restrictive Covenants. Pertinent portions of the APA and the form Employment Agreement exhibits are attached hereto as Ex. A.

2

8.      Independent of the Employment Agreements, Thompson expressly agreed with

TPI in paragraph 2.4 of the APA to abide by the same Restrictive Covenants stated in the form

Employment Agreements attached to the APA, and the Restrictive Covenants set out in Section 9

of each Employment Agreement were expressly incorporated by reference into the APA to bind

Thompson and his brother Mark.

9.      Therefore, in the APA, Thompson specifically agreed with TPI as follows:

> (a)      . . . that during his employment with [Thompson Paper
> Box Co., Inc.], he was, and during his employment with Employer
> [TPI], he will be exposed to Confidential Information, all of which is
> proprietary and which will rightfully belong to the Employer. The
> Employee shall hold in a fiduciary capacity for the benefit of the
> Employer such Confidential Information obtained by Employee during
> his employment with the Employer and shall not, directly or indirectly,
> at any time, during the Employment Term of this Agreement and for a
> period of two (2) years following termination of Employee's
> employment hereunder . . . divulge or use any Confidential Information
> without the prior written consent of a duly empowered officer of the
> Employer, except (i) as required in the performance of his duties for the
> Employer, (ii) as otherwise required by law; provided that prior to any
> such disclosure, notice of such requirement of disclosure is provided to
> Employer and Employer is afforded the reasonable opportunity to object
> to such disclosure, and (iii) as and to the extent such information is
> either not unique to the Employer or generally available to the public
> and became generally available to the public other than as a result of a
> disclosure by Employee in violation of this Agreement. Employee shall
> take all reasonable steps to safeguard such Confidential Information and
> to protect such Confidential Information against disclosure, misuse, loss
> or theft;

> (b)      that for period of two (2) years following termination of
> Employee's employment hereunder, the Employee will not, directly or
> indirectly, solicit, employ or associate in any business relationship with
> any person, who was employed within six (6) months prior to the
> termination of Employee's employment by the Employer or any
> business in which Employer has a material interest, direct, or indirect, as
> an officer, partner, shareholder or beneficial owner;

> (c)      that for a period of two (2) years following termination of
> Employee's employment hereunder Employee will not within the
> continental United States, directly or indirectly, assist in, engage in, have

3

any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder;

(d)    that he represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (iii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated; and

(e)    that [n]otwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, **the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.**

10.    In addition, Thompson agreed in paragraph 2.4 of the APA, as expressly

incorporated there from Section 9 of the form Employment Agreement exhibits, that

(a)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto; and

(b)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be

4

entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

11.     On January 5, 1998, as required by the APA, Thompson and TPI executed the Employment Agreement in the form attached to the APA, (the executed Employment Agreement being referred to hereinafter as the "1998 Agreement"). The 1998 Agreement provided for Thompson's employment by TPI as its President for consideration and contained in Section 9 the Restrictive Covenants itemized above. A copy of the 1998 Agreement is attached as Ex. B. Glenn's brother Mark executed the same form Employment Agreement.

12.     The 1998 Agreement had a two-year term, which expired on December 31, 2000. However, even though the 1998 Agreement terminated on that date, TPI and Thompson expressly agreed in Section 9(g) of that Agreement that

> Notwithstanding termination of this Agreement or any other termination of [Thompson's] employment with [TPI, **[Thompson's] obligations under this Section 9 shall survive termination of [Thompson's] employment with [TPI] any time for any reason.**

This was the same covenant that Thompson made to TPI in paragraph 2.4 of the APA. See paragraph 9 of the Verified Amended Complaint above.

B.      The 2001 Employment Agreement

13.     On information and belief, on or about January 1, 2001, also incident to the 1997 sale of Thompson Paper Box Co., Inc.'s assets to TPI and TPHI, TPI and Thompson entered into a successor Employment Agreement (referred to hereinafter as the "2001 Agreement"). The 2001 Agreement also provided for Thompson's employment by TPI as its President in exchange for an annual compensation of $200,000, plus benefits. An unexecuted copy of the 2001 Agreement is attached as Ex. C.

