## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMPSON PRODUCTS, INC., ) <br> A Delaware corporation, ) <br>       Plaintiff, ) <br> ) <br>      v. ) <br> ) <br> GLENN THOMPSON and ) <br> THOMPSON ENTERPRISES, INC., ) <br>       Defendants. ) <br> ) | C.A. No. 05-11810-RGS |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Defendants Glenn Thompson ("Glenn") and Splash Creations, Inc. ("Splash") (f/k/a Thompson Enterprises, Inc.) hereby oppose plaintiff Thompson Products, Inc.'s ("TPI") Motion for Preliminary Injunction. Defendants submit the accompanying Affidavit of Glenn Thompson ("Thompson Aff.") and their Motion to Strike the Declaration of Emerson Talbott Briddell ("Briddell Decl.") and supporting Memorandum of Law.

## I.  INTRODUCTION

TPI's motion must be denied. More than 2 ½ months after filing this action -- during which time defendants have been fairly and openly competing with TPI -- TPI seeks drastic and entirely unwarranted injunctive relief which would close Splash's doors, put Glenn and Splash's 7 other employees out of work, and jeopardize Glenn's multi-million dollar investment in Splash, as well as his reputation in the industry. TPI bases its Motion solely upon a misguided breach of contract claim, which alleges that Glenn has violated the restrictive covenants contained in his 1998 Employment Agreement. TPI has no chance of succeeding on that claim because it is indisputable that the 1998 Agreement terminated on December 31, 2000, and that its restrictive covenants expired on December 31, 2002. Moreover, TPI never even mentioned in its

motion papers that the 1998 Agreement was superseded by another, fully-integrated employment agreement in 2003, which contained no restrictions on Glenn's business activities after his departure from TPI. That 2003 Agreement is another insurmountable barrier to TPI's claim.

Nor has TPI demonstrated that it is suffering any irreparable harm. As discussed in considerable detail in Defendants' Motion to Strike and supporting memorandum, TPI has not offered this Court a shred of admissible evidence to support its bare claims that defendants either possess or have actually used any TPI confidential customer or other business information. There is no such information. When Glenn left TPI in July 2005, he did not take with him any lists, reports or other TPI documents. He took his knowledge, expertise, and personal experience in the picture frame and photo album business, which he had acquired during his 27 years in the business. Also, neither TPI nor its predecessor, Thompson Paper Box, ever took any steps to protect any of the unspecified information that it apparently now seeks to label confidential.

The photo album and photo storage box market is an open, non-concentrated, low-technology industry with more than 50 competitors. TPI's filing of this action and its untimely motion for injunctive relief premised upon a long-expired agreement, TPI's gross disparagement of Glenn and Splash in the industry as set forth in defendants' counterclaim, its baseless and untimely motion to disqualify defendants' counsel, and its other litigation tactics are all part of TPI's calculated and deliberate effort to throw as many obstacles in Glenn's path to success as it can, to slow him down or cause him to retreat from an industry that has few barriers to entry.

## II.    **FACTUAL BACKGROUND**

In 1906, Glenn's grandfather founded Thompson Paper Box Company, the predecessor of TPI, a company that manufactures, sells, and imports photo albums and related products. Affidavit of Glenn Thompson ("Glenn Aff.") ¶ 5. Glenn's father was the President of Thompson

Paper Box Company until his sudden death in 1979. Id. ¶ 5. After his father died, Glenn, who was 19 years old, dropped out of college to run the business. Id. ¶ 6.

In 1981, Glenn bought the business from his mother, incorporated it as Thompson Paper Box Co., Inc., and became its President. Id. ¶ 7. He worked at Thompson Paper Box and its successor, TPI, for 27 years before leaving in July 2005 to start a new business, Splash. Id. ¶ 8. During Glenn's tenure at Thompson Paper Box and TPI, annual sales increased from $200,000 to approximately $30 million. Id. ¶ 9.

## A.     Glenn's Employment Agreements with TPI

On or about January 5, 1998, Glenn entered into his first Employment Agreement with TPI (the "1998 Agreement"). Id. ¶ 10 and **Exhibit A**.[1] TPI Board member Victor Kiarsis signed the 1998 Agreement on behalf of TPI. Id.

