## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THOMPSON PRODUCTS, INC.,          )
                                  )
          Plaintiff,              )
                                  )
v.                                )          CA No. 05-11810-RGS
                                  )
GLENN THOMPSON, *et al.*,         )
                                  )
          Defendants.             )
_____ )

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY

### A.     Preliminary Statement

This reply to the Motion to Disqualify ("Motion") responds to three "facts" stated in the Affidavit ("Aff." or "Affidavit") of Glenn Thompson ("Glenn") and argued in Defendants' Opposition to Plaintiff's Motion to Disqualify ("Opposition Memo"):

1.     No confidential communications were had between Medeiros (meaning Matthew F. Medeiros and his firm), as attorney, and Glenn, as TPI's President, concerning the Restrictive Covenants sought to be enforced by TPI against Mark Thompson ("Mark") in the Prior Litigation;[1]

2.     On behalf of TPI, Medeiros filed the Second Counterclaim in the Prior Litigation to enjoin Mark's alleged violations of the Restrictive Covenants, but did not pursue the Second Counterclaim; and

3.     TPI unduly delayed in filing the Motion here.

None of these assertions is correct.

---

[1] The "Prior Litigation" refers to the case styled Mark Thompson v. Glenn Thompson, Thompson Box Company, Inc. and Thompson Products, Inc., CA No. 02-0428, in the Plymouth County Superior Court, filed on April 4, 2002 and ended on January 7, 2005.

### B.     Facts and Argument

*1.     Because The Cases Are "Substantially Related", Confidential Communications Between Medeiros And Glenn In The Prior Litigation Are Assumed.*

The disqualifying link between the Prior Litigation and this case is the Second Counterclaim asserted by Medeiros on behalf of TPI in the Prior Litigation. There, Medeiros, on behalf of TPI, asserted and advocated the validity, reasonableness and enforceability of the identical Restrictive Covenants sought to be enforced by TPI against Glenn here. In this case, Medeiros, on behalf of Glenn, asserts and apparently intends to advocate, in opposition to TPI, the invalidity, unreasonableness and unenforceability of these same Restrictive Covenants.

Medeiros/Glenn attempt to avoid the link between the cases by emphasizing that in the Prior Litigation, there was no issue of whether the Restrictive Covenants were in effect to bind Mark, while here, the issue is whether the Restrictive Covenants are in effect to bind Glenn. While that is indeed true, it does not go far enough toward an understanding of why the two cases are "substantially related". In any case involving the enforcement of restrictive covenants, a central issue is always whether the covenants are reasonable and enforceable. Are they reasonable for the needs of the employer, or are they too broad to meet his needs? Are they reasonable as to scope of activities prohibited? As to geography? As to duration of restriction? Are they overly restrictive for the employee? Is it in the public interest to enforce the covenants? All of these issues are presented in both cases involving the very same Restrictive Covenants even though applied to different employees in the two cases. In the Prior Litigation, Medeiros, on behalf of TPI, asserted that these very Restrictive Covenants at issue in this case were both reasonable and enforceable as applied to Mark, but here, in pleadings already filed, Medeiros asserts, on behalf of Glenn, that the Restrictive Covenants are neither reasonable nor enforceable by TPI. It is certainly true that Medeiros/Glenn assert in defense of this action that

the Restrictive Covenants are not in effect to bind Glenn, but if and when that defense falls, and

it will, Medeiros will be squarely at odds with his prior position as to the reasonableness and

enforceability of these Restrictive Covenants. Will he, at that point, concede, in accord with his

position taken for TPI in the Prior Litigation, that the Restrictive Covenants are reasonable and

enforceable? Of course not; he cannot adequately represent Glenn if he does. Moreover, he has

already asserted just the opposite position in his Answer to the Complaint.

      Nevertheless, to ward off the inevitable conclusion of disqualification that ethics demand,

Glenn, for himself and for Medeiros, boldly asserts in his Affidavit, and Medeiros argues in the

Opposition Memo, that there were, in fact, no confidential communications between them over

the two-year course of the Prior Litigation that would compromise TPI's entitlement to fairness

here. To be sure, Glenn and Medeiros have nothing but their own self-interests at stake in

making this assertion. Fortunately for TPI, however, and for any other party in TPI's position,

this Court need not delve into what actual communications occurred between Medeiros and

Glenn on the claim that links the two cases. The Court must assume that confidential

communications on the issue occurred.

      The critical inquiry for the Court is this: "**[C]ould** [Medeiros] have obtained confidential

information in the first suit that would have been relevant to the second [?]" *Borges v. Our Lady*

*of the Sea Corp.*, 935 F.2d 436, 439-440 (1st Cir. 1991) (emphasis added). If the answer is yes,

then Medeiros must be disqualified. There is <u>no</u> additional requirement that TPI prove the

contents of the confidential information that could have been obtained. In fact:

> The former client need show no more than that the matters
> embraced within the pending suit wherein his former attorney
> appears on behalf of his adversary are substantially related to the
> matters or cause of action wherein the attorney previously
> represented him, the former client. **The Court will assume that**
> **during the course of the former representation confidences**
> **were disclosed to the attorney bearing on the subject matter of**
> **the representation. It will not inquire into their nature and**

> extent. Only in this manner can the lawyer's duty of absolute
> fidelity be enforced and the spirit of the rule relating to privileged
> communications be maintained.

*Kevlik v. Goldstein*, 724 F.2d 844, 851 (1st Cir. 1984) (quoting *T.C. Theater Corp. v. Warner*

*Bros. Pictures, Inc.*, 113 F. Supp. 265, 268-69 (S.D.N.Y. 1953)) (emphasis added); *see also*

*Inverness Medical Switzerland GMBH v. Acon Laboratories, Inc.*, 2005 WL 1491233, *6, n.1

(D. Mass.) (relying on *Kevlik*). In *ebix.com v. McCracken*, 312 F. Supp. 2d 82 (D. Mass. 2004),

this Court elaborated on the point of the "substantial relationship" test:

> A finding of actual use of confidential information is unnecessary
> if the substantial relationship test is met; under that test, the court
> will assume an attorney will use confidences obtained from the
> former client in the subsequent representation. *See Bays v. Theran*,
> 418 Mass. 685, 691, 639 N.E.2d 720, 724 (1994) ("[T]he
> 'substantial relationship' test operates by assuming that
> confidences were transmitted in the former attorney-client
> relationship.")

*Id.* at 89-90.

Even so, as the Court will see hereafter, documents from Medeiros/TPI's file from the

Prior Litigation make it probable that actual confidential communications about the linking

Second Counterclaim did, in fact, occur.

2. *Contrary To The Assertion Of Glenn In His Affidavit, Medeiros Pursued The Critical Counterclaim After Filing It.*

Defendants assert "that the Second Counterclaim was never pursued," that the validity

and enforceability of the Restrictive Covenants were never discussed "because these issues were

not contemplated during the Prior Litigation," and that the Second Counterclaim "was

abandoned and never prosecuted." *Id.* at 14-15. Glenn's sworn testimony is that "TPI . . . never

pursued the Second Counterclaim," that "TPI had effectively abandoned it, for lack of proof,"

and that the "non-compete Counterclaim simply never got beyond the initial pleading state."

Aff. at ¶¶ 26-27. Armed with these "facts," Defendants argue that Medeiros "acquired no

confidences during the Prior Litigation that would be relevant in the Current Litigation," thus rendering disqualification unnecessary. Opposition Memo at 17.[2]

A review of Medeiros's file from the Prior Litigation, however, which was reviewed by counsel for TPI after Defendants filed their Opposition Memo and Affidavit, reveals that these "facts" are but fiction. Not only was the Second Counterclaim "pursued" and "prosecuted" well beyond the "initial pleading stage," it was an integral part of the Prior Litigation for months. The Second Counterclaim was filed in July 2002, but the case did not settle until late 2004. The Second Counterclaim was never withdrawn or voluntarily dismissed by Medeiros.

Based on Medeiros's own notes, there can be little doubt that the validity and enforceability of the Restrictive Covenants were, at a minimum, "contemplated" and "discussed." In short, his file from the Prior Litigation establishes that the Second Counterclaim is "substantially related" to the claims made in the Current Litigation. Telling documents from that file includes the following:

- Medeiros's May 7, 2002 Memo to File contemplating a counterclaim based on Mark's "violat[ion of] his non-compete." *See* Exhibit A.

- Medeiros's December 5, 2002 email exchange with his associate, Scott Pomeroy, discussing the need for a Protective Order to protect TPI's confidential information from competitors like Mark. *See* Exhibit B.

- Medeiros's December 31, 2002 note to file about the conflict of interest relating to Mark's employment with Malden Frames. *See* Exhibit C.

