**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THOMPSON PRODUCTS, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05-11810-RGS |
| GLENN THOMPSON, | ) ) | |
| and | ) ) | |
| THOMPSON ENTERPRISES, INC. (now SPLASH CREATIONS, INC.), | ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiff, Thompson Products, Inc. ("TPI"), by counsel, for its Amended Complaint against Defendant Glenn Thompson ("Thompson") and Thompson Enterprises, Inc. (now Splash Creations, Inc. by name change) ("Splash"), says as follows:

### PARTIES, JURISDICTION AND VENUE

1.     TPI is a Delaware corporation with its principal place of business at 310 Kenneth W. Welch Drive, Lakeville, MA 02347. TPI is in the business of manufacturing, selling and importing photo albums, cardboard based gift boxes, easel backs for picture frames and related products. TPI is a wholly-owned subsidiary of Thompson Products Holdings, Inc. ("TPHI").

2.     Thompson was the President, a director and a shareholder of TPI. On July 12, 2005 he resigned as President, director and employee. Thompson's last known residential address is 330 Rumstick Road, Barrington, RI 02806.

3.    Splash is a Rhode Island corporation with its principal place of business at 330 Rumstick Road in Barrington, RI 02806. It was formed by Thompson on July 18, 2005 for the sole purpose of serving as his operating entity to compete directly against TPI.

4.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.    Venue is proper in this jurisdictional district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

FACTS

A.    The Asset Purchase Agreement and the 1998 Employment Agreement

6.    Thompson, with other members of his family, started, developed and operated Thompson Paper Box Co., Inc., the predecessor to TPI, until November 24, 1997. On that date, Thompson Paper Box Co., Inc., along with Thompson, his brother Mark Thompson and two other shareholders of Thompson Paper Box Co., Inc., as sellers, executed an Asset Purchase Agreement (APA") whereby they sold all of the company's assets to TPI and TPHI. Thompson remained with TPI as its President, a director and an employee.

7.    In the APA, the sellers, including Thompson and his brother Mark, promised to deliver to TPI at closing Employment Agreements in the form attached to the APA as Exhibits 3.2(c)-1 and 3.2(c)-2. Each form Employment Agreement, in Section 9, contained identical Restrictive Covenants. Pertinent portions of the APA and the form Employment Agreement exhibits are attached hereto as Ex. A.

8.    Independent of the Employment Agreements, Thompson expressly agreed with

TPI in paragraph 2.4 of the APA to abide by the same Restrictive Covenants stated in the form

Employment Agreements attached to the APA, and the Restrictive Covenants set out in Section 9

of each Employment Agreement were expressly incorporated by reference into the APA to bind

Thompson and his brother Mark.

9.    Therefore, in the APA, Thompson specifically agreed with TPI as follows:

(a)    . . . that during his employment with [Thompson Paper Box Co., Inc.], he was, and during his employment with Employer [TPI], he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer.  The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder . . . divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement.  Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft;

(b)    that for period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct, or indirect, as an officer, partner, shareholder or beneficial owner;

(c)    that for a period of two (2) years following termination of Employee's employment hereunder Employee will not within the continental United States, directly or indirectly, assist in, engage in, have

any financial interest in, or participate in any way in, as an owner,
partner, employee, agent, officer, board member, consultant,
independent contractor or shareholder, in any business that involves, in
whole or in part, activities similar to, related to or competitive with (a)
the business of the Employer or (b) the business of any affiliate of the
Employer as carried on during the term of Executive's employment
hereunder;

(d)    that he represents and admits that (i) in the event of
termination of this Agreement, Employee's experience and capabilities
are such that Employee can obtain employment in a business engaged in
other lines and/or of a different nature than the business of the
Employer, and that the enforcement of a remedy by way of injunction
will not prevent the Employee from earning a livelihood, and (iii) this
Employee covenant and non-competition provision is being entered into
in connection with the Employee's sale of his ownership interest in the
Employer and in the absence of this provision Employee understands
and has been advised by Employer that the sale would not be
consummated; and

(e)    that [n]otwithstanding termination of this Agreement as
provided in Section 8 herein or any other termination of Employee's
employment with the Employer, **the Employee's obligations under this
Section 9 shall survive any termination of the Employee's
employment with the Employer at any time and for any reason.**

10.    In addition, Thompson agreed in paragraph 2.4 of the APA, as expressly

incorporated there from Section 9 of the form Employment Agreement exhibits, that

(a)    If, at the time of enforcement of this Section 9, a court
shall hold that the duration, scope, area or other restrictions stated herein
are unreasonable, the parties agree that reasonable maximum duration,
scope, area or other restrictions may be substituted by such court for the
stated duration, scope, area or other restrictions and upon substitution by
such court, this Agreement shall be automatically modified without
further action by the parties hereto; and

(b)    Employee hereby agrees that damages at law, including,
but not limited to, monetary damages, will be an insufficient remedy to
Employer in the event that the restrictive covenants contained in this
Section 9 are violated and that, in addition to any remedies or rights that
may be available to Employer, all of which other remedies or rights shall
be deemed to be cumulative, retained by Employer and not waived by
the enforcement of any remedy available hereunder, including, but not
limited to, the right to sue for monetary damages, Employer shall also be

4

entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

11.     On January 5, 1998, as required by the APA, Thompson and TPI executed the Employment Agreement in the form attached to the APA, (the executed Employment Agreement being referred to hereinafter as the "1998 Agreement"). The 1998 Agreement provided for Thompson's employment by TPI as its President for consideration and contained in Section 9 the Restrictive Covenants itemized above. A copy of the 1998 Agreement is attached as Ex. B. Glenn's brother Mark executed the same form Employment Agreement.

12.     The 1998 Agreement had a two-year term, which expired on December 31, 2000. However, even though the 1998 Agreement terminated on that date, TPI and Thompson expressly agreed in Section 9(g) of that Agreement that

Notwithstanding termination of this Agreement or any other termination of [Thompson's] employment with [TPI, **[Thompson's] obligations under this Section 9 shall survive termination of [Thompson's] employment with [TPI] any time for any reason.**

This was the same covenant that Thompson made to TPI in paragraph 2.4 of the APA. See paragraph 9 of the Amended Complaint above.

B.      The 2001 Employment Agreement

13.     On information and belief, on or about January 1, 2001, also incident to the 1997 sale of Thompson Paper Box Co., Inc.'s assets to TPI and TPHI, TPI and Thompson entered into a successor Employment Agreement (referred to hereinafter as the "2001 Agreement"). The 2001 Agreement also provided for Thompson's employment by TPI as its President in exchange for an annual compensation of $200,000, plus benefits. An unexecuted copy of the 2001 Agreement is attached as Ex. C.

5

14.     The 2001 Agreement had an initial term of one year, which expired on December 31, 2002. Unlike the 1998 Agreement, however, the 2001 Agreement provided for its automatic renewal for successive one-year renewal terms <u>unless</u> either party provided the other with "notice of desire to terminate or modify [the 2001 Agreement] . . . at least ninety (90) days before the end of the Initial Term or the applicable Renewal Term."

15.     Pursuant to Section 9 of the 2001 Agreement, Thompson agreed to the same Restrictive Covenants set out in the APA and in the 1998 Agreement.

16.     On January 1, 2003 and January 1, 2004, the 2001 Agreement automatically renewed for an additional one-year term as neither party provided the other with the mandatory 90-day notice of termination before the end of the applicable term.