5

14.    The 2001 Agreement had an initial term of one year, which expired on

December 31, 2002. Unlike the 1998 Agreement, however, the 2001 Agreement provided for its

automatic renewal for successive one-year renewal terms unless either party provided the other

with "notice of desire to terminate or modify [the 2001 Agreement] . . . at least ninety (90) days

before the end of the Initial Term or the applicable Renewal Term."

15.    Pursuant to Section 9 of the 2001 Agreement, Thompson agreed to the same

Restrictive Covenants set out in the APA and in the 1998 Agreement.

16.    On January 1, 2003 and January 1, 2004, the 2001 Agreement automatically

renewed for an additional one-year term as neither party provided the other with the mandatory

90-day notice of termination before the end of the applicable term.

      C.    The 2003 Employment Agreement

17.    In April 2003, Thompson was a director of TPHI and TPI, along with James

Conlan ("Conlan") and Victor Kiarsis ("Kiarsis"). In March 2003, TPHI, by its Board of

Directors, gave formal notice to Conlon, Kiarsis and Thompson that there would be a special

shareholders meeting on May 1, 2003 for the purpose of removing Conlan and Kiarsis as

members of the TPHI board. Notice attached as Ex. D. At the time of the notice, Conlan and

Kiarsis had been advised by TPI's ultimate parent company that their relationships with TPHI,

TPI and a number of other companies affiliated with and controlled by TPHI's ultimate parent,

were being severed for cause. The contentious relationship between Conlan and Kiarsis, on the

one hand, and TPI, TPHI, and companies affiliated with TPHI and TPI, on the other, resulted in

litigation commencing in 2003. Accordingly, in April 2003, Conlan and Kiarsis did not have the

best interests of TPI at heart.

6

18.    In collaboration with each other, Conlan, Kiarsis and/or Thompson prepared, or
caused to be prepared, a new and very different Employment Agreement between TPI and
Thompson. This new Employment Agreement (referred to hereinafter as the "2003 Agreement")
purported to eviscerate all of the provisions that protected TPI, which had been included in both
the 1998 Agreement and the 2001 Agreement. A copy of the 2003 Agreement is attached as Ex.

19.    To Thompson's benefit and TPI's detriment, Conlan, Kiarsis and/or Thompson
provided for the following in the 2003 Agreement:

(a)    the elimination of all restrictive covenants that had been an essential part
of the 1998 Agreement and the 2001 Agreement;

(b)    the elimination of a definition of "business" that had been provided in the
1998 Agreement and the 2001 Agreement, which was pertinent to the restrictive
covenants in those Agreements;

(c)    the substantial curtailment of the definition of "cause" that had been
provided in the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's
ability to terminate Thompson's employment with TPI;

(d)    the elimination of any definition for "disability" that had been defined in
the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's termination
of Thompson's employment;

(e)    the substantial modification of provisions in the 1998 Agreement and the
2001 Agreement that defined Thompson's employment responsibilities and provided for
the TPI Board of Directors' control over Thompson's responsibilities;

7

(f)     the elimination of the right of the TPI Board of Directors to require
Thompson to relocate from his Lakeville, MA location if in the best interest of the
company, which was provided for in the 1998 Agreement and the 2001 Agreement;

(g)     the elimination of the automatic renewal provision from the 2001
Agreement and substitution of a 3-year term, which coincided with Thompson's intended
retirement from TPI;

(h)     an increase of Thompson's annual salary from $200,000 to $280,000;

(i)     the modification of Thompson's right to terminate his employment with
TPI for cause, making it easier for him to do so;

(j)     the elimination of TPI's right to terminate the 2003 Employment
Agreement for cause, in contrast to the 1998 Agreement and the 2001 Agreement, which
contained "for cause" termination provisions;

(k)     the provision of a complete release of Thompson by TPI and its parent
company from past, present and future claims; and

(l)     the elimination of TPI's right to assign Thompson's employment
agreement, which had been provided for in the 1998 Agreement and the 2001 Agreement.