Paragraph 5 of the 1998 Agreement, entitled "Term," provides: "The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term")." Id. ¶ 11 and **Exhibit A**. Subparagraph (a) of paragraph 9, which is entitled "Restrictive Covenants," provides in part that "during the Employment Term of this Agreement and for a period of two (2) years following *termination of Employee's employment hereunder*," Glenn would not divulge or use confidential information of TPI. Id. ¶ 12 and **Exhibit A**. (Emphasis added). Subparagraphs (b) and (c), prohibiting solicitation of TPI employees and competition respectively, contain the same expiration date: "two (2) years following termination of Employee's employment *hereunder*. . . ." Id. The 1998 Agreement also uses the word **"hereunder"** to qualify a number of other rights and obligations of both parties. Id. ¶ 16.

---

[1] Curiously, TPI's motion papers rely solely upon an unexecuted draft of the 1998 Agreement which is dated as of November 1997.

The "termination of [Glenn's] employment *hereunder*" (within the meaning of paragraph 9) occurred on December 31, 2000.  Id. ¶ 13.  When the 1998 Agreement ran out, Glenn continued to work for TPI as an at-will employee.  Id. ¶ 18.  Glenn always has believed that the restrictive covenants in paragraph 9 expired on December 31, 2002.  No one from TPI ever indicated otherwise.  Id. ¶ 13.

In this suit, TPI now contends for the first time that the restrictive covenants in the 1998 Agreement extended beyond December 31, 2002, and were to remain in effect until two years after Glenn left TPI, no matter how many years in the future that occurred.  Id. ¶¶ 14-15.  TPI itself did not have such a distorted interpretation of the Agreement until recently.  On November 22, 2002, approximately five weeks before the restrictions in the 1998 Agreement were set to expire, David Jansen, who was then a TPI Director, presented Glenn with a proposed new employment agreement, prepared by the same law firm that had drafted the 1998 Agreement. The proposal, like the 1998 Agreement, contained a paragraph 9 entitled "Restrictive Covenants," but with a major revision: it deleted the word "hereunder," thereby extending the time period of the restrictions to two years after Glenn left the employ of TPI, whenever that might occur.  Undoubtedly TPI's goal in proposing that change was to tie up Glenn for two full years after he left the employ of TPI, no matter when he left.  Glenn rejected the proposed 2002 agreement, but TPI now pretends in its motion papers that the 1998 Agreement contained the identical, expanded time period for the restrictive covenants as in the rejected 2002 proposal.

TPI's motion papers contain no mention of the proposed 2002 agreement.  Nor does TPI inform the Court of a 2003 Agreement that was fully executed and which the parties proceeded to perform, which replaced the 1998 Agreement and eliminated the restrictive covenants entirely.

4

As of early 2003, TPI's duly-appointed directors were Victor Kiarsis, James Conlon and Glenn. Id. ¶ 19. At that time Glenn had ongoing discussions with the other directors about the terms of a new employment agreement. Id. In connection with those discussions, Mr. Kiarsis hired Cameron Read, Esq. of Choate Hall & Stewart as new outside counsel to TPI, and TPI also commissioned an independent salary survey. Id. and **Exhibit C**.

Eventually, TPI prepared a new proposed Employment Agreement (the "2003 Agreement"), which contained ***none*** of the Restrictive Covenants to which Glenn had been subject in the 1998 Agreement, but which by then had expired. Id. ¶¶ 20, 22 and **Exhibit D**. On April 21, 2003, TPI's Board of Directors met to discuss whether to approve that Agreement. Id. ¶ 20. Glenn attended the meeting, as did Kiarsis, Conlon, and Read, and the Directors concluded that execution of the 2003 Agreement was in TPI's best interest. Id. During that meeting, Mr. Kiarsis, on behalf of TPI, asked Mr. Read for his legal opinion whether, if the Agreement were signed, it would be valid and enforceable. Id. Mr. Read answered, "Yes." Id. TPI's Directors then voted unanimously to approve that Agreement. Mr. Kiarsis (who had signed Glenn's 1998 Employment Agreement on behalf of TPI), the Chairman of the Board, signed the 2003 Agreement on behalf of TPI and handed it to Glenn for his execution. Id. Glenn explained that he wanted to review the 2003 Agreement with his legal counsel, which he then did. Id. Glenn signed the 2003 Agreement either that same day, April 21, 2003, or the following day, and immediately returned a fully-executed original to Mr. Kiarsis. Id.