- Medeiros's March 31, 2003 notes made in preparation for Glenn's deposition, specifically itemizing "Mark's breach of non-compete" and "duration was 2 years after employment ended." *See* Exhibit D.

- Medeiros's June 20, 2003 email exchange with Glenn wherein he questioned Glenn as to the veracity of Mark's denials that he was competing against TPI. *See* Exhibit E.

---

[2] Defendants also imply that the Second Counterclaim was based solely on Thompson's suspicions about Mark's competitive activities, which later proved unfounded. TPI submits that Medeiros had an affirmative duty under Mass. R. Civ. P. 11 to verify that any claim he asserted was not frivolous. To the extent that Medeiros argues that he did not discuss the substance of the Second Counterclaim with his client, he tacitly admits violating that Rule.

- Pomeroy's August 26, 2004 memo to Medeiros identifying possible issues for the Pretrial Memo including: "Enforceability of non-competes; provision was of reasonable scope in time and place." *See* Exhibit F.

- Below the above note appears the following handwritten comment, presumably made by Medeiros: "No evidence on this claim (No Proof) so just remain silent on it." *See* Exhibit F.

In addition to these notes and memos, Medeiros, on TPI's behalf, responded to discovery requests from Mark that specifically questioned the basis of the Second Counterclaim. *See* Exhibit G. Likewise, Medeiros issued discovery requests focusing on the Second Counterclaim. In fact, Defendants' Second Request for Production of Documents, which was issued on April 21, 2003, is specifically and exclusively focused on establishing whether Mark was violating his non-compete. *See* Exhibit H. In addition, at Mark's deposition on May 2[3] and May 5, 2003, Medeiros asked him a number of questions exploring the viability of the Second Counterclaim. *See* Exhibit I.

Contrary to Defendants' assertions regarding their treatment of the Second Counterclaim, it is clear that Medeiros actively and aggressively pursued this Counterclaim in discovery, as reflected in the foregoing documents, if not longer. While Defendants ultimately may have determined that they could not prove this claim, the documents contained in Medeiros's file make it improbable that there were no attorney/client communications as to the viability of this claim as Glenn states in his Affidavit.

3.    *TPI Did Not Unduly Delay In Filing The Motion To Disqualify Here.*

Defendants assert that TPI unduly delayed in filing its Motion to Disqualify. The timing of TPI's Motion requires explanation, and it is provided in the Declaration of Adeyemi O. Sonuga ("Sonuga Decl."), attached hereto as Exhibit J. Medeiros first appeared in this case as

---

[3] Portions of the May 2, 2003 deposition transcript were designated "Highly Confidential." Rather than attach an excerpt from that portion of the transcript, TPI submits that the questions and answers appearing on p. 6 (l. 7-24) and p. 7 (l. 1-8) directly relate to the Second Counterclaim in the Prior Litigation.

counsel of record for Glenn and Splash on September 26 when he filed pleadings in response to the Complaint. While TPI immediately recognized the potential conflict in Medeiros' representation of Glenn in opposition the very client he represented in Prior Litigation, TPI was advised that Medeiros' withdrawal is required only if there is a "substantial relationship" between this case and the Prior Litigation (Sonuga Decl. ¶ 3-4). TPI instructed its counsel to investigate the Prior Litigation to make that determination. (Sonuga Decl. ¶ 4). TPI counsel was well aware of the seriousness of any effort to compel withdrawal and the need to comply with the mandate of FRCP 11 to investigate the factual support for any motion to disqualify Medeiros. When TPI was unable to locate any file for the Prior Litigation in its offices, counsel arranged to review the Plymouth Superior Court's file from the Prior Litigation on October 14, 2005. (Sonuga Decl. ¶ 5). That review revealed the TPI Second Counterclaim that substantially relates to the primary claim in this action. (Sonuga Decl. ¶ 6). TPI directed its counsel to pursue the disqualification of Medeiros (Sonuga Decl. ¶ 8). On October 26, TPI counsel sent a letter to Medeiros explaining TPI's position and demanding his withdrawal (Sonuga Decl. ¶ 9). Medeiros refused on November 2 (Sonuga Decl. ¶ 9). TPI filed its Motion to Disqualify on November 14. The Motion is still pending. In the interim, counsel for TPI, by necessity, have continued to treat Medeiros as lead counsel of record on all case matters.

## C.  Conclusion

There is no question that Restrictive Covenants that served as the foundation for the Second Counterclaim in the Prior Litigation are the identical Restrictive Covenants that form the basis for TPI's claims in the Current Litigation. Pursuant to the "substantial relationship" test, first articulated in *T.C. Theater* more than 50 years ago, the Court must find that these claims are "substantially related" and must assume that confidences relevant to these claims passed between client and counsel in the Prior Litigation.

It is well-settled that the Supreme Judicial Court of Massachusetts encourages courts to show "deference to an attorney's best judgment as to whether [his] representation of a client brings [him] into conflict with any provisions of the disciplinary code." *Adoption of Erica*, 426 Mass. 55, 63, 686 N.E.2d 967, 973 (1997). However, when an attorney fails to disqualify himself, the Court may do so for him if it determines that "his continued participation as counsel taints the legal system or the trial of the cause before it." *Gorovitz v. Planning Board of Nantucket*, 394 Mass. 246, 250, 475 N.E.2d 377, 380 (1985). If Medeiros is permitted to proceed with representation of Glenn in opposition to the validity, reasonableness and enforceability of the very Restrictive Covenants he sought to enforce for TPI in the Prior Litigation, fairness for TPI will be tainted and the legal system that permits it will be equally tainted. Accordingly, Medeiros must be disqualified from any further representation of Defendants in this action.

THOMPSON PRODUCTS, INC.

By its attorneys,


/s/  Andrew D. Kang
Terence P. McCourt   (BBO #555784)
Andrew D. Kang       (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN, A PROFESSIONAL CORPORATION
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507


DATED:  January 24, 2006

### CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 24th day of January, 2006, I served a copy

of the foregoing by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI  02903

Michael S. Chinitz, Esq.
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA  02110

/s/ Andrew D. Kang
Andrew D. Kang

bos-fs1\kanga\181626v01\1/24/06\90594.010100

TO:             File

FROM:           MFM

DATE:           May 7, 2002

RE:             Background Facts

_____

This memorandum is a composite of two meetings:  1) 4/16/02 with Carl

Freedman and Fausto Anguilla; and b) 4/24/02 with Glenn Thompson and representatives

of Dilmun Investments, Inc.

Fausto's card is:

## Chace Ruttenberg & Freedman, LLP
### Attorneys at Law

### Fausto C. Anguilla

One Park Row ▪ Suite 300 ▪ Providence ▪ Rhode Island ▪ 02903
Tel. 401.453.6400 ▪ Fax 401.453.6411
▪ Email fanguilla@crfllp.com ▪


On April 9, 2002, Nick Nesgos filed suit in Plymouth County on behalf of Mark

Thompson, against Glenn Thompson, Thompson Paper Box Company, Inc. and

Thompson Products, Inc.  He has not served the Complaint, apparently because he hopes

to settle it right away.  But he apparently filed when he did in order to beat the statute of

limitations.

This suit is a sequel to one that Nesgos had brought a couple of years ago, on

behalf of a former officer, Geoffrey Lafond.  The defendants wound up paying Lafond

something like $5MM in settlement, following mediation before Eric Green.

Thompson Products is primarily a photo album manufacturer, with $30-40MM of

annual sales.  Its headquarters is in Lakeville, Massachusetts.  Glenn, who has run the



**EXHIBIT**

A

company for years, is the principal shareholder.  Mark is a 10% shareholder, having been

brought into the company by his brother to perform sales/marketing.  Glenn and Mark

worked together and were very close.

In 1998, 80% of the stock was sold to an investment banking firm, Dilmun

Investments, Inc.  The cards of the three Dilmun representatives who attended the

meeting are:



**Dilmun Investments, Inc.**
A subsidiary of Bahrain International Bank EC

**Victor Kiarsis**
Managing Director
Merchant Banking Group

Metro Center, One Station Place, Stamford, CT 06902
Telephone: (203) 353-5710    Fax: (203) 353-5761
E-Mail: vkiarsis@dilmun.com



**Dilmun Investments, Inc.**

**James M. Conlon**
Managing Director,
Merchant Banking

Metro Center, One Station Place, Stamford, CT 06902
Telephone: (203) 353-5707    Fax: (203) 353-5726
E-Mail: jconlon@dilmun.com

**Dilmun Investments, Inc.**
A subsidiary of Bahrain International Bank EC

**Jill Bauland**
Associate, Merchant Banking

Metro Center, One Station Place, Stamford, CT 06902
Telephone: (203) 353-5705    Fax: (203) 353-5761
E-Mail: jbauland@dilmun.com

The exact organizational structure is that there was originally Thompson Paper

Box Co., Inc., a Massachusetts corporation.  The shareholders were Glenn (40%), Mark

(10%), Skip Weingeroff (25%) and Gregg Weingeroff (25%).  In 1997 there was an asset

sale from Thompson Paper Box Co., Inc. to Thompson Product Holdings, Inc.  The

shareholders of "Holdings" were Glenn (19%), Mark (19%), and Dilmun (62%).  The

2

successor operating company is now Thompson Products, Inc. I need to pay particular

attention to Article 7, § 4.7 of the Asset Purchase Agreement, which deals with

indemnification for undisclosed liabilities.