C.     <u>The 2003 Employment Agreement</u>

17.     In April 2003, Thompson was a director of TPHI and TPI, along with James Conlan ("Conlan") and Victor Kiarsis ("Kiarsis"). In March 2003, TPHI, by its Board of Directors, gave formal notice to Conlon, Kiarsis and Thompson that there would be a special shareholders meeting on May 1, 2003 for the purpose of removing Conlan and Kiarsis as members of the TPHI board. Notice attached as Ex. D. At the time of the notice, Conlan and Kiarsis had been advised by TPI's ultimate parent company that their relationships with TPHI, TPI and a number of other companies affiliated with and controlled by TPHI's ultimate parent, were being severed for cause. The contentious relationship between Conlan and Kiarsis, on the one hand, and TPI, TPHI, and companies affiliated with TPHI and TPI, on the other, resulted in litigation commencing in 2003. Accordingly, in April 2003, Conlan and Kiarsis did not have the best interests of TPI at heart.

18.    In collaboration with each other, Conlan, Kiarsis and/or Thompson prepared, or caused to be prepared, a new and very different Employment Agreement between TPI and Thompson.  This new Employment Agreement (referred to hereinafter as the "2003 Agreement") purported to eviscerate all of the provisions that protected TPI, which had been included in both the 1998 Agreement and the 2001 Agreement.  A copy of the 2003 Agreement is attached as Ex. E.

19.    To Thompson's benefit and TPI's detriment, Conlan, Kiarsis and/or Thompson provided for the following in the 2003 Agreement:

(a)    the elimination of all restrictive covenants that had been an essential part of the 1998 Agreement and the 2001 Agreement;

(b)    the elimination of a definition of "business" that had been provided in the 1998 Agreement and the 2001 Agreement, which was pertinent to the restrictive covenants in those Agreements;

(c)    the substantial curtailment of the definition of "cause" that had been provided in the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's ability to terminate Thompson's employment with TPI;

(d)    the elimination of any definition for "disability" that had been defined in the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's termination of Thompson's employment;

(e)    the substantial modification of provisions in the 1998 Agreement and the 2001 Agreement that defined Thompson's employment responsibilities and provided for the TPI Board of Directors' control over Thompson's responsibilities;

(f)    the elimination of the right of the TPI Board of Directors to require Thompson to relocate from his Lakeville, MA location if in the best interest of the company, which was provided for in the 1998 Agreement and the 2001 Agreement;

(g)    the elimination of the automatic renewal provision from the 2001 Agreement and substitution of a 3-year term, which coincided with Thompson's intended retirement from TPI;

(h)    an increase of Thompson's annual salary from $200,000 to $280,000;

(i)    the modification of Thompson's right to terminate his employment with TPI for cause, making it easier for him to do so;

(j)    the elimination of TPI's right to terminate the 2003 Employment Agreement for cause, in contrast to the 1998 Agreement and the 2001 Agreement, which contained "for cause" termination provisions;

(k)    the provision of a complete release of Thompson by TPI and its parent company from past, present and future claims; and

(l)    the elimination of TPI's right to assign Thompson's employment agreement, which had been provided for in the 1998 Agreement and the 2001 Agreement.

20.    Conlan, Kiarsis and Thompson then called a TPI and TPHI joint board of directors meeting on April 23, 2003, one week before Conlan and Kiarsis were to be removed as directors of TPHI, for the sole purpose of approving the 2003 Agreement. Corporate counsel for TPI and TPHI attended the meeting. Counsel advised the three-member Board that the 2003 Agreement should not be executed. After counsel departed the meeting, Conlan, Kiarsis and Thompson nevertheless voted to approve the 2003 Agreement. Kiarsis signed the 2003 Agreement on behalf of TPI and gave it to Thompson, who did not sign it. Board minutes were

8

prepared by Conlon, Kiarsis and/or Thompson, or by another at their direction, to reflect the approval of the transaction. A copy of the board minutes is attached as Ex. F.

21.    Thompson lacked the authority to act on behalf of TPI in this conflict of interest situation, and Conlon, Kiarsis and Thompson deliberately and willfully breached their fiduciary duties of loyalty to TPI in voting to approve the 2003 Agreement. Kiarsis violated the same duty to TPI in executing the 2003 Agreement on behalf of TPI. Their actions and the 2003 Agreement were grossly unfair to TPI and voidable by it.

22.    Thompson did not immediately execute the 2003 Agreement following the April 2003 Board meeting. Instead he continued to negotiate with new TPI board of director members on his employment terms for the remainder of 2003.

23.    On May 1, 2003, the shareholders of TPHI, in a special meeting, removed Conlan and Kiarsis as directors. A copy of the minutes of the shareholders meeting is attached as Ex. G. Also in May and early June, Conlan and Kiarsis were removed as directors, employees and officers from all companies affiliated with TPHI and TPI.

24.    TPHI and TPI promptly replaced Conlon and Kiarsis with two new board members.

25.    Upon learning of the 2003 Agreement and its execution by Kiarsis, one or both of the new Board members advised Thompson that, in their view, the 2003 Agreement was unfair to TPI, that it had been prepared and executed without proper TPI authority and that it was unacceptable to TPI. With this notice, TPI effectively withdrew the unsigned 2003 Agreement, then only an offer, from further consideration before its execution by Thompson.

26.    Despite receipt of this communication, Thompson nonetheless signed the 2003 Agreement on or about November 17, 2003, and thereby breached his fiduciary duty of loyalty to TPI.

D.    Thompson's Pre-Resignation Activities

27.    On January 1, 2004, without valid authorization by the TPI or TPHI board of directors, Thompson caused his annual salary to be increased to $280,000. Thompson caused TPI to pay him on the basis of $280,000 annually from January 1, 2004 through July 12, 2005, the date of his departure from TPI. Therefore, Thompson drew a salary from TPI that was calculated on the basis of an annual salary of $280,000, which was $80,000 more annually than he was entitled to be paid.

28.    On May 19, 2005, Thompson, individually contracted with Medhat Salyh to provide personal consulting services to Thompson in connection with Thompson's potential acquisition of TPI. Thompson caused TPI to pay Salyh for such services that were rendered solely to Thompson and for his personal benefit. At Thompson's direction, TPI paid Salyh $42,500 for services rendered to Thompson individually.

29.    For months Thompson negotiated with TPHI for his acquisition of TPI, but TPHI and Thompson never agreed upon terms.

30.    Therefore, on July 12, 2005, Thompson resigned as an officer, director and employee of TPI and set immediately upon a course to use all of the confidential and proprietary information he had acquired at TPI concerning the operation of the company to establish a mirror image of TPI for the manufacture and sale of photo boxes, photo albums and journal, to solicit and hire TPI's employees, to solicit and convert its customers and, in the end, either to drive TPI

out of business or to reduce its market value to a point where TPI would be willing to sell the company to him at a below market price.

E.    Thompson's Post-Termination Competitive Activities

31.    In furtherance of that scheme, on or before July 18, 2005, Thompson formed Splash (originally named Thompson Enterprises, Inc.) for the sole purpose of becoming a direct competitor of TPI.  Upon the filing of this action, Thompson changed the name of Thompson Enterprises, Inc. to Splash Creations, Inc.  Thompson was the incorporator, and is the registered agent and sole shareholder of Splash.

32.    Armed with every confidential and proprietary detail of TPI's business, including its finances, suppliers, product designs, customers, customer account numbers, manufacturer's representatives, overhead, profit margins and the like, Thompson and Splash have established in the short span of approximately three months a mirror image of TPI to compete unlawfully with it in the marketplace as to the manufacture and sale of certain products.  Without such proprietary and confidential information, Thompson and Splash would have been required to spend many months, perhaps even years, to be ready and able to compete directly, head-to-head, with TPI for the business of TPI's major customers, such as Target, Wal-Mart and K-Mart.

33.    With Thompson's competitive advantage acquired through years of employment in top management with TPI, Thompson and Splash have, in the past three months

(a)    successfully solicited and employed at least nine key TPI employees, including TPI's office manager in Hong Kong; its director of manufacturing in Hengli Town, Dong Guan, China; its product development director; its vice president of operations; and its art director, among others;

11

(b)     rented office space in Hong Kong in the very building housing TPI's China business office;

(c)     on information and belief, established manufacturing and distribution capabilities in China for the U. S. market and in the United States;

(d)     solicited TPI's manufacturer's representatives with key TPI customer relationships to switch their allegiances to Thompson and Splash from TPI; and

(e)     used TPI's confidential customer account numbers to contact TPI's customers and attempt to sell them competitive products.