20.     Conlan, Kiarsis and Thompson then called a TPI and TPHI joint board of
directors meeting on April 23, 2003, one week before Conlan and Kiarsis were to be removed as
directors of TPHI, for the sole purpose of approving the 2003 Agreement. Corporate counsel for
TPI and TPHI attended the meeting. Counsel advised the three-member Board that the 2003
Agreement should not be executed. After counsel departed the meeting, Conlan, Kiarsis and
Thompson nevertheless voted to approve the 2003 Agreement. Kiarsis signed the 2003
Agreement on behalf of TPI and gave it to Thompson, who did not sign it. Board minutes were

8

prepared by Conlon, Kiarsis and/or Thompson, or by another at their direction, to reflect the approval of the transaction. A copy of the board minutes is attached as Ex. E.

21.    Thompson lacked the authority to act on behalf of TPI in this conflict of interest situation, and Conlon, Kiarsis and Thompson deliberately and willfully breached their fiduciary duties of loyalty to TPI in voting to approve the 2003 Agreement. Kiarsis violated the same duty to TPI in executing the 2003 Agreement on behalf of TPI. Their actions and the 2003 Agreement were grossly unfair to TPI and voidable by it.

22.    Thompson did not immediately execute the 2003 Agreement following the April 2003 Board meeting. Instead he continued to negotiate with new TPI board of director members on his employment terms for the remainder of 2003.

23.    On May 1, 2003, the shareholders of TPHI, in a special meeting, removed Conlan and Kiarsis as directors. A copy of the minutes of the shareholders meeting is attached as Ex. G. Also in May and early June, Conlan and Kiarsis were removed as directors, employees and officers from all companies affiliated with TPHI and TPI.

24.    TPHI and TPI promptly replaced Conlon and Kiarsis with two new board members.

25.    Upon learning of the 2003 Agreement and its execution by Kiarsis, one or both of the new Board members advised Thompson that, in their view, the 2003 Agreement was unfair to TPI, that it had been prepared and executed without proper TPI authority and that it was unacceptable to TPI. With this notice, TPI effectively withdrew the unsigned 2003 Agreement, then only an offer, from further consideration before its execution by Thompson.

26.    Despite receipt of this communication, Thompson nonetheless signed the 2003

Agreement cn or about November 17, 2003, and thereby breached his fiduciary duty of loyalty to

TPI.

D.    Thompson's Pre-Resignation Activities

27.    On January 1, 2005, without valid authorization by the TPI or TPHI board of

directors, Thompson caused his annual salary to be increased to $280,000. Thompson caused

TPI to pay him on the basis of $280,000 annually from January 1, 2005 through July 12, 2005,

the date of his departure from TPI. Therefore, Thompson drew a salary from TPI that was

calculated on the basis of an annual salary of $280,000, which was $80,000 more annually than

he was entitled to be paid.

28.    On May 19, 2005, Thompson, individually contracted with Medhat Salyh to

provide personal consulting services to Thompson in connection with Thompson's potential

acquisition of TPI. Thompson caused TPI to pay Salyh for such services that were rendered

solely to Thompson and for his personal benefit. At Thompson's direction, TPI paid Salyh

$42,500 for services rendered to Thompson individually.

29.    For months Thompson negotiated with TPHI for his acquisition of TPI, but TPHI

and Thompson never agreed upon terms.

30.    Therefore, on July 12, 2005, Thompson resigned as an officer, director and

employee of TPI and set immediately upon a course to use all of the confidential and proprietary

information he had acquired at TPI concerning the operation of the company to establish a mirror

image of TPI for the manufacture and sale of photo boxes, photo albums and journal, to solicit

and hire TPI's employees, to solicit and convert its customers and, in the end, either to drive TPI

10

out of business or to reduce its market value to a point where TPI would be willing to sell the company to him at a below market price.

E.    Thompson's Post-Termination Competitive Activities

31.    In furtherance of that scheme, on or before July 18, 2005, Thompson formed Splash (originally named Thompson Enterprises, Inc.) for the sole purpose of becoming a direct competitor of TPI. Upon the filing of this action, Thompson changed the name of Thompson Enterprises, Inc. to Splash Creations, Inc. Thompson was the incorporator, and is the registered agent and sole shareholder of Splash.