Thereafter Glenn and TPI proceeded to perform the 2003 Agreement. Id. ¶ 21. For instance, TPI increased Glenn's salary from $200,000 to $280,000 in 2003, as stated in that Agreement. Id. Also Glenn thereafter exercised his newly-granted exclusive right to hire and

fire employees as provided by paragraph 3 of that Agreement. Id. The 2003 Agreement remained in effect until Glenn left TPI in 2005.[2] Id. ¶ 23 and **Exhibit D**.

Accordingly, TPI's reliance on the 1998 Agreement is misplaced. TPI also ignores another gaping hole in its claim of breach under the 1998 Agreement. Paragraph 9(a) of that Agreement (**Exhibit A**) limits "Confidential Information" that is subject to the restrictive covenants to information "obtained by Employee during his employment with the Employer," and "Employer" is defined on page 1 as TPI, as distinguished from Thompson Paper Box (which is referred to by the term "Seller"). Id. Glenn knew virtually all of the information there was to know about the Company and its customers before TPI even acquired the assets of Thompson Paper Box at the end of 1997. Id. ¶ 43. Therefore that information is not subject to the 1998 Agreement restrictions at all.

B.    **Absence of Confidential Information**

The expiration of the restrictive covenants in the 1998 Agreement and the execution of the 2003 Agreement are two separate and independent fatal flaws in the breach of contract claim upon which TPI bases its request for injunctive relief. The Court can, and should, deny TPI's motion on those contractual grounds alone. But to complete the picture, TPI's request for injunctive relief also lacks merit because there are no trade secrets or confidences at issue here and no threat of irreparable harm to TPI.

TPI's vague allegations in its Complaint and in the Briddell Declaration that accompanies its Motion would lead the Court to believe that TPI's business and manufacturing operations, and the identity of its customers, are closely guarded TPI secrets. Nothing could be further from the

---

[2]  Glenn resigned his position as a TPI Director effective May 22, 2005, and as President on July 12, 2005. Glenn Aff. ¶ 23.

truth. Glenn's accompanying Affidavit contains the facts that TPI failed to provide. The
Company never asked employees to sign any confidentiality agreements, either before or after
TPI acquired the assets of Thompson Paper Box in 1997. Id. ¶ 41. Nor did TPI otherwise treat
its business or customer information as confidential. The Company never imposed any
restrictions on access by its employees to documents or reports about its products or customers.
Id. ¶ 42. Reports containing information about costs, prices, margins, sales volume, production
schedules, delivery dates, customers, suppliers and virtually every other aspect of the business
were open and available to virtually any employee from TPI's production line, sales force, or
operations and administrative staff. Id. TPI never had a business practice of marking such
reports "confidential" and it did not treat them as such. Id. TPI never published any rules or
other policies limiting the access to any such reports. Id. Nor did TPI keep them safeguarded
under lock and key. Rather, they were stored in open and accessible, unlocked file cabinets. Id.
One looks in vain for any of that information that one would expect to see discussed in TPI's
motion papers.

As for purported trade secrets, TPI sells photo albums which consist of individual plastic
sleeves that are heat-sealed together at the binding. Id. ¶32 and the photos contained in
**Exhibit F**. A card containing a photograph or design is inserted in the front of the album and
retail information is printed on another card at the back. Id. There is no proprietary or
confidential information in the manufacture of these albums. Id. ¶ 33. TPI has no patents on its
photo album products. The component sleeves are a readily available commodity, and the heat-
sealing process is a well-known, rudimentary operation. Id. Also, the raw materials used in the
manufacture of TPI's albums are well-known in the industry. Id. ¶ 34. The only customized

component is the front insert card, which each supplier designs to try to attract customers. <u>Id</u>. ¶ 33. Splash prides itself on the talents of its designers, and has never used a TPI design. <u>Id</u>.

The other product that TPI mentions in its motion papers are the photo storage boxes that Splash manufactures in Rhode Island and sells to the Christmas Tree Shops.[3] <u>Id</u>. ¶ 35 and the photos contained in **Exhibit G**. Like photo albums, there is no proprietary or confidential information used in the manufacture of photo storage boxes. <u>Id</u>. ¶ 38. TPI has no patents on these boxes, which are similar to shoe boxes and are constructed of cardboard with metal handles on the front. <u>Id</u>. This design and these materials are not proprietary but are well-known in the industry. <u>Id</u>. ¶ 39. Like photo albums, the only customized aspect is the design on the outside of the box. <u>Id</u>.