In 1993 Glenn had run into Lafond and struck a deal to spin off the photo album

division. The Lafond agreement provided that when photo album sales reached a

specified annual dollar volume, Lafond would be made president of a newly-formed

corporation, **Tricor**, and would receive 25% of the stock of that company.

In 1995-96, Glenn and Mark jointly came to the decision that Lafond needed to be

cut out of the company -- i.e., that Tricor would not be formed and that Lafond's

employment contract would not be renewed.

Lafond sued in approximately 1999, claiming that the defendants (who did <u>not</u>

include Mark) had breached the 1993 agreement, by failing to form Tricor.

After they settled the Lafond litigation, disagreements arose between Glenn and

Mark. Mark's employment contract lapsed and was <u>not</u> renewed.

Only within the past month did our clients first realize that Mark's beef is based

on the same agreement Lafond sued over, which provided that Mark was to receive an

identical ownership interest in Tricor when formed.

Potential issues include:

a)    estoppel, as to Glenn's involvement in decision not to form Tricor;

b)    statute of limitations;

c)    disqualification of Posternak, Blankstein & Lund; and

d)    counterclaims.

3

Also lurking in the background is Dilmun's claim against Glenn (and Mark) for nondisclosure of Mark's claim.

One of Mark's claims is for wrongful termination (in the context of a closely-held corporation in particular). But he had a 3-year contract that expired in December 2000. **QUERE: Why doesn't that negate <u>any</u> wrongful termination claim?** Mark had in fact called Kiarsis to tell him that he was going to be leaving the company. Even so, he was <u>offered</u> another job. The contract required that Mark be paid $100K over the next two years.

All executives received bonuses of $5,000 - $20,000 annually. No large bonuses (like Mark is suing for) were given to the others, and none at all to either Glenn or Mark

Speculation is that the litigation was fomented by Mark's wife, who is angry over how much more Glenn received than Mark, in the sale to Dilmun.

In 1999, Bahrain International Bank (BIB) (the majority shareholder of Dilmun) determined that its best interest was to sell its stock in Thompson. The company was actively marketed. The feeling was that it was worthwhile to settle the Lafond litigation in order to facilitate the sale of the company. There is no similar rationale for settling Mark's suit.

A potential counterclaim by Thompson Product Holdings, Inc., is that under the Acquisition Agreement, Mark must pay back $1.1MM, which was the company's contribution toward Mark's joint and several liability on the Lafond claim.

An issue is what representations survived the time limits and the dollar amounts of the Agreement.

4

A second potential counterclaim is that Mark breached his obligation to pay $500,000 personally to fund the Lafond settlement.

A third potential counterclaim is for misrepresentation or non-disclosure of his intention to leave the company, at the time the company gave him a 5% option.

A fourth potential counterclaim is for fraudulent expense reimbursement claims.

A fifth potential counterclaim is for violation of his non-compete. He has formed an LLC, which arguably is in competition with Thompson. He also has committed fraud in the state of Massachusetts in connection with his receipt of unemployment compensation. He also was paid $50K in expectation that he would honor his non-compete.

Mark never showed up at Thompson's offices between January and October, 2001.

mfm\thompson\file memo re background facts.doc

**Medeiros, Matthew**

| | |
|---|---|
| **From:** | Pomeroy, Scott |
| **Sent:** | Thursday, December 05, 2002 10:31 AM |
| **To:** | Medeiros, Matthew |
| **Subject:** | THOMPSON: Status of Various Issues |

Matt,

1.

I looked at the MA rules re depositions. Because Victor and Jim are officers and directors of a party, I think we need to file a motion regarding their upcoming depositions, unless Nesgos agrees to whatever accommodation we're going to ask for. (Rule 37 provides sanctions for the failure of an "officer, director, or managing agent of a party" to appear at a deposition after "being served with proper notice.")

I not sure however exactly what kind of motion you would prefer to file: a motion to quash the depos completely, a motion for a protective order regarding the location of the depos, or something else that simply addresses costs. In any event, we should probably send Nesgos a letter explaining our objection and position first so that if we need to file a motion we can say we attempted to resolve the issue without the court's intervention...

In addition, I spoke with Glenn regarding a protective order regarding business confidential and competitive sensitive info and documents. He'd like to have one because he is concerned about (especially the recent, 2001-present) sales and financial info being used by competitors including Mark. We should probably mention this in our letter to Nesgos also, and include a proposed form of protective order.

Thoughts on the content and timing of our letter and motion(s)?

2.

I've drafted an Answer and Counterclaim for Glenn and Responses to the Admissions Requests. (Copies attached.) I've not sent copies of these to Glenn, Victor, or Jim yet. (I assume that Victor and Jim should only get drafts of the discovery responses to review and not a draft of Glenn's answer.)

In discussing the facts with Glenn the other day, he repeatedly referred to Mark's equity interest in Tricor as being a "gift gone bad." It occurred to me that a gift isn't an enforceable contract, and I started looking for consideration. Mark had no duties or obligations under the Tricor agreement, and Glenn (as majority shareholder at the time) probably could have entered the agreement even over Mark's objection. Have you given any thought to this possible defense, or have I taken a boneheaded wrong-turn somewhere...

3.

I'm working on drafts of the Responses to the Interrogatories and 2d Set of Document Requests. I should have drafts for you later today. (I am still waiting for certain info that Glenn said he would provide, so the drafts will contain blanks where info is still needed...)

4.

I've not spoken to Glenn about the situation with Dilmun's documents since our meeting on Tuesday. Given our phone problems at the office today, I'm not sure that I'll be able to. Do you want to give him a call to follow-up on this issue?



EXHIBIT

B

--Scott






05AD Answer &          05AE Def's Resp to
Counterclaim of ...      PI's 1st Ad...

------------------------------------------------
Scott K. Pomeroy
Little, Bulman, Medeiros & Whitney, P.C.
72 Pine Street
Providence, RI 02903

(401) 272-8080
Fax: (401) 521-3555
Email: spomeroy@lbmwlaw.com

------------------------------------------------
This e-mail message and its attachments are confidential and intended only for the designated recipient(s). They may contain  proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy, or distribute this message. If you receive this e-mail in error, please notify the sender by reply e-mail and delete this message. Thank you.

------------------------------------------------

TO:            Thompson File

FROM:        MFM

DATE:        December 31, 2002

RE:            Background Facts

---

1.     Malden Frames also sells photo albums, so it's something of a conflict of interest for Mark to be working for them.

2.     Dilmun's equity investment in Thompson is about $3MM but Dilmun also has an $18MM loan to Thompson.

3.     The current stock ownership in the Company is:

Mark -- 15%
Glenn -- 23%
Dilmun -- 62%

mfm\thompson\file memo – background facts.doc

**EXHIBIT**

C

## GLENN THOMPSON DEPOSITION PREPARATION

1.     Instructions for testifying

2.     Company history
   - Glenn's positions from inception (1979)
   - circumstances of Mark joining in 1983
   - size of company before/after Mark
   - relationships among TPI/TPH/Dilmun
   - historical/current stock ownership
   - capital investment by Glenn/Mark
   - historical/current officer positions (see Ans. to I.6)
   - historical/compensation (salary/bonus/other) -- see Ans. to I.7 -- why the slight differences?
   - any labor disputes/organizing?
   - what is Rich Paper Box, Inc.?
   - construction of Lakeville facility -- any personal guaranty?
   - investment by Weingeroffs
   - how did Mark wind up owning 12.4% of TPH and Glenn only 9.5%?  because Glenn gave away his options?
   - director Mathies who resigned 1/19/00 (Conlon's boss) -- favorable to Mark?
   - who else is favorable to Mark?  LaFond?  ex-employees?
   - what will be the effect on a jury of ownership by Kuwaiti/Bahrain interests?  any Iraqi connection?