34.     The recent conduct of Thompson and Splash, including his resignation from TPI, the formation of Splash to compete with TPI, the solicitation of TPI customers, the solicitation and employment of TPI key employees and other competitive activities itemized herein have been for the purpose of devaluing TPI and either putting TPI out of business or reducing the value of TPI in an effort to pursuade TPI to sell its stock or assets to him at a price well below market value.  His conduct has, in fact, caused great harm to TPI and has devalued TPI for sale in the marketplace.

<u>COUNT I</u>
(Declaratory Judgment)

35.     TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

36.     Until signed by Thompson, the 2003 Agreement was only an unaccepted offer, and the offer was withdrawn by TPI's newly elected board members prior to Thompson's acceptance by execution of the 2001 Agreement.  Therefore, it was never valid.

12

37.     There is an actual case or controversy as to whether the 2003 Agreement became a valid contract between Thompson and TPI or whether it was only an unaccepted offer that was lawfully withdrawn prior to acceptance by Thompson.

WHEREFORE, TPI seeks a declaratory judgment that the 2003 Agreement was never a valid contract between Thompson and TPI.

COUNT II
(Rescission of the 2003 Agreement)

38.     TPI repeats and realleges here paragraphs 1 through 34 above as if set out fully herein.

39.     Even if Thompson signed the 2003 Agreement before it was withdrawn by TPI, approval of the 2003 Agreement at the April 23, 2003 TPI board of directors meeting was a conflict of interest transaction for which Thompson was ineligible to vote. Even though approved by Conlan and Kiarsis, the other two TPI directors, the 2003 Agreement was grossly unfair to TPI, is voidable and is subject to rescission.

WHEREFORE, TPI prays for rescission of the 2003 Agreement as voidable due to unfairness in this board of directors conflict of interest matter.

COUNT III
(Breach of Restrictive Covenants)

40.     TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

41.     The Restrictive Covenants set forth in the APA, paragraph 2.4, and/or in paragraph 9 of the 1998 Agreement and/or in paragraph 9 of the 2001 Agreement are in effect and binding upon Thompson for a two-year period following his termination of employment with TPI on July 12, 2005.

42.    Thompson violated, and he continues to violate, the Restrictive Covenants set out in the APA and/or in the 1998 Agreement and/or the 2001 Agreement as follows:

(a)    he has used, and he continues to use, TPI's Confidential Information to the detriment of TPI without its prior written consent in violation of subsection (a) of the Restrictive Covenants;

(b)    he has failed, and he continues to fail, to take all reasonable steps against his own misuse of TPI's Confidential Information in violation of subsection (a) of the Restrictive Covenants;

(c)    he has solicited, employed or associated in his competitive business persons who were employed by TPI or its affiliated companies within six months prior to Thompson's termination of employment with TPI in violation of subsection (b) of the Restrictive Covenants and he continues to do so; and

(d)    he has directly engaged in and participated as an owner and officer in a business that involves activities similar to, related to or competitive with the business of TPI, and he continues to do so, in violation of subsection (c) of the Restrictive Covenants.

43.    Pursuant to paragraph 2.4 of the APA and/or Section 9(f) of the 1998 Agreement and/or Section 9(f) of the 2001 Agreement, Thompson agreed that:

> . . . damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employee shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary preliminary or permanent injunction, to enforce the provisions contained in Section 9, all

14

of which shall constitute rights and remedies to which Employer may be entitled.

44.    Pursuant to paragraph 2.4 of the APA and/or Section 9(g) of the 1998 Agreement and/or Section 9(g) of the 2001 Agreement, Thompson further agreed that:

> Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, **the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.**

45.    Thompson's violations of the Restrictive Covenants contained in the APA and/or the 1998 Agreement and/or the 2001 Agreement have caused, and continue to cause, irreparable harm to TPI for which there is no adequate remedy at law.

46.    The Restrictive Covenants are reasonable in scope, duration, area and geography and are necessary for the protection of TPI's interests, and are in the public interest.

WHEREFORE, TPI respectfully requests the following relief:

A.    a temporary restraining order, preliminary injunction and permanent injunction

(i) compelling Thompson and Splash to cease and desist from all competitive business activities for a period of two (2) years from entry of the order;

(ii)    prohibiting Thompson's and Splash's use of TPI's confidential information either to gain a competitive advantage over TPI or generally to TPI's detriment; and

(iii)    prohibiting Thompson and Splash from, directly or indirectly, soliciting or employing any person who was employed by TPI within the six-month period prior to Thompson's resignation from TPI for a period of two (2) years from entry of the order;

B.    Judgment against Thompson and Splash for all past breaches in an amount to be proved at trial; and

15

C.     for such other and further general relief as equity may deem meet.

## COUNT IV
### (Breach of Fiduciary Duties)

47.     TPI repeats and realleges here paragraphs 1 through 34 above as if fully set forth

herein.

48.     Prior to his resignation from TPI, Thompson breached his fiduciary duties of

loyalty and good faith to TPI by, among other things:

(a)     engaging in self-serving conduct in the preparation, approval and

execution of the 2003 Agreement;

(b)     accepting increased annual compensation of $280,000 under the 2003

Agreement, rather than the $200,000 annual compensation to which he was entitled, from

January 1, 2004 through July 12, 2005;

(c)     causing TPI to pay Medhat Slayh $42,500 for consulting services rendered

to Thompson individually.

49.     TPI has been damaged by Thompson's past breaches of his fiduciary duties to

TPI, and to the extent that damages for any one or more of such breaches may be reasonably

measured, TPI is entitled to an award of such damages.

WHEREFORE, TPI respectfully requests entry of judgment against Thompson in the

amount of TWO MILLION DOLLARS ($2,000,000.00), or in such lesser amount as the

evidence may show, plus interest and costs.

## COUNT V
### (Accounting)

50.     TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth

herein.

51.    Upon information and belief, Thompson's and Splash's unlawful competitive activities have produced income and/or profits for Thompson and/or Splash which must be disgorged as a measure of TPI's damages.

52.    Absent a full accounting by Thompson and Splash of all sales and profits that they made in their conduct of unlawful competitive activities, TPI cannot accurately measure its damages.

53.    Accordingly, TPI is entitled to a full accounting by Thompson and Splash of all such sales and profits.

WHEREFORE, TPI respectfully requests entry of an order compelling Thompson and Splash to account fully for all sales of products in competition with TPI since Thompson's departure from TPI and for all profits made on such sales and any other unlawful business activities in competition with TPI.

COUNT VI<br>(Misappropriation of Trade Secrets)

54.    TPI repeats and realleges here paragraphs 1 through 34 as set out in full.

55.    The confidential and proprietary aspects of TPI's business, individually, as to many, but collectively as to all, are trade secrets.  They include:

(a)    the identity of TPI's suppliers;

(b)    the terms and conditions of TPI's supplier contracts;

(c)    the identity of TPI's supplier account representatives;

(d)    TPI's cost of raw materials;

(e)    TPI's cost of labor;

(f)    TPI's product designs and history concerning which designs are profitable and which designs are not;

17

(g)     customer/buyer design preferences;

(h)     machinery needed for its operation, vendors of such machinery and costs;

(i)     manufacturing components for various designs;

(j)     vendor discounts provided to TPI, by whom and under what conditions;

(k)     sources of skilled and unskilled labor;

(l)     the China market applicable to the manufacture and distribution of TPI's products;

(m)     import/export duty requirements applicable to TPI's operations in China;

(n)     TPI's delivery costs;

(o)     the identity of TPI customers and the history of their relationships with TPI;

(p)     the identity of TPI's manufacturer representatives;

(q)     knowledge of TPI customer confidential accounts;

(r)     TPI's wholesale prices;

(s)     TPI's customer delivery demands, TPI's ability to comply and its history of compliance;

(t)     the identity of key TPI employees, their salary, benefits and satisfaction and dissatisfaction with TPI;

(u)     TPI's profit margins; and

(w)     TPI's strengths and weaknesses unknown in the marketplace generally.