32.    Armed with every confidential and proprietary detail of TPI's business, including its finances, suppliers, product designs, customers, customer account numbers, manufacturer's representatives, overhead, profit margins and the like, Thompson and Splash have established in the short span of approximately three months a mirror image of TPI to compete unlawfully with it in the marketplace as to the manufacture and sale of certain products. Without such proprietary and confidential information, Thompson and Splash would have been required to spend many months, perhaps even years, to be ready and able to compete directly, head-to-head, with TPI for the business of TPI's major customers, such as Target, Wal-Mart and K-Mart.

33.    With Thompson's competitive advantage acquired through years of employment in top management with TPI, Thompson and Splash have, in the past three months

(a)    successfully solicited and employed at least nine key TPI employees, including TPI's office manager in Hong Kong; its director of manufacturing in Hengli Town, Dong Guan, China; its product development director; its vice president of operations; and its art director, among others;

11

(b)     rented office space in Hong Kong in the very building housing TPI's China business office;

(c)     on information and belief, established manufacturing and distribution capabilities in China for the U. S. market and in the United States;

(d)     solicited TPI's manufacturer's representatives with key TPI customer relationships to switch their allegiances to Thompson and Splash from TPI; and

(e)     used TPI's confidential customer account numbers to contact TPI's customers and attempt to sell them competitive products.

34.     The recent conduct of Thompson and Splash, including his resignation from TPI, the formation of Splash to compete with TPI, the solicitation of TPI customers, the solicitation and employment of TPI key employees and other competitive activities itemized herein have been for the purpose of devaluing TPI and either putting TPI out of business or reducing the value of TPI in an effort to pursuade TPI to sell its stock or assets to him at a price well below market value. His conduct has, in fact, caused great harm to TPI and has devalued TPI for sale in the marketplace.

## COUNT I
### (Declaratory Judgment)

35.     TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

36.     Until signed by Thompson, the 2003 Agreement was only an unaccepted offer, and the offer was withdrawn by TPI's newly elected board members prior to Thompson's acceptance by execution of the 2001 Agreement. Therefore, it was never valid.

12

37.    There is an actual case or controversy as to whether the 2003 Agreement became a valid contract between Thompson and TPI or whether it was only an unaccepted offer that was lawfully withdrawn prior to acceptance by Thompson.

WHEREFORE, TPI seeks a declaratory judgment that the 2003 Agreement was never a valid contract between Thompson and TPI.

## COUNT II
### (Rescission of the 2003 Agreement)

38.    TPI repeats and realleges here paragraphs 1 through 34 above as if set out fully herein.

39.    Even if Thompson signed the 2003 Agreement before it was withdrawn by TPI, approval of the 2003 Agreement at the April 23, 2003 TPI board of directors meeting was a conflict of interest transaction for which Thompson was ineligible to vote. Even though approved by Conlan and Kiarsis, the other two TPI directors, the 2003 Agreement was grossly unfair to TPI, is voidable and is subject to rescission.

WHEREFORE, TPI prays for rescission of the 2001 Agreement as voidable due to unfairness in this board of directors conflict of interest matter.

## COUNT III
### (Breach of Restrictive Covenants)

40.    TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

41.    The Restrictive Covenants set forth in the APA, paragraph 2.4, and/or in paragraph 9 of the 1998 Agreement and/or in paragraph 9 of the 2001 Agreement are in effect and binding upon Thompson for a two-year period following his termination of employment with TPI on July 12, 2005.