There also is nothing proprietary about the machines TPI uses to manufacture photo albums or photo storage boxes. <u>Id</u>. Those machines have been commonly used for many years in this industry, and are available for purchase on the open market. <u>Id</u>. In fact, during the year before Glenn left TPI, he purchased for TPI some of this machinery at public auction. <u>Id</u>.

Contrary to TPI's unsubstantiated accusations, Glenn did not use any TPI "confidential information" to establish Splash's manufacturing plant in China or its offices in Hong Kong. <u>Id</u>. ¶ 44. After leaving TPI, and before establishing those facilities, Glenn traveled to China and Hong Kong and toured approximately 10 different manufacturing plants, none owned by TPI, to develop designs and ideas for Splash's future plant. <u>Id</u>. ¶45. Those business owners welcomed Glenn to visit their plants, observe their machinery and equipment, and they answered Glenn's

---

[3] TPI's Memorandum implies that Splash accomplished its sales to Christmas Tree Shops by misusing confidential information. <u>Id</u>. ¶ 37. That is false. The Christmas Tree Shops' buyer told Glenn that TPI's price for its photo storage boxes had been $1.50; that TPI planned to increase its price to $1.65; and that if Splash could sell its boxes for $1.25, the Christmas Tree Shops would buy from Splash. <u>Id</u>. Glenn agreed to the $1.25 price, and thereafter began receiving orders. <u>Id</u>. Splash has no long-term supply contract with the Christmas Tree Shops, and TPI is free to compete for that business. <u>Id</u>.

questions. Id. Based upon what he learned on those visits, Glenn ordered equipment on the open market and selected appropriate locations for each Splash facility. Id. Glenn neither needed to use, nor actually used, any TPI information to select his equipment and locations. Id.

TPI falsely charges that Glenn misappropriated some unspecified "confidential customer account numbers." TPI Mem. at 5, 7. Defendants have no idea what TPI is referring to. Could the Briddell Declaration be referring to TPI's customer number that appears in a bar code on the millions of albums that it sells, in thousands of stores? (See Thompson Aff. ¶25 and **Exhibit F**). Moreover, TPI itself did not treat the identity of its customers as confidential, but instead used their names as a marketing tool. Until the middle of 2002 (when TPI suffered a catastrophic computer crash), TPI's website openly disclosed its customer base to the entire world. Id. and **Exhibit E.**[4]  Page 2 of that website contained links to the customer sites where TPI's products were available, and page 3 identified those customers by name: "Wal-Mart, Target, Costco, Shopko, BJ's Wholesale, Staples, Michael's and Sam's Club." Id. and **Exhibit E**. These large, mass-market customers accounted for an overwhelming percentage of TPI's total annual sales. Id.

Finally, TPI bases its claim upon Glenn's hiring of TPI employees. As with TPI's other arguments, this one is based on the expired 1998 Agreement. But the claim has no merit even independent of that infirmity. Out of a total TPI work force of over 100 people, Splash has hired only five former TPI employees and none of them had employment contracts with TPI or are subject to non-competition restrictions. Id. Moreover, TPI has made no allegation that Glenn solicited or hired any TPI employees before he left TPI. He did not do so.

---

[4] TPI's website was reconstructed from Web archives, and some of the images are no longer functional.

## III.     THE DEFENDANTS ARE UNDULY PREJUDICED BY TPI'S DELAY IN FILING ITS MOTION

TPI filed this action on September 1, 2005. Although it knew then and alleged in its Complaint that Glenn had formed Splash and was competing directly against TPI, it did nothing about it. When a business truly believes that it is being irreparably injured, it moves promptly to seek a temporary restraining order or preliminary injunction. TPI did neither. Instead, TPI sat idly by while Glenn justifiably (and correctly) concluded that he was free to expand his business and increase his investment in it. TPI finally filed its Motion on November 23, 2005 -- the day before the Thanksgiving Holiday.

TPI's significant delay in filing its Motion is very prejudicial to Glenn, Splash, and all of its employees. Id. Splash has 8 employees, whom TPI now seeks to put out of work. Id. ¶ 57. TPI has known about Glenn's hiring of several of its former employees since Splash hired Mr. Orsi nearly 4 months ago, yet it took no prompt action. Id.