3.     Glenn/Mark division of responsibilities
   - typical workday
   - Mark's primary accomplishments
   - disagreements?
   - any formal job descriptions?
   - Complaint, ¶ 6 re: agreement that Mark would assist LaFond

4.     Decision to focus on photo albums
   - 1990?
   - why?
   - how was decision made?
   - when did manufacturing begin? (1992?)
   - any formal business plan?


EXHIBIT

D

5.  Decision to hire LaFond
    - who communicated with him?  Mark at all?
    - Mark supported?  why?
    - any documents

6.  LaFond Agreement (4/9/93)
    - circumstances of its preparation
    - from whom did LaFond get info re then-current $3MM sales?
    - Mark's request that it be signed while Glenn was in Europe
    - who reviewed it?  legal counsel?
    - who negotiated it?
    - discussion of signature lines
    - in what capacity did Glenn sign?  why not individually? (compare Mark's Aff., ¶ 3)
    - same as Mark's capacity?
    - why didn't Mark sign?  wasn't he proud that he didn't have to?
    - why 3-year term?
    - why was Mark given 1/3 share of Tricor?
    - our recent demand for indemnification not being an acknowledgement that the agreement is enforceable

7.  LaFond's performance
    - who did he report to?  who reported to him?
    - any formal reviews?
    - discussions with Mark re: his evaluation of LaFond?
    - who deserves credit for major customers:
        - Wal-Mart (Fred Acker)
        - Target
        - Sam's club
        - BJ's
        - Shopko
    - problems/disagreements
    - LaFond's interactions with other employees
    - any documents?
    - necessity for Glenn/Mark to travel with LaFond

8.  LaFond's departure
    - not terminated; K expired by own terms (LaFond Dep. 61:  was fired by Glenn)
    - who made decision not to renew? (jointly between Glenn & Mark)
    - Mark's opinion -- expressed to other employees (compare Mark's Aff, ¶ 6)
    - any documents?

9.  Issue of formation of Tricor
    - understanding of contractual obligation ("profitable") (compare Mark's Aff., ¶ 5)
    - discussions with Mark
    - discussions with LaFond
    - who made decision? when?
    - any documents?
    - based on financial reports? which ones?
    - based on Searles analysis? shared with Mark?
    - what were Mark's incentives/disincentives?
    - Complaint, ¶ 9, re: alleged misrepresentations to Mark
    - Glenn's request to Searles for pro forma calculations (Searles Dep., 47, ff.)

10. Mark's access to sales/financial information
    - hard copy reports? what kind? who prepared? how often?
    - re: photo album sales in particular
    - computer? beginning when? what kind of information? who prepared?
    - discussions with Mark
    - Board meetings
    - audited financials?
    - anything that Mark did not have access to? (compare Mark's Aff., ¶ 5)
    - did Mark ever discuss any of that information with anyone?
    - party to celebrate $10MM sales figure
    - 5/30/96 Searles letter to Freedman, re Tricor -- any way to know whether Mark saw it at the time?
    - Mark's depo @ 74 -- admits access

11. Settlement of the LaFond litigation
    - history
    - discussions with Mark, including Mark not happy paying the "piece of shit LaFond"
    - agreement on terms; increase from $3MM to $5MM
    - discussions with Weingeroffs
    - connection to pending sale of interest in TPB (i.e., Mark wanted to settle)
    - Complaint, ¶ 12, re: continued alleged misrepresentations
    - confirm that Mark was the only existing shareholder who would benefit from Tricor, since Weingeroffs already owned 25% of the Company

12.    Contribution Agreement (12/29/99)
- do we have a copy that is signed by Mark?
- purpose
- drafting process
- discussions with Mark
- understanding of mutual release (compare Mark's Aff., ¶ 15)
- Mark's argument that "the intent of the mutual release, as discussed by the parties in advance of negotiating it, was to release claims the shareholders might have against one another on account of the expenses incurred in connection with the LaFond litigation." -- true?
- explain "integration clause"
- calculation of each person's contribution (proportional to ownership); **NOTE**: significant that Weingeroffs contributed, even though they hadn't signed the LaFond agreement either.

13.    Glenn's alleged promise to reimburse Mark
- Complaint, ¶ 16 -- alleges that Glenn made promise before 12/29/99 and after
- Mark's Affidavit in opposition to motion to dismiss alleges Glenn also made same promise afterwards (see Mark's Aff., ¶¶ 11, ff.)
- alleged consideration was "in exchange for Mark's continuing to work" (Mark's Aff., ¶ 14)

14.    Actual funding of Mark's share
- refer to funding chart
- alleged entitlement by Mark to large bonuses in 1999, 2000 and 2001 -- Complaint, ¶¶ 14, 18
- Glenn's alleged statement to Mark that the Contribution Agreement had to show Mark making payments, in order to keep other shareholders from balking (Mark's Aff., ¶ 12)
- Mark's claim that Glenn made even the first $50K payment (Mark's Aff., ¶¶ 13-14)
- Mark's first complaints about funding (after last payment to LaFond?) -- what was it that he then learned for the first time?
- see Mark's 4/2/01 e-mail to Victor re: "I am coming to end of the LaFond commitment" and "my remaining balance with LaFond"
- also Mark's 1/9/01 e-mail to Victor re: $100K of his bonus going to LaFond
- recent communications re: TPB Liquidating's initial payment for Mark
- tax deductions taken by Glenn and the entities (See Nesgos' 3/27/03 letter)
- review subpoena to Piccerelli Gilstein

15.    Mark's performance after LaFond's departure
- Complaint, ¶ 11, re: photo album sales increased because of Mark's efforts
- why/when did Mark become VP Sales?

16.  Mark's departure
- circumstances re: execution of employment K
- contract expired 12/31/00
- his announcement at July 4th, 2000 party that he would retire at year-end
- why did he write the elaborate proposal for COO etc. on 12/11/00?
- physically moved out on 1/4/01
- did he ever sign the 15/01 resignation letter? why not?
- discussions of continued employment, including 10/12/01 Board minutes
- work at Gem Case
- $4MM (or 4.5MM?) received from 1/5/98 sale to TPH
- offer to Mark of Presidency
- Mark to Glenn: "I want to fucking kill you"
- Complaint, ¶ 14: assured that he would have continued employment, absent "just cause" (also compare Mark's Aff., ¶ 10)
- compare his 11/30/00 "Wishlist" which states "3 year Contract-ends Dec. 31, 2000"
- Complaint, ¶ 19: in 10/01 terminated without cause (date when company decided to stop paying Mark -- see Ans. to I. 11)
- decision made by <u>Dilmun</u>, not by Glenn? (compare Mark's Aff., ¶¶ 17-18)
- see 12/18/01 draft Mutual Release Agreement, 2d "WHEREAS" says "terminated"
- review 11/6/01 letter from TPI (Victor) to Mark -- did Glenn review before it was sent?
- if his employment expired at 12/31/00, what was the $140K he received in 2001? What <u>work</u> did he do for that compensation? (see Mark's Aff., ¶ 18 – he even wants a bonus for 2001)
- Mark's 11/2/01 letter 2d paragraph -- details of the lunch conversation with Glenn
- Mark's 3/14/01 e-mail to Victor re going on sales trip for the company -- why?
- Mark's 1/9/01 e-mail to Victor

17.  Stock options
- 1500 each issued to Glenn and Mark in 1/00 (see 1/20/00 Board minutes)
- purpose
- communications with Mark
- any documents?
- ever exercised? ($162,000 paid by Mark)
- Victor's feeling that Mark showed bad faith, knowing he would be leaving

18. Mark's damages claims (Complaint, ¶ 24)
   - 25% of net profits of photo album division pre-Dilmun sale <u>plus</u>
   - 25% share of that portion of $40MM sales price attributable to photo album division
   - his claim that the portion of the 1998 sales price attributable to the photo album division was its % share of total revenues -- how does he know that?
   - extent to which TPB's performance after LaFond left was attributable to other than LaFond/Mark's efforts
   - why were no profits distributed to <u>any</u> shareholders?
   - should we use McNamee as our expert?

19. Mark's breach of non-compete
   - see language in employment K
   - duration was 2 years after employment ended
   - what damages?
   - who should we interview/depose?