56.     Thompson and Splash have misappropriated TPI's trade secrets and have used, and are continuing to use, such trade secrets to the substantial detriment of TPI.

WHEREFORE, TPI respectfully prays for the following relief:

A.    a temporary restraining order, preliminary injunction and permanent injunction prohibiting Thompson and Splash from all further misappropriation and use of TPI's trade secrets;

B.    judgment against Thompson and Splash for past misappropriations in an amount to be proved at trial; and

C.    for such other further and general relief as equity may deem meet.

## COUNT VII
### (Violation of M.G.L. c. 93A §11)

57.    TPI repeats and realleges paragraphs 1 though 34 above as if fully set forth herein.

58.    TPI, a corporation with its principal place of business in the Commonwealth, is a person within the meaning of M.G.L. c. 93A, § 11.

59.    Thompson and Splash are currently in the trade or business of manufacturing, selling and or importing goods substantially similar to those of TPI.

60.    Following his resignation from TPI, Thompson established Splash for the specific purpose of unfairly competing with TPI, in Massachusetts and elsewhere, by stealing TPI's customers and utilizing TPI's trade secrets, confidential business information, and other proprietary or protected information and knowledge possessed by him and owned by TPI.

61.    Thompson and Splash have engaged in unfair and deceptive acts, undertaken willfully and knowingly in violation of M.G.L. c. 93A §11.

62.    As a result of the foregoing, TPI has been damaged, and continues to suffer damages as the unfair competition continues unchecked, in the amount of TWO MILLION DOLLARS and 00/100 ($2,000,000.00), or in such other amount as the evidence may show, plus interest, multiple damages, attorney's fees and costs.

**THOMPSON PRODUCTS, INC.**

By its attorneys

/s/  Andrew D. Kang
Terence P. McCourt (BBO #555784)
Andrew T. Kang (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

and

Sandy T. Tucker
*Admitted Pro Hac Vice*
Monica McCarroll
*Admitted Pro Hac Vice*
WILLIAMS MULLEN
A Professional Corporation
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507

DATED:  January 31, 2006

## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 31st of January, 2006, I served a copy of

foregoing *Amended Complaint w/ Exhibits* by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI 02903

Michael L. Chinitz, Esq
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA 02110

                                        /s/ Andrew D. Kang
                                        Andrew D. Kang

bos-fs1\kanga\181893v01\1/26/06\90594.010100

ASSET PURCHASE AGREEMENT

Dated as of November 24, 1997

among

Thompson Products, Inc.

and

Thompson Paper Box Co., Inc.,

Glenn Thompson,

Mark A. Thompson,

Frederick L. Weingeroff

and

Gregg Weingeroff



EXHIBIT

A

**EXHIBITS**

Exhibit 1.23        -    Form of Subordinated Promissory Note
Exhibit 3.2(a)      -    Form of Bill of Sale
Exhibit 3.2(b)      -    Form of Assignment and Assumption on Agreement
Exhibit 3.2(c)-1    -    Form of Employment Agreement of Glenn Thompson
Exhibit 3.2(c)-2    -    Form of Employment Agreement of Mark Thompson
Exhibit 3.2(d)      -    Form of Subscription Agreement
Exhibit 3.2(j)-1    -    Form of Officer's Certificate
Exhibit 3.2(j)-2    -    Form of Stockholders Certificate
Exhibit 3.2(m)      -    Form of Net Operating Asset Certificate
Exhibit 3.2(n)      -    Form of Stockholders Letter
Exhibit 3.2(o)      -    Form of Landlord's Waiver and Estoppel Certificate
Exhibit 3.2(p)      -    Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit 3.2(q)      -    Form of Third Amendment to Lease

iv

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") made and entered into as of the 24th day of November, 1997, by and among Thompson Products, Inc., a Delaware corporation ("Purchaser"), which is a Wholly-Owned Subsidiary of Thompson Products Holdings, Inc., a Massachusetts corporation ("Thompson Holdings"), Thompson Paper Box Co., Inc., a Massachusetts corporation (the "Company"), Glenn Thompson, an individual residing at 5 Assawompsett Court, Lakeville, MA 02347 ("GT"), Mark A. Thompson, an individual residing at 230 Grange Park, Bridgewater, MA 02324 ("MT"), Frederick L. Weingeroff, an individual residing at 3181 Monet Drive, Palm Beach Garden, FL 33410 ("FW"), and Gregg Weingeroff, an individual residing at 11 Loring Avenue, Providence, R.I. 02906 ("GW") (GT, MT, FW and GW are sometimes collectively referred to herein as the "Stockholders" and individually as a "Stockholder").

## W I T N E S S E T H

WHEREAS, the Company is in the business of the manufacture and sales of photo albums, cardboard-based gift boxes and leasebacks for picture frames (the "Business");

WHEREAS, GT, MT, FW and GW collectively own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Company;

WHEREAS, Purchaser wishes to acquire from the Company and the Company desires to sell to the Purchaser, the Acquired Assets (as defined below), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the aforesaid and the respective warranties, representations, covenants and agreements hereinafter set forth, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings specified with respect thereto below.

1.1     "Acquired Assets" shall mean all of the assets and properties of the Company (other than the Excluded Assets), with such additions thereto or deletions therefrom as may be permitted by the terms of this Agreement, including the Company's goodwill and all of its concepts, plans and materials relating to the operation of the business and also including without limitation:

57483-v5                                             1

shall be payable by the execution and delivery of the Subordinated Note; provided, however, that the cash portion of the Purchase Price and any allocation thereof are subject to adjustment as set forth in Section 2.3.

2.3    Purchase Price Adjustment.  (a)  The cash portion of the Purchase Price shall be reduced, on a dollar for dollar basis, by an amount equal to (i) the amount that the value of the Net Operating Assets of the Company on the Closing Date, as certified by an executive officer of the Company pursuant to Section 3.2(m) hereof and subject to confirmation by Arthur Andersen, Purchaser's accountant, on the Closing Date is less than $11,163,750.00, and (ii) the aggregate amount of all those liabilities, if any, set forth on Schedule 2.3 of the Company expressly assumed by the Purchaser; Schedule 2.3 shall be prepared by Purchaser and delivered to the Company no later than five (5) business days prior to the Closing.

(b)    If the value of Net Operating Assets (as determined in accordance with Section 2.3(a)(i) above) of the Company on the Closing Date exceeds $11,740,000.00 (the "Excess"), Purchaser shall deliver to the Company at the Closing a promissory note (the "Excess Note") in the principle amount equal to the Excess, due one hundred and eighty (180) days after the Closing, bearing interest at nine percent (9%) per annum and secured by a first priority lien on the accounts receivable of Purchaser pursuant to a security agreement; provided, that the principle amount of the note shall in no event be greater than the amount due on the Closing Date to First National Bank of Boston (the "Bank") by the Company under the existing loan facility with the Bank.

2.4    Noncompetition.  (a)  As additional consideration for Purchaser's agreement to purchase the Acquired Assets and pay the Purchase Price, GT and MT have agreed, severally but not jointly, to the noncompetition provisions (the "Restrictive Covenants") contained in their respective Employment Agreements, which noncompetition provisions are incorporated herein by reference and made a part hereof as if restated herein.