13

42.    Thompson violated, and he continues to violate, the Restrictive Covenants set out in the APA and/or in the 1998 Agreement and/or the 2001 Agreement as follows:

(a)    he has used, and he continues to use, TPI's Confidential Information to the detriment of TPI without its prior written consent in violation of subsection (a) of the Restrictive Covenants;

(b)    he has failed, and he continues to fail, to take all reasonable steps against his own misuse of TPI's Confidential Information in violation of subsection (a) of the Restrictive Covenants;

(c)    he has solicited, employed or associated in his competitive business persons who were employed by TPI or its affiliated companies within six months prior to Thompson's termination of employment with TPI in violation of subsection (b) of the Restrictive Covenants and he continues to do so; and

(d)    he has directly engaged in and participated as an owner and officer in a business that involves activities similar to, related to or competitive with the business of TPI, and he continues to do so, in violation of subsection (c) of the Restrictive Covenants.

43.    Pursuant to paragraph 2.4 of the APA and/or Section 9(f) of the 1998 Agreement and/or Section 9(f) of the 2001 Agreement, Thompson agreed that:

> . . . damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employee shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary preliminary or permanent injunction, to enforce the provisions contained in Section 9, all

14

> of which shall constitute rights and remedies to which Employer may be
> entitled.

44. Pursuant to paragraph 2.4 of the APA and/or Section 9(g) of the 1998 Agreement

and/or Section 9(g) of the 2001 Agreement, Thompson further agreed that:

> Notwithstanding termination of this Agreement as provided in Section 8
> herein or any other termination of Employee's employment with the
> Employer, **the Employee's obligations under this Section 9 shall
> survive any termination of the Employee's employment with the
> Employer at any time and for any reason.**

45. Thompson's violations of the Restrictive Covenants contained in the APA and/or

the 1998 Agreement and/or the 2001 Agreement have caused, and continue to cause, irreparable

harm to TPI for which there is no adequate remedy at law.

46. The Restrictive Covenants are reasonable in scope, duration, area and geography

and are necessary for the protection of TPI's interests, and are in the public interest.

WHEREFORE, TPI respectfully requests the following relief:

A. a temporary restraining order, preliminary injunction and permanent injunction

(i) compelling Thompson and Splash to cease and desist from all competitive

business activities for a period of two (2) years from entry of the order;

(ii) prohibiting Thompson's and Splash's use of TPI's confidential

information either to gain a competitive advantage over TPI or generally to TPI's

detriment; and

(iii) prohibiting Thompson and Splash from, directly or indirectly, soliciting or

employing any person who was employed by TPI within the six-month period prior to

Thompson's resignation from TPI for a period of two (2) years from entry of the order;

B. Judgment against Thompson and Splash for all past breaches in an amount to be

proved at trial; and

15

C.   for such other and further general relief as equity may deem meet.

## COUNT IV
### (Breach of Fiduciary Duties)

47.   TPI repeats and realleges here paragraphs 1 through 34 above as if fully set forth herein.

48.   Prior to his resignation from TPI, Thompson breached his fiduciary duties of loyalty and good faith to TPI by, among other things:

(a)   engaging in self-serving conduct in the preparation, approval and execution of the 2003 Agreement;

(b)   accepting increased annual compensation of $280,000 under the 2003 Agreement, rather than the $200,000 annual compensation to which he was entitled, from January 1 through July 12, 2005;

(c)   causing TPI to pay Medhat Slayh $42,500 for consulting services rendered to Thompson individually.

49.   TPI has been damaged by Thompson's past breaches of his fiduciary duties to TPI, and to the extent that damages for any one or more of such breaches may be reasonably measured, TPI is entitled to an award of such damages.

WHEREFORE, TPI respectfully requests entry of judgment against Thompson in the amount of TWO MILLION DOLLARS ($2,000,000.00), or in such lesser amount as the evidence may show, plus interest and costs.

## COUNT V
### (Accounting)

50.   TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

51.     Upon information and belief, Thompson's and Splash's unlawful competitive
activities have produced income and/or profits for Thompson and/or Splash which must be
disgorged as a measure of TPI's damages.

52.     Absent a full accounting by Thompson and Splash of all sales and profits that they
made in their conduct of unlawful competitive activities, TPI cannot accurately measure its
damages.

53.     Accordingly, TPI is entitled to a full accounting by Thompson and Splash of all
such sales and profits.

WHEREFORE, TPI respectfully requests entry of an order compelling Thompson and
Splash to account fully for all sales of products in competition with TPI since Thompson's
departure from TPI and for all profits made on such sales and any other unlawful business
activities in competition with TPI.