Moreover, as early as September 2005, TPI had actual knowledge of the trips Glenn took to Hong Kong and China to set up Splash's facilities there, even sending him a letter warning him to stay out of TPI's facilities there. Id. ¶ 58. TPI waited as Glenn invested millions of dollars setting up Splash's headquarters and album and box-manufacturing facilities. Id. ¶ 59. Splash has incurred the salaries of its employees, large and recurring overhead expense and significant travel expenses for multiple trips to Asia and other trips to meet with prospective customers and begin to establish good will and business relationships with them.

## IV.     ARGUMENT

### A.     The Court Should Not Grant TPI any Injunctive Relief

A preliminary injunction is "a drastic remedy that the court should not grant unless the movant, by a clear showing, carries its burden of persuasion." *Lajoie Investigations, Inc. v.*

*Griffin*, 1996 WL 1186792, *1 (Mass. Super. March 11, 1996). To obtain a preliminary injunction, TPI must prove that: (a) it has a substantial likelihood of success on the merits of its claims; (b) injunctive relief must enter to prevent TPI from suffering immediate and irreparable harm; (c) its requested relief does not pose a substantial risk of harm to the defendants; and (d) granting the injunction is in the public interest. *Lanier Professional Services, Inc. v. Ricci*, 192 F.3d 1, 3, (1st Cir. 1999); *Packaging Indust. Group, Inc. v. Cheney*, 380 Mass. 609, 615-16 (1980).

The First Circuit has instructed district courts not to grant such relief unless the plaintiff has clearly and unequivocally established ***each of*** these elements. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004). Yet here, TPI cannot establish ***any*** of the requisite elements for obtaining a preliminary injunction.

**B.    TPI Will Not Succeed on the Merits of its Claims**

> 1.    The 1998 Employment Agreement has Terminated and its Restrictions "Hereunder" Expired as of December 31, 2002.

TPI's Motion rests entirely on its bare assertion that the 1998 Agreement remains effective and that the restrictive covenants therein were, and remain, enforceable. However, that Agreement terminated by its terms on December 31, 2000, and the restrictive covenants in that Agreement expired on December 31, 2002. Only by ignoring the critical qualifier "hereunder" can TPI present its argument at all.

According to basic principles of contract interpretation, the unambiguous term "***hereunder***" in the 1998 Agreement should be given its usual and ordinary meaning, *Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., Inc.*, 47 Mass. App. Ct. 726, 729 (1999) (noting that words that are plain and free from ambiguity must be construed in their usual and ordinary sense). Plainly, the word "***hereunder***" refers to and means "in accordance with the terms of the

1998 Agreement." *See Grizzard Commc'ns Group v. Monk*, 2005 WL 2563046, *6 (D. Neb. Oct. 11, 2005) (concluding that the term "employment hereunder" undisputedly means "employment under the employment agreement"). Notably, this interpretation is consistent with the dictionary definition of the word *hereunder*. *See Merriam Webster's Collegiate Dictionary* 543 (1996) (defining hereunder as "under or in accordance with this writing or document"); *Grizzard*, 2005 WL 2563046, * 6 (quoting *Webster's Third New International Dictionary* 1059 (1969) (defining "hereunder" as "a: under this written statement . . . b: under this agreement: in accordance with the terms of this document").

That plain meaning is reinforced by the context of the term "hereunder" as it appears a total of twelve times in the 1998 Agreement. For instance, paragraph 8(c) provides that "[i]f the Employer terminates employment of the Employee *hereunder* without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 . . . ." (Emphasis added). That provision can only mean that if Glenn had been terminated without cause before December 31, 2000 (i.e., "hereunder"), he would be entitled to his Base Salary through December 31, 2000; that provision would make no sense if, as TPI urges, "hereunder" meant even after the 1998 Agreement had expired. To take just one other example, paragraph 12 specified the form of all notices to be given "hereunder", which can only mean under the 1998 Agreement. It is axiomatic that "[u]nless a contrary intent is evident, words used in one sense in one part of a contract are deemed of like significance in another part." *Grizzard*, 2005 WL 2563046, *6.

What's more, if TPI argues that term "*hereunder*" does not mean "in accordance with the terms of the 1998 Agreement" because the survival clause in paragraph 9(g) thereby would be

rendered superfluous, that argument fails for the same reasons that the District Court in <u>Grizzard</u> rejected the identical argument. <u>See Grizzard</u>, 2005 WL 2563046, *6.