20. Mark's breach of indemnification provision of asset purchase agreement

21. Mark's breach of Contribution Agreement
   - refused to pay last $100K installment (1/3/02)
   - released Glenn from "all claims arising out or relating to the LaFond litigation"

22. Document production issues
   - missing e-mails (see also Nesgos' 3/27/03 letter)
   - LaFond's disruption of TPI's documents during discovery (see Ans. to I.1)

23. Past/present efforts to sell TPI
   - 1/20/00 Board minutes
   - Mark's knowledge/participation
   - review points highlighted in 5/00 Confidential Information Memorandum, particularly:
     - p. 30 re: no impending legal proceeding
     - reasons for the dramatic sales growth (other than LaFond & Mark)
   - Dilmun's ongoing efforts to sell (confidentiality issues?)
   - communications with Rembrandt Photo Services and/or Centre Partners LLP

24. Gem Case issues
   - Mark's duties
   - Mark's salary
   - terms of sale of company (alleged breach of fiduciary duty)
   - decision to sell discussed with Mark?
   - Mark's 4/2/01 e-mail to Victor
   - how much did Glenn/Mark lose?

25.  Glenn's interrogatory answers and testimony in <u>LaFond</u> cases
   - Answer to I.2
   - Dep., 2-120, 2-127

26.  Miscellaneous
   - any efforts by Mark to hurt the company?
   - Mark's expressions of anger toward Glenn, Victor, et al.
   - statements by Mark's wife, reflecting jealousy
   - Mark's newly-served interrogatories and document requests re employee hirings/firings
   - Mark's requests for information and subpoenas to E&Y and Piccerelli Gilstein
   - response to Bunk Read @ Choate Hall
   - what do we know about whether Mark committed unemployment compensation fraud in Mass.?
   - how to prepare Kiarsis for his depo?  (none for Conlon?)
   - Mark's threat to enjoin future asset sale

**Medeiros, Matthew**

| | |
|---|---|
| **From:** | Glenn Thompson [gthompsonri@msn.com] |
| **Sent:** | Friday, June 20, 2003 9:35 PM |
| **To:** | mfm@lbmwlaw.com |
| **Subject:** | Re: Mark's depo testimony |

Matt,

1. I think Mark has probably not sold any photo albums yet, but may be teaching Malden how to get into the business either manufacturing or importing the product. I am trying to get a Malden catalog to see what products they are currently selling

2. After Mark started at TPB he stopped working regular details with the police. He only worked special details like traffic at the Raynham Dog Track. I am not sure when he stopped volunteering for the fire department. I will check with my sister or mother for more details.


Glenn Thompson
330 Rumstick Rd.
Barrington, RI  02806
401-247-1891



>From: "Medeiros, Matthew" <mfm@lbmwlaw.com>
>To: "'gthompsonri@msn.com'" <gthompsonri@msn.com>
>Subject: Mark's depo testimony
>Date: Fri, 23 May 2003 16:17:37 -0400
>
>Hi Glenn,
>I've finished reviewing your transcript and preparing excerpts to discuss
>with Ruth and Victor before their depos. So I'm now turning to the first
>day
>of Mark's, which just arrived. I'd appreciate your thoughts about the
>following two points that could be useful to impeach him at trial:
>1) at page 7 he says that JustCo has never been involved in the sale of
>photo albums since he left TPI. do you believe him, or is that something
>that you think he may be lying about?
>2) you had told me that you initially took him into Thompson Paper Box
>because your mother was concerned for his safety as a policeman. But at
>page
>10 he testified that he continued to work for the Raynham Police (and the
>Raynham Fire) Department at night after joining the Company. Is that true?
>I'm sure I'll be back with additional questions. Have a nice weekend. Matt.

Add photos to your e-mail with MSN 8. Get 2 months FREE*.
http://join.msn.com/?page=features/featuredemail



EXHIBIT
E

**Pomeroy, Scott**

| | |
|---|---|
| **From:** | Pomeroy, Scott |
| **Sent:** | Thursday, August 26, 2004 3:05 PM |
| **To:** | Medeiros, Matthew |
| **Subject:** | THOMPSON: Pretrial memo issues |

Matt,

My list of issues (and reasons therefore) was too long for an email, so I made it a memo:



)895 Memo to MFM
   re Issues for...

–Scott

--------------------------------------------------
Scott K. Pomeroy
Little, Medeiros, Kinder, Bulman & Whitney, P.C.
72 Pine Street
Providence, RI 02903

(401) 272-8080
Fax: (401) 521-3555
Email: spomeroy@lmkbw.com

--------------------------------------------------
This e-mail message and its attachments are confidential and intended only for the designated recipient(s). They may contain  proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy, or distribute this message. If you receive this e-mail in error, please notify the sender by reply e-mail and delete this message. Thank you.

--------------------------------------------------

1

**EXHIBIT**

F

## MEMORANDUM

To:   MFM

From: SKP

Re:   Thompson
        Legal issues for possible inclusion in pretrial memo

Date:  August 26, 2004

---

In our motion for summary judgment on all claims and counterclaims, we broke Mark's claims down into three categories: (1) employment/bonus claims; (2) contribution agreement/oral promise to pay claims; and (3) Tricor claims. Mark's fiduciary and Chapter 93A claims are worded in such a way (in the complaint) that they might be deemed to stick to anything or everything.

In his decision, Judge Troy expressly broke the claims down into four categories by breaking our employment/bonus category into two:

> (1) allegation that "defendants . . . wrongfully terminated [Mark's] employment";
>
> (2) allegation that "defendants . . . denied him bonus payments";
>
> (3) allegation that "defendants . . . breached an oral contract to pay [Mark's] share of a contribution settlement"; and
>
> (4) allegation that "defendants . . . breached an agreement regarding the formation of a business [Tricor]."

After this break-down in the intro paragraph of the decision, Troy devotes four paragraphs in the body of the decision to explain the reasons why each set of claims either stands or falls (one paragraph per set of allegations).

Summary judgment denied on categories 1 and 3: With respect to Troy's category 1, he finds that there is a "factual issue as to whether [Mark's] termination was the result of [Glenn's] actual malice." Malice as an issue only makes sense if Troy is analyzing the claim as one for tortious interference with contract, as Nesgos urged in his memoranda and we urged against. Arguably, all other potential claims arising out of the termination (*i.e.*, Chapter 93A, breach of fiduciary duty, breach of employment contract, discharge of "at will" employee in violation of public policy) did not survive because (a) those theories do not have a "malice" element and (b) Troy expressly refers to the surviving "claim" in the singular: "Based on this evidence [Kiarsis

email], a rational and fair minded jury could find that actual malice motivated plaintiff's termination, and summary judgment on this claim is therefore <u>DENIED</u>." (emphasis in original)

With respect to Troy's category 3, he cites Mark's affidavit which alleges Glenn's oral promise to pay as establishing "a genuine issue of material fact" regarding the oral contract claim. "As such, summary judgment is <u>DENIED</u> as to [Mark's] breach of contract claim." Again, this refers to the "claim" in the singular and arguably excludes any other claim arising out of the allegations. By denying summary judgment, Troy implicitly rejected all of the defenses we argued (integration clause, statute of frauds, no consideration), but he didn't mention any of them in his decision.

Summary judgment enters on categories 2 and 4. Category 2: Troy dismisses the "claim [singular] . . . as to wrongful denial of bonus payments." But having found no factual basis for the claim and no expectation of bonuses on Mark's part, this probably includes any other claims that might have arisen out of the alleged non-payment of bonuses.

Category 4: Troy dismisses all "claims [plural!] . . . arising out of [Defendants'] alleged breach of the Tricor agreement." Given the use of the plural, and that the basis for summary judgment is estoppel (as we have argued despite Troy's sloppy reference to the release language in the Contribution Agreement), the grant of summary judgment probably encompasses all possible claims arising out of the Tricor dispute (including Chapter 93A and fiduciary duty claims).

Defendants' counterclaims were not addressed at all by Troy's ruling. (Should we ask for a hearing and/or formal ruling on these claims before trial?) - No.

So, reasoning from Troy's decision as a starting point, potential legal issues for the pretrial memo are:

**Wrongful termination claim:**

1.      Rule that "at will" employee can be fired for any reason (to try to divert the issue back from a tortious interference analysis).

2.      Legal standard for tortious interference claim; especially with respect to qualified privilege and the high standard for "actual malice" to overcome the privilege. Personal dislike is not enough for actual malice.

3.      Employment termination dispute does not give rise to Chapter 93A action as a matter of law. (belts and suspenders)

4.      Employment termination dispute does not giver rise to breach of fiduciary duty claim or no fiduciary duty owed in employer-employee relationship (as opposed to close corporation shareholder roles). I'm not sure how sound this line of argument is, but the objective would be to keep the fiduciary claim (whatever it is) from re-emerging Phoenix-like from the employment allegations.

*look into - ?*

5. — even if liability for wrongful term; No bonus ∴ no damages even if claim were successful.          (except e.g. wages...)

6. A.   No bonuses on tortious interference.
   B.   Salary & Benefits: hurdle as a factual matter as to expectancy of renewed contract.