(b)    It is agreed and understood by and among the parties to this Agreement that the Restrictive Covenants incorporated by reference in subsection (a) above are each individually essential elements of this Agreement and that, but for the agreement of GT and MT to comply with such Restrictive Covenants, Purchaser would not have agreed to enter into this Agreement.  Further, each of GT and MT expressly acknowledges that the restrictions incorporated by reference into subsection (a) of this Section 2.4 are reasonable and necessary to accomplish the mutual objectives of the parties and to protect Purchaser's interests in the Business after the Closing.  Each of GT and MT further acknowledges that enforcement of such restrictions will not deprive him of the ability to earn a reasonable living and that any violation of such restrictions will cause irreparable injury to Purchaser.  Such Restrictive Covenants of GT and MT shall be construed as agreements independent of any other provision of this Agreement and of each other.

(c)    GT and MT hereby agree that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that the Restrictive Covenants incorporated by reference into subsection (a) of this Section 2.4 are

violated and that, in addition to any remedies or rights that may be available to Purchaser, all of which other remedies or rights shall be deemed to be cumulative, retained by Purchaser and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Purchaser shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions incorporated by reference into subsection (a) of this Section 2.4, all of which shall constitute rights and remedies to which Purchaser may be entitled.

(d)    If any court determines that the covenant not to compete incorporated by reference into subsection (a) of this Section 2.4, or any part hereof, is unenforceable because of the duration or geographic scope of such provision, such court shall reduce the duration or scope of such provisions (to the maximum duration or scope permitted by law), as the case may be, and such provision in its reduced form shall then be enforceable.

(e)    Notwithstanding anything to the contrary contained in the foregoing provisions of this Section 2.4, any other provisions of this Agreement or their respective Employment Agreements, each of GT and MT shall have liability only for his own breach of a Restrictive Covenant.

2.5    Closing.  The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at 10:00 a.m. at the offices of Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, New York 10022 on the later of (i) January 5, 1998 (with a pre-closing on December 30, 1997) or (ii) the third business day following the satisfaction or waiver of all of the conditions to Closing set forth in Article III hereof, or at such other time, date or place as the parties may mutually agree.  The actual date of the Closing is sometimes referred to herein as the "Closing Date".

## ARTICLE III.

## CONDITIONS TO CLOSING

3.1    Conditions to Purchaser's Obligations to Close.  The obligations of Purchaser to consummate the Acquisition is subject to the satisfaction at the time of the Closing of the following conditions (any or all of which may be waived by Purchaser in Purchaser's sole discretion):

(a)    The representations and warranties of the Company and the Stockholders made in this Agreement and in each of the other agreements to be delivered in connection with the Acquisition shall be true and correct in all respects as of the date of this Agreement and as of the time of Closing as though made as of such time, and the Company and the Stockholders shall have performed in all respects each and every covenant contained in this Agreement required to be performed by them by the time of the Closing.

(b)    The Acquisition as provided in this Agreement and each of the other agreements shall not violate any applicable law or governmental regulation.

(c)    There shall be no action, suit, investigation, or proceeding pending, or to the knowledge of the Company or any Stockholder, threatened against the Company, or the Company's properties or rights, including, without limitation, the Acquired Assets or any of the Company's officers or directors, before any court, arbitrator or administrative or governmental body which (i) seeks to restrain, enjoin, prevent the consummation of the transactions contemplated by this Agreement or (ii) questions the validity or legality of any such transactions or seeks to recover damages or to obtain other relief in connection with any such transactions.

(d)    Purchaser shall have received duly executed copies of all other deeds, endorsements, assignments, consents of third parties and other instruments as, in the opinion of counsel to Purchaser, are reasonably necessary to vest in Purchaser all right, title and interest in and to any of the Acquired Assets.

(e)    The Company shall not have suffered any material adverse change in its Business, assets, financial condition or results of operations of the Company since December 31, 1996, other than any such changes which are accurately reflected on the Schedules to this Agreement and delivered on or prior to the date of this Agreement.

(f)    Stockholders and the Company shall have received the Consents and any other consents, approvals, authorizations, exemptions or waivers that are necessary for the consummation of the transactions contemplated hereby or that are required to prevent a breach of or default under, a termination or modification of, or acceleration of the terms of, any Contract, agreement, instrument or understanding identified on Schedule 4.13, in each case pursuant to instruments in form and substance reasonably satisfactory to Purchaser.

(g)    Purchaser shall have received an opinion from Chace, Ruttenberg & Freedman, counsel to the Stockholders and the Company, dated the Closing Date and in form and substance satisfactory to the Purchaser.

(h)    All applicable waiting periods, if any, under the Hart-Scott-Rodino Anti-trust Improvements Act of 1976, as amended (the "HSR Act") with respect to the transactions contemplated by this Agreement, including without limitation the Acquisition and the financing to be obtained by the Purchaser in connection therewith, shall have expired or been terminated.

(i)    Purchaser shall have received from the Company and the Stockholders all of the items to be delivered in accordance with Section 3.2 below.

(j).    The value of the Net Operating Assets shall have been confirmed by Arthur Andersen pursuant to Section 2.3(a)(i).

3.2.    <u>Deliveries by the Company and the Stockholders</u>.  The Company and the Stockholders agree to deliver (or cause to be delivered) to the Purchaser and at the Closing on the

Closing Date the following agreements and documents, all satisfactory in form and substance to Purchaser and their legal counsel:

(a)    a duly executed Bill of Sale for all Owned Tangible Property, substantially in the form as set forth on Exhibit 3.2(a) (the "Bill of Sale").

(b)    a duly executed Assignment and Assumption Agreement for all Contracts, substantially in the form as set forth on Exhibit 3.2(b) (the "Assignment and Assumption Agreement").

(c)    a duly executed Employment Agreement from each of GT and MT, in the form as set forth on Exhibit 3.2(c)-1 and Exhibit 3.2(c)-2, respectively (collectively, the "Employment Agreements").

(d)    a duly executed Subscription Agreement, in the form as set forth on Exhibit 3.2(d) (the "Subscription Agreement"), from each of GT and MT providing for the aggregate purchase of nineteen and one-half percent (19.5%) of the common stock (the "Thompson Shares"), $.01 par value per share ("Thompson Holdings Common Stock"), of Thompson Holdings, divided between GT and MT as set forth on Schedule 3.2(d), for an aggregate purchase price of $975,000.00.

(e)    all documents of title, if any, necessary to transfer to Purchaser any of the Owned Tangible Property.

(f)    all assignments necessary to transfer to Purchaser complete rights in all Intellectual Property Rights in each case included within the Acquired Assets, and other intangible personal property owned by the Company and the Stockholders.

(g)    if deemed necessary by Purchaser, specific assignments of Contracts.

(h)    all documents, if any, containing or related to proprietary information being purchased by Purchaser pursuant hereto.

(i)    all other deeds, endorsements, assignments, consents of third parties and other instruments as, in the opinion of counsel for Purchaser, are necessary to vest in Purchaser all right, title and interest in and to any of the Acquired Assets.

(j)    a certificate dated the Closing Date and signed by an executive officer of the Company confirming the matters set forth in Section 3.1(a) and Section 3.1(e) above, in the form of Exhibit 3.2(j)-1 attached hereto; and a certificate dated the Closing Date and signed by GT, MT, FW and GW confirming the matters set forth in Section 3.1(a), in the form of Exhibit 3.1(j)-2.

(k)    the December Balance Sheet.

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

THOMPSON PRODUCTS, INC.

By: _____
    Name: Dennis M. Carlson
    Title: Sec. + Treasurer

THOMPSON PAPER BOX CO., INC.