### COUNT VI
(Misappropriation of Trade Secrets)

54.     TPI repeats and realleges here paragraphs 1 through 34 as set out in full.

55.     The confidential and proprietary aspects of TPI's business, individually, as to
many, but collectively as to all, are trade secrets. They include:

> (a)     the identity of TPI's suppliers;
>
> (b)     the terms and conditions of TPI's supplier contracts;
>
> (c)     the identity of TPI's supplier account representatives;
>
> (d)     TPI's cost of raw materials;
>
> (e)     TPI's cost of labor;
>
> (f)     TPI's product designs and history concerning which designs are profitable
>         and which designs are not;

17

(g)    customer/buyer design preferences;

(h)    machinery needed for its operation, vendors of such machinery and costs;

(i)    manufacturing components for various designs;

(j)    vendor discounts provided to TPI, by whom and under what conditions;

(k)    sources of skilled and unskilled labor;

(l)    the China market applicable to the manufacture and distribution of TPI's products;

(m)    import/export duty requirements applicable to TPI's operations in China;

(n)    TPI's delivery costs;

(o)    the identity of TPI customers and the history of their relationships with TPI;

(p)    the identity of TPI's manufacturer representatives;

(q)    knowledge of TPI customer confidential accounts;

(r)    TPI's wholesale prices;

(s)    TPI's customer delivery demands, TPI's ability to comply and its history of compliance;

(t)    the identity of key TPI employees, their salary, benefits and satisfaction and dissatisfaction with TPI;

(u)    TPI's profit margins; and

(w)    TPI's strengths and weaknesses unknown in the marketplace generally.

56.    Thompson and Splash have misappropriated TPI's trade secrets and have used,

and are continuing to use, such trade secrets to the substantial detriment of TPI.

WHEREFORE, TPI respectfully prays for the following relief:

18

A.     a temporary restraining order, preliminary injunction and permanent injunction prohibiting Thompson and Splash from all further misappropriation and use of TPI's trade secrets;

B.     judgment against Thompson and Splash for past misappropriations in an amount to be proved at trial; and

C.     for such other further and general relief as equity may deem meet.

## COUNT VII
### (Violation of M.G.L. c. 93A §11)

57.     TPI repeats and realleges paragraphs 1 though 34 above as if fully set forth herein.

58.     TPI, a corporation with its principal place of business in the Commonwealth, is a person within the meaning of M.G.L. c. 93A, § 11.

59.     Thompson and Splash are currently in the trade or business of manufacturing, selling and or importing goods substantially similar to those of TPI.

60.     Following his resignation from TPI, Thompson established Splash for the specific purpose of unfairly competing with TPI, in Massachusetts and elsewhere, by stealing TPI's customers and utilizing TPI's trade secrets, confidential business information, and other proprietary or protected information and knowledge possessed by him and owned by TPI.

61.     Thompson and Splash have engaged in unfair and deceptive acts, undertaken willfully and knowingly in violation of M.G.L. c. 93A §11.

62.     As a result of the foregoing, TPI has been damaged, and continues to suffer damages as the unfair competition continues unchecked, in the amount of TWO MILLION DOLLARS and 00/100 ($2,000,000.00), or in such other amount as the evidence may show, plus interest, multiple damages, attorney's fees and costs.

**THOMPSON PRODUCTS, INC.**

By its attorneys

/s/ Andrew D. Kang
Terence P. McCourt (BBO #555784)
Andrew T. Kang (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
Tel: 617.310.6000
Fax: 617.310.6001

and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN
A Professional Corporation
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA 23218-1320
Tel: 804.783.6418
Fax: 804.783.6507

DATED: November 23, 2005

## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 23rd of November, 2005, I served a copy of

foregoing by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI 02903

Michael S. Chinitz, Esq
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA 02110

/s/ Andrew D. Kang
Andrew D. Kang

bos-fs1\McCourtT\177411v01\11/23/05\90594.010100

21