Moreover, TPI tellingly presented to Glenn roughly 5 weeks before the restrictive covenants expired a proposed new employment agreement in which the very same lawyers had deleted the qualifier "hereunder" from the restrictive covenants. Under the proposed agreement, the restrictive covenants would have remained in effect for 2 years following the end of Glenn's employment at TPI, whenever that might occur. Why did TPI believe that this contract term needed to be changed, if the 1998 Agreement already accomplished what TPI now claims? Clearly, TPI knew the agreement needed to be changed, if it wanted to restrict Glenn beyond December 31, 2002. Glenn rejected that proposed agreement, and with it, the open-ended term of the restrictions that it now asserts. TPI's own draftsmanship sinks its argument in the Motion.

    2.    The 2003 Agreement Contained No Restrictive Covenants.

Although one would not know it from reading TPI's Memorandum, TPI and Glenn entered into a superceding Employment Agreement in 2003, which contained no restrictive covenants. That Agreement was a negotiated, enforceable agreement, executed by the Chairman of TPI's Board and was pronounced valid and enforceable by TPI's outside corporate counsel before TPI signed it. The parties thereafter performed in accordance with its terms. The integration clause found in paragraph 12(d) of the 2003 Agreement[5] makes it certain that TPI can no longer rely on the 1998 Agreement to sustain its claims, even assuming that Agreement originally was valid and enforceable. <u>See Starr v. Fordham</u>, 420 Mass. 178, 188 n. 8 (1995)

---

[5] Paragraph 12(d) of the 2003 Agreement provides in relevant part that: "This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought."

(citing Restatement (Second) of Contracts § 210(1) (1981) and noting that a fully integrated agreement is "a statement which the parties have adopted as a complete and exclusive expression of their agreement"); *see also Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 n.2 (1st Cir. 1995) (quoting Restatement (Second) of Contract § 213 for the proposition that a binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them). Accordingly, the 2003 Employment Agreement additionally undermines TPI's Motion and by itself justifies the denial of that Motion.

3.     TPI Has Failed to Identify Any Legitimate Business Interests At Stake To Sustain the Enforceability of the Restrictive Covenants in the 1998 Agreement.

For the reasons discussed above, the restrictive covenants in the 1998 Agreement expired two years ago, making it unnecessary for the Court to delve into whether those restrictions, even if still extant, would be valid and enforceable under Massachusetts law. TPI chose not to even discuss its burden of demonstrating that those covenants are anything other than a naked restraint upon lawful competition. Accordingly, defendants will merely offer an abbreviated presentation of those issues, on which TPI's Motion would also founder.

Massachusetts courts will not enforce any restrictive covenants whose purpose is to prevent ordinary competition. *New England Canteen Service v. Ashley*, 372 Mass. 671, 676 (1977); *Bowne of Boston, Inc. v. Levine*, 1997 WL 781444, *2 (Mass. Super. November 25, 1997) (covenant is unenforceable if its application protects employer from ordinary competition). TPI has the burden of proving that: (a) the information in question is in fact **confidential**; (b) TPI took reasonable steps to preserve the secrecy and confidentiality of the information; and (c) the Defendants "used improper means, in breach of a confidential relationship, to acquire and use the [confidential information]." *Data General Corp. v. Grumman Sys. Support*, 36 F.3d 1147,

1165 (1st Cir. 1994); *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 737-39 (1970). As further addressed in the Defendants' Motion to Strike the Briddell Declaration and their supporting memorandum of law, TPI cannot prove a single one of these elements.

a.    *TPI's Business Information Is Not Confidential*

Not all commercial information qualifies as "confidential information." *See Dynamics Research Corp. v. Analytic Sciences Corp.*, 9 Mass. App. Ct. 254, 273 n. 23 (1980). To determine whether information is "confidential," courts consider the extent to which the information is known outside the business, the measures taken to guard the information's secrecy, and the ease with which it could be acquired legitimately by others. *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 841-42 (1972); *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 169 (1991); *Chomerics, Inc. v. Ehrreich*, 12 Mass. App. Ct. 1, 10 n.17 (1981) (there is no meaningful distinction between trade secrets and confidential information). As set forth above and in Glenn Thompson's accompanying Affidavit (at ¶¶ 25-46), the facts of this case overwhelmingly preclude TPI from meeting that burden.

b.    *TPI Has Done Nothing To Preserve The Secrecy of Its Information*

Also, to sustain its burden of proving that its business information deserves legal protection, TPI must show that it pursued an "active course of conduct designed to inform . . . employees that such secrets and information were to remain confidential." *Jet Spray*, 361 Mass. at 841. TPI cannot make that showing. TPI took **no measures** during Glenn's tenure to safeguard its business and product information or the identity of its customers. As set forth above and in Glenn Thompson's accompanying Affidavit (at ¶¶ 25-46), the facts of this case overwhelmingly preclude TPI from meeting its burden on that issue as well.