**Bonus payment claim:**

5.    Exclude all evidence of allegedly unpaid bonuses.  Summary judgment entered on claim, and evidence of unpaid bonuses is irrelevant and prejudicial.

**Breach of oral contract claim:**



*factual issues* — *proven by fraud/misrepresentation*

6.    Oral promise barred by integration clause in Contribution Agreement.  (Troy didn't explicitly mention this defense, so let's re-argue it.)  Maybe re-mold it as a parol evidence issue.

7.    Oral promise barred by statute of frauds.  (ditto)    *factual issue: Mark's reliance on Glenn's promise*

8.    Oral promise unenforceable for want of consideration.  (ditto)    *— what consideration.*

9.    In light of ruling re bonuses, no oral contract claim because no damages.  (Mark is out-of-pocket exactly $0.)

10.    The oral contract claim does not give rise to a Chapter 93A claim because transaction did not occur in the context of "trade or commerce."  (belts and suspenders again)

11.    The oral contract claim does not give rise to a fiduciary duty claim . . .

*(7.)*  12.    Evidentiary issue: Mark's wife not competent as witness as to conversation between Mark and Glenn.

*save for trial or in P.T. memo.*  13.    Evidentiary issue: E&Y docs inadmissible for lack of foundation for business record exception to hearsay rule.  (*see* #9 above; share taken out of TPB?)

**Tricor claims:**

14.    Exclude all evidence of alleged Tricor breach.  Summary judgment entered on all Tricor claims, and evidence of breach is irrelevant and prejudicial.  (Though we will need to explain the existence of the Lafond suit so as to provide context for the Contribution Agreement.)

**TPB/TPI counterclaim 1 (indemnity/breach of warranties in 1997 Asset Purchase Agreement):**

[no unusual issues]

**TPB/TPI counterclaim 2 (breach of non-compete provision in employment agreement):**

15.    Enforceability of non-competes; provision was of reasonable scope in time and place.

*— No evidence on this claim (No Proof)*
*so just remain silent on it*



3

**Glenn's counterclaim (unjust enrichment/breach of Contribution Agreement):**

16.    Enforceability of integration clause (to counter Mark's oral promise claim).  (*see* #6 above)

17.    Elements of unjust enrichment claim.

scott/A064/0895

4

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                                    SUPERIOR COURT

|  |  |
|---|---|
| MARK THOMPSON, ) | |
|     Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. 02-0428 |
| ) | |
| GLENN THOMPSON, THOMPSON PAPER ) | |
| BOX COMPANY, INC., and THOMPSON ) | |
| PRODUCTS, INC., ) | |
|     Defendants. ) | |
| ) | |

### DEFENDANTS' ANSWERS TO
### PLAINTIFF'S FIRST SET OF INTERROGATORIES

#### General Objections

Defendants object to Plaintiff's first set of interrogatories on the grounds that the

"Instructions and Definitions" contained therein are overly broad, unduly burdensome, seek to

impose obligations beyond those required by the Rules of Civil Procedure, and seek to impose

discovery obligations on individuals and entities who are not parties to this action.  In addition,

Defendants object that the definition of "Company" supplied by Plaintiff is ambiguous and

unreasonably vague.

Defendants object to Plaintiff's first set of interrogatories to the extent that they request

information or documents protected by the attorney-client privilege and/or attorney work

product.

Defendants object to Plaintiff's first set of interrogatories to the extent that they seek

trade secrets or other information that is of a proprietary, highly confidential, and/or

competitively sensitive nature.

1


EXHIBIT
G

The foregoing general objections are deemed to be incorporated and made a part of each of the following responses:

## Specific Responses

**REDACTED**

**REDACTED**

Interrogatory No. 23: State the factual basis for the allegation in the Second Counterclaim that, upon information and belief, Mark Thompson has breached, and is continuing to breach, the non-compete obligations set forth in the Employment Agreement between Mark Thompson and Thompson Products, Inc.

Response No. 23: In addition to the foregoing general objections, Defendants object to this interrogatory on the grounds that it is overly broad, unduly burdensome, and improperly seeks information that is subject to the attorney-client privilege and/or the work product doctrine.

Subject to these objections, Defendants state that Mark has breached and continues to breach the confidentiality and non-compete obligations of his written employment contract through, *inter alia*, his past and current sales efforts for Weingeroff Enterprises, Malden

13

International, and other competitors of TPI that may be revealed in discovery.  Defendants will

supplement this response in accordance with the Rules of Civil Procedure.

As to answers:

_____
Glenn Thompson
on behalf of all Defendants

STATE OF  RHODE ISLAND
COUNTY OF PROVIDENCE

Subscribed and sworn before me this 30th day of December, 2002.

_____
Notary Public
My commission expires:  1/17/2006

As to objections:

_____
Matthew F. Medeiros, Esq.  (#544915)
Little, Bulman, Medeiros & Whitney, P.C.
72 Pine Street
Providence, RI  02903
Tel:  (401) 272-8080
Fax: (401) 521-3555

**Attorneys for Defendants**

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of December, 2002, I caused to be served by First Class U.S. Mail, postage prepaid a copy of the within Defendants Answers to Plaintiff's First Set of Interrogatories to Nicholas J. Nesgos, Esq., Posternak, Blankstein & Lund, L.L.P., 100 Charles River Plaza, Boston, MA  02114.

scott/A065/05AF

15

# COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                                          SUPERIOR COURT

)
MARK THOMPSON,                    )
    Plaintiff,                    )
                   )          Civil Action
                   )          No. 02-0428
v.                                )
)
GLENN THOMPSON, THOMPSON PAPER    )
BOX COMPANY, INC., and THOMPSON   )
PRODUCTS, INC.,                   )
    Defendants.                   )
)

## DEFENDANTS' SECOND REQUEST
## FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule of Civil Procedure 34, Defendants hereby request that Plaintiff produce responsive documents within thirty (30) days.

### Definitions and Instructions

In responding to these document requests, produce all responsive documents that are within the scope of Rule of Civil Procedure 26(b) and which are in the possession, custody, or control of Plaintiff, including documents in the possession of Plaintiff's attorneys, their investigators, and all other persons acting in Plaintiff's behalf. All documents produced shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the categories in this request.

For any requested document or thing as to which any claim of privilege is made or as to which any claim of protection from discovery made, identify the privilege or Rule upon which Plaintiff relies, identify the document by date, author, addresses, present custodian, general subject matter, and location, and set forth the facts upon which such claim of privilege or protection is based.

1



EXHIBIT

H

These requests for production shall be deemed to be continuing so as to require supplemental responses. If Plaintiff subsequently obtains information which renders his responses incomplete or incorrect, Plaintiff shall produce any and all additional responsive documents within a reasonable time after obtaining such information.

On the day the responses are to be served, Plaintiff shall produce for inspection or copying all responsive documents at the offices of Little, Bulman, Medeiros & Whitney, P.C., 72 Pine Street, Providence, Rhode Island 02903.

The following definitions and rules of construction shall apply to these requests for production of documents:

(a)    The term "documents" is defined to be synonymous in meaning and equal in scope to the usage of this term in Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations of any kind. A draft or non-identical copy is a separate document within the meaning of this term.

(b)    The term "communication" means the transmittal of information in the form of facts, opinions, ideas, inquiries, or otherwise. Both oral communications and communications by document are within the meaning of this term unless it is otherwise modified.

(c)    The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

(d)    The terms "Plaintiff" and "Defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, agents, members, trustees, employees, partners, members, corporate parent, subsidiaries, and affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

2

(e)    The term "person" means any natural person or any business, legal, or governmental entity or association.

(f)    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

(g)    The terms "any" and "all" shall each be construed to mean any or all as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

(h)    The use of the singular form of any word includes the plural and vice versa.

## Requests

1.    All documents of any kind evidencing the salary, commissions, or income from any source earned by Mark Thompson from December 31, 2000 to present.

2.    All documents of any kind that concern, reflect, or evidence Mark Thompson's communications with any person regarding any negotiations or discussions to sell any picture frame, photo album, or photo box product to or for any person or business from December 31, 2000 to present.

3.    All logs, diaries, calendars, travel records, or other documents of any kind that reflect or evidence any telephone conversation or meeting between Mark Thompson and any customer or potential customer of Thompson Products, Inc. from December 31, 2000 to present.

4.    All logs, diaries, calendars, expense reports, travel records, or other documents of any kind that reflect or evidence any telephone conversation or meeting between Mark Thompson and any competitor or potential competitor of Thompson Products, Inc. from December 31, 2000 to present.

3

5.      All emails, documents, and correspondence of any kind exchanged between Mark Thompson and any customer or potential customer of Thompson Products, Inc. from December 31, 2000 to present.