By: _____
    Name: Glenn Thompson
    Title: President

STOCKHOLDERS

_____
Glenn Thompson

_____
Mark A. Thompson

_____
Frederick L. Weingeroff

_____
Gregg Weingeroff

57413-v3            45

EXHIBIT 3.2 (c) – 1

TO

ASSET PURCHASE AGREEMENT
DATED 11/24/97

11/20/97  DRAFT

EXHIBIT 3.2(c) - 1

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January __, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### WITNESSETH:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November __, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

[58205-v3]

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

-2-

3.    **Employment**

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

4.    **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    **Term**

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    **Compensation and Benefits**

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

- 3 -

(d)     The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)     The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.     **Vacation**

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.     **Termination**

(a)     Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)     If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)     If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

9.     **Restrictive Covenants**

(a)     Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong

- 4 -

to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)    Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such

- 5 -

court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

## 10.    Return of Documents

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

## 11.    Binding Effect

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

## 12.    Miscellaneous

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability

- 6 -

shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)     This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law.  Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)     All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery.  Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)     This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought.  Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

- 7 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January ___, 1998.

THOMPSON, INC.

By:_____
  Name:
  Title:


_____

Glenn Thompson

EXHIBIT 3.2 (c) – 2

TO

ASSET PURCHASE AGREEMENT
DATED 11/24/97

11/20/97  DRAFT

EXHIBIT 3.2(e) - 2

## EMPLOYMENT AGREEMENT

     This Employment Agreement ("Agreement"), effective as of January __, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Mark A. Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### W I T N E S S E T H:

     WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November __, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Glenn Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

     WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

     WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

     WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

     WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

     NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

    1.     **Definitions**

[60363]

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any

- 2 -

way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

3.    **Employment**

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

4.    **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    **Term**

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    **Compensation and Benefits**

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

- 3 -

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

## 7.    Vacation

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

## 8.    Termination

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; (iii) pay to Employee any earned but unpaid bonuses and (iv) pay to Employee $100,000 with such amount payable in equal monthly installments over a period of two (2) years following the termination of Employee's employment hereunder; provided, that

- 4 -

in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease.

(d)    If Employee's employment with the Employer is not extended by mutual agreement of the parties after the expiration of this Agreement on December 31, 2000, the Employer shall pay to Employee $100,000 with such amount payable in equal monthly installments over the period of two (2) years following the termination of Employee's employment hereunder; provided, that in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease. In the event Employee is receiving payments pursuant to Section 8(c) above, Employee shall be precluded from receiving payments under this Section 8(d).

9.    **Restrictive Covenants**

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the

- 5 -

Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)     Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)     If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)     Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)     Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.     **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies,

upon the termination of Employee's employment or at any time as requested by the Employer.

11.    **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12.    **Miscellaneous**

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered

- 7 -

to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January ___, 1998.

THOMPSON, INC.

By:_____
    Name:
    Title:


_____
Mark A. Thompson

- 8 -

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January 5, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### W I T N E S S E T H :

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November 24, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

[88205-v3]

EXHIBIT

B

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

3.    **Employment**

- 2 -

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

### 4.    Place of Employment

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

### 5.    Term

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

### 6.    Compensation and Benefits

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable

- 3 -

expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.    Vacation

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.    Termination

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

9.    Restrictive Covenants

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of

- 4 -

this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and become generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

      (b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

      (c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

      (d)    Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

      (e)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties

-5-

hereto.

(f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

## 10.    Return of Documents

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

## 11.    Binding Effect

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

## 12.    Miscellaneous

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or

- 6 -

unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

- 7 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January 5, 1998.

THOMPSON PRODUCTS, INC.

By: _____
Name: Victor Kiarsis
Title:   President

_____
Glenn Thompson

- 8 -

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January 1, 2001 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 330 Rumstick Road, Barrington, RI 02806 ("Employee").

### W I T N E S S E T H:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November 24, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer acquired certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee was the owner of certain interests in the Seller which were conveyed to Employer;

WHEREAS, Employee was an executive officer of Seller and post Closing, Employer and Employee entered into an Employment Agreement, which expired December 31, 2000, and Employer and Employee now seek to renew and extend this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by

[58205v3]

**EXHIBIT**

tabbies

**C**

the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements, which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

## 2.    Representations and Warranties

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

## 3.    Employment

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

## 4.    Place of Employment

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change

- 2 -

the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    **Term**

(a) Initial Term: The term of this Agreement shall commence on the Closing and shall expire on <u>December 31, 2002</u> unless sooner terminated pursuant to Section 8 hereof.

(b) RENEWAL, EMPLOYMENT PERIOD DEFINED. This Employment Agreement will be automatically renewed at the end of the Initial Term for additional one year periods, subsequent renewal periods to commence one year after commencement of the previous renewal period and ending one year after the end of the previous renewal period (each such period to be known as "Renewal Term"), unless either party serves notice of desire to terminate or modify this Employment Agreement to the other. Such notice must be given at least ninety (90) days before the end of the Initial Term or the applicable Renewal Term (taken together, the "Employment Term").

6.    **Compensation and Benefits**

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any

- 3 -

Federal, state or city laws, rules or regulations.

7.    **Vacation**

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.    **Termination**

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through the Employment Term payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through the end of the Employment Term on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

9.    **Restrictive Covenants**

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally

- 4 -

available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)     During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)     During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)     Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)     If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)     Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain

- 5 -

injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)     Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.     **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

11.     **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12.     **Miscellaneous**

(a)     If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)     This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of

- 6 -

an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

        (c)     All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiursis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

        (d)     This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of October __, 2001.

THOMPSON PRODUCTS, INC.

By:_____
  Name:
  Title:

_____

Glenn Thompson

- 8 -

CERTIFICATE OF MAILING NOTICE

    I, Sallie E. Brainard, certify that I caused the attached Notice of Special Meeting of Stockholders of THOMPSON PRODUCTS HOLDINGS, INC. to be given by mailing said Notice, FIRST CLASS/AIR MAIL postage prepaid, on March 6, 2003, to each of the Stockholders of said corporation set forth on the Exhibit A hereto.

Date: _3/6/2003_____

                                          _Sallie E. Brainard_
                                          Sallie E. Brainard

3536477v1

EXHIBIT
D

## THOMPSON PRODUCTS HOLDINGS, INC.

To:        Stockholders of Thompson Products Holdings, Inc. (the "Company")

From:      Board of Directors of the Company

Date:      March 6, 2003

Re:        Special Meeting of Stockholders

---

BIB (Bermuda) Holdings, Ltd. ("BIBH"), the holder of approximately 64% of the outstanding shares of capital stock of the Company, has requested that a special meeting of stockholders of the Company be called for the purpose of (1) removing Victor Kiarsis and James M. Conlon as directors of the Company and (2) electing David Jansen and Stephen Mallet as directors of the Company. Under Massachusetts law and the Company's By-laws, the Company is required to call a special stockholders' meeting on the written request of one or more stockholders owning at least 10% of the outstanding capital stock.

Accordingly, enclosed please find:

1.    Notice of Special Meeting of Stockholders;

2.    Proxy appointing Victor Kiarsis to vote your shares if you are unable to attend the meeting in person.

Under Massachusetts law and the Company's By-laws, the holders of a majority of the Company's outstanding stock represented in person or by proxy shall constitute a quorum at the meeting and, if a quorum is present, the holders of a majority of the stock represented in person or by proxy shall decide the matters stated in the Notice.

The Company's Board of Directors currently consists of Messrs. Kiarsis and Conlon and Glenn Thompson, whose term as a director shall continue following the meeting. The Board of Directors shall continue to have three (3) members following the meeting unless the resolution to remove Messrs. Kiarsis and Conlon is not approved and the resolution to elect Messrs. Jansen and Mallet is approved, in which event the Board of Directors shall have five (5) members following the meeting.

If you are unable to attend the meeting in person, please complete and return the enclosed Proxy in accordance with the instructions on the Proxy.