15

c. *Defendants Did Not Use Improper Means to Acquire Information*

Glenn has not used any confidential TPI information to build Splash. Rather, he has used his substantial knowledge of the photo album business, acquired over 27 years in the industry, and information that TPI has made publicly available. *William Gallagher Assoc. Ins. Brokers, Inc. v. Everts*, 2001 WL 1334763, *6 (Mass. Super. Sept. 6, 2001) (quoting *Dynamics Research Corp. v. Analytic Sciences Corp.*, 9 Mass. App. Ct. 254, 267 (1980)) ("Upon termination, an employee 'may carry away and use the general skill or knowledge acquired during the course of employment.'"). When he left TPI, Glenn did not take any documents or reports concerning TPI's customers or any aspect of its business and manufacturing process, and TPI cannot prove otherwise.

d. *Glenn Did Not Improperly Solicit or Hire TPI Employees*

TPI also refers in its Motion to Glenn's hiring of a few former TPI employees to work for Splash. But not one of those employees had an employment contract with TPI, nor was any of them subject to non-competition restrictions. *See BBF, Inc. v. Germanium Power Devices Corp.*, 13 Mass. App. Ct. 166, 173 (1982), *review denied*, 385 Mass. 1103 (1982) (explaining that absent the use of wrongful means, an employer may hire an at-will employee of another employer without exposure to liability).

**C.    TPI Cannot Establish Any Immediate and Irreparable Harm**

"Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Massachusetts Coalition of Citizens with Disabilities v. Civil Def. Agency and Office of Emergency Preparedness*, 649 F.2d 71, 74 (1st Cir. 1981). Courts do not issue preliminary injunctions where a plaintiff relies solely on speculation and unsubstantiated fears of what may happen in the

16

future. *See In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 902 (1st Cir. 1988); *Weeks v. Alpert*, 131 F. Supp. 608, 609 (D. Mass. 1955) (to prove irreparable harm, the threat of injury must be real not fancied, actual not prospective, and threatened not imagined).

Moreover, unless the very existence of a plaintiff's business is threatened, economic harm alone is inadequate. *See Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable*, 433 Mass. 217, 228 (2001) ("Economic harm alone will not suffice as irreparable harm unless 'the loss threatens the very existence of the movant's business."); *IONA Techs., Inc. v. Walmsley*, 2002 WL 1290217 (Mass. Super. Apr. 29, 2002) (same). Here, TPI has provided absolutely no evidence that its business has been damaged by defendants' conduct, much less that TPI's very existence is threatened by the defendants. TPI's annual revenues are nearly 30 million dollars (Glenn Aff., ¶ 62).

TPI has tried to overcome that glaring deficiency in its presentation by arguing that the Court need not engage in any irreparable harm analysis because such an examination is obviated where a contract simply recites that injunctive relief may enter. This argument, like TPI's others, is fundamentally flawed.

First, it has become fashionable to insert in agreements such as these a contractual recital of irreparable harm and related "entitlement" to injunctive relief, as a way to foreclose judicial scrutiny of the actual facts. If TPI's view of the law were correct (which it is not), there would be no need for courts to engage in any search for proof of irreparable harm or to make an explicit finding of such harm. The parties' boilerplate contractual recitals would be sufficient. But, this is not the law under Fed. R. Civ. P. 65(a), which requires that the court "define the injury and state why it is irreparable." *See also Ed Bertholet & Assocs. v. Stefanko*, 690 N.E.2d 361, 363 (Ind. App. 1998) (contract provisions requiring the issuance of an injunction upon one party's

breach are not binding upon the trial court because, if enforced, such agreements "would serve to oust the inherent jurisdiction of the court to determine whether an injunction is appropriate."); *Sonny's Pizza, Inc. v. Braley*, 612 So. 2d 844, 846 (La. App. 1992) ("We hold that parties may not stipulate that an injunction may be issued and that the determination of irreparable injury is a question of law which a court must decide based on the facts of the case rather than the will of the parties.").