6.      All email, documents, and correspondence of any kind exchanged between Mark Thompson and any competitor or potential competitor of Thompson Products, Inc. from December 31, 2000 to present.

7.      All federal and state tax returns including all W-2s and all schedules and attachments filed by Mark Thompson since December 31, 2000.

8.      All employment contracts entered between Mark Thompson and any other person since December 31, 2000.

9.      All logs, registers, spreadsheets, records, and documents of any kind reflecting or evidencing all of Mark Thompson's sales of any picture frame, photo album, or photo box product, on behalf of himself or any other person or business, to any other person or business from December 31, 2000 to present.

10.     All email, correspondence, and documents of any kind concerning or reflecting any effort by Mark Thompson to sell any picture frame, photo album, or photo box product, on behalf of himself or any other person or business, to any other person or business from December 31, 2000 to present.

11.     All email, correspondence, and documents of any kind concerning or reflecting any effort by Mark Thompson to obtain employment from December 31, 2000 to present.

12.     All commission checks received by Mark Thompson concerning the sale of any product by Mark Thompson, on behalf of himself or any other person or business, to any other person or business from December 31, 2000 to present.

13.    All account statements, deposit slips, bank records, or other documents reflecting any commission or other payment received by Mark Thompson concerning the sale of any product by Mark Thompson, on behalf of himself or any other person or business, to any other person or business from December 31, 2000 to present.

14.    All documents of any kind concerning Mark Thompson's work for or on behalf of Frederick or Gregg Weingeroff, Weingeroff Enterprises, any other company affiliated with Frederick or Gregg Weingeroff, JustCo Marketing, or Malden International from December 31, 2000 to present.


_____

Matthew F. Medeiros, Esq. (#544915)
Little, Bulman, Medeiros & Whitney, P.C.
72 Pine Street
Providence, RI  02903
Tel:  (401) 272-8080
Fax: (401) 521-3555

**Attorneys for Defendants**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of April, 2003, I caused to be served by First Class U.S. Mail, postage prepaid a copy of the within Defendants Second Request for Production of Documents to Nicholas J. Nesgos, Esq., Posternak, Blankstein & Lund, L.L.P., 100 Charles River Plaza, Boston, MA  02114.


_____

scott/A065/0635

5

COMMONWEALTH OF MASSACHUSETTS
PLYMOUTH, SS.                    SUPERIOR COURT

```
******************************
MARK THOMPSON,               *
        Plaintiff            *
     VS.                     *       CIVIL ACTION
                             *       NO. 02-0428
                             *
GLENN THOMPSON, THOMPSON     *
PAPER BOX COMPANY, INC., and *
THOMPSON PRODUCTS, INC.,     *
        Defendants           *
******************************
```

**CONTINUED** DEPOSITION OF MARK A. THOMPSON,
Plaintiff in the above-entitled cause, taken on behalf
of the Defendants, pursuant to notice, before Michaela
E. Harris, Notary Public in and for the State of Rhode
Island, at the office of Little, Bulman, Medeiros &
Whitney, P.C., 72 Pine Street, Providence, RI 02903 on
May 5, 2003, commencing at 9:30 a.m.

APPEARANCES:

FOR THE PLAINTIFF...POSTERNACK, BLANKSTEIN & LUND, LLP
                    **BY:  NICHOLAS J. NESGOS, ESQ.**

FOR THE DEFENDANTS..LITTLE, BULMAN, MEDEIROS &
                    WHITNEY, P.C.
                    **BY:  MATTHEW F. MEDEIROS, ESQ.**

ALSO PRESENT........**DEFENDANT GLENN THOMPSON**

EXHIBIT
I

1

2

3

4

5

6

7

8

9                              **REDACTED**

10

11

12

13

14

15

16

17

18

19

20

21     Q    Have you, in fact, competed with the company

22 since you left?

23     A    No, sir.

24     Q    Aren't you entitled, then, to the $100,000?

1          MR. NESGOS:  Object to the question.

2          MR. MEDEIROS:  You may answer.

3     A    If somebody wants to give me the $100,000, I'm

4     probably entitled to it, because I haven't competed

5     against the company nor do I intend to compete against

6     the company.

7

8

9

10

11

12

13

14

15
                         **REDACTED**
16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10                              **REDACTED**

11

12

13

14

15

16

17

18      (DEFENDANT'S EXHIBIT 10 MARKED FOR IDENTIFICATION)

19      Q    I'm showing you a document that's been marked

20      Exhibit 10.  Please take your time to review it.

21                        (SHORT PAUSE)

22      Q    Oh, you're done reviewing it?

23      A    Well, I'm not -- I didn't read the whole thing,

24      but it appears to be the Employment Agreement that I

1     signed.

2     Q    Is that your signature on the last page of

3     Exhibit 10?

4     A    Yes.

5     Q    And did you sign this agreement on or about

6     January 5, 1998, as indicated above the signatures on

7     the last page?

8     A    On or about, I believe, yes.

9     Q    Was this the first time you ever had a written

10    Employment Agreement?

11    A    Yes, I believe so.

12    Q    And is this also the last time you ever had a

13    written Employment Agreement?

14    A    Yes.

15    Q    Okay.  How did this agreement come about?

16    A    I don't -- I don't know how it came about.  I

17    know it was when the company was purchased by Dilmun

18    or BIB, in the negotiations part of the negotiations

19    were that Glenn and myself, and I don't know if it was

20    anybody else, I think it was just Glenn and myself

21    would receive Employment Agreements.

22    Q    Did you want one?

23    A    Yeah, yes.

24    Q    Why?

1 A I think I did.  I think at the time we really

2 didn't know the people at Dilmun and they really

3 didn't know us.  It just made sense, I guess.

4 Q Gave you some protection, didn't it?

5    MR. NESGOS:  I'll object.

6 A It was a little security.

7 Q What do you mean by "a little security"?

8 A Well, just for the time period that -- until I

9 was able to prove to them who I was and everything.

10 Q A $200,000 salary plus benefits for three years

11 is a little security to you, Mr. Thompson?

12 A It's security.

13 Q Just a little security?

14 A I look at it as being a little security because

15 I've never had one before, so I guess it should be

16 viewed as big security.  I don't know.

17 Q 600,000, is that chump change to you, Mr.

18 Thompson?

19    MR. NESGOS:  Objection.  Save the argument

20 for --

21 A I didn't say that.

22 Q Well, do you view that as very little security,

23 600,000 of guaranteed compensation?

24    MR. NESGOS:  Objection.

1      A    It wasn't really the compensation that was

2      driving me so --

3      Q    What negotiations did you have over the terms of

4      your Employment Agreement, Exhibit 10?

5      A    I don't know how many meetings we had.  They had

6      -- Victor and Jim Conlon had thrown some numbers

7      around based on salary, based on term, and I think we

8      had a chance to give them a little bit of input.

9      Then, after that, I don't know who finished drafting

10     it.  I believe it was the people at Dilmun.

11     Q    Were you involved at all in negotiations over the

12     terms of the agreement, Exhibit 10?

13     A    No.

14     Q    Who was, do you know, on behalf of Thompson?

15     A    In one of the meetings with Victor, Jim Conlon,

16     and Glenn Thompson, Jim Conlon was very vocal.  He

17     threw out the number of three years at one of our

18     meetings, and I said to Jim Conlon, I said, "You know,

19     why don't you make it five years?" and he said, "What

20     if I," his comment was, and jokingly, "What if I find

21     out I don't like you, I don't want you around for five

22     years."

23          MR. MEDEIROS:  Maybe my question was poorly

24     phrased.

1     Q    Were the negotiations over your Employment

2    Agreement carried out by Glenn Thompson on behalf of

3    you and Glenn?

4    A    I think it happened in that meeting where numbers

5    were thrown out.  I don't know where the numbers came

6    from to start.  It could have been -- it could have

7    been between anybody, but that was the first I had

8    heard of any type of years or what it would be or what

9    they were hoping it would be.  It was, you know,

10    thrown at me three years.  I don't know who came up

11    with the three-year thing.

12    Q    But you had no back and forth yourself with

13    Kiarsis and Conlon over the proposed terms of the

14    Employment Agreement, right?

15    A    No, just in that meeting was -- when they asked

16    if three years would be okay, and the only back and

17    forth we had was I was -- if they were throwing out

18    three so easily, then I was going to ask them for

19    five.