Special Meeting of Stockholders
Memorandum
March 6, 2003
Page 2

      If you have any questions, please feel free to contact Cameron Read at Choate, Hall &
Stewart, the Company's counsel. His contact information is:

Cameron Read
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109-2804
Direct Dial: 617-248-5045
Facsimile: 617-248-4000
Email: CRead@Choate.com

3535168v1

# THOMPSON PRODUCTS HOLDINGS, INC.
### 310 Kenneth Welch Drive
### Lakeville, Massachusetts 02347

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

March 6, 2003

To the Stockholders of Thompson Products Holdings, Inc.:

BIB Holdings (Bermuda), Ltd., as holder of at least ten percent (10%) of the entire capital stock issued and outstanding and entitled to vote of Thompson Products Holdings, Inc. (the "Company") has directed the Clerk of the Company to call a Special Meeting of Stockholders of the Company (the "Meeting") pursuant to Section 34 of the Massachusetts Business Corporation Law and Section 1.04 of the By-Laws of the Company.  In accordance with such direction, the Meeting will be held at the offices of the Company on May 1, 2003 at 2:00 P.M. local time for the following purposes:

(1)    Approval of a resolution to remove Victor Kiarsis and James M. Conlon as directors of the Company, attached hereto as Exhibit A;

(2)    Approval of a resolution to appoint David Jansen and Stephen Mallet as directors of the Company, attached hereto as Exhibit B; and

(3)    To consider and act upon such other business as may properly come before the Special Meeting and any adjournment or adjournments thereof.

By order of the Board of Directors
James M. Conlon, Clerk

3535149v1

## EXHIBIT A

RESOLVED, that the following individuals are hereby removed from the Board of Directors of the Company effective immediately and without any further action as of the date hereof:

Victor Kiarsis; and
James M. Conlon.

3535149v1

## EXHIBIT B

RESOLVED, that the following individuals are hereby appointed to serve as directors of the Company, effective as of the date hereof, until their successors are duly appointed and qualified:

David Jansen; and
Stephen Mallet.

3535149v1

# PROXY
## THOMPSON PRODUCTS HOLDINGS, INC.

| X |
|---|

**PLEASE MARK VOTES
AS IN THIS EXAMPLE**

The undersigned hereby appoint(s) Victor Kiarsis as the lawful attorney and proxy of the undersigned with full power of substitution, for and in the name, place and stead of the undersigned to attend the Special Meeting of Stockholders of Thompson Products Holdings, Inc. to be held at 310 Kenneth Welch Drive, Lakeville, Massachusetts 02347 on May 1, 2003 at 2:00 P.M. local time, and any adjournment(s) or postponement(s) thereof, with all powers the undersigned would possess if personally present and to vote the number of votes the undersigned would be entitled to vote if personally present.

**PROPOSAL 1:**
Approval of the resolution to remove Victor Kiarsis and James M. Conlon as directors of the Company.

| For | Against | Abstain |
|-----|---------|---------|
|     |         |         |

**PROPOSAL 2:**
Approval of the resolution to appoint David Jansen and Stephen Mallet as directors of the Company

| For | Against | Abstain |
|-----|---------|---------|
|     |         |         |

In his discretion, the Proxy is authorized to vote upon such other business as may properly come before the Special Meeting.

This Proxy when properly executed will be voted in the manner directed herein by the undersigned. If no direction is made, this Proxy will be voted for Proposals 1 and 2 above, and if any other business is presented at such meeting, this Proxy will be voted by that person named in the Proxy in his best judgment.

| Please be sure to sign and date this Proxy in the box below. | Date |
|---|---|
| Stockholder sign above | |

**THOMPSON PRODUCTS HOLDINGS, INC.**

Please sign and print your name on this Proxy and mail it to Victor Kiarsis, c/o Thompson Products Holdings, Inc., 310 Kenneth Welch Drive, Lakeville, Massachusetts 02347. When shares are held by joint tenants, both should sign. When signing as attorney, executor, administrator, trustee or corporation, please sign in full corporate name by president or other authorized person. If a partnership, please sign in partnership name by authorized person.

3535149v1

03/03/2003   09:49    2035638593              CONLON                        PAGE  07

exhibit a

## Thompson Products Holdings, Inc.

Shareholder Name & Address

BIB Holdings (Bermuda) Ltd.
c/o Codan Services Limited
Clarendon House
2 Church Street
Hamilton HM 11
Bermuda
Attn: E. John Thompson

Glenn Thompson
Thompson Products, Inc.
310 Kenneth W. Welch Drive
Lakeville, MA  02347

Mark Thompson
230 Grange Park
Bridgewater, MA  02324

Thompson Investment Partnership L.P.
Victor Kiarsis
320 Grace Church St.
Rye, NY 10580

James M. Conlon
22 Deacons Lane
Wilton, CT 06897

Abdul Aziz Faisal Al Zabin
Shuwaikh 'B' Block 1
Street 14, House no. 3
Kuwait

Al Marzook United Commercial Company
Abdullah Mubarak Street
Gulf Bank building
4th floor
Kuwait

Bader Ahmed Wahidi
Al Shuab Part 1
House no. 7
Road 17
Kuwait

Adel Abdulla Fakhro
Villa 584
Road 1413
Hamala 1014
Kingdom of Bahrain

Page 1 of 3

**Thompson Products Holdings, Inc.**

*Shareholder Name & Address*

Telcap Limited
P.O Box 20663
Manama
Kingdom of Bahrain
Tel: 530330
Fax: 530331
Secretary: Iona Moniz

Al Nabah General Trading Company
P O Box 20144
Safat 13062
Kuwait

Abdul Aziz Khalid Al Abdul Razzak
House No. 13, Area 2 Block 27
Ma'an Bin Zaida Street
Dahiyat Abdulla Salem
Kuwait

Abdul Wahab Yousef Al Nafisi
Al Shuwaik, Area No. 6
Street 63, House No. 2
Kuwait

Paul F. Murphy
Sentinel Capital Partners
777 Third Avenue
New York, NY  10017
Attn: Paul Murphy

David Jansen
Dilmun Investments, Inc.
84 West Park Place
Stamford, CT  06901

William & Corrine Khouri
United Gulf Bank (B.S.C.) E.C.
P.O. Box 5964
Manama
Kingdom of Bahrain

Sameer Salman Al Aradi
Villa 1257
Road 7325
Bilad Al Qadeem 373
Kingdom of Bahrain

Khalid Habib Abdul Karim
1185 Lane 1620
Muharraq Town 216
Kingdom of Bahrain

03/03/2003  09:49  2035630593  CENLON  PAGE  09

# Thompson Products Holdings, Inc.

## Shareholder Name & Address

| Benjamin Bach<br>73 Ladbroke Grove<br>London W11 2PD | *UK* |

| Stephen Mallet<br>Foxhanger Farm<br>Priorsfield Road<br>Godalming<br>Surrey GU7 2RG | *UK* |

| George K Kardouche & Amanda S Kardouche<br>172 Oakwood Court<br>Abbotsbury Road<br>London W14 8JE | *UK* |

| Cassim Doerat<br>Villa No. 6<br>Road 22 Entrance 12<br>Block 520  Barbar<br>Kingdom of Bahrain |

| Mohammed Nooruddin<br>Villa 622 Road 1113<br>Tubli 711<br>Kingdom of Bahrain |

| Faizel Hoodbhoy<br>P O Box 11516<br>Kingdom of Bahrain | or  C/o Saudi International Bank<br>One Knightsbridge<br>London SW1X 7XS |

| Neal Lowson<br>Wayfarings<br>Swan Lane<br>Edenbridge<br>Kent<br>TN8 6AL | *UK* |

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of April 22, 2003 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 330 Rumstick Road, Barrington, Rhode Island 02806 ("Employee").

## WITNESSETH:

WHEREAS, Employee has served for many years as President of Employer; and

WHEREAS, Employer desires to continue to employ Employee as its President and Employee desires to continue to be employed by Employer as its President;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Cause" shall mean: (1) a felony conviction of Employee involving a crime of moral turpitude (or a plea of no lo contendere in lieu thereof); or (2) an act of gross misconduct not undertaken in good faith in connection with Employee's duties hereunder;.