      1.     <u>TPI's Delay in Seeking Injunctive Relief Constitutes Laches and also Belies Any Claim of Irreparable Harm</u>.

TPI's claim that it will suffer immediate irreparable harm absent an injunction is absurd in light of the fact that it waited nearly three months after filing suit before moving for injunctive relief. "Unexplained delay in seeking relief for allegedly wrongful conduct may indicate the absence of irreparable harm and may make an injunction based upon that conduct inappropriate." *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 494-95 (1986); *see also Yarde Metals, Inc. v. New England Patriots Ltd. P'Ship*, 2003 WL 22304072, *8 (Mass. Super. Sept. 26, 2003 (unreported decision), *aff'd*, 64 Mass. App. Ct. 656 (2005) (noting that plaintiff's "delay in the pursuit of injunctive relief tends to subtract from the urgency and irreparability of the claimed injury").

TPI inexplicably waited from September 1, 2005 (when it filed its Complaint) until November 23, 2005 to seek an injunction. Businesses that truly are facing irreparable harm or whose existence is genuinely being threatened do not wait so long to seek relief. (The delay certainly was not occasioned by TPI's gathering of supporting facts, as its skeletal and wholly inadequate submissions demonstrate.) TPI has no viable claim to injunctive relief under the 1998 Agreement or otherwise.

**D.    The Public Interest Would Be Harmed If Defendants Were Enjoined**

Injunctions should not issue in violation of the public interest. *See Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 825 (D. Mass. 1990); *see also Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995). TPI here is using its and its parent's substantial resources to threaten and intimidate Glenn into either going out of business or as leverage in price negotiations over the sale of the Company. Such conduct clearly is not in the public interest. *See Banner Indus. v. Bilodeau*, 2003 WL 831974, at *2 (Mass. Super. Feb. 27, 2003) (former employee's interest in "earning a living and supporting his family" far outweighs an employer's "monetary interest in stifling adverse competition").

**V.    THE ISSUANCE OF ANY INJUNCTION AGAINST DEFENDANTS MUST BE CONDITIONED UPON TPI'S POSTING OF A CONSIDERABLE BOND.**

The Court should never need to reach one final issue, but we present it here for the sake of completeness. If the Court were to enjoin the defendants as TPI requests, Rule 65(c) requires TPI to post an injunction bond. *Equipment & Systems for Industry, Inc. v. Zevetchin*, 864 F. Supp. 253, 257-58 (D. Mass. 1994) (explaining that security required for payment of damages that may be suffered by an enjoined party); *Flag Fables Inc. v. Jean Ann's Country Flags and Crafts*, Inc., 753 F. Supp. 1007, 1019 (D. Mass. 1990) (purpose of injunction bond is to cover costs and damages due directly to injunction). As "security," the face amount of the bond should be double the amount of the estimated harm to defendants that would result from the suspension of Splash's business operations, if defendants ultimately prevail on the merits. Based on the accompanying Glenn Aff., ¶ 61, defendants suggest that that amount should be $6 million.

## VI.    **CONCLUSION**

For all of the foregoing reasons, TPI's request for injunctive relief against defendants

Glenn Thompson and Splash should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

GLENN THOMPSON AND THOMPSON
ENTERPRISES, INC.

By their attorneys,


/s/ Matthew F. Medeiros
Matthew F. Medeiros (BBO #544915)
LITTLE MEDEIROS KINDER BULMAN &
WHITNEY, PC
72 Pine Street
Providence, RI  02903
Tel:    (401) 272-8080
Fax:    (401) 272-8195


/s/ Lisa A. Tenerowicz
Michael L. Chinitz (BBO # 552915)
Lisa A. Tenerowicz (BBO# 654188)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA  02116
Tel:    (617) 536-0040
Fax:    (617) 536-4400

</div>

DATED:  December 21, 2005

**Certificate of Service**

I, Lisa A. Tenerowicz, hereby certify that on December 21, 2005, I served a true and accurate copy of the above Motion to Extend Time by U.S. Mail to Terrence P. McCourt, esq. and Andrew T. Kang, Esq., Greenberg Traurig, LLP, One International Place, Boston, MA 02110, and a copy was also sent via overnight mail to Sandy Tucker, Esq., Williams Mullen, A Professional Corporation, 1021 East Cary St. (23219) P.O. Box 1320, Richmond, VA 23218-1320.

_____
Lisa A. Tenerowicz

21