20    Q    But in terms of all the other provisions of the

21    Employment Agreement, compensation, the noncompete,

22    you had no negotiations yourself with Kiarsis or

23    Conlon over any of those other terms, did you?

24    A    I don't believe so, no.

1    Q    Was there ever an amendment entered into to

2    Exhibit 10?

3              MR. NESGOS:  I'll object.

4    A    Amendment?  Not that I'm aware of.

5    Q    Was Exhibit 10 -- strike that.  Turn to Paragraph

6    No. 5 on page 3.  As you ultimately signed your

7    Employment Agreement, what was the term of the

8    agreement, the duration of it, in other words?

9    A    "The term of this Agreement shall commence on the

10   Closing and shall expire on December 31, 2002..".

11   Q    Okay.  So it was, basically, a three-year

12   agreement as it wound up, right?

13   A    Correct.

14   Q    Was any extension of this agreement ever entered

15   into?

16   A    No, not that I know of.

17   Q    So is it your understanding that when December

18   31, 2002 came around, this agreement, Exhibit 10,

19   expired?

20   A    That was my understanding.

21   Q                        REDACTED

22

23

24   A

MICHAELA E. HARRIS, CSR
(401) 461-0148

REDACTED

Q    When's the last time you spoke with Mr. Ng?

A    Probably within the last few months.

Q    Are you doing business with Mr. Ng?

A    Not currently, no.

Q    Are you currently seeking to sell backpacks for

from Mr. Ng?

A    Yes, yes.

Q    To whom?

A    Right now he doesn't have distribution other than

to Office Max, and he mentioned that I could take any

of the accounts I wanted, Wal-Mart, Target, just about

anybody.

Q    And have you started to make calls on behalf of

Mr. Ng?

A    I have started to make my calls on that, but

backpack season doesn't happen until the end of this

year.

Q    Are you familiar with a company by the name of

1    Northvale?

2    A    That's his company.

3    Q    How about Intercontinental?

4    A    That's his company.

5    Q    Are you doing work on behalf of both of them?

6    A    I don't know.  He sent me a letter telling me who

7    the company was that the retailers could use on behalf

8    of backpacks.  It might be Northvale.  I'm not

9    positive.

10   Q    Where is Mr. Ng located, situated?

11   A    Canada.

12   Q    Does he ever live in Hong Kong?

13   A    He travels back and forth.

14   Q    To Hong Kong?

15   A    To Hong Kong.

16   Q    But his residence is in Canada?

17   A    I think so.

18   Q    Did you have a conversation with Mr. Ng a couple

19   of weeks ago, as recently as a couple of weeks ago?

20   A    I don't think it's been that recent.  It could be

21   a couple of weeks, a month.

22   Q    Didn't you have a conversation with Mr. Ng a

23   couple of weeks ago in which you told him rumors about

24   the company?

1    A    Rumors about the company?

2    Q    Yes.

3    A    I think he had -- I don't think I told him any

4    rumors.  I think he had asked me rumors about the

5    company, and that's all I know them to be as rumors,

6    too.

7    Q    You made disparaging remarks about Thompson

8    Products to Mr. Ng in your conversation with him a

9    couple of weeks ago, didn't you?

10   A    I don't think so.

11   Q    And you told him what Glenn Thompson's future

12   with the company was going to be when you spoke with

13   him a couple of weeks ago, didn't you?

14   A    I don't think so.

15   Q    You were trying to disrupt the business

16   relationship between Thompson Products and Mr. Ng,

17   weren't you, when you made those remarks?

18   A    No, sir.

19

20

21                    REDACTED

22

23

24

MICHAELA E. HARRIS, CSR
(401) 461-0148

**165**

1

2

3

4

5                              **REDACTED**

6

7

8

9

10    Q    And is it your testimony from the first day of

11    this deposition that since you left work at Thompson

12    you've never received any income from any source?

13    A    JustCo Marketing received a commission check in

14    advance on an order from Office Depot, but I'm under

15    the impression that because the product wasn't

16    successful and there wasn't a full -- there wasn't a

17    sell through, in fact a return product, there's a

18    possibility that Red Square and/or Gregg Winegeroff

19    may be adjusting the amount that was paid out.   In

20    fact, I might have to reimburse them for some of that

21    amount.

22    Q    When did JustCo Marketing receive that advance

23    commission check?

24    A    It might have been in 2002.   I'm not positive.

1    I'm not positive.

2    Q    Is that the only income that's ever come into

3    JustCo Marketing?

4    A    Yes.

5    Q    And you individually have had no income

6    whatsoever since you left Thompson in November of

7    2001?

8    A    Other than unemployment, no.

9    Q    Why's that?

10    A    What do you mean "Why's that"?

11    Q    Why have you had no other income?  Did you try to

12    get a job?

13    A    I have been struggling to try to put together

14    some orders for the products that I'm carrying.

15    Q    Did you try to get a regular job while you were

16    doing that?

17            MR. NESGOS:  Objection.

18    A    No, I was dedicating my time to that.

19    Q    So have you ever put in an employment application

20    any place since you left Thompson?

21    A    No.

22    Q    Ever gone for any interviews since you left

23    Thompson?

24    A    No, other than the interviews with Red Square in

1    Malden, which you know.

2

3

4

5

6

7

8

9

10

11                              **REDACTED**

12

13

14

15

16

17

18

19

20

21

22

23

24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THOMPSON PRODUCTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )      Case No. 05-11810-RGS |
| GLENN THOMPSON, *et al.*, | ) |
| | ) |
| Defendants. | ) |

<u>**DECLARATION OF ADEYEMI O. SONUGA**</u>

This day came Adeyemi O. Sonuga and declared under penalty of perjury as follows:

1.     Since May 18, 2004, I have been Treasurer and a director of Thompson Products, Inc. ("TPI").

2.     Glenn Thompson ("Glenn") in his Affidavit and Matthew Medeiros ("Medeiros") in his memorandum filed in opposition to TPI's motion to disqualify Medeiros as counsel in this case for Glenn and his new competitive company, Splash Creations, Inc. ("Splash") have asserted that TPI unduly delayed in filing the Motion to Disqualify. This Declaration is made for the purpose of denying that assertion.

3.     When TPI filed this lawsuit on or about September 1, 2005, I and all other board members of TPI certainly knew that Medeiros had represented TPI and Glenn in the 2002-2004 litigation brought against TPI and Glenn by Glenn's brother, Mark. Indeed, as soon as Medeiros declared himself to be counsel for Glenn and Splash in this case, opposing TPI, I and other board members and officers advised our counsel that we did not consent to Medeiros's representation and that we wanted him and his firm removed as counsel.

4.     Our litigation counsel advised us that the rules of ethics governing Medeiros's representation of Glenn and Splash required that there be a "substantial relationship" between the



EXHIBIT
J

two cases in order for us to compel Medeiros's disqualification. The board instructed our litigation counsel to investigate the relationship, and, if justified, to file a motion demanding the disqualification of Medeiros.

5.      TPI personnel were unable to locate a file on the Mark Thompson litigation in its offices. Therefore, our litigation counsel arranged to review the file in the Plymouth Superior Court on October 14, 2005.

6.      Counsel reported that their examination of the Court's file showed that in response to Mark's Complaint, Medeiros, on behalf of TPI, had filed a counterclaim against Mark alleging Mark's violation of the very same Restrictive Covenants that TPI relies upon here to enforce against Glenn. The filing makes clear that Medeiros, on behalf of TPI, took the position in that case that not only were the Restrictive Covenants in effect and binding upon Mark but also that they were reasonable and enforceable.

7.      Counsel further advised that in this case, Medeiros, on behalf of Glenn, had filed papers denying not just that these very same Restrictive Covenants are in effect and binding on Glenn but also denying that even if they are in effect, they are not reasonable and enforceable. Medeiros is, therefore, taking a position in this case against TPI that is the polar opposite of the position he took on behalf of TPI against Mark in the prior case concerning the validity, reasonableness and enforceability of the Restrictive Covenants.

8.      The board, therefore, instructed our litigation counsel to pursue the disqualification of Medeiros.

9.      On October 26, 2005, our litigation counsel sent a letter to Medeiros reciting TPI's position and its demand for Medeiros's withdrawal. Medeiros, by letter from his co-counsel dated November 2, responded, referring to withdraw.

10.    Accordingly, Medeiros and Glenn left TPI no choice but to file the Motion to Disqualify seeking the Court's order for his withdrawal.  TPI filed that motion on November 14, 2005.

11.    TPI did not unduly delay in filing the Motion to Disqualify.  It merely sought to investigate whether grounds existed for disqualification before making the demand and filing the motion, and upon determining that grounds existed, TPI acted promptly.

12.    TPI does not consent to Medeiros's representation of Glenn and Splash in this case.

13.    I declare under penalty of perjury that the foregoing is true and correct. Executed this 24 day of January, 2006.

ADEYEMI O. SONUGA

1240548v1

3