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by Employer or the performance of his duties, as contemplated herein.

3.    **Employment**

Employer hereby employs Employee and Employee accepts such employment as President of Employer. As the President of Employer, Employee shall be the chief executive

EXHIBIT

E

tabbies

officer and shall have control over the management of the business and operations of Employer. Without limiting the scope of such authority, Employee shall have the exclusive authority, in the exercise at his sole discretion, (a) to hire and fire any employees, advisors, consultants, and other independent contractors and (b) to disclose or decline to disclose to any third party any information which Employee, in his sole discretion, determines to be proprietary concerning the business and operations of Employer. Employee accepts such employment and agrees to use his reasonable efforts to perform and discharge his duties in an efficient and businesslike manner. Employer waives any claims is has or may have against Employee for poor performance, conflict of interest or breach of fiduciary duty.

4.    Place of Employment

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the    Employer's office in Lakeville, Massachusetts; provided, however, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    Term

The term of this Agreement shall be three (3) years, shall commence on the Effective Date, and shall expire on December 30, 2005 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    Compensation and Benefits

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $280,000, payable in accordance with the Employer's customary payroll practices. Such Base Salary shall be effective January 1, 2003;

(b)    Except as specifically provided herein, Employee shall be entitled to a continuation of all of the employee benefits he currently receives and shall be entitled to participate or receive such additional benefits as may be adopted or maintained by Employer and made generally available to executives of Employer;

7.    Vacation

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and Employer, it being understood that any portion of such vacation not taken in such year shall be available to be taken during any other year.

8.    Termination

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by Employer for Cause; (iii) as a result of the death of Employee, (iv) by Employee after a Change in Control, as

hereinafter defined, in Employer or (v) or by Employee for good reason.

(b)    For purposes of this Section 8, the term "Change in Control" refers to the transfer of more than fifty (50%) percent of the issued and outstanding stock of Employer or Thompson Products Holdings, Inc., a Massachusetts corporation ("TPH"), or a merger or other reorganization pursuant to which the current holders of the issued and outstanding stock of Employer or TPH retain less than fifty (50%) percent of the issued and outstanding stock of the surviving entity, or the sale of substantially all of the assets of the Employer or TPH.

(c)    If Employer terminates the employment of Employee for Cause or Employee terminates pursuant to 8(a)(v), Employer's sole obligations hereunder shall be to pay to Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(d)    If the employment of Employee is terminated due to the death of Employee, Employer's sole obligations hereunder shall be to pay to the estate of Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination and to continue the health coverage for Employee's family for two (2) additional years on the same basis as health coverage is provided by Employer for active employees and as may be amended from time to time.

(e)    If Employee terminates his employment pursuant to the provisions of Section 8(a)(iv), Employer's sole obligations hereunder shall be to continue the health coverage for Employee and his family for two (2) additional years on the same basis as health coverage is provided by Employer for active employees and as may be amended from time to time and to pay to Employee, in a lump sum, an amount equal to the balance of Employee's Base Salary to which Employee would have been entitled had Employee not terminated this Agreement (the "Severance Amount"). Employer shall pay the Severance Amount required hereunder within sixty (60) days after Employee notifies Employer of the termination of this Agreement.

9.    Release and Indemnification

(a)    Employer and Thompson Products Holdings, Inc. ("TPH") release Employee from any claim, demand, cause of action, liability, or theory of recovery which Employer or TPH now have, ever had, or in the future may have against Employee arising out of or relating to any event or occurrence which took place prior to the Effective Date, including, without limitation, any such claim, demand, cause of action, liability, or theory of recovery against Employee relating to or arising out of the civil action brought against Employer and others by Geoffrey Lafond (the "Lafond Litigation") and the civil action brought against Employer and others by Mark Thompson (the "Thompson Litigation").

10.    Return of Documents

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the

- 3 -

exclusive property of Employer, shall not be copied, summarized, extracted from, or removed from the premises of Employer, except in pursuit of the business of Employer and at the direction of Employer, and shall be delivered to Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by Employer.

### 11.    Binding Effect

This Agreement shall inure to the benefit of and be binding upon Employer and its successors. Employer shall cause any successor, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that Employer would be required to perform it if no such succession had taken place or with or into which Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

### 12.    Miscellaneous

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts without giving effect to any rules of conflicts of law.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

- 4 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of the Effective Date.

THOMPSON PRODUCTS, INC.

By: _Victor Kiarsis_

Name: VICTOR KIARSIS

Title: Vice President

THOMPSON PRODUCTS HOLDINGS, INC.

By: _Victor Kiarsis_

Name: VICTOR KIARSIS

Title: President

Glenn Thompson

**Minutes of Meeting**
**Of Board of Directors of**
**Thompson Products Holdings, Inc.**
**And**
**Thompson Products, Inc.**
310 Kenneth W. Welch Drive
Lakeville, MA 02347

On April 21, 2003 at 10:00 am the Board of Directors of Thompson Products, Inc., a Delaware corporation ("TPI"), and Thompson Products Holdings, Inc, a Massachusetts corporation ("TPH"), convened a meeting. Messrs. James M. Conlon, Victor Kiarsis, and Glenn Thompson, being all the directors of TPI, and TPH, were present and each individually waived all notice.

Pursuant to the applicable provisions of the Annotated Laws of Massachusetts and the Delaware Business Corporation Law, as amended, the undersigned, being the directors of Thompson Products, Inc., a Delaware corporation ("TPI"), and Thompson Products Holdings, Inc., a Massachusetts corporation ("TPH"), do hereby adopt the following resolutions.

The meeting opened with a discussion of the significance of Mr. Glenn Thompson to the success of the business and the necessity to insure that his services are maintained by the company. The board further determined that the interests of the company were best served by offering Mr. Thompson an employment contract.

RESOLVED: The board agrees to provide Mr. Glenn Thompson with an employment contract in the form attached and empowers Mr. Kiarsis to take all necessary steps to execute the contract.

Upon passage of the foregoing resolution, the meeting adjourned.

IN WITNESS WHEREOF, the undersigned have executed these minutes as of the date first above written.

_____
Victor Kiarsis

_____
James Conlon

_____
Glenn Thompson

**EXHIBIT**
7

THOMPSON PRODUCTS HOLDINGS, INC.

SPECIAL MEETING OF STOCKHOLDERS

May 1, 2003

Pursuant to notice duly given, a special meeting of the stockholders of Thompson Products Holdings, Inc. (the "Company") was held at the offices of the Company at 310 Kenneth Welch Drive, Lakeville, Massachusetts on May 1, 2003 at 2:00 p.m. The meeting was called pursuant to the written request of BIB (Bermuda) Holdings, Ltd., the holder of approximately 63% of the outstanding shares of the Company's Common Stock. There were represented at the meeting in person or by proxy a total of 47,224 shares of Common Stock, representing 91.7% of the 51,495 shares of Common Stock entitled to vote at the meeting. The By-laws of the Company provide that a majority of the shares represented and entitled to vote at a meeting constitutes a quorum, and thus a quorum was present. At the request of the Board of Directors of the Company, Cameron Read of Choate, Hall & Stewart, counsel to the Company, served as moderator and temporary clerk of the meeting.

The first item of business was consideration of a resolution to remove Victor Kiarsis and James Conlon as directors of the Company. This resolution was approved by a vote of 37,779 shares in favor, constituting 80% of the shares represented at the meeting, with 3,075 shares voting against and 6,370 shares abstaining.

The next item of business was to consider a resolution to appoint David Jansen and Stephen Mallet as directors of the Company. This resolution was approved by a vote of 37,779 shares in favor, constituting 80% of the shares represented at the meeting, with 3,075 shares voting against and 6,370 shares abstaining.

There being no further business, the meeting was adjourned.

_Cameron Read_
Cameron Read
Temporary Clerk

EXHIBIT
G

tabbies