**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| THOMPSON PRODUCTS, INC.,<br>    Plaintiff,<br><br>v.<br><br>GLENN THOMPSON, and THOMPSON<br>ENTERPRISES, INC.,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action<br>No. 05-11810-RGS |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
ON COUNT III OF THE AMENDED COMPLAINT**

Defendants submit this Memorandum in support of their motion for summary judgment

dismissing Count III of the Amended Complaint.  That Count asserts that Glenn Thompson has

breached restrictive covenants in an Employment Agreement (as incorporated by reference in an

Asset Purchase Agreement) that he entered into in 1998.  But those covenants expired over three

years ago and in the meantime, Glenn and plaintiff Thompson Products, Inc. ("TPI") entered into

a new, fully-integrated Employment Agreement that contained no restrictive covenants at all.

Accordingly, for both of those independent reasons, defendants are entitled to judgment as a

matter of law on Count III (which is the claim that is driving this litigation).

**I.     TPI's NON-COMPETE ALLEGATIONS AGAINST GLENN**

TPI filed its original Complaint on September 1, 2005, a copy of which is appended as

**Exhibit A**.  Counts I and II sought injunctive relief and damages, respectively, for Glenn's

breach of his alleged 1998 and 2001 employment agreements with TPI.  Paragraph 7 of the

original Complaint in particular alleged that on January 5, 1998, TPI entered into an

Employment Agreement with Glenn ("the 1998 Agreement") that contained three restrictive

covenants effective "for a period of two years following his employment with TPI."

But the 1998 Agreement did <u>not</u> provide that Glenn would be subject to the restrictions

for such an extended period. Instead, TPI's Complaint omitted a critical word contained in all

three covenants in the 1998 Agreement, a deletion that changes the entire meaning of the

restrictive period: the actual language of the 1998 Agreement provided that the restrictions

would be in effect "for a period of two (2) years following termination of Employee's

employment **hereunder**...." (emphasis supplied). Accordingly, defendants denied those

allegations in their Amended Answer and Counterclaim filed on October 13, 2005.

On November 23, 2005, TPI performed an abrupt *volte-face* by moving for leave to file a

dramatically revised Amended Complaint. Count III of the Amended Complaint (a copy of

which is appended as **Exhibit B**) now contains the non-compete allegations, but they purport to

be based on the provisions of a 1997 Asset Purchase Agreement (which had not even been

mentioned in the original Complaint), rather than the 1998 Agreement. TPI has yet to explain

the reason for the switch.[1] Undoubtedly TPI realized that its reliance on the expired 1998

covenants was a lost cause.[2] That suggestion is borne out by TPI's preliminary injunction

motion papers, which rely exclusively upon the Asset Purchase Agreement and barely mention

the 1998 Agreement. Nevertheless, the Asset Purchase Agreement incorporated by reference the

---

[1] TPI's Motion to Amend the Complaint recited only that it wanted to substitute the renamed Splash Creations, Inc. for Thompson Enterprises, Inc. and also wanted to add allegations based on newly-discovered evidence of Glenn's alleged unlawful activities. (See **Exhibit C** appended.) TPI made no mention of its wholesale revision of the contractual basis for its non-compete claim.

[2] To its credit, TPI finally included the word "hereunder" in its quotation in the Amended Complaint of the actual language of the restrictive covenant time period.

restrictive covenants in the 1998 Agreement and did not create any pertinent new restrictions on Glenn. TPI is no better off under its reformulated Amended Complaint.[3]

## II.   UNDISPUTED FACTS

There is no genuine dispute as to the following facts.

On November 24, 1997, Glenn and the other shareholders of Thompson Paper Box Co., Inc. entered into an Asset Purchase Agreement with a newly-formed entity named Thompson Products, Inc. (the plaintiff in this case), whereby all the assets of Thompson Paper Box were sold to TPI. (Affidavit of Glenn Thompson, ¶ 4). A true and accurate copy of that Asset Purchase Agreement is appended as **Exhibit D** to the Glenn Aff.[4]

As provided in the Asset Purchase Agreement, Glenn entered into his first employment agreement (the 1998 Agreement) with TPI on January 5, 1998 (Glenn Aff. ¶ 5), a true and accurate copy of which is appended as **Exhibit F**. Mr. Victor Kiarsis, a Board member, signed the 1998 Agreement on behalf of TPI. (Glenn Aff. ¶ 5).

Paragraph 5 of the 1998 Agreement provided that its term was through December 31, 2000, when it would automatically terminate.[5] Paragraph 9 of that agreement prohibited Glenn from divulging confidential information, competing with TPI or hiring employees of TPI for "two (2) years following termination of Employee's employment **hereunder**", or in other words through December 31, 2002.

---

[3]  The Amended Complaint also added two makeweight claims against Glenn -- one for some $40,000 of salary that he allegedly was overpaid in 2005 and the second for $42,500 in salary that TPI paid to a new Chief Financial Officer that it hired in late May 2005. Both of those claims are frivolous, but they do not affect Count III, on which this Motion is based.

[4]  For ease of reference, defendants append as **Exhibit E** the pertinent excerpts from the Asset Purchase Agreement.

[5]  For ease of reference, defendants append as **Exhibit G** the pertinent excerpts from the 1998 Agreement.

In 2001 TPI proposed a new employment agreement, but Glenn rejected it as unacceptable, and never signed it. TPI has produced only an unexecuted copy. (Glenn Aff. ¶ 6).

On November 22, 2002, approximately six weeks before the restrictive covenants contained in **Exhibit F** were set to expire, TPI proposed to Glenn another version of a new employment agreement (Glenn Aff. ¶ 7), a true and accurate copy of which is appended as **Exhibit H**. That agreement would have modified paragraph 9 by extending the period of the restrictive covenants to two years after Glenn left TPI, whenever that might occur. Glenn rejected that proposed agreement. That proposed agreement bears the initials "PCSF", which refers to the law firm Pryor Cashman Sherman & Flynn, the same law firm that had drafted on behalf of TPI the Asset Purchase Agreement (**Exhibit D**) and the 1998 Agreement (**Exhibit F**) (Glenn Aff. ¶ 7).

After **Exhibit F** expired on December 31, 2000, Glenn continued to work for TPI as an employee at will (Glenn Aff. ¶ 8).

As of early 2003, the duly-elected directors of TPI were Victor Kiarsis, James Conlon and Glenn (Glenn Aff. ¶ 9). During that time Glenn had ongoing discussions with the other directors about the terms of a new employment agreement (id.). In connection with those discussions, Mr. Kiarsis hired Cameron Read, Esq., as new outside counsel for TPI, because regular corporate counsel also represented Glenn in personal matters such as estate planning (id.). Mr. Kiarsis also commissioned an independent salary survey, a copy of which is appended as **Exhibit I** (id.).

Eventually a new Employment Agreement was prepared, a true and accurate copy of which is appended as **Exhibit J**. A TPI Board of Directors meeting was held on April 21, 2003, to discuss whether to approve that agreement (Glenn Aff. ¶ 10). Glenn personally attended, as

did Messrs. Kiarsis, Conlon and Read (id.).  The Directors discussed the reasons why **Exhibit J** was in the best interest of TPI (id.).  During that meeting, Mr. Kiarsis, on behalf of TPI, asked Mr. Read whether, if the agreement were signed, it would be valid and enforceable (id.).  Mr. Read, on behalf of TPI, responded "Yes."  The Directors then voted to approve it, as recorded in TPI's official Board minutes (copy appended as **Exhibit K**).  Mr. Kiarsis (who had signed Glenn's original, 1998 employment agreement, **Exhibit F**, on behalf of TPI) then signed it on behalf of TPI and handed it to Glenn for signature.  Glenn stated that he wanted to review it with his legal counsel, which he did.  Glenn then signed **Exhibit J** either that same day, April 21, 2003, or the following day, and immediately returned one fully-executed original to Mr. Kiarsis (Glenn Aff. ¶ 10).

Thereafter the parties proceeded to perform in accordance with **Exhibit J** (Glenn Aff. ¶ 11).  For one thing, **Exhibit J** increased Glenn's salary from $200,000 per year to $280,000. TPI paid Glenn the increased salary of $280,000 from 2003 through Glenn's departure from TPI in 2005, with the full knowledge and approval of its then-management (Glenn Aff. ¶ 11).

**Exhibit J** contained none of the restrictive covenants to which Glenn at one time had been subject under **Exhibit F** (Glenn Aff. ¶ 12).  Paragraph 12(d) of **Exhibit J** provided in part that "[t]his Agreement represents the entire understanding of the parties with reference to the subject matter hereof ...."

**Exhibit J** remained in effect until Glenn left TPI (Glenn Aff. ¶ 13).  Glenn resigned as a Director of TPI effective May 22, 2005 and as President on July 12, 2005 (see **Exhibit L** appended).

III.     **SUMMARY JUDGMENT STANDARDS**

Under Massachusetts law, contract interpretation ordinarily is a question of law, and unambiguous contracts must be enforced according to their terms.  *See*, *e.g.*, Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981)(affirming summary judgment).  Whether a contract is ambiguous is likewise a question of law.  Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998); Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992).  Even where a contract is ambiguous, there will be no genuine dispute of material fact if the evidence "presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary."  Boston Five Cents Savings Bank v. Department of Housing & Urban Dev., 768 F.2d 5, 8 (1st Cir. 1985).

On a motion for summary judgment, if the non-movant fails to demonstrate that a genuine issue exists with respect to some element of a claim on which it bears the burden of proof at trial, the Court must grant summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  TPI bears the burden of proof that Glenn remains subject to any non-compete restrictions.

IV.     **GLENN THOMPSON IS NOT SUBJECT TO ANY NON-COMPETE
RESTRICTIONS**

Defendants are entitled to summary judgment on Count III of the Amended Complaint for three independent reasons: a) the restrictive covenants in the 1998 Agreement expired on December 31, 2002; b) the 1997 Asset Purchase Agreement did not impose on Glenn any separate restrictive covenants; and c) the parties entered into a successor, fully-integrated employment agreement in 2003 that contained no such restrictions.[6]

---

[6] Splash also is named a defendant on Count III.  But Splash never entered into any separate agreements with TPI, so dismissal of the claim against Glenn requires dismissal also against Splash (Glenn Aff. 14).

A.     As a Matter of Law, the Restrictive Covenants in the 1998 Agreement Have
       Expired

Paragraph 5 of the 1998 Agreement, entitled "Term," provides:  "The term of this

Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner

terminated pursuant to Section 8 hereof (the "Employment Term")."  (Glenn Aff. ¶ 6 and **Exhibit**

**F**).  Subparagraph (a) of paragraph 9, which is entitled "Restrictive Covenants," provides in part

that "during the Employment Term of this Agreement and for a period of two (2) years following

***termination of Employee's employment hereunder***," Glenn would not divulge or use confidential

information of TPI.  (Glenn Aff. ¶ 7 and **Exhibit F**).  (Emphasis added).  Subparagraphs (b) and

(c), prohibiting solicitation of TPI employees and competition respectively, contain the same

expiration date:  "two (2) years following termination of Employee's employment ***hereunder***. . . ."

Id.  The 1998 Agreement also uses the word **"hereunder"** to qualify a number of other rights and

obligations of both parties.  **Exhibit F**.

The "termination of [Glenn's] employment ***hereunder***" (within the meaning of paragraph

9) occurred on December 31, 2000.  (Glenn Aff. ¶ 8).  When the 1998 Agreement ran out, Glenn

continued to work for TPI as an at-will employee.  (Glenn Aff. ¶ 8).[7]  Glenn always has believed

that the restrictive covenants in paragraph 9 expired on December 31, 2002.  No one from TPI

ever indicated otherwise.  (Glenn Aff. ¶ 8).

In this suit, TPI now contends for the first time that the restrictive covenants in the 1998

Agreement extended beyond December 31, 2002, and were to remain in effect until two years

after Glenn left TPI, no matter how many years in the future that occurred.  TPI itself did not

have such a distorted interpretation of the Agreement until recently.  On November 22, 2002,

---

[7]  Although the Amended Complaint refers to a purported 2001 Agreement (Amended Complaint, ¶¶ 13-16), it
was never executed (Glenn Aff. ¶ 6), and therefore warrants no further discussion.

approximately five weeks before the restrictions in the 1998 Agreement were set to expire,

David Jansen, who was then a TPI Director, presented Glenn with a proposed new employment

agreement (**Exhibit H**), prepared by the same law firm that had drafted the 1998 Agreement.

(Glenn Aff. ¶ 7).  The proposal, like the 1998 Agreement, contained a paragraph 9 entitled

"Restrictive Covenants," but with a major revision: it deleted the word "hereunder," thereby

extending the time period of the restrictions to two years after Glenn left the employ of TPI,

whenever that might occur.  Undoubtedly TPI's goal in proposing that change was to tie up

Glenn for two full years after he left the employ of TPI, no matter when he left.  Glenn rejected

the proposed 2002 agreement, but TPI now pretends in this litigation that the 1998 Agreement

contained the identical, expanded time period for the restrictive covenants as in the rejected 2002

proposal.

    Whether the covenants in the 1998 Agreement expired on December 31, 2002 is

appropriate for summary judgment because the determination of the meaning of contracts is

initially a question of law for the court.  Bank v. International Business Machines Corp., 145

F.3d 420, 424 (1st Cir. 1998); Allen v. Adage, Inc., 967 F. 2d 695, 698 (1st Cir. 1992).

Determining whether a contract is ambiguous is also a question of law for the court.  Id.  "[A]

contract is ambiguous only when it is reasonably and clearly susceptible of more than one

interpretation."  Rubery v. Downing Corp., 760 A.2d 945, 947 (R.I. 2000) (affirming summary

judgment).  "In determining whether a contract is clear and unambiguous, the document must be

viewed in its entirety and its language be given its plain, ordinary and usual meaning."  Id.  If the

Court finds that the terms of an agreement are unambiguous, then the agreement must be applied

as written.  Capital Properties, Inc. v. State, 749 A.2d 1069, 1081 (R.I. 1999) (affirming

summary judgment).

According to basic principles of contract interpretation, the unambiguous term "*hereunder*" in the 1998 Agreement should be given its usual and ordinary meaning . <u>Davis v. Dawson</u>, 15 F.Supp.2d 64, 109 (D. Mass. 1998); <u>Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., Inc.</u>, 47 Mass. App. Ct. 726, 729 (1999) (noting that words that are plain and free from ambiguity must be construed in their usual and ordinary sense).  Plainly, the word "*hereunder*" refers to and means "in accordance with the terms of the 1998 Agreement."  <u>See</u> <u>Grizzard Commc'ns Group v. Monk</u>, 2005 WL 2563046, *6 (D. Neb. Oct. 11, 2005) (concluding that the term "employment hereunder" undisputedly means "employment under the employment agreement").  Notably, this interpretation is consistent with the dictionary definition of the word *hereunder*.  <u>See</u> <u>Merriam Webster's Collegiate Dictionary</u> 543 (1996) (defining hereunder as "under or in accordance with this writing or document"); <u>Grizzard</u>, 2005 WL 2563046, * 6 (quoting <u>Webster's Third New International Dictionary</u> 1059 (1969) (defining "hereunder" as "a: under this written statement . . . b: under this agreement:  in accordance with the terms of this document").

That plain meaning is reinforced by the context of the term "hereunder" as it appears a total of twelve times in the 1998 Agreement.  For instance, paragraph 8(c) provides that "[i]f the Employer terminates employment of the Employee *hereunder* without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 . . . ." (Emphasis added).  That provision can only mean that if Glenn had been terminated without cause before December 31, 2000 (i.e., "hereunder"), he would be entitled to his Base Salary through December 31, 2000; that provision would make no sense if, as TPI urges, "hereunder" meant even after the 1998 Agreement had expired.  To take just one other example, paragraph 12 specified the form of all notices to be given "hereunder", which can only mean under the 1998

Agreement. It is axiomatic that "[u]nless a contrary intent is evident, words used in one sense in one part of a contract are deemed of like significance in another part." <u>Grizzard</u>, 2005 WL 2563046, *6.

      If that is not the correct meaning of "hereunder", then what does TPI think it means? We may never know, since TPI did not ask to submit any reply whatsoever to defendants' opposition to TPI's preliminary injunction motion, which highlighted this very issue.[8]

      TPI may argue that the ordinary meaning of the term "***hereunder***" is trumped by a survival clause contained in paragraph 9(g):

> (g)     Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason. (see **Exhibit G**)

Any such argument is legally flawed. A survival clause such as paragraph 9(g) is simply a standard way of providing that the mere expiration of an agreement does not render any continuing obligations unenforceable. So, in this case, the expiration of the 1998 Employment Agreement on December 31, 2000 did not affect the survival of Glenn's obligation not to compete for two years thereafter. TPI in effect urges the Court to conclude that paragraph 9(g) overrides the specific time limits contained in the individual restrictive covenants that precede it in paragraph 9. That argument fails for the same reasons that the District Court in <u>Grizzard</u> rejected the identical argument. <u>*See*</u> <u>Grizzard</u>, 2005 WL 2563046, *6. The court's holding in <u>Grizzard is equally apt here: "I have studied the entire employment agreement, and I find no instance where the word 'hereunder' might plausibly mean something other than 'under the employment agreement."</u> <u>Id</u>. More generally, any such argument by TPI would run afoul of the

---

[8] That reticence contrasts markedly with TPI's insistence on filing a reply memo in support of its disqualification motion (at the same time it opposed defendants' request for leave to respond to such a reply).

longstanding admonition that an agreement should be construed to give effect to all of its terms, leaving no provision meaningless.  E.g., Siegel v. Berkshire Life Ins. Co., 51 Mass. App. Ct. 744, 749 (2001); Jiminez v. Peninsular & Oriental Steam Navigation Co., 974 F. 2d 221, 223 (1ˢᵗ Cir. 1992).

Moreover, TPI's epiphany as to the interpretation of paragraph 9 is inconsistent with its own contemporaneous conduct.  Tellingly, TPI presented to Glenn roughly 5 weeks before the restrictive covenants were to expire a proposed new employment agreement (**Exhibit H**) in which the very same lawyers had deleted the qualifier "hereunder" from the restrictive covenants.  Under that proposed agreement, the restrictive covenants would have remained in effect for 2 years following the end of Glenn's employment at TPI, whenever that might occur. Why did TPI believe that this contract term needed to be changed, if the 1998 Agreement already accomplished what TPI now claims?  Clearly, TPI knew that the agreement needed to be changed, if it wanted to restrict Glenn beyond December 31, 2002.  Glenn rejected that proposed agreement, and with it, the open-ended term of the restrictions that it now asserts.  TPI's own draftsmanship undercuts its position here.

It is entirely appropriate for the Court to take into account TPI's own wording of the proposed 2002 replacement employment agreement.  The subsequent conduct and dealings of the parties helps to determine the meaning that they themselves have put upon the contract.  Martino v. First Nat'l Bank of Boston, 361 Mass. 325, 332 (1972); Maxwell-Davis, Inc. v. Hooper, 317 Mass. 149, 152 (1944); Rizzo v. Cunningham, 303 Mass. 16, 21 (1939); Pittsfield & North Adams R.R. v. Boston & Albany R.R., 260 Mass. 390, 398 (1927); *see also* Restatement (2d) Contracts §§ 202(4) and 220(2) (A.L.I. 1981).  "There is no surer way to find out what parties meant, than to see what they have done."  Martino, 361 Mass. at 332 (quoting Pittsfield, 260

Mass. at 398); *accord.* <u>Keating v. Stadium Mgt. Corp.</u>, 24 Mass. App. Ct. 246, 251–52 (1987) review denied, 400 Mass. 1104 (1987). "A person's actions subsequent to executing a legal document which tend to show his understanding of the document's legal effect may be considered in determining his intention at the time of execution." <u>Bourgeois v. Hurley</u>, 8 Mass. App. Ct. 213, 215–16 (Mass. App. 1979). "Where parties act on a particular construction of a written instrument, 'such construction will be of great weight and will usually be adopted by the court.'" <u>Lembo v. Waters</u>, 1 Mass. App. 227, 234 (Mass. App. 1973)(quoting <u>Canadian Club Bev. Co. v. Canadian Club Corp.</u>, 268 Mass. 561, 569 (1929)); *see also* <u>Maxwell-Davis</u>, 317 Mass. at 152; <u>Pittsfield</u>, 260 Mass. at 398.

Therefore, as a matter of law TPI has no claim for breach of the restrictive covenants in the 1998 Agreement.

B.    <u>The 1997 Asset Purchase Agreement Does Not Support TPI's Claim</u>

TPI's non-compete claim, as it has morphed in the Amended Complaint, alleges that

> "[i]ndependent of the Employment Agreements, Thompson expressly agreed with TPI in paragraph 2.4 of the [Asset Purchase Agreement] to abide by the same restrictive Covenants stated in the form Employment Agreements attached to the APA, and the Restrictive Covenants set out in Section 9 of each Employment Agreement were expressly incorporated by reference into the APA to bind Thompson...." (Amended Complaint, **Exhibit B**, ¶ 8).

Paragraph 2.4 of the Asset Purchase Agreement provides in pertinent part as follows

> 2.4    <u>Noncompetition</u>.  (a) As additional consideration for Purchaser's agreement to purchase the Acquired Assets and pay the Purchase Price, GT and MT have agreed, severally but not jointly, to the noncompetition provisions (the "Restrictive Covenants") contained in their respective Employment Agreements, which noncompetition provisions are incorporated herein by reference and made a part hereof as if restated herein.  (see **Exhibit E**)

The succeeding subparagraphs of 2.4 repeatedly refer to the "Restrictive Covenants incorporated by reference" from the form of employment agreement that wound up as Glenn's 1998 Agreement.  It is not as if the covenants in the Asset Purchase Agreement provided one thing and the 1998 Agreement provided differently; they are identical.  And since the 1998 Agreement contained an integration clause (see **Exhibit G**, ¶12), the 1998 Agreement is controlling over the Asset Purchase Agreement on this issue.  There is nothing "independent" about the non-compete provisions in the earlier Asset Purchase Agreement.  Glenn undertook a single set of non-compete obligations, all of which expired on December 31, 2002.

The Supreme Judicial Court rejected a contention identical to that in TPI's Complaint in Chelsea Indus., Inc. v. Florence, 358 Mass. 50 (1970).  Chelsea arose out of the sale of all the stock of a corporation, where the sales agreement provided that one of the selling shareholders agreed to enter into an employment agreement with the purchaser.  The sales agreement and the employment agreement contained separate non-compete covenants, in which the duration and some other terms were different.  The employer contended that the employee was bound by the more restrictive provisions of the sales agreement.  The court rejected that argument, reasoning that "[t]he two contracts were part of a single transaction," 358 Mass. 50 at 55, and were "closely interrelated."  Id.  The court was "not persuaded that each of these provisions was to operate independently of the other, or that each had any significant separate business purpose," id. at 56, and concluded that allowing the purchase contract to override the employment contract would render "illusory" the limitations contained in the employment contract's restrictive covenant.  Id.  Accordingly, the court held that the restrictive covenant in the employment contract controlled.  Id.  The same reasoning and the same conclusion applies here.

Furthermore, TPI cannot point to anything in the Asset Purchase Agreement that specifies a different duration for the restrictive covenants. If the Asset Purchase Covenants were not to expire on December 31, 2002, the same as the 1998 Agreement covenants, what other expiration date does the Asset Purchase Agreement specify? There is none. A specific contract term controls over a conflicting general one. In re 604 Columbus Ave. Realty Trust, 968 F. 2d 1332, 1357 (1st Cir. 1992). Moreover, because the two agreements are part of a single, integrated transaction, they must be interpreted together and in a manner that does not render the time limits of the 1998 Agreement illusory and meaningless. Chelsea Indus., Inc. v. Florence, supra, at 55-56. See also Thomas v. Christensen, 12 Mass. App. Ct. 169, 174 (Mass. App. 1981)(purchase agreement and employment agreement must be construed together). In short, TPI's belated reliance on the Asset Purchase Agreement accomplishes nothing.

The Court need go no further, in order to conclude that defendants are entitled to summary judgment, based on this straightforward issue of contract interpretation. The 1998 Agreement and the Asset Purchase Agreement are TPI's only sources for the restrictive covenants it is seeking to enforce. Because TPI's argument fails under both agreements, that is sufficient to end the inquiry. And no discovery is needed to resolve those interpretation questions. But to complete the picture, defendants now turn to a final flaw in TPI's non-compete claim.

C.    The 2003 Agreement Contained No Restrictive Covenants.

Finally, it is undisputed that the parties entered into a fully-integrated 2003 Agreement (**Exhibit J**) in April 2003. That Agreement replaced the 1998 Agreement and eliminated the restrictive covenants entirely.[9]

---

[9]  TPI's Amended Complaint contains two newly-added claims (Counts I and II) seeking invalidation of the 2003 Agreement.

That Agreement was a negotiated, enforceable agreement, executed by the Chairman of TPI's Board and was pronounced valid and enforceable by TPI's outside corporate counsel before TPI signed it (see Undisputed Facts above). The parties thereafter performed in accordance with its terms. The integration clause found in paragraph 12(d) of the 2003 Agreement[10] makes it certain that TPI can no longer rely on the 1998 Agreement to sustain its claims, even assuming that Agreement originally was valid and enforceable. *See* Starr v. Fordham, 420 Mass. 178, 188 n. 8 (1995) (citing Restatement (Second) of Contracts § 210(1) (1981)) and noting that a fully-integrated agreement is "a statement which the parties have adopted as a complete and exclusive expression of their agreement"); *see also* Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 n.2 (1st Cir. 1995) (quoting Restatement (Second) of Contracts § 213 for the proposition that a binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them). TPI's reliance on the superceded provisions of the 1997 Asset Purchase Agreement and the 1998 Agreement is misplaced. Therefore, the 2003 Agreement additionally undermines TPI's claim and by itself justifies the entry of summary judgment for defendants on Count III of the Amended Complaint.

## V.     **CONCLUSION**

For all of these reasons, the Court should enter summary judgment in favor of defendants on Count III of the Amended Complaint.

---

[10] Paragraph 12(d) of the 2003 Agreement provides in relevant part that: "This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought."

Respectfully submitted,

GLENN THOMPSON and
SPLASH CREATIONS, INC.

By their attorneys,


/s/ Matthew F. Medeiros
Matthew F. Medeiros (BBO #544915)
LITTLE MEDEIROS KINDER BULMAN &
WHITNEY, PC
72 Pine Street
Providence, RI  02903
Tel:     (401) 272-8080
Fax:     (401) 272-8195


/s/ Michael L. Chinitz
Michael L. Chinitz (BBO # 552915)
Lisa A. Tenerowicz (BBO# 654188)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA  02116
Tel:     (617) 536-0040
Fax:     (617) 536-4400

.

DATED:  February 2, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 2, 2006.

/s/ Michael L. Chinitz

_____

Michael L. Chinitz, Esq.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMPSON PRODUCTS, INC., ) <br> a Delaware corporation, ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GLENN THOMPSON and ) <br> THOMPSON ENTERPRISES, INC., ) <br> Defendants. ) | C.A. No. 05-11810-RGS |

## AFFIDAVIT OF GLENN THOMPSON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT III OF THE AMENDED COMPLAINT

Glenn Thompson, having first been duly sworn on oath, deposes and states as follows:

1.      My name is Glenn Thompson, and I live in Barrington, Rhode Island.  I am the President of defendant Splash Creations, Inc. ("Splash") (f/k/a Thompson Enterprises, Inc.).

2.      I am submitting this Affidavit in support of defendants' motion for summary judgment on Count III of the Amended Complaint.

3.      I have personal knowledge that all of the statements contained in this Affidavit are true.

4.      On or about November 24, 1997, I and the other shareholders of Thompson Paper Box Co., Inc. entered into an Asset Purchase Agreement with a newly-formed entity named Thompson Products, Inc. (the plaintiff in this case). A true and accurate copy of that Agreement is appended as **Exhibit D**.

5.      On or about January 5, 1998, I entered into my first Employment Agreement with TPI, a true and accurate copy of which is appended as **Exhibit F**.  Mr. Victor Kiarsis, a Board member, signed that agreement on behalf of TPI.

6.      **Exhibit F** provided in paragraph 5 that its term was through December 31, 2000. In 2001 TPI proposed a new employment agreement, but I rejected it as unacceptable, and I never signed it. TPI has never produced a signed copy.

7.      **Exhibit F** also provided in paragraph 9 that certain restrictive covenants were to be in effect for "two (2) years following termination of Employee's employment hereunder." On November 22, 2002, approximately six weeks before those restrictive covenants were set to expire, David Jansen, who was then a TPI Director, proposed another version of a new employment agreement, a true and accurate copy of which is appended as **Exhibit H**. That agreement would have modified paragraph 9 by extending the period of the restrictive covenants to two years after I left TPI, whenever that might occur, but I rejected it. That proposed agreement bears the initials "PCSF", which I know refers to the law firm Pryor Cashman Sherman & Flynn, the same law firm that had drafted on behalf of TPI the Asset Purchase Agreement (**Exhibit D**) and my original Employment Agreement (**Exhibit F**).

8.      After **Exhibit F** expired on December 31, 2000, I continued to work for TPI as an employee at will. I have always believed that the restrictive covenants in paragraph 9 expired on December 31, 2002. No one from TPI ever indicated otherwise.

9.      As of early 2003 the duly-appointed directors of TPI were Victor Kiarsis, James Conlon and myself. During that time I had ongoing discussions with the other directors about the terms of a new employment agreement. In connection with those discussions, Mr. Kiarsis hired Cameron Read, Esq., as new outside counsel for TPI, because regular corporate counsel also represented me in personal matters such as estate planning. Mr. Kiarsis also commissioned an independent salary survey, a copy of which is appended as **Exhibit I**.

10.    Eventually a new Employment Agreement was prepared, a true and accurate copy of which is appended as **Exhibit J**. A TPI Board of Directors meeting was held on April 21, 2003, to discuss whether to approve that agreement. I personally attended, as did Messrs. Kiarsis, Conlon and Read. The Directors discussed the reasons why **Exhibit J** was in the best interest of TPI. During that meeting, Mr. Kiarsis, on behalf of TPI, asked Mr. Read whether, if the agreement were signed, it would be valid and enforceable. Mr. Read, on behalf of TPI, responded "Yes." The directors then voted to approve it, as recorded in TPI's official Board minutes (copy appended as **Exhibit K**). Mr. Kiarsis (who had signed my original employment agreement, **Exhibit F**, on behalf of TPI) then signed it on behalf of TPI and handed it to me for signature. I stated that I wanted to review it with my legal counsel, which I did. I then signed **Exhibit J** either that same day, April 21, 2003, or the following day, and immediately returned one fully-executed original to Mr. Kiarsis.

11.    Thereafter the parties proceeded to perform in accordance with **Exhibit J**. For one thing, **Exhibit J** increased my salary from $200,000 per year to $280,000. TPI paid me the increased salary of $280,000 from 2003 through my departure from TPI, with the full knowledge and approval of its then-management.

12.    **Exhibit J** contained none of the Restrictive Covenants to which I once had been subject in **Exhibit F**.

13.    **Exhibit J** remained in effect until I left TPI. I resigned as a Director of TPI effective May 22, 2005 and as President on July 12, 2005 (see **Exhibit L** appended).

14.    Splash has never entered into any agreements of any kind with TPI.

_____
Glenn Thompson

Subscribed and sworn to before me this       day of ~~February~~, 2006.

_____
Notary Public

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

THOMPSON PRODUCTS, INC.,                    )
                                                                )
                        Plaintiff,                          )
                                                                )
v.                                                              )          C.A. No.  05-11810-RGS
                                                                )
GLENN THOMPSON and                          )
THOMPSON ENTERPRISES, INC.              )
                                                                )
                        Defendants.                      )
_____)

## DEFENDANTS' COMBINED APPENDIX OF EXHIBITS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNT III OF THE AMENDED COMPLAINT

Defendants Glenn Thompson and Splash Creations, Inc. respectfully submit this

Combined Appendix of Exhibits in support Defendants' Motion for Summary Judgment on

Count III of the Amended Complaint.  These exhibits correspond to those referenced in

Defendants' Motion for Summary Judgment on Count III of the Amended Complaint and the

Affidavit of Glenn Thompson in support thereof.

### Index of Exhibits

| Tab | Exhibit Name |
|-----|--------------|
| A | TPI's Complaint, filed September 1, 2005 (without exhibits thereto) |
| B | TPI's Amended Complaint, filed November 23, 2005 (without exhibits thereto) |
| C | TPI's Motion to Amend Complaint, filed November 23, 2005 (without exhibits thereto) |
| D | Asset Purchase Agreement, dated November 24, 1997 |

| | |
|---|---|
| E | EXCERPT from Asset Purchase Agreement, dated November 24, 1997 |
| F | Glenn Thompson's Employment Agreement, dated January 5, 1998 |
| G | EXCERPT from Glenn Thompson's Employment Agreement, dated January 5, 1998 |
| H | Draft of Proposed Employment Agreement for Glenn Thompson, dated November 22, 2002 |
| I | Independent Salary Survey, dated March 12, 2003 |
| J | Glenn Thompson's Employment Agreement, dated April 22, 2003 |
| K | Minutes of Thompson Products Holdings, Inc. and TPI's April 21, 2003 Board of Directors Meeting |
| L | Cameron Read's Letter to Glenn Thompson, dated July 19, 2005, acknowledging Glenn's resignation |

Respectfully Submitted,

GLENN THOMPSON and
SPLASH CREATIONS, INC.

By their attorneys,


/s/ Matthew F. Medeiros                          /s/ Michael L. Chinitz
_____          _____
Matthew F. Medeiros (BBO #544915)     Michael L. Chinitz (BBO # 552915)
LITTLE MEDEIROS KINDER BULMAN         Lisa A. Tenerowicz (BBO #654188)
& WHITNEY, PC                         ROSE & ASSOCIATES
72 Pine Street                        29 Commonwealth Avenue
Providence, RI  02903                 Boston, MA  02116
Tel:    (401) 272-8080                Tel:    (617) 536-0040
Fax:    (401) 272-8195                Fax:    (617) 536-4400


Date:  February 2, 2006

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 2, 2006.

/s/ Michael L. Chinitz

_____

Michael L. Chinitz, Esq.

Tab A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THOMPSON PRODUCTS, INC.,         )
a Delaware corporation,          )
                                 )
                    Plaintiff,   )
                                 )
v.                               )
                                 )
GLENN THOMPSON,                  )     C.A. NO. 05-11810-RGS
                                 )
and                              )
                                 )
THOMPSON ENTERPRISES, INC.,      )
                                 )
                    Defendants.  )
_____)

## COMPLAINT

Plaintiff, Thompson Products, Inc. ("TPI"), by counsel, for its Complaint against

Defendants, Glenn Thompson ("Thompson") and Thompson Enterprises, Inc. ("Enterprises"),

says as follows:

### PARTIES, JURISDICTION AND VENUE

1.      TPI is a Delaware corporation with its principal place of business at 310 Kenneth

W. Welch Drive, Lakeville, MA 02347.  TPI is in the business of manufacturing, selling and

importing photo albums, cardboard based gift boxes, easel backs for picture frames and related

products.

2.      Thompson was the President, a director and a shareholder of TPI.  He recently

resigned as President and director but remains a shareholder.  Thompson's residential address is

330 Rumstick Road, Barrington, RI 02806.

3.      Enterprises is a Rhode Island corporation with its principal place of business at

330 Rumstick Road in Barrington, RI 02806.  Enterprises is a newly formed corporation

organized, on information and belief, for the purpose of serving as Thompson's operating entity for competitive activities described hereafter. Thompson is the Registered Agent of Enterprises.

4.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.    Venue is proper in this jurisdictional district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

6.    Thompson, with other members of his family, started, developed and operated Thompson Paper Box Co., Inc., the predecessor to TPI, until 1997. In 1997, Thompson Paper Box Co., Inc. sold its assets to TPI. Thompson remained with TPI as its President, a director and as a shareholder.

7.    On January 5, 1998, incident to the sale of Thompson Paper Box Co., Inc.'s assets to TPI, TPI entered into an Employment Agreement with Thompson, (referred to hereinafter as the "1998 Agreement"). The 1998 Agreement provided for Thompson's employment by TPI as its President for consideration and contained in Section 9 certain restrictive covenants necessary to protect the best interests of TPI, including the following:

(a)    that for a period of two years following termination of his employment with TPI, Thompson would neither divulge nor use any TPI Confidential Information (a defined term) without TPI's consent;

(b)    that for a period of two years following termination of his employment with TPI, Thompson would not, directly nor indirectly solicit, employ or associate with

2

any person who was employed within six (6) months prior to Thompson's termination of employment with TPI; and

        (c)     that for a period of two years following termination of his employment with TPI, Thompson would not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with the business of TPI.

      8.     The 1998 Agreement had a two-year term, which expired on December 31, 2000. However, even though the 1998 Agreement terminated on that date, TPI and Thompson expressly agreed in paragraph 9(g) of that Agreement that

> Notwithstanding termination of this Agreement or any other termination of [Thompson's] employment with [TPI], [Thompson's] obligations under this Section 9 shall survive termination of [Thompson's] employment with [TPI] any time for any reason.

      9.     On information and belief, on or about January 1, 2001, also incident to the 1997 sale of Thompson Box Co., Inc.'s assets to TPI, TPI and Thompson entered into a successor Employment Agreement (referred to hereinafter as the "2001 Agreement"). The 2001 Agreement also provided for Thompson's employment by TPI as its President in exchange for an annual compensation of $200,000, plus benefits.

      10.    The 2001 Agreement, which also specifically referenced the company sale, had an initial term of one year, which expired on December 31, 2002. Unlike the 1998 Agreement, however, the 2001 Agreement provided for its automatic renewal for successive one-year renewal terms unless either party provided the other with "notice of desire to terminate or modify

[the 2001 Agreement] . . . at least ninety (90) days before the end of the Initial Term or the
applicable Renewal Term."

11.    Pursuant to paragraph 9(a) of the 2001 Agreement, the parties again agreed upon
terms for TPI's protection of "Confidential Information" in the possession of Thompson, and
defined "Confidential Information" as:

> . . . all nonpublic information concerning the Employer's business relating,
> without limitation, to its products, customer lists, pricing, trade secrets,
> intellectual property, business methods, financial and cost data, business
> plans, budgets, strategies, competitive analysis, the substance of
> agreements with customers, marketing and concession arrangements, or
> other confidential agreements, which was obtained from the Employer or
> its predecessors or which was learned, discovered, developed, conceived,
> originated or prepared during or as a result of the performance of any
> services by Employee on behalf of the Employer or its predecessors. For
> purposes of this definition, the Employer shall be deemed to include any
> entity which is controlled, directly or indirectly, by the Employer and any
> entity of which a majority of the economic interest is owned, directly or
> indirectly, by the Employer.

12.    Pursuant to paragraph 9(b) of the 2001 Agreement, the parties again agreed upon
terms to protect TPI from Thompson's possible pirating of TPI employees:

> During the Employment Term and for a period of two (2) years following
> termination of Employee's employment hereunder, the Employee will not,
> directly or indirectly, solicit, employ or associate in any business
> relationship with any person, who was employed within six (6) months
> prior to the termination of Employee's employment by the Employer or
> any business in which Employer has a material interest, direct or indirect,
> as an officer, partner, shareholder or beneficial owner.

13.    Pursuant to paragraph 9(c) of the 2001 Agreement, the parties again agreed upon
terms to protect TPI from Thompson's possible competition with TPI, both during his tenure
with TPI and following his termination from TPI:

> During the Employment Term or period of two (2) years following
> termination of Employee's employment hereunder, Employee will not
> within the continental United States, directly or indirectly, assist in,
> engage in, have any financial interest in, or participate in any way in, as an

4

owner, partner, employee, agent officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

14. On January 1, 2003, the 2001 Agreement automatically renewed for an additional one-year term as neither party provided the other with the mandatory 90-day notice of termination before the initial term expired on December 31, 2002.

15. From January 1 through April 22, 2003, Thompson and TPI performed the 2001 Agreement by Thompson's continuation of services as President of TPI and by TPI's payment to Thompson of compensation and benefits in accord with paragraph 6.

16. In April 2003, Thompson was a director of TPI, along with James Conlan ("Conlan") and Victor Kiarsis ("Kiarsis"). At that time, Conlan and Kiarsis had been advised by TPI's majority shareholder that their relationships with TPI and with a number of other companies affiliated with and controlled by TPI's majority shareholder, were being severed for cause. The contentious relationship between Conlan and Kiarsis, on the one hand, and TPI, TPI's majority shareholder, and companies affiliated with TPI's majority shareholder, on the other, resulted in litigation commencing in 2003. Accordingly, in April 2003, Conlan and Kiarsis did not have the best interests of TPI at heart.

17. In collaboration with Thompson, Conlan, Kiarsis and/or Thompson prepared, or caused to be prepared, a new and very different Employment Agreement between TPI and Thompson. This new Employment Agreement (referred to hereinafter as the "2003 Agreement")

5

eviscerated all of the provisions that protected TPI, which had been included in both the 1998
Agreement and the 2001 Agreement.

18.     To Thompson's benefit and TPI's detriment, Conlan, Kiarsis and/or Thompson
provided for the following in the 2003 Agreement:

(a)     the elimination of all restrictive covenants that had been an essential part
of the 1998 Agreement and the 2001 Agreement;

(b)     the elimination of a definition of "business" that had been provided in the
1998 Agreement and the 2001 Agreement, which was pertinent to the restrictive
covenants in those Agreements;

(c)     the substantial curtailment of the definition of "cause" that had been
provided in the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's
ability to terminate Thompson's employment with TPI;

(d)     the elimination of any definition for "disability" that had been defined in
the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's termination
of Thompson's employment;

(e)     the substantial modification of provisions in the 1998 Agreement and the
2001 Agreement that defined Thompson's employment responsibilities and provided for
the TPI Board of Directors' control over Thompson's responsibilities;

(f)     the elimination of the right of the TPI Board of Directors to require
Thompson to relocate from his Lakeville, MA location if in the best interest of the
company, which was provided for in the 1998 Agreement and the 2001 Agreement;

6

(g)    the elimination of the automatic renewal provision from the 2001 Agreement and substitution of a 3-year term, which coincided with Thompson's intended retirement from TPI;

(h)    an increase of Thompson's annual salary from $200,000 to $280,000;

(i)    the modification of Thompson's right to terminate his employment with TPI for cause, making it easier for him to do so;

(j)    the elimination of TPI's right to terminate the 2003 Employment Agreement for cause, in contrast to the 1998 Agreement and the 2001 Agreement, which contained "for cause" termination provisions;

(k)    the provision of a complete release of Thompson by TPI and its parent company from past, present and future claims;

(l)    the elimination of TPI's right to assign Thompson's employment agreement, which had been provided for in the 1998 Agreement and the 2001 Agreement; and

(m)    the elimination of all references to the sale of Thompson Box Company as the basis for Thompson's employment with TPI.

19.    The 2003 Agreement was discussed at a TPI Board meeting held in April 2003 and attended by Conlon, Kiarsis, Thompson and counsel for TPI. Counsel advised the three-member Board that the 2003 Agreement should not be executed. After counsel departed the meeting, Kiarsis nevertheless signed the 2003 Agreement on behalf of TPI and gave it to Thompson, who did not sign it. Board minutes were prepared by Conlon, Kiarsis and/or Thompson, or by another at their direction, to reflect the approval of the transaction.

7

20.    Not only did Conlon, Kiarsis and Thompson lack the authority to act on behalf of TPI in this conflict of interest situation, but they also deliberately and willfully breached their fiduciary duties of loyalty to TPI when Kiarsis executed the 2003 Agreement for TPI with the consent of Conlon and Thompson, and when all three Board members voted to approve the transaction on behalf of TPI.

21.    Thompson did not immediately execute the 2003 Agreement following the April 2003 Board meeting.  Instead he continued to negotiate with new TPI board of director members on his employment terms for the remainder of 2003.

22.    In May 2003, TPI's controlling shareholder terminated Conlon's and Kiarsis's employment with TPI and with all of TPI's related or affiliated companies.

23.    Two new Board members were elected to replace Conlon and Kiarsis after their termination.

24.    Upon learning of the 2003 Agreement and its execution by Kiarsis, one or both of the new Board members advised Thompson that, in their view, the 2003 Agreement was prepared and executed without proper TPI authority and that its terms were unacceptable to TPI. With this notice, TPI effectively withdrew the unsigned 2003 Agreement from further consideration.

25.    Despite receipt of this communication, Thompson nonetheless signed the 2003 Agreement on or about November 17, 2003.

26.    On January 1, 2004, Thompson caused TPI to begin paying him on the basis of $280,000 annual salary for his services as President of TPI.

27.    In July 2005, Thompson resigned as an officer, director and employee of TPI.

8

28.    Shortly after his resignation from TPI, Thompson formed Enterprises, which, on information and belief, was formed by Thompson to become a direct competitor of TPI. Thompson is now competing directly with TPI through Enterprises or Thompson is positioning himself or Enterprises to compete directly with TPI. Thompson was the incorporator, and is the registered agent and, on information and belief, sole shareholder of Enterprises.

29.    Upon information and belief, in the course of forming and either commencing operation or positioning Enterprises to commence operation of a competing business, Thompson has removed confidential and proprietary documents and information from TPI; he has used his knowledge of TPI's confidential information to identify and contact TPI customers in hopes of eventually persuading them to leave TPI and become customers of Thompson's or Enterprises's competitive business; he has utilized TPI's confidential financial information to attempt to gain an unfair competitive advantage in the marketplace; and he has solicited, with promises of employment, valuable TPI employees to work in his competitive business, causing them to resign their employment with TPI, all to the great detriment of TPI.

30.    To the extent that Thompson and Enterprises have not already used TPI's Confidential Information in connection with a competing business, TPI reasonably believes that Thompson and/or Enterprises will use its confidential information soon, and that said use will be to the great detriment of TPI. Indeed, before resigning from TPI, Thompson made efforts to purchase TPI but was unable to do so, and all of his recent conduct, including his resignation from TPI, his formation of Enterprises to compete with TPI, his contact of TPI customers and his solicitation of TPI employees has been for the purpose of devaluing TPI and causing TPI to sell its stock or assets to him at a price well below market value. His conduct has, in fact, devalued TPI for sale in the marketplace.

31.     On January 1, 2004, the 2001 Agreement automatically renewed for an additional one-year term as neither party provided the other with the mandatory 90-day notice of termination before the renewal term expired on December 31, 2003.

32.     Assuming *arguendo* that the 2001 Agreement did not automatically renew for an additional one-year term on January 1, 2004, the restrictive covenants set forth in either the 1998 Agreement or the 2001 Agreement nonetheless are in effect for a two-year period following Thompson's termination of employment with TPI.

33.     Thompson's breaches of the 2001 Agreement, his breach of his fiduciary duties of loyalty and good faith to TPI and his unauthorized disclosure and use of TPI's confidential information have damaged and continue to damage TPI; and his and Enterprises's future disclosure and use of TPI's confidential information in competition with TPI will damage TPI as well.

## COUNT I
### (Injunctive Relief)

34.     TPI repeats and realleges paragraphs 1-33 above as if fully set forth herein.

35.     By his actions described above, Thompson breached either the 1998 Agreement or the 2001 Agreement, specifically Sections 9(a), 9(b) and 9(c) of each Agreement, and he continues to breach the 1998 Agreement and the 2001 Agreement to the substantial detriment of TPI.

36.     Pursuant to Section 9(f) of the 1998 Agreement and the 2001 Agreement, Thompson agreed that:

> . . . damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by

10

Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right the sue for monetary damages, Employee shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary preliminary or permanent injunction, to enforce the provisions contained in Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

37.    Pursuant to Section 9(g) of the 1998 Agreement and the 2001 Agreement, Thompson further agreed that:

Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

38.    Thompson's breaches of the 1998 Agreement and/or the 2001 Agreement have caused, and continue to cause, irreparable harm to TPI for which there is no adequate remedy at law.

WHEREFORE, TPI respectfully requests entry of preliminary and permanent injunctions:

(a)    compelling Thompson and Enterprises to cease and desist from all competitive business activities for a period of two (2) years from entry of the order;

(b)    prohibiting Thompson's and Enterprises's use of TPI's confidential information either to gain a competitive advantage over TPI or generally to TPI's detriment;

(c)    prohibiting Thompson and Enterprises from, directly or indirectly, soliciting or employing any person who was employed by TPI within the six-month period prior to Thompson's resignation from TPI for a period of two (2) years from entry of the order; and

11

(d)    for such other and further general relief as equity may deem meet.

## COUNT II
### (Breach of Contract)

39.    TPI incorporates paragraphs 1 through 33 above as if fully set forth herein.

40.    Thompson has breached the 1998 Agreement and/or the 2001 Agreement in the following ways:

(a)    by forming and operating a competitive business within the effective period of his covenant against competition;

(b)    by contacting customers of TPI with intent to cause them, now or later, to become customers of Thompson Enterprises;

(c)    by soliciting and/or employing employees of TPI;

(d)    by using TPI's confidential information to gain a competitive advantage in the marketplace; and

(e)    by paying to himself an annual compensation of $280,000 rather than $200,000.

41.    TPI has been damaged by Thompson's breaches of contract, and to the extent damages for any one or more breaches may be reasonably measured, TPI is entitled to an award of such damages.

WHEREFORE, TPI respectfully requests entry of judgment against Thompson in the amount of TWO MILLION DOLLARS ($2,000,000.00) or in such lesser amount as the evidence may show, plus interest and costs.

## COUNT III
### (Breach of Fiduciary Duty)

42.    TPI repeats and realleges here paragraphs 1 through 33 above as if fully set forth herein.

43.    Prior to his resignation from TPI, Thompson breached his fiduciary duties of loyalty and good faith to TPI with the following actions:

(a)    by engaging in self-serving conduct in the preparation, approval and execution of the 2003 Agreement;

(b)    by accepting increased annual compensation of $280,000 under the 2003 Agreement, rather than the $200,000 annual compensation to which he was entitled;

(c)    by voting as a director of TPI to approve the 2003 Agreement;

(d)    by preparing to form and/or forming a business in competition with TPI;

(e)    by confiscating TPI customers; and

(f)    by soliciting valuable TPI employees to leave TPI and work for him.

44.    TPI has been damaged by Thompson's breaches of his fiduciary duties to TPI, and to the extent that damages for any one or more breaches may be reasonably measured, TPI is entitled to an award of such damages.

WHEREFORE, TPI respectfully requests entry of judgment against Thompson in the amount of TWO MILLION DOLLARS ($2,000,000.00), or in such lesser amount as the evidence may show, plus interest and costs.

## COUNT IV
### (Accounting)

45.    TPI repeats and realleges paragraphs 1 through 33 above as if fully set forth herein.

13

46.     Upon information and belief, Thompson's and Enterprises's unlawful competitive activities have produced income and/or profits for Thompson and/or Enterprises which must be disgorged as a measure of TPI's damages.

47.     Absent a full accounting by Thompson and Enterprises of all sales and profits that they made in their conduct of unlawful competitive activities, TPI cannot accurately measure its damages.

48.     Accordingly, TPI is entitled to a full accounting by Thompson and Enterprises of all such sales and profits.

WHEREFORE, TPI respectfully requests entry of an order compelling Thompson and Enterprises to account fully for all sales of products in competition with TPI since Thompson's departure from TPI and for all profits made on such sales and any other unlawful business activities in competition with TPI.

## COUNT V
### (Violation of M.G.L. c. 93A §11)

49.     TPI repeats and realleges paragraphs 1 though 33 above as if fully set forth herein.

50.     TPI, a corporation with its principal place of business in the Commonwealth, is a person within the meaning of M.G.L. c. 93A, § 11.

51.     On information and belief, Thompson and Enterprises are currently in (or are preparing to be in) the trade or business of manufacturing, selling and or importing good substantially similar in nature to those of TPI.

52.     Following his resignation from TPI, Thompson established Enterprises for the specific purpose of unfairly competing with TPI, in Massachusetts and elsewhere, by stealing

14

TPI's customers, and utilizing TPI's trade secrets, confidential business information, and other proprietary or protected information and knowledge possessed by him and owned by TPI.

53.    Thompson and Enterprises have engaged in unfair and deceptive acts, undertaken willfully and knowingly in violation of M.G.L. c. 93A §11.

54.    As a result of the foregoing, TPI has been damaged, and continues to suffer damages as the unfair competition continues unchecked, in the amount of TWO MILLION DOLLARS and 00/100 ($2,000,000.00), or in such other amount as the evidence may show, plus interest, multiple damages, attorney's fees and costs.

WHEREFORE, TPI respectfully requests entry of judgment against Thompson and Enterprises for willful and knowing violation of M.G.L. c. 93A and award actual damages, doubled or trebled, plus interest, costs, expenses and attorneys' fees.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

THOMPSON PRODUCTS, INC.

By its attorneys,

Terence P. McCourt   (BBO #555784)
Andrew T. Kang      (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN, A PROFESSIONAL CORPORATION
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507

DATED:  September 1, 2005

bos-fs1\kanga\171249v01\9/1/05\99917.377855

16

Tab B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMPSON PRODUCTS, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05-11810-RGS |
| GLENN THOMPSON, | ) ) | |
| and | ) ) | |
| THOMPSON ENTERPRISES, INC. (now SPLASH CREATIONS, INC.), | ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiff, Thompson Products, Inc. ("TPI"), by counsel, for its Amended Complaint against Defendant Glenn Thompson ("Thompson") and Thompson Enterprises, Inc. (now Splash Creations, Inc. by name change) ("Splash"), says as follows:

### PARTIES, JURISDICTION AND VENUE

1.     TPI is a Delaware corporation with its principal place of business at 310 Kenneth W. Welch Drive, Lakeville, MA 02347. TPI is in the business of manufacturing, selling and importing photo albums, cardboard based gift boxes, easel backs for picture frames and related products. TPI is a wholly-owned subsidiary of Thompson Products Holdings, Inc. ("TPHI").

2.     Thompson was the President, a director and a shareholder of TPI. On July 12, 2005 he resigned as President, director and employee. Thompson's last known residential address is 330 Rumstick Road, Barrington, RI 02806.

3.      Splash is a Rhode Island corporation with its principal place of business at 330 Rumstick Road in Barrington, RI 02806. It was formed by Thompson on July 18, 2005 for the sole purpose of serving as his operating entity to compete directly against TPI.

4.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      Venue is proper in this jurisdictional district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

A.      The Asset Purchase Agreement and the 1998 Employment Agreement

6.      Thompson, with other members of his family, started, developed and operated Thompson Paper Box Co., Inc., the predecessor to TPI, until November 24, 1997. On that date, Thompson Paper Box Co., Inc., along with Thompson, his brother Mark Thompson and two other shareholders of Thompson Paper Box Co., Inc., as sellers, executed an Asset Purchase Agreement (APA") whereby they sold all of the company's assets to TPI and TPHI. Thompson remained with TPI as its President, a director and an employee.

7.      In the APA, the sellers, including Thompson and his brother Mark, promised to deliver to TPI at closing Employment Agreements in the form attached to the APA as Exhibits 3.2(c)-1 and 3.2(c)-2. Each form Employment Agreement, in Section 9, contained identical Restrictive Covenants. Pertinent portions of the APA and the form Employment Agreement exhibits are attached hereto as Ex. A.

2

8.    Independent of the Employment Agreements, Thompson expressly agreed with

TPI in paragraph 2.4 of the APA to abide by the same Restrictive Covenants stated in the form

Employment Agreements attached to the APA, and the Restrictive Covenants set out in Section 9

of each Employment Agreement were expressly incorporated by reference into the APA to bind

Thompson and his brother Mark.

9.    Therefore, in the APA, Thompson specifically agreed with TPI as follows:

(a)    . . . that during his employment with [Thompson Paper
Box Co., Inc.], he was, and during his employment with Employer
[TPI], he will be exposed to Confidential Information, all of which is
proprietary and which will rightfully belong to the Employer. The
Employee shall hold in a fiduciary capacity for the benefit of the
Employer such Confidential Information obtained by Employee during
his employment with the Employer and shall not, directly or indirectly,
at any time, during the Employment Term of this Agreement and for a
period of two (2) years following termination of Employee's
employment hereunder . . . divulge or use any Confidential Information
without the prior written consent of a duly empowered officer of the
Employer, except (i) as required in the performance of his duties for the
Employer, (ii) as otherwise required by law; provided that prior to any
such disclosure, notice of such requirement of disclosure is provided to
Employer and Employer is afforded the reasonable opportunity to object
to such disclosure, and (iii) as and to the extent such information is
either not unique to the Employer or generally available to the public
and became generally available to the public other than as a result of a
disclosure by Employee in violation of this Agreement. Employee shall
take all reasonable steps to safeguard such Confidential Information and
to protect such Confidential Information against disclosure, misuse, loss
or theft;

(b)    that for period of two (2) years following termination of
Employee's employment hereunder, the Employee will not, directly or
indirectly, solicit, employ or associate in any business relationship with
any person, who was employed within six (6) months prior to the
termination of Employee's employment by the Employer or any
business in which Employer has a material interest, direct, or indirect, as
an officer, partner, shareholder or beneficial owner;

(c)    that for a period of two (2) years following termination of
Employee's employment hereunder Employee will not within the
continental United States, directly or indirectly, assist in, engage in, have

3

any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder;

(d)    that he represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (iii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated; and

(e)    that [n]otwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, **the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.**

10.    In addition, Thompson agreed in paragraph 2.4 of the APA, as expressly incorporated there from Section 9 of the form Employment Agreement exhibits, that

(a)    If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto; and

(b)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be

> entitled, upon application to a court of competent jurisdiction, to obtain
> injunctive relief, including, but not limited to, a temporary restraining
> order or temporary, preliminary or permanent injunction, to enforce the
> provisions contained in this Section 9, all of which shall constitute rights
> and remedies to which Employer may be entitled.

11.    On January 5, 1998, as required by the APA, Thompson and TPI executed the

Employment Agreement in the form attached to the APA, (the executed Employment Agreement

being referred to hereinafter as the "1998 Agreement"). The 1998 Agreement provided for

Thompson's employment by TPI as its President for consideration and contained in Section 9 the

Restrictive Covenants itemized above. A copy of the 1998 Agreement is attached as Ex. B.

Glenn's brother Mark executed the same form Employment Agreement.

12.    The 1998 Agreement had a two-year term, which expired on December 31, 2000.

However, even though the 1998 Agreement terminated on that date, TPI and Thompson

expressly agreed in Section 9(g) of that Agreement that

> Notwithstanding termination of this Agreement or any other termination
> of [Thompson's] employment with [TPI, **[Thompson's] obligations
> under this Section 9 shall survive termination of [Thompson's]
> employment with [TPI] any time for any reason.**

This was the same covenant that Thompson made to TPI in paragraph 2.4 of the APA. See

paragraph 9 of the Verified Amended Complaint above.

B.    The 2001 Employment Agreement

13.    On information and belief, on or about January 1, 2001, also incident to the 1997

sale of Thompson Paper Box Co., Inc.'s assets to TPI and TPHI, TPI and Thompson entered into

a successor Employment Agreement (referred to hereinafter as the "2001 Agreement"). The

2001 Agreement also provided for Thompson's employment by TPI as its President in exchange

for an annual compensation of $200,000, plus benefits. An unexecuted copy of the 2001

Agreement is attached as Ex. C.

5

14.      The 2001 Agreement had an initial term of one year, which expired on December 31, 2002. Unlike the 1998 Agreement, however, the 2001 Agreement provided for its automatic renewal for successive one-year renewal terms <u>unless</u> either party provided the other with "notice of desire to terminate or modify [the 2001 Agreement] . . . at least ninety (90) days before the end of the Initial Term or the applicable Renewal Term."

15.      Pursuant to Section 9 of the 2001 Agreement, Thompson agreed to the same Restrictive Covenants set out in the APA and in the 1998 Agreement.

16.      On January 1, 2003 and January 1, 2004, the 2001 Agreement automatically renewed for an additional one-year term as neither party provided the other with the mandatory 90-day notice of termination before the end of the applicable term.

         C.      The 2003 Employment Agreement

17.      In April 2003, Thompson was a director of TPHI and TPI, along with James Conlan ("Conlan") and Victor Kiarsis ("Kiarsis"). In March 2003, TPHI, by its Board of Directors, gave formal notice to Conlon, Kiarsis and Thompson that there would be a special shareholders meeting on May 1, 2003 for the purpose of removing Conlan and Kiarsis as members of the TPHI board. Notice attached as Ex. D. At the time of the notice, Conlan and Kiarsis had been advised by TPI's ultimate parent company that their relationships with TPHI, TPI and a number of other companies affiliated with and controlled by TPHI's ultimate parent, were being severed for cause. The contentious relationship between Conlan and Kiarsis, on the one hand, and TPI, TPHI, and companies affiliated with TPHI and TPI, on the other, resulted in litigation commencing in 2003. Accordingly, in April 2003, Conlan and Kiarsis did not have the best interests of TPI at heart.

18.     In collaboration with each other, Conlan, Kiarsis and/or Thompson prepared, or caused to be prepared, a new and very different Employment Agreement between TPI and Thompson. This new Employment Agreement (referred to hereinafter as the "2003 Agreement") purported to eviscerate all of the provisions that protected TPI, which had been included in both the 1998 Agreement and the 2001 Agreement. A copy of the 2003 Agreement is attached as Ex.

19.     To Thompson's benefit and TPI's detriment, Conlan, Kiarsis and/or Thompson provided for the following in the 2003 Agreement:

(a)     the elimination of all restrictive covenants that had been an essential part of the 1998 Agreement and the 2001 Agreement;

(b)     the elimination of a definition of "business" that had been provided in the 1998 Agreement and the 2001 Agreement, which was pertinent to the restrictive covenants in those Agreements;

(c)     the substantial curtailment of the definition of "cause" that had been provided in the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's ability to terminate Thompson's employment with TPI;

(d)     the elimination of any definition for "disability" that had been defined in the 1998 Agreement and the 2001 Agreement, which was pertinent to TPI's termination of Thompson's employment;

(e)     the substantial modification of provisions in the 1998 Agreement and the 2001 Agreement that defined Thompson's employment responsibilities and provided for the TPI Board of Directors' control over Thompson's responsibilities;

(f)    the elimination of the right of the TPI Board of Directors to require Thompson to relocate from his Lakeville, MA location if in the best interest of the company, which was provided for in the 1998 Agreement and the 2001 Agreement;

(g)    the elimination of the automatic renewal provision from the 2001 Agreement and substitution of a 3-year term, which coincided with Thompson's intended retirement from TPI;

(h)    an increase of Thompson's annual salary from $200,000 to $280,000;

(i)    the modification of Thompson's right to terminate his employment with TPI for cause, making it easier for him to do so;

(j)    the elimination of TPI's right to terminate the 2003 Employment Agreement for cause, in contrast to the 1998 Agreement and the 2001 Agreement, which contained "for cause" termination provisions;

(k)    the provision of a complete release of Thompson by TPI and its parent company from past, present and future claims; and

(l)    the elimination of TPI's right to assign Thompson's employment agreement, which had been provided for in the 1998 Agreement and the 2001 Agreement.

20.    Conlan, Kiarsis and Thompson then called a TPI and TPHI joint board of directors meeting on April 23, 2003, one week before Conlan and Kiarsis were to be removed as directors of TPHI, for the sole purpose of approving the 2003 Agreement.  Corporate counsel for TPI and TPHI attended the meeting.  Counsel advised the three-member Board that the 2003 Agreement should <u>not</u> be executed.  After counsel departed the meeting, Conlan, Kiarsis and Thompson nevertheless voted to approve the 2003 Agreement.  Kiarsis signed the 2003 Agreement on behalf of TPI and gave it to Thompson, who did not sign it.  Board minutes were

8

prepared by Conlon, Kiarsis and/or Thompson, or by another at their direction, to reflect the approval of the transaction. A copy of the board minutes is attached as Ex. E.

21.     Thompson lacked the authority to act on behalf of TPI in this conflict of interest situation, and Conlon, Kiarsis and Thompson deliberately and willfully breached their fiduciary duties of loyalty to TPI in voting to approve the 2003 Agreement. Kiarsis violated the same duty to TPI in executing the 2003 Agreement on behalf of TPI. Their actions and the 2003 Agreement were grossly unfair to TPI and voidable by it.

22.     Thompson did not immediately execute the 2003 Agreement following the April 2003 Board meeting. Instead he continued to negotiate with new TPI board of director members on his employment terms for the remainder of 2003.

23.     On May 1, 2003, the shareholders of TPHI, in a special meeting, removed Conlan and Kiarsis as directors. A copy of the minutes of the shareholders meeting is attached as Ex. G. Also in May and early June, Conlan and Kiarsis were removed as directors, employees and officers from all companies affiliated with TPHI and TPI.

24.     TPHI and TPI promptly replaced Conlon and Kiarsis with two new board members.

25.     Upon learning of the 2003 Agreement and its execution by Kiarsis, one or both of the new Board members advised Thompson that, in their view, the 2003 Agreement was unfair to TPI, that it had been prepared and executed without proper TPI authority and that it was unacceptable to TPI. With this notice, TPI effectively withdrew the unsigned 2003 Agreement, then only an offer, from further consideration before its execution by Thompson.

26.    Despite receipt of this communication, Thompson nonetheless signed the 2003

Agreement on or about November 17, 2003, and thereby breached his fiduciary duty of loyalty to

TPI.

D.    Thompson's Pre-Resignation Activities

27.    On January 1, 2005, without valid authorization by the TPI or TPHI board of

directors, Thompson caused his annual salary to be increased to $280,000.  Thompson caused

TPI to pay him on the basis of $280,000 annually from January 1, 2005 through July 12, 2005,

the date of his departure from TPI.  Therefore, Thompson drew a salary from TPI that was

calculated on the basis of an annual salary of $280,000, which was $80,000 more annually than

he was entitled to be paid.

28.    On May 19, 2005, Thompson, individually contracted with Medhat Salyh to

provide personal consulting services to Thompson in connection with Thompson's potential

acquisition of TPI.  Thompson caused TPI to pay Salyh for such services that were rendered

solely to Thompson and for his personal benefit.  At Thompson's direction, TPI paid Salyh

$42,500 for services rendered to Thompson individually.

29.    For months Thompson negotiated with TPHI for his acquisition of TPI, but TPHI

and Thompson never agreed upon terms.

30.    Therefore, on July 12, 2005, Thompson resigned as an officer, director and

employee of TPI and set immediately upon a course to use all of the confidential and proprietary

information he had acquired at TPI concerning the operation of the company to establish a mirror

image of TPI for the manufacture and sale of photo boxes, photo albums and journal, to solicit

and hire TPI's employees, to solicit and convert its customers and, in the end, either to drive TPI

10

out of business or to reduce its market value to a point where TPI would be willing to sell the

company to him at a below market price.

        E.      Thompson's Post-Termination Competitive Activities

       31.      In furtherance of that scheme, on or before July 18, 2005, Thompson formed

Splash (originally named Thompson Enterprises, Inc.) for the sole purpose of becoming a direct

competitor of TPI. Upon the filing of this action, Thompson changed the name of Thompson

Enterprises, Inc. to Splash Creations, Inc. Thompson was the incorporator, and is the registered

agent and sole shareholder of Splash.

       32.      Armed with every confidential and proprietary detail of TPI's business, including

its finances, suppliers, product designs, customers, customer account numbers, manufacturer's

representatives, overhead, profit margins and the like, Thompson and Splash have established in

the short span of approximately three months a mirror image of TPI to compete unlawfully with

it in the marketplace as to the manufacture and sale of certain products. Without such

proprietary and confidential information, Thompson and Splash would have been required to

spend many months, perhaps even years, to be ready and able to compete directly, head-to-head,

with TPI for the business of TPI's major customers, such as Target, Wal-Mart and K-Mart.

       33.      With Thompson's competitive advantage acquired through years of employment

in top management with TPI, Thompson and Splash have, in the past three months

       (a)      successfully solicited and employed at least nine key TPI employees,

      including TPI's office manager in Hong Kong; its director of manufacturing in Hengli

      Town, Dong Guan, China; its product development director; its vice president of

      operations; and its art director, among others;

11

(b)     rented office space in Hong Kong in the very building housing TPI's China business office;

(c)     on information and belief, established manufacturing and distribution capabilities in China for the U. S. market and in the United States;

(d)     solicited TPI's manufacturer's representatives with key TPI customer relationships to switch their allegiances to Thompson and Splash from TPI; and

(e)     used TPI's confidential customer account numbers to contact TPI's customers and attempt to sell them competitive products.

34.     The recent conduct of Thompson and Splash, including his resignation from TPI, the formation of Splash to compete with TPI, the solicitation of TPI customers, the solicitation and employment of TPI key employees and other competitive activities itemized herein have been for the purpose of devaluing TPI and either putting TPI out of business or reducing the value of TPI in an effort to pursuade TPI to sell its stock or assets to him at a price well below market value.  His conduct has, in fact, caused great harm to TPI and has devalued TPI for sale in the marketplace.

## COUNT I
(Declaratory Judgment)

35.     TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

36.     Until signed by Thompson, the 2003 Agreement was only an unaccepted offer, and the offer was withdrawn by TPI's newly elected board members prior to Thompson's acceptance by execution of the 2001 Agreement.  Therefore, it was never valid.

37.     There is an actual case or controversy as to whether the 2003 Agreement became a valid contract between Thompson and TPI or whether it was only an unaccepted offer that was lawfully withdrawn prior to acceptance by Thompson.

WHEREFORE, TPI seeks a declaratory judgment that the 2003 Agreement was never a valid contract between Thompson and TPI.

COUNT II
(Rescission of the 2003 Agreement)

38.     TPI repeats and realleges here paragraphs 1 through 34 above as if set out fully herein.

39.     Even if Thompson signed the 2003 Agreement before it was withdrawn by TPI, approval of the 2003 Agreement at the April 23, 2003 TPI board of directors meeting was a conflict of interest transaction for which Thompson was ineligible to vote.  Even though approved by Conlan and Kiarsis, the other two TPI directors, the 2003 Agreement was grossly unfair to TPI, is voidable and is subject to rescission.

WHEREFORE, TPI prays for rescission of the 2001 Agreement as voidable due to unfairness in this board of directors conflict of interest matter.

COUNT III
(Breach of Restrictive Covenants)

40.     TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

41.     The Restrictive Covenants set forth in the APA, paragraph 2.4, and/or in paragraph 9 of the 1998 Agreement and/or in paragraph 9 of the 2001 Agreement are in effect and binding upon Thompson for a two-year period following his termination of employment with TPI on July 12, 2005.

13

42.    Thompson violated, and he continues to violate, the Restrictive Covenants set out

in the APA and/or in the 1998 Agreement and/or the 2001 Agreement as follows:

(a)    he has used, and he continues to use, TPI's Confidential Information to the

detriment of TPI without its prior written consent in violation of subsection (a) of the

Restrictive Covenants;

(b)    he has failed, and he continues to fail, to take all reasonable steps against

his own misuse of TPI's Confidential Information in violation of subsection (a) of the

Restrictive Covenants;

(c)    he has solicited, employed or associated in his competitive business

persons who were employed by TPI or its affiliated companies within six months prior to

Thompson's termination of employment with TPI in violation of subsection (b) of the

Restrictive Covenants and he continues to do so; and

(d)    he has directly engaged in and participated as an owner and officer in a

business that involves activities similar to, related to or competitive with the business of

TPI, and he continues to do so, in violation of subsection (c) of the Restrictive Covenants.

43.    Pursuant to paragraph 2.4 of the APA and/or Section 9(f) of the 1998 Agreement

and/or Section 9(f) of the 2001 Agreement, Thompson agreed that:

> . . . damages at law, including, but not limited to, monetary damages, will
> be an insufficient remedy to Employer in the event that the restrictive
> covenants contained in this Section 9 are violated and that, in addition to
> any remedies or rights that may be available to Employer, all of which
> other remedies or rights shall be deemed to be cumulative, retained by
> Employer and not waived by the enforcement of any remedy available
> hereunder, including, but not limited to, the right to sue for monetary
> damages, Employee shall also be entitled, upon application to a court of
> competent jurisdiction, to obtain injunctive relief, including, but not
> limited to, a temporary restraining order or temporary preliminary or
> permanent injunction, to enforce the provisions contained in Section 9, all

14

of which shall constitute rights and remedies to which Employer may be entitled.

44.    Pursuant to paragraph 2.4 of the APA and/or Section 9(g) of the 1998 Agreement and/or Section 9(g) of the 2001 Agreement, Thompson further agreed that:

> Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, **the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.**

45.    Thompson's violations of the Restrictive Covenants contained in the APA and/or the 1998 Agreement and/or the 2001 Agreement have caused, and continue to cause, irreparable harm to TPI for which there is no adequate remedy at law.

46.    The Restrictive Covenants are reasonable in scope, duration, area and geography and are necessary for the protection of TPI's interests, and are in the public interest.

WHEREFORE, TPI respectfully requests the following relief:

A.    a temporary restraining order, preliminary injunction and permanent injunction

(i) compelling Thompson and Splash to cease and desist from all competitive business activities for a period of two (2) years from entry of the order;

(ii)    prohibiting Thompson's and Splash's use of TPI's confidential information either to gain a competitive advantage over TPI or generally to TPI's detriment; and

(iii)    prohibiting Thompson and Splash from, directly or indirectly, soliciting or employing any person who was employed by TPI within the six-month period prior to Thompson's resignation from TPI for a period of two (2) years from entry of the order;

B.    Judgment against Thompson and Splash for all past breaches in an amount to be proved at trial; and

C.    for such other and further general relief as equity may deem meet.

## COUNT IV
### (Breach of Fiduciary Duties)

47.    TPI repeats and realleges here paragraphs 1 through 34 above as if fully set forth herein.

48.    Prior to his resignation from TPI, Thompson breached his fiduciary duties of loyalty and good faith to TPI by, among other things:

(a)    engaging in self-serving conduct in the preparation, approval and execution of the 2003 Agreement;

(b)    accepting increased annual compensation of $280,000 under the 2003 Agreement, rather than the $200,000 annual compensation to which he was entitled, from January 1 through July 12, 2005;

(c)    causing TPI to pay Medhat Slayh $42,500 for consulting services rendered to Thompson individually.

49.    TPI has been damaged by Thompson's past breaches of his fiduciary duties to TPI, and to the extent that damages for any one or more of such breaches may be reasonably measured, TPI is entitled to an award of such damages.

WHEREFORE, TPI respectfully requests entry of judgment against Thompson in the amount of TWO MILLION DOLLARS ($2,000,000.00), or in such lesser amount as the evidence may show, plus interest and costs.

## COUNT V
### (Accounting)

50.    TPI repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

16

51.     Upon information and belief, Thompson's and Splash's unlawful competitive activities have produced income and/or profits for Thompson and/or Splash which must be disgorged as a measure of TPI's damages.

52.     Absent a full accounting by Thompson and Splash of all sales and profits that they made in their conduct of unlawful competitive activities, TPI cannot accurately measure its damages.

53.     Accordingly, TPI is entitled to a full accounting by Thompson and Splash of all such sales and profits.

WHEREFORE, TPI respectfully requests entry of an order compelling Thompson and Splash to account fully for all sales of products in competition with TPI since Thompson's departure from TPI and for all profits made on such sales and any other unlawful business activities in competition with TPI.

<u>COUNT VI</u>
(Misappropriation of Trade Secrets)

54.     TPI repeats and realleges here paragraphs 1 through 34 as set out in full.

55.     The confidential and proprietary aspects of TPI's business, individually, as to many, but collectively as to all, are trade secrets.  They include:

(a)     the identity of TPI's suppliers;

(b)     the terms and conditions of TPI's supplier contracts;

(c)     the identity of TPI's supplier account representatives;

(d)     TPI's cost of raw materials;

(e)     TPI's cost of labor;

(f)     TPI's product designs and history concerning which designs are profitable and which designs are not;

17

(g)     customer/buyer design preferences;

(h)     machinery needed for its operation, vendors of such machinery and costs;

(i)     manufacturing components for various designs;

(j)     vendor discounts provided to TPI, by whom and under what conditions;

(k)     sources of skilled and unskilled labor;

(l)     the China market applicable to the manufacture and distribution of TPI's products;

(m)     import/export duty requirements applicable to TPI's operations in China;

(n)     TPI's delivery costs;

(o)     the identity of TPI customers and the history of their relationships with TPI;

(p)     the identity of TPI's manufacturer representatives;

(q)     knowledge of TPI customer confidential accounts;

(r)     TPI's wholesale prices;

(s)     TPI's customer delivery demands, TPI's ability to comply and its history of compliance;

(t)     the identity of key TPI employees, their salary, benefits and satisfaction and dissatisfaction with TPI;

(u)     TPI's profit margins; and

(w)     TPI's strengths and weaknesses unknown in the marketplace generally.

56.     Thompson and Splash have misappropriated TPI's trade secrets and have used, and are continuing to use, such trade secrets to the substantial detriment of TPI.

WHEREFORE, TPI respectfully prays for the following relief:

A.    a temporary restraining order, preliminary injunction and permanent injunction prohibiting Thompson and Splash from all further misappropriation and use of TPI's trade secrets;

B.    judgment against Thompson and Splash for past misappropriations in an amount to be proved at trial; and

C.    for such other further and general relief as equity may deem meet.

## COUNT VII
### (Violation of M.G.L. c. 93A §11)

57.    TPI repeats and realleges paragraphs 1 though 34 above as if fully set forth herein.

58.    TPI, a corporation with its principal place of business in the Commonwealth, is a person within the meaning of M.G.L. c. 93A, § 11.

59.    Thompson and Splash are currently in the trade or business of manufacturing, selling and or importing goods substantially similar to those of TPI.

60.    Following his resignation from TPI, Thompson established Splash for the specific purpose of unfairly competing with TPI, in Massachusetts and elsewhere, by stealing TPI's customers and utilizing TPI's trade secrets, confidential business information, and other proprietary or protected information and knowledge possessed by him and owned by TPI.

61.    Thompson and Splash have engaged in unfair and deceptive acts, undertaken willfully and knowingly in violation of M.G.L. c. 93A §11.

62.    As a result of the foregoing, TPI has been damaged, and continues to suffer damages as the unfair competition continues unchecked, in the amount of TWO MILLION DOLLARS and 00/100 ($2,000,000.00), or in such other amount as the evidence may show, plus interest, multiple damages, attorney's fees and costs.

**THOMPSON PRODUCTS, INC.**

By its attorneys


/s/  Andrew D. Kang
Terence P. McCourt (BBO #555784)
Andrew T. Kang (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

          and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN
A Professional Corporation
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507


DATED:  November 23, 2005

## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 23rd of November, 2005, I served a copy of

foregoing by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI 02903

Michael S. Chinitz, Esq
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA 02110

/s/ Andrew D. Kang
Andrew D. Kang

bos-fs1\McCourtT\177411v01\11/23/05\90594.010100

Tab C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THOMPSON PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-11810-RGS |
| | ) | |
| GLENN THOMPSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MOTION TO AMEND COMPLAINT AND TO SUBSTITUTE
SPLASH CREATIONS FOR THOMPSON ENTERPRISES, INC.**

Pursuant to Fed.R.Civ.P. Rule 17, plaintiff, Thompson Products, Inc. ("TPI"),

moves this Court for entry of an order substituting Splash Creations, Inc. for Thompson

Products, Inc. as the proper defendant and real party in interest herein by reason of a

name change of that corporate defendant that was made after TPI filed its Complaint.

Also, pursuant to Fed.R.Civ.P. Rule 17, TPI moves the Court for leave to file the

Amended Complaint tendered herewith, and in support of its motion, TPI states as

follows:

1.    This case arises out defendant, Glenn Thompson's, termination of employment

with TPI in July, 2005, and his post-termination establishment and operation of a

business in direct competition with TPI.

2.    TPI filed its Complaint in early September seeking injunctive relief and damages

for Thompson's commencement of competitive activities then known to TPI.

3.    Since TPI filed its Complaint, TPI has uncovered pre-termination breaches by

Thompson of his fiduciary duties to TPI in preparing for termination; Thompson has

taken numerous actions to intensify his unlawful efforts to compete with TPI; and

1

Thompson has recently used confidential, proprietary and trade secret information of TPI in an effort to steal its customers and compete unfairly with TPI in the marketplace, all justifying amendment of the Complaint as more particularly set out in the Amended Complaint.

4.      Because the case has recently matured on the pleadings; no discovery has been taken; and the initial Scheduling Conference will not be held until January 18, 2006, there will be no prejudice to the defendants if this motion is granted.

        WHEREFORE, the plaintiff requests that this Court grant its Motion to Amend the Complaint, order that the Amended Complaint tendered herewith be filed and grant defendants a reasonable time to file pleadings in response to the Amended Complaint.


        **<u>REQUEST FOR HEARING PURSUANT TO LOCAL RULE 7.1</u>**

        Plaintiff believes that oral argument will assist the Court in ruling upon this motion and, therefore, requests a hearing.

2

THOMPSON PRODUCTS, INC.

By its attorneys,

/s/  Andrew D. Kang
Terence P. McCourt    (BBO #555784)
Andrew D. Kang        (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

     and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN, A PROFESSIONAL CORPORATION
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507

DATED:  November 23, 2005

3

## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 23rd day of November, 2005, I

served a copy of the foregoing by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI  02903

Michael S. Chinitz, Esq.
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA  02110

/s/ Andrew D. Kang
Andrew D. Kang

bos-fs1\McCourtT\177405v01\11/23/05\90594.010100

4

Tab D
(Part 1 of 2)

**ASSET PURCHASE AGREEMENT**

Dated as of November 24, 1997

among

Thompson Products, Inc.

and

Thompson Paper Box Co., Inc.,

Glenn Thompson,

Mark A. Thompson,

Frederick L. Weingeroff

and

Gregg Weingeroff

EXHIBIT A

TABLE OF CONTENTS

PAGE NO.

ARTICLE I. DEFINITIONS ........................................................................ 2

ARTICLE II. THE ACQUISITION ............................................................... 9
2.1    Purchase and Sale of the Acquired Assets ................................. 9
2.2    Purchase Price .............................................................................. 9
2.3    Purchase Price Adjustment .......................................................... 9
2.4    Non Competition ........................................................................... 10
2.5    Closing ........................................................................................... 10

ARTICLE III. CONDITIONS TO CLOSING .................................................. 11
3.1    Conditions to Purchaser's Obligations to Close ......................... 11
3.2    Deliveries by the Company and the Stockholders ....................... 12
3.3    Conditions to the Company's Obligations ................................... 13
3.4    Frustration of Conditions ............................................................. 14

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF
STOCKHOLDERS AND THE COMPANY .................................................... 14
4.1    Organization; Corporate Power and Licenses .............................. 14
4.2    Capital Stock and Related Matters .............................................. 15
4.3    Subsidiaries; Investments ............................................................ 15
4.4    Authorization; No Breach .............................................................. 15
4.5    Regulatory Approval ..................................................................... 15
4.6    Financial Statements ..................................................................... 15
4.7    Absence of Undisclosed Liabilities .............................................. 16
4.8    Affiliated Transactions ................................................................. 17
4.9    No Material Adverse Change ........................................................ 17
4.10   Absence of Certain Developments ............................................... 17
4.11   Assets; Real Property .................................................................... 18
4.12   Tax Matters ................................................................................... 20
4.13   Contracts and Commitments ........................................................ 21
4.14   Intellectual Property Rights; Inventory ...................................... 23
4.15   Accounts Receivable ..................................................................... 24
4.16   Litigation, etc. .............................................................................. 24
4.17   Brokerage ...................................................................................... 25
4.18   Insurance ....................................................................................... 25
4.19   List of Certain Employees, Suppliers and Customers ................ 25
4.20   Employees; Labor Matters ............................................................ 26
4.21   ERISA ............................................................................................ 27
4.22   Compliance with Laws .................................................................. 28

i

| | | |
|---|---|---|
| 4.23 | Environmental and Safety Matters | 28 |
| 4.24 | Backlog | 29 |
| 4.25 | Customers and Distributors | 29 |
| 4.26 | Assets Conveyed | 29 |
| 4.27 | Disclosure | 30 |

**ARTICLE V.  REPRESENTATIONS AND WARRANTIES OF PURCHASER** — 30
| | | |
|---|---|---|
| 5.1 | Organization | 30 |
| 5.2 | Authorization | 30 |
| 5.3 | Valid and Binding Agreement | 30 |
| 5.4 | No Violation | 31 |
| 5.5 | Brokerage | 31 |

**ARTICLE VI.  COVENANTS OF THE PARTIES** — 31
| | | |
|---|---|---|
| 6.1 | Covenants of the Company and the Stockholders | 31 |
| 6.2 | Mutual Covenants | 34 |
| 6.3 | Bulk Sales Laws | 34 |
| 6.4 | Confidentiality | 35 |
| 6.5 | Employees | 35 |
| 6.6 | Change and Assignment of Name | 36 |
| 6.7 | Investigation | 36 |
| 6.8 | Pre-Merger Notification and Other Consents | 36 |

**ARTICLE VII.  SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION** — 37
| | | |
|---|---|---|
| 7.1 | Survival of Representations | 37 |
| 7.2 | Notice of Damages | 37 |
| 7.3 | Agreements to Indemnify | 37 |
| 7.4 | Conditions of Indemnification of Third Party Claims | 38 |
| 7.5 | Limitations on Indemnification | 39 |

**ARTICLE VIII.  TERMINATION; AMENDMENT AND WAIVER** — 40
| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 40 |
| 8.2 | Effect of Termination | 40 |
| 8.3 | Amendment, Extension and Waiver | 40 |

**ARTICLE IX.  MISCELLANEOUS** — 41
| | | |
|---|---|---|
| 9.1 | Expenses; Taxes | 41 |
| 9.2 | Further Assurances | 41 |
| 9.3 | Parties in Interest | 41 |
| 9.4 | Entire Agreement | 41 |
| 9.5 | Headings | 41 |
| 9.6 | Notices | 41 |
| 9.7 | Severability | 42 |
| 9.8 | Governing Law; Consent to Jurisdiction and Venue | 43 |
| 9.9 | Counterparts | 43 |

ii

9.10   Exhibits...................................................................................................... 43
9.11   Knowledge................................................................................................... 43
9.12   Third Parties................................................................................................ 43

iii

# EXHIBITS

| | | |
|---|---|---|
| Exhibit 1.23 | - | Form of Subordinated Promissory Note |
| Exhibit 3.2(a) | - | Form of Bill of Sale |
| Exhibit 3.2(b) | - | Form of Assignment and Assumption on Agreement |
| Exhibit 3.2(c)-1 | - | Form of Employment Agreement of Glenn Thompson |
| Exhibit 3.2(c)-2 | - | Form of Employment Agreement of Mark Thompson |
| Exhibit 3.2(d) | - | Form of Subscription Agreement |
| Exhibit 3.2(j)-1 | - | Form of Officer's Certificate |
| Exhibit 3.2(j)-2 | - | Form of Stockholders Certificate |
| Exhibit 3.2(m) | - | Form of Net Operating Asset Certificate |
| Exhibit 3.2(n) | - | Form of Stockholders Letter |
| Exhibit 3.2(o) | - | Form of Landlord's Waiver and Estoppel Certificate |
| Exhibit 3.2(p) | - | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit 3.2(q) | - | Form of Third Amendment to Lease |

iv

## SCHEDULES

Schedule 1.1(a)        Contracts
Schedule 1.1(b)        Owned Tangible Property
Schedule 1.1(c)        Intangible Assets
Schedule 1.1(g)        Insurance
Schedule 1.1(m)        Government Authorizations; Permits
Schedule 1.4           Assumed Liabilities
Schedule 1.9(i)        Excluded Assets
Schedule 1.9(iv)       Excluded Assets
Schedule 1.10          Excluded Liabilities
Schedule 2.2           Purchase Price
Schedule 2.3           Purchase Price Adjustment
Schedule 3.2(d)        Allocation of Thompson Holdings Common Stock
Schedule 4.2           Capital Stock and Related Matters
Schedule 4.3           Subsidiaries; Investments
Schedule 4.6           Financial Statements
Schedule 4.7           Absence of Undisclosed Liabilities
Schedule 4.8           Affiliated Transactions
Schedule 4.10          Absence of Certain Developments
Schedule 4.11(a)       Condition of Acquired Assets
Schedule 4.11(b)       Leased Real Property
Schedule 4.11(b)(i)    Leases of Real Property
Schedule 4.11(b)(iv)   Real Property Taxes
Schedule 4.12          Tax Matters
Schedule 4.13          Contracts and Commitments
Schedule 4.14(a)       Intellectual Property Rights
Schedule 4.14(b)       Returns
Schedule 4.15          Accounts Receivable
Schedule 4.16          Litigation
Schedule 4.17          Brokerage
Schedule 4.18          Insurance
Schedule 4.19(a)       Certain Employees
Schedule 4.19(b)       Suppliers
Schedule 4.20          Employees; Labor Matters
Schedule 4.21(a)       Employee Benefit Plans
Schedule 4.21(b)       Termination of Benefit Plans
Schedule 4.21(c)       Retiree Welfare Plans
Schedule 4.21(j)       Termination of Employee Welfare Plans
Schedule 4.22          Compliance with Laws
Schedule 4.23          Environmental and Safety Matters
Schedule 4.24          Backlog
Schedule 4.25(a)       Customers
Schedule 4.25(b)       Sales Representative and Distributors
Schedule 5.4           No Violation
Schedule 6.1(a)        Ordinary Conduct
Schedule 6.5(a)        Terminated Employees
Schedule 6.5(b)        Assumed Plans

v

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") made and entered into as of the 24th day of November, 1997, by and among Thompson Products, Inc., a Delaware corporation ("Purchaser"), which is a Wholly-Owned Subsidiary of Thompson Products Holdings, Inc., a Massachusetts corporation ("Thompson Holdings"), Thompson Paper Box Co., Inc., a Massachusetts corporation (the "Company"), Glenn Thompson, an individual residing at 5 Assawompsett Court, Lakeville, MA 02347 ("GT"), Mark A. Thompson, an individual residing at 230 Grange Park, Bridgewater, MA 02324 ("MT"), Frederick L. Weingeroff, an individual residing at 3181 Monet Drive, Palm Beach Garden, FL 33410 ("FW"), and Gregg Weingeroff, an individual residing at 11 Loring Avenue, Providence, R.I. 02906 ("GW") (GT, MT, FW and GW are sometimes collectively referred to herein as the "Stockholders" and individually as a "Stockholder").

## WITNESSETH

WHEREAS, the Company is in the business of the manufacture and sales of photo albums, cardboard-based gift boxes and easelbacks for picture frames (the "Business");

WHEREAS, GT, MT, FW and GW collectively own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Company;

WHEREAS, Purchaser wishes to acquire from the Company and the Company desires to sell to the Purchaser, the Acquired Assets (as defined below), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the aforesaid and the respective warranties, representations, covenants and agreements hereinafter set forth, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings specified with respect thereto below.

1.1    "Acquired Assets" shall mean all of the assets and properties of the Company (other than the Excluded Assets), with such additions thereto or deletions therefrom as may be permitted by the terms of this Agreement, including the Company's goodwill and all of its concepts, plans and materials relating to the operation of the business and also including without limitation:

57483-v5

(a)    All rights, to the extent assignable, existing under contracts, personal property leases, licenses, permits, supply and distribution arrangements, sales and purchase agreements and orders, consignment arrangements, warranties, consents, orders, registrations, privileges, franchises, memberships, certificates, approvals or other similar rights and all other agreements, arrangements and understandings, including, without limitation, all rights existing under the contracts listed on Schedule 1.1(a) and all Plans (as defined in Section 4.21 hereof) including employment and consulting agreements all as listed on Schedule 6.5(b) (collectively, the "Contracts") which Schedule shall also indicate which of such Contracts requires the consent of a third party for assignment to Purchaser (collectively, the "Consents");

(b)    All interests in fixtures, fittings, furniture, machinery and equipment (including but not limited to any computer software) ("FF&E") and all other tangible personal property, (including without limitation automobiles, trucks, tractors, trailers and other vehicles, spare parts and supplies, whether owned or leased used or held for use in the Business, a list of which at the date hereof and at the Closing Date (including information as to the tax basis thereof in the hands of the Stockholders and the Company at the date hereof and at the Closing Date) is set forth on Schedule 1.1(b) (collectively, "Owned Tangible Property");

(c)    All of the Company's rights, to the extent assignable, in and to all intangible assets and intellectual property (including, without limitation, registered and unregistered trademarks, service marks and trade names, trade dress and other names, marks and slogans, including the names "Thompson Paper", "Thompson Paper Box", "Thompson Paper Box Company" and "Thompson" and all variations and permutations thereof), all package designs, all logos, all distribution rights, and all associated goodwill; all statutory, common law and registered copyrights; all patents, inventions, shop rights, know-how, trade secrets, confidential and proprietary information, procedures, records, test information, marketing surveys and business and marketing know how relating to the Business; all discoveries, improvements, processes, formulae (secret or otherwise), data, confidential information, engineering, technical and shop drawings, specifications and ideas, whether patentable or not, all licenses and other similar agreements, and all drawings, records, books or other indicia, however evidenced, of the foregoing; and all registration applications for any of the foregoing; together with all rights to use all of the foregoing and all other rights in, to and under the foregoing in all countries, including, without limitation, all the intangible assets and intellectual property listed on Schedule 1.1(c) (collectively, "Intellectual Property Rights");

(d)    All cash and cash equivalents, marketable securities, working capital and brokerage and investment accounts of the Company;

(e)    All prepayments, security deposits and prepaid expenses (including, without limitation, prepaid insurance premiums) to the extent the Purchaser shall obtain the benefit thereof;

(f)    All inventories and related supplies, including those which are held at, or are in transit from or to, the locations at which the Business is operated or at which inventory or supplies are held;

57483-v5                                    2

(g)    All insurance, insurance reserves and deposits (including, without limitation, reserves and deposits relating to workmen's compensation) including, without limitation, the insurance listed on Schedule 1.1(g);

(h)    The right to receive mail and other communications relating to the Business addressed to the Company (including, without limitation, mail and communications from customers, suppliers, distributors, agents and others and accounts receivable payments);

(i)    All lists and records pertaining to customers, suppliers, distributors, personnel and agents and all other books, ledgers, files, documents, correspondence, plats, architectural plans, drawings and specifications, computer software, computer data, business records, advertising matter, catalogues, correspondence, mailing lists, customer lists, prospect lists, photographs, sales materials and records, purchasing materials and records, personnel records and other records of every kind and nature;

(j)    All creative materials (including, without limitation, photographs, films, artwork, color separations and the like), advertising and promotional materials and all other printed or written materials;

(k)    All claims, refunds (other than any tax refunds as contemplated by Section 1.15) causes of action, choses in action, rights of recovery and rights of set-off of every kind and nature, including all rights under warranties, representations and guaranties made by suppliers or manufacturers in connection with products sold or services provided by the Business;

(l)    All goodwill as a going concern and all other intangible property;

(m)    all governmental approvals, authorizations, certifications, consents, variances, permissions, licenses, and permits to or from, or filings, notices, or recordings to or with, federal, state, and local governmental authorities listed in Schedule 1.1(m) (the "Authorizations");

(n)    all rights existing under the Leases (as defined in Section 4.11) listed on Schedule 4.11(b)(i) to this Agreement and improvements thereon;

(o)    All Receivables (as defined in Section 6.1(e)) of the Company, together with all notes receivable and other receivable items relating to the Business or the Acquired Assets;

(p)    All other assets and properties of any nature whatsoever used or held for use in connection with the Business (other than assets expressly excluded as provided in Section 1.1), including, without limitation, accounting and other records (other than records necessary for the Company's and/or the Stockholders' tax, corporate and legal purposes, copies of which will be provided to the Purchaser) and any such assets which are represented on the December Balance Sheet (as defined in Section 4.6(c)) or acquired by the Company thereafter, except in

each case for such property which has been sold or otherwise disposed of in the ordinary course of business and in a manner consistent with past practices and otherwise consistent with the representations, warranties and terms of this Agreement.

1.2    "Acquisition" shall mean the purchase and sale of the Acquired Assets in accordance with the terms and conditions of this Agreement.

1.3    "Affiliate" of any particular Person shall mean any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

1.4    "Assumed Liabilities" shall mean (i) all liabilities reflected on the October Balance Sheet (as defined in Section 4.6(b)) including the liability for debt not to exceed $1,170,000 associated with certain recently acquired machinery, as described in further detail on Schedule 1.4, together with liabilities and obligations which have arisen after October 31, 1997 in the ordinary course of business which exist at the Closing and relate to the Business (none of which is a liability resulting from a breach of contract, breach of warranty, tort, infringement, claim or lawsuit), except for the Excluded Liabilities and (ii) any liabilities set forth on Schedule 2.3, which by their inclusion on such Schedule by Purchaser shall be deemed to be Assumed Liabilities.

1.5    "Environmental Claims" refers to any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any governmental agency, department, bureau, office or other authority, or any third party involving violations of Environmental Laws or Releases of Hazardous Materials from (i) any assets, properties or businesses of the Company or any predecessor in interest or assets, properties or businesses of the Stockholders which relate to the Acquired Assets; (ii) from adjoining properties or businesses; or (iii) from or onto any facilities which received Hazardous Materials generated by the Company or any predecessor in interest.

1.6    "Environmental Laws" includes the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et seq., as amended; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. 6901 et seq., as amended; the Clean Air Act ("CAA"), 42 U.S.C. 7401 et seq., as amended; the Clean Water Act ("CWA"), 33 U.S.C. 1251 et seq., as amended; the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. 655 et seq., and any other federal, state, local or municipal laws, statutes, regulations, rules or ordinances imposing liability or establishing standards of conduct for protection of the environment.

1.7    "Environmental Liabilities" means any monetary obligations, losses, liabilities (including strict liability), damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable out-of-pocket fees, disbursements and expenses of counsel, out-of-pocket expert and consulting fees and out-of-pocket costs for environmental site assessments, remedial investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Environmental Claim filed by any governmental authority or

57483-v5

4

any third party which relate to any violations of Environmental Laws, Remedial Actions, any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure to Hazardous Materials used, handled, generated, transported or disposed of by the Stockholders or the Company at the Leased Real Property, any Releases or threatened Releases of Hazardous Materials from or onto (i) any property presently or formerly owned by the Company or a predecessor in interest or the Stockholders if such property was used in connection with the Business, or (ii) any facility which received Hazardous Materials generated by the Company or a predecessor in interest.

1.8     "ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

1.9     "Excluded Assets" means:

       (i)     Assets and property disposed of by the Company or Stockholders since the date of the October Balance Sheet; provided, such disposition was in the ordinary course of business and in a manner consistent with past practices and otherwise consistent with the representations, warranties and terms hereof or as otherwise set forth on Schedule 1.9(i);

       (ii)    The Company's corporate franchise, record books containing minutes of meetings and such other records as have to do exclusively with the Company's organization or capitalization (collectively, the "Corporate Records");

       (iii)   All of the Company's claims, rights and interest in and to any refunds for federal, state or local Taxes with respect to periods ending or prior to the Closing Date; and

       (iv)    Those assets set forth on Schedule 1.9(iv).

1.10    "Excluded Liabilities" shall mean all liabilities of the Company not expressly assumed by Purchaser as Assumed Liabilities including, without limitation, those liabilities set forth on Schedule 1.10 (i.e. the Company's outstanding term and revolving loan facility, current portion of long term debt and amounts due to officers), unless such Excluded Liabilities are included by Purchaser on Schedule 2.3 after the date hereof.

1.11    "Hazardous Materials" shall include (a) any element, compound, or chemical that is defined, listed or otherwise classified as a contaminants, pollutant, toxic pollutant, toxic or hazardous substances, extremely hazardous substance or chemical, hazardous waste, biohazardous or infectious waste, special waste, or solid waste under Environmental Laws; (b) petroleum, petroleum-based or petroleum-derived products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic including but not limited to corrosivity, ignitibility, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components, including but not limited to asbestos-containing materials and manufactured products containing Hazardous Materials.

1.12    "Indebtedness" shall mean at a particular time, without duplication. (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingent or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course of business), (iv) any commitment by which a Person assures a creditor against loss (including, without limitation, contingent reimbursement obligations with respect to letters of credit), (v) any indebtedness guaranteed in any manner by a Person (including, without limitation, guarantees in the form of an agreement to repurchase or reimburse), (vi) any obligations under capitalized leases with respect to which a Person is liable, contingent or otherwise, as obligor, guarantor or otherwise. or with respect to which obligations a Person assures a creditor against loss, (vii) any indebtedness secured by a Lien on a Person's assets and (viii) any unsatisfied obligation for "withdrawal liability" to a "multiemployer plan" as such terms are defined under ERISA.

1.13    "Investment" shall mean as applied to any Person (i) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, stock, securities or ownership interest (including partnership interests and joint venture interests) of any other Person and (ii) any capital contribution by such Person to any other Person.

1.14    "IRC" shall mean the Internal Revenue Code of 1986, as amended. and any reference to any particular IRC section shall be interpreted to include any revision of or successor to that section regardless of how numbered or classified.

1.15    "IRS" shall mean the United States Internal Revenue Service.

1.16    "Lakeville Lease" shall mean the lease, dated as of April 15. 1992, as amended, by and between the Company and Thompson Realty Trust.

1.17    "Liens" shall mean any claims, mortgages, pledges, liens, security or other third party interests, conditional sales agreements, options, encumbrances or charges of any kind affecting real or personal property.

1.18    "Net Operating Assets" shall mean the total assets of the Company less its accounts payable and accrued expenses, calculated on the same basis and consistent with such calculation as set forth in the October Balance Sheet.

1.19    "PBGC" shall mean the Pension Benefit Guaranty Corporation.

1.20    "Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

1.21    "Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other closed receptacles containing Hazardous Materials) into the environment.

1.22    "Remedial Action" means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (ii) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (iv) any other actions authorized by 42 U.S.C. 9601.

1.23    "Subordinated Note" shall mean the Subordinated Promissory Note issued by Thompson Holdings to the Company, in the form of Exhibit 1.23 attached hereto.

1.24    "Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

1.25    "Taxes" mean all federal, state, county, local, foreign and other taxes of any kind whatsoever (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, license, stamp, environmental, withholding, employment, unemployment compensation, payroll related and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustment related to any of the foregoing.

1.26    "Tax Return" means any return, information report or filing with respect to Taxes, including any schedules attached thereto and including any amendment thereof.

1.27    "Treasury Regulations" shall mean the United States Treasury Regulations promulgated under the IRC, and any reference to any particular Treasury Regulation section shall be

interpreted to include any final or temporary revision of or successor to that section regardless of how numbered or classified.

1.28   "Wholly-Owned Subsidiary" shall mean with respect to any Person, a Subsidiary of which all of the outstanding capital stock or other ownership interests are owned by such Person or another Wholly-Owned Subsidiary of such Person.

## ARTICLE II.

## THE ACQUISITION

2.1   Purchase and Sale of the Acquired Assets.  Upon the terms and subject to the conditions contained in this Agreement:

(a)     the Company hereby agrees to sell, transfer, convey, assign and deliver to the Purchaser, and Purchaser hereby agrees to purchase, acquire and accept from the Company, the Acquired Assets at the Closing on the Closing Date free and clear of all Liens, except Liens relating to liabilities expressly assumed by Purchaser on Schedule 2.3.

(b)     Purchaser hereby agrees to assume and undertake at the Closing on the Closing Date to pay, satisfy or discharge only the Assumed Liabilities and no other liabilities of the Company.  Purchaser will not assume any obligations under any Contracts or agreements executed between the date hereof and the Closing, unless (i) such contracts or agreements are entered into in the ordinary course of business and involve aggregate payments over the term of such contract not in excess of $250,000 or (ii) Purchaser previously consents in writing to such Contracts or agreements prior to the execution thereof by the Company.

(c)     Procedures for Assets not Transferable.  If any of the Contracts or agreements or any other property or rights included in the Acquired Assets are not assignable or transferable either by virtue of the provisions thereof or under applicable law without the consent of some party or parties and any such consent has not been obtained prior to the Closing Date, this Agreement and the related instruments of transfer shall not constitute an assignment or transfer thereof and the Purchaser shall not assume the Company's obligations with respect thereto, but the Company shall use all commercially reasonable efforts to obtain any such consent as soon as possible or otherwise obtain for the Purchaser and its assignees the practical benefit of such property or rights and Purchaser shall use all commercially reasonable efforts to assist in that endeavor.

2.2   Purchase Price.  The aggregate consideration for the Acquired Assets shall be $45,000,000 (the "Purchase Price") plus the assumption of the Assumed Liabilities, and the Purchase Price shall be payable by the Purchaser to the Company as follows: (i) $40,000,000 shall be payable in cash by wire transfer of immediately available funds to such bank account or bank accounts as shall be designated by the Company in writing prior to the Closing Date (as defined in Section 2.4 hereof) in the amounts set forth on Schedule 2.2 hereto and (ii) $5,000,000

57483-v5                                      8

shall be payable by the execution and delivery of the Subordinated Note; provided, however, that the cash portion of the Purchase Price and any allocation thereof are subject to adjustment as set forth in Section 2.3.

2.3    Purchase Price Adjustment. (a) The cash portion of the Purchase Price shall be reduced, on a dollar for dollar basis, by an amount equal to (i) the amount that the value of the Net Operating Assets of the Company on the Closing Date, as certified by an executive officer of the Company pursuant to Section 3.2(m) hereof and subject to confirmation by Arthur Andersen, Purchaser's accountant, on the Closing Date is less than $11,163,750.00, and (ii) the aggregate amount of all those liabilities, if any, set forth on Schedule 2.3 of the Company expressly assumed by the Purchaser; Schedule 2.3 shall be prepared by Purchaser and delivered to the Company no later than five (5) business days prior to the Closing.

(b)    If the value of Net Operating Assets (as determined in accordance with Section 2.3(a)(i) above) of the Company on the Closing Date exceeds $11,740,000.00 (the "Excess"), Purchaser shall deliver to the Company at the Closing a promissory note (the "Excess Note") in the principle amount equal to the Excess, due one hundred and eighty (180) days after the Closing, bearing interest at nine percent (9%) per annum and secured by a first priority lien on the accounts receivable of Purchaser pursuant to a security agreement; provided, that the principle amount of the note shall in no event be greater than the amount due on the Closing Date to First National Bank of Boston (the "Bank") by the Company under the existing loan facility with the Bank.

2.4    Noncompetition. (a) As additional consideration for Purchaser's agreement to purchase the Acquired Assets and pay the Purchase Price, GT and MT have agreed, severally but not jointly, to the noncompetition provisions (the "Restrictive Covenants") contained in their respective Employment Agreements, which noncompetition provisions are incorporated herein by reference and made a part hereof as if restated herein.

(b)    It is agreed and understood by and among the parties to this Agreement that the Restrictive Covenants incorporated by reference in subsection (a) above are each individually essential elements of this Agreement and that, but for the agreement of GT and MT to comply with such Restrictive Covenants, Purchaser would not have agreed to enter into this Agreement. Further, each of GT and MT expressly acknowledges that the restrictions incorporated by reference into subsection (a) of this Section 2.4 are reasonable and necessary to accomplish the mutual objectives of the parties and to protect Purchaser's interests in the Business after the Closing. Each of GT and MT further acknowledges that enforcement of such restrictions will not deprive him of the ability to earn a reasonable living and that any violation of such restrictions will cause irreparable injury to Purchaser. Such Restrictive Covenants of GT and MT shall be construed as agreements independent of any other provision of this Agreement and of each other.

(c)    GT and MT hereby agree that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that the Restrictive Covenants incorporated by reference into subsection (a) of this Section 2.4 are

57483-v5                                          9

violated and that. in addition to any remedies or rights that may be available to Purchaser. all of which other remedies or rights shall be deemed to be cumulative. retained by Purchaser and not waived by the enforcement of any remedy available hereunder. including. but not limited to. the right to sue for monetary damages, Purchaser shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to. a temporary restraining order or temporary, preliminary or permanent injunction. to enforce the provisions incorporated by reference into subsection (a) of this Section 2.4. all of which shall constitute rights and remedies to which Purchaser may be entitled.

(d)     If any court determines that the covenant not to compete incorporated by reference into subsection (a) of this Section 2.4, or any part hereof. is unenforceable because of the duration or geographic scope of such provision, such court shall reduce the duration or scope of such provisions (to the maximum duration or scope permitted by law), as the case may be, and such provision in its reduced form shall then be enforceable.

(e)     Notwithstanding anything to the contrary contained in the foregoing provisions of this Section 2.4, any other provisions of this Agreement or their respective Employment Agreements, each of GT and MT shall have liability only for his own breach of a Restrictive Covenant.

2.5     Closing.  The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at 10:00 a.m. at the offices of Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, New York 10022 on the later of (i) January 5, 1998 (with a pre-closing on December 30, 1997) or (ii) the third business day following the satisfaction or waiver of all of the conditions to Closing set forth in Article III hereof, or at such other time, date or place as the parties may mutually agree.  The actual date of the Closing is sometimes referred to herein as the "Closing Date".

## ARTICLE III.

## CONDITIONS TO CLOSING

3.1     Conditions to Purchaser's Obligations to Close.  The obligations of Purchaser to consummate the Acquisition is subject to the satisfaction at the time of the Closing of the following conditions (any or all of which may be waived by Purchaser in Purchaser's sole discretion):

(a)     The representations and warranties of the Company and the Stockholders made in this Agreement and in each of the other agreements to be delivered in connection with the Acquisition shall be true and correct in all respects as of the date of this Agreement and as of the time of Closing as though made as of such time, and the Company and the Stockholders shall have performed in all respects each and every covenant contained in this Agreement required to be performed by them by the time of the Closing.

(b)    The Acquisition as provided in this Agreement and each of the other agreements shall not violate any applicable law or governmental regulation.

(c)    There shall be no action, suit, investigation, or proceeding pending, or to the knowledge of the Company or any Stockholder, threatened against the Company, or the Company's properties or rights, including, without limitation, the Acquired Assets or any of the Company's officers or directors, before any court, arbitrator or administrative or governmental body which (i) seeks to restrain, enjoin, prevent the consummation of the transactions contemplated by this Agreement or (ii) questions the validity or legality of any such transactions or seeks to recover damages or to obtain other relief in connection with any such transactions.

(d)    Purchaser shall have received duly executed copies of all other deeds, endorsements, assignments, consents of third parties and other instruments as, in the opinion of counsel to Purchaser, are reasonably necessary to vest in Purchaser all right, title and interest in and to any of the Acquired Assets.

(e)    The Company shall not have suffered any material adverse change in its Business, assets, financial condition or results of operations of the Company since December 31, 1996, other than any such changes which are accurately reflected on the Schedules to this Agreement and delivered on or prior to the date of this Agreement.

(f)    Stockholders and the Company shall have received the Consents and any other consents, approvals, authorizations, exemptions or waivers that are necessary for the consummation of the transactions contemplated hereby or that are required to prevent a breach of or default under, a termination or modification of, or acceleration of the terms of, any Contract, agreement, instrument or understanding identified on Schedule 4.13, in each case pursuant to instruments in form and substance reasonably satisfactory to Purchaser.

(g)    Purchaser shall have received an opinion from Chace, Ruttenberg & Freedman, counsel to the Stockholders and the Company, dated the Closing Date and in form and substance satisfactory to the Purchaser.

(h)    All applicable waiting periods, if any, under the Hart-Scott-Rodino Anti-trust Improvements Act of 1976, as amended (the "HSR Act") with respect to the transactions contemplated by this Agreement, including without limitation the Acquisition and the financing to be obtained by the Purchaser in connection therewith, shall have expired or been terminated.

(i)    Purchaser shall have received from the Company and the Stockholders all of the items to be delivered in accordance with Section 3.2 below.

(j)    The value of the Net Operating Assets shall have been confirmed by Arthur Andersen pursuant to Section 2.3(a)(i).

3.2.    Deliveries by the Company and the Stockholders.  The Company and the Stockholders agree to deliver (or cause to be delivered) to the Purchaser and at the Closing on the

57483-v5                                    11

Closing Date the following agreements and documents, all satisfactory in form and substance to Purchaser and their legal counsel:

(a)     a duly executed Bill of Sale for all Owned Tangible Property, substantially in the form as set forth on Exhibit 3.2(a) (the "Bill of Sale").

(b)     a duly executed Assignment and Assumption Agreement for all Contracts, substantially in the form as set forth on Exhibit 3.2(b) (the "Assignment and Assumption Agreement").

(c)     a duly executed Employment Agreement from each of GT and MT, in the form as set forth on Exhibit 3.2(c)-1 and Exhibit 3.2(c)-2, respectively (collectively, the "Employment Agreements").

(d)     a duly executed Subscription Agreement, in the form as set forth on Exhibit 3.2(d) (the "Subscription Agreement"), from each of GT and MT providing for the aggregate purchase of nineteen and one-half percent (19.5%) of the common stock (the "Thompson Shares"), $.01 par value per share ("Thompson Holdings Common Stock"), of Thompson Holdings, divided between GT and MT as set forth on Schedule 3.2(d), for an aggregate purchase price of $975,000.00.

(e)     all documents of title, if any, necessary to transfer to Purchaser any of the Owned Tangible Property.

(f)     all assignments necessary to transfer to Purchaser complete rights in all Intellectual Property Rights in each case included within the Acquired Assets, and other intangible personal property owned by the Company and the Stockholders.

(g)     if deemed necessary by Purchaser, specific assignments of Contracts.

(h)     all documents, if any, containing or related to proprietary information being purchased by Purchaser pursuant hereto.

(i)     all other deeds, endorsements, assignments, consents of third parties and other instruments as, in the opinion of counsel for Purchaser, are necessary to vest in Purchaser all right, title and interest in and to any of the Acquired Assets.

(j)     a certificate dated the Closing Date and signed by an executive officer of the Company confirming the matters set forth in Section 3.1(a) and Section 3.1(e) above, in the form of Exhibit 3.2(j)-1 attached hereto; and a certificate dated the Closing Date and signed by GT, MT, FW and GW confirming the matters set forth in Section 3.1(a), in the form of Exhibit 3.1(j)-2.

(k)     the December Balance Sheet.

(l)     (I) a certificate of the Company's corporate secretary or assistant secretary as to the Company's Certificate of Incorporation and By-laws and all amendments to date as being in full force and effect, with true, correct and complete copies of such resolutions. Certificates of Incorporation and By-laws attached thereto. (II) a certificate of subsistence and/or good standing of the Company dated as of a recent date prior to the Closing. issued by the Secretary of the Commonwealth of Massachusetts and of each other state in which the Company is qualified to do business and (III) certified copies of resolutions duly adopted by the board of directors of the Company and a unanimous consent of the Stockholders of the Company, in each case authorizing the execution, delivery and performance of this Agreement and of each of the other agreements contemplated hereby to which the Company is a party.

(m)     a certificate dated the Closing Date and signed by an executive officer of the Company, in the form of Exhibit 3.2(m) attached hereto.

(n)     The Stockholder Letter, in the form attached hereto as Exhibit 3.2(n). duly executed by each of GT and MT in connection with the purchase of Thompson Holdings Common Stock.

(o)     a duly executed estoppel certificate from Thompson Realty Trust, in the form of Exhibit 3.2(o) attached hereto.

(p)     a duly executed non-disturbance agreement, substantially in the form of Exhibit 3.2(p) attached hereto (with such changes as the parties may agree upon).

(q)     a duly executed amendment to the Lakeville Lease, in the form of Exhibit 3.2(q) attached hereto.

(r)     original copies of the Consents listed on Schedule 1.1(a).

(s)     duly executed copies of all other deeds, endorsements, assignments, consents of third parties and other instruments as, in the opinion of counsel to the Purchaser, are necessary to transfer title of the Acquired Assets.

3.3.     Conditions to the Company's Obligations.  The obligation of the Company to consummate the Acquisition is subject to the satisfaction at the time of the Closing of the following conditions (any or all of which may be waived by the Stockholders and the Company in their sole discretion):

(a)     Purchaser shall have paid to the Company the Purchase Price in accordance with Section 2.2 above.

(b)     The representations and warranties of Purchaser made in this Agreement and in each other agreement to be delivered in connection with the Acquisition shall be true and correct as of the date of this Agreement and as of the time of Closing as though made as of such

13

time and Purchaser shall have performed in all material respects each and every covenant contained in this Agreement required to be performed by Purchaser by the time of the Closing.

(c)    Purchaser shall have delivered to the Company a certificate dated the Closing Date and signed by an executive officer of Purchaser confirming the matters set forth in Section 3.3(b) above.

(d)    Purchaser shall have delivered to the Company a duly executed Assignment and Assumption Agreement.

(e)    Purchaser shall have delivered to the Company duly executed copy of all other deeds, endorsements, assignments, consents of third parties and other instruments as. in the opinion of counsel to the Company and the Stockholders, are necessary to evidence the assumption by Purchaser of the Assumed Company Liabilities.

(f)    The Company shall have received an opinion from Pryor. Cashman. Sherman & Flynn, counsel to the Purchaser, dated the Closing Date and in form and substance satisfactory to the Purchaser.

(g)    All applicable waiting periods, if any, under the HSR Act with respect to the transactions contemplated by this Agreement, including without limitation the Acquisition and the financing to be obtained by the Purchaser in connection therewith. shall have expired or been terminated.

(h)    Delivery of certificates representing the Thompson Shares.

(i)    If required pursuant to 2.3(b), the Company shall have received the Excess Note and a security agreement in connection therewith reasonably acceptable to the Company.

3.4    Frustration of Conditions. No party may rely upon the failure of any condition set forth in this Article III to be satisfied if such failure was caused by such party's failure to act in good faith or to use its best efforts to cause the Closing to occur.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF STOCKHOLDERS AND THE COMPANY.

The Company and the Stockholders hereby represent and warrant to the Purchaser, jointly and severally, as follows:

4.1    Organization: Corporate Power and Licenses. The Company is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and is qualified to do business in every jurisdiction in which its ownership of

57483-v5

14

property or conduct of business requires it to qualify. The Company possesses all requisite corporate power and authority and all material licenses, permits and authorizations necessary to own and operate its properties, to carry on its businesses as now conducted and to carry out the transactions contemplated by this Agreement. The copies of the Company's charter documents and bylaws which have been furnished to the Purchaser reflect all amendments made thereto at any time prior to the date of this Agreement and are correct and complete in all respects.

4.2     Capital Stock and Related Matters. Schedule 4.2 hereto correctly sets forth the authorized and outstanding capital stock of the Company and the name and number of shares of stock held by each stockholder of the Company. The Company has no outstanding any stock or securities convertible or exchangeable for any shares of its capital stock or containing any profit participation features, nor does it have outstanding any rights or options to subscribe for or to purchase its capital stock or any stock or securities convertible into or exchangeable for its capital stock or any stock appreciation rights or phantom stock plans. The Company shall not be subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock. All of the outstanding shares of the Company's capital stock has been validly issued and is fully paid and nonassessable.

4.3     Subsidiaries; Investments. The Company does not have any Subsidiaries. Except as set forth on Schedule 4.3 hereto, the Company does not own or hold any Investment in any other Person.

4.4     Authorization; No Breach. The execution, delivery and performance of this Agreement and all other agreements contemplated hereby to which the Company or a Stockholder is a party have been duly authorized by the Company and/or such Stockholder, as the case may be. This Agreement and all other agreements contemplated hereby to which the Company or a Stockholder is a party each constitutes a valid and binding obligation of the Company and/or each such Stockholder, as the case may be, enforceable against the Company and/or each such Stockholder, as the case may be, in accordance with its terms, except that (a) such enforcement may be limited by or subject to any bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to or limiting creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief are subject to certain equitable defenses and to the discretion of the court before which any proceeding therefor may be brought. The execution and delivery by the Company and the Stockholders of this Agreement and all other agreements contemplated hereby to which the Company and/or any such Stockholder is a party, the purchase and sale of the Acquired Assets, and the fulfillment of and compliance with the respective terms hereof and thereof by the Company and/or the Stockholders, do not and shall not (i) conflict with or result in a breach of the terms, conditions or provisions of (ii) constitute a default under, (iii) result in the creation of any lien, security interest, charge or encumbrance upon the Company's capital stock or the Acquired Assets, (iv) give any third party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or governmental body or agency pursuant to (A) the charter or bylaws of the

57483-v5                                    15

Company. or (B) any law, statute, rule or regulation to which the Company or any Stockholder is subject, or (C) any agreement, instrument, order, judgment or decree to which the Company or any Stockholder is subject.

4.5    Regulatory Approval.  Except for any filings required to be made pursuant to the HSR Act, no permit, consent, approval or authorization of, or declaration to or filing with. any governmental authority is required in connection with the execution, delivery and performance by the Company and each Stockholder of this Agreement or the other agreements contemplated hereby. or the consummation by the Company and the Stockholders of the transactions contemplated hereby or thereby.

4.6    Financial Statements.  The items described in subparagraph (a) and (b) below are attached hereto as Schedule 4.6:

(a)    the audited financial statements of the Company and its affiliates, which financial statements contain balance sheets and profit and loss statements, for the fiscal periods ending on April 30, 1995, December 31, 1995 and December 31, 1996. Said financial statements have been audited by Harte, Carucci & Driscoll, P.C., independent public accountants. and their reports are appended thereto; and

(b)    the unaudited balance sheet of the Company as of October 31, 1997 (the "October Balance Sheet"), and the related statements of income and cash flows (or the equivalent) for the ten-month period then ended; and

(c)    the unaudited balance sheet of the Company as of December 31, 1997 (the "December Balance Sheet"), and the related statements of income and cash flows (or the equivalent) for the twelve-month period then ended, will be delivered to Purchaser at the Closing.

Said financial statements (including in all cases the notes thereto, if any) have been. and the December Balance Sheet will, present fairly in all material respects the financial position and results of operations of the Company for the periods listed above in accordance with generally accepted accounting principles applied consistently during the periods covered.

4.7    Absence of Undisclosed Liabilities.  Except as set forth on the Schedule 4.7 hereto, the Company does not have any obligation or liability (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known to the Company, whether due or to become due and regardless of when asserted) arising out of transactions entered into at or prior to the Closing, or any action or inaction at or prior to the Closing, or any state of facts existing at or prior to the Closing other than: (a) liabilities set forth on the October Balance Sheet (including any notes thereto), (b) liabilities and obligations which have arisen after the date of the October Balance Sheet in the ordinary course of business (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement, claim or lawsuit) and (c) other liabilities and obligations expressly disclosed in the other Schedules to this Agreement.

4.8    **Affiliated Transactions.**  Except as set forth on Schedule 4.8 hereto, no officer, director, employee, stockholder, or Affiliate of the Company or any Stockholder or any individual related by blood, marriage, or adoption to any such individual or any entity in which such person or individual owns any beneficial interest, is a party to any agreement, contract, commitment, or transaction with the Company or any Stockholder or has any interest in any property used by the Company or the Acquired Assets.

4.9    **No Material Adverse Change.**  Since the date of the October Balance Sheet, there has been no material adverse change in the Business, assets, condition (financial or otherwise) or results of operations of the Company.

4.10    **Absence of Certain Developments.**  Except as expressly contemplated by this Agreement or as set forth on Schedule 4.10 hereto, since the date of the October Balance Sheet, the Company has not:

(a)    borrowed any amount or incurred or become subject to any liabilities, except current liabilities incurred in the ordinary course of business and liabilities under contracts entered into in the ordinary course of business;

(b)    discharged or satisfied any Lien or paid any obligation or liability, other than current liabilities paid in the ordinary course of business;

(c)    declared or made any payment or distribution of cash or other property to its stockholders;

(d)    mortgaged or pledged any of the Acquired Assets or subjected them to any Lien, except Liens for current property taxes not yet due and payable;

(e)    sold, assigned or transferred any of the Acquired Assets, except in the ordinary course of business, or canceled any debts or claims;

(f)    sold, assigned, transferred, or permitted to lapse, any rights for the use of any Intellectual Property Right, or disclosed, any proprietary confidential information to any Person;

(g)    made any change in any method of accounting or accounting practice;

(h)    suffered any extraordinary losses or waived any rights of value, whether or not in the ordinary course of business, or consistent with past practice;

(i)    made capital expenditures or commitments therefor that aggregate in excess of $100,000;

(j)    made any loans or advances to, guarantees for the benefit of or any Investments in, any Persons in excess of $100,000 in the aggregate;

57483-v5                                17

(k)     made any charitable contributions or pledges;

(l)     suffered any damage, destruction or casualty loss exceeding in the aggregates $50,000, not fully covered by insurance;

(m)     made any Investment in or taken steps to incorporate any Subsidiary;

(n)     acquired any operating business or any assets outside of the ordinary course of business or entered any commitment to do so;

(o)     except for this Agreement or any other agreement contemplated hereby, entered into any other material transaction other than in the ordinary course of business.

(p)     paid and/or declared any dividends with respect to its shares of capital stock, whether in cash, shares of capital stock or other property;

(q)     granted to any officer or employee any increase in compensation or benefits, other than increases of compensation or benefits to employees in the ordinary course of business and consistent with past practice; or

(r)     paid any pension, retirement allowance or other employee benefit not required by any plan, policy or program identified on Schedule 4.21(a) hereto. whether past or present.

4.11    Assets: Real Property.

(a)     Except as set forth on Schedule 4.11(a) hereto, the Company has good title to the Acquired Assets, free and clear of all Liens, except for properties and assets disposed of in the ordinary course of business since the date of the October Balance Sheet and except for Liens disclosed on the October Balance Sheet (including any notes thereto) and Liens for current property taxes not yet due and payable. Except as described on Schedule 4.11(a), the Acquired Assets are in good operating condition in all respects (ordinary wear and tear excepted) as required for their use in the ordinary course of the business as presently conducted. The Company owns, together with the Acquired Assets, all rights, properties, Intellectual Property Rights, proprietary information and other assets necessary for the conduct of its businesses as presently conducted.

(b)     The Acquired Assets do not include any owned real estate. All of the real property leased or used in connection with the Business (the "Leased Real Property") and formerly owned or operated in connection with the Business is identified in Schedule 4.11(b). Further:

(i)     Leases. All of the leases or licenses of any of the Leased Real Property (collectively, the "Leases") are listed in Schedule 4.11(b)(i). The copies of the

57483-v5                                        18

written Leases heretofore delivered or furnished by the Company to Purchaser are complete, accurate, true and correct copies of each of the written Leases as in effect at the date hereof. With respect to each of the Leases:

(A)    each of the Leases is in full force and effect on the terms set forth therein and has not been modified, amended or altered, in writing or otherwise;

(B)    all obligations of the landlord or lessor under the Leases which have accrued have been performed, and no landlord or lessor is in default under or in arrears in the payment of any sum or in the performance of any obligation required of it under any Lease, and no circumstance presently exists which, with notice or the passage of time, or both, would give rise to a default by the landlord or lessor under any Lease;

(C)    all obligations of the tenant or lessee under the Leases which have accrued have been performed, and the Company is not in default under or in arrears in the payment of any sum or in the performance of any obligation required of it under any Lease, and no circumstance presently exists which, with notice or the passage of time, or both, would give rise to a default by the Company; and

(D)    The Company has obtained the consent of each landlord or lessor under any Leases whose consent is required to the assignment of any Lease to the Purchaser and its assignees, the collateral assignment of any Lease by the Purchaser or its assignees or the sale of the Acquired Assets.

(ii)    <u>Title and Description</u>. The Company holds a valid and enforceable leasehold interest in the Leased Real Property leased by it pursuant to the Leases.

(iii)    <u>Compliance with Law; Government Approvals</u>. Neither the Company nor any of the Stockholders has received notice from any municipal, state, federal or other governmental authority of any violation of any zoning, building, fire, water, use, health, or other law, ordinance, code, regulation, license, permit or authorization issued in respect of any of the Leased Real Property that has not been heretofore corrected, and no such violation or violations now exist. Improvements located on or constituting a part of the Leased Real Property that were constructed by the Company or any Stockholder (or any affiliate thereof) are now in compliance, in all material respects, with all applicable municipal, state, federal or other governmental laws, ordinances, codes, regulations, licenses, permits and authorizations, including, without limitation, applicable zoning, building, fire, water, use, minimum access or health laws, ordinances, codes, regulations, licenses, permits and authorizations, and there are presently in effect all certificates of occupancy, licenses, permits and authorizations required by law, ordinance, code or regulation or by any governmental or private authority having jurisdiction over any of the Leased Real Property or any portion thereof,

or the occupancy thereof or any present use thereof (collectively. "Governmental Approvals"), which are material to the conduct of the Business.

(iv)     Real Property Taxes. Except as set forth on Schedule 4.11(b)(iv). neither the Company nor any Stockholder has received notice of any pending or threatened reassessment of all or any portion of any of the Leased Real Property.

(v)     Zoning and Land Use Matters. All required licenses. permits. certificates and approvals, including building and use permits, planning permissions and building regulations consents (collectively. the "Real Property Permits"), were obtained and remain valid for the construction, use and occupancy and operation of the Leased Real Property. The Leased Real Property and all improvements located thereon are zoned or have a variance or conditional use permit or valid planning permission for the intended use by the zoning jurisdictions or planning authority in which it is located. The Leased Real Property is in material compliance with all conditions and requirements of any building permit, use permits, conditional use permits or zoning classifications. subdivision approvals, zoning restrictions, building codes, environmental zoning and land-use laws and planning permissions, and other applicable national, regional. provincial. state or local laws and regulations and complies in all material respects with the requirements of all conditions, covenants and restrictions applicable to the Leased Real Property. There are no pending or, to the best knowledge of the Company or the Stockholders, threatened, actions or proceedings that might prohibit. restrict or impair the use and occupancy of the Leased Real Property, or result in the suspension, revocation, impairment, forfeiture or non-renewal of any of the Real Property Permits.

4.12     Tax Matters.

(a)     Except as set forth on Schedule 4.12 hereto, the Company has filed all tax returns which they are required to file under applicable laws and regulations; all such Tax Returns are complete and correct in all material respects and have been prepared in compliance with all applicable laws and regulations in all material respects; the Company in all respects has paid all Taxes due and owing by it (whether or not such Taxes are required to be shown on a Tax Return) and have withheld and paid over to the appropriate taxing authority all Taxes which it is required to withhold from amounts paid or owing to any employee, stockholder, creditor or other third party; the Company has not waived any statute of limitations with respect to any taxes or agreed to any extension of time with respect to any tax assessment or deficiency; the accrual for Taxes on the October Balance Sheet would be adequate to pay all Tax liabilities of the Company if its current tax year were treated as ending on the date of the October Balance Sheet (excluding any amount recorded which is attributable solely to timing differences between book and Tax income); since the date of the October Balance Sheet, the Company has not incurred any liability for Taxes other than in the ordinary course of business; the assessment of any additional Taxes for periods for which Tax Returns have been filed by the Company shall not exceed the recorded liability therefor on the October Balance Sheet (excluding any amount recorded which is attributable solely to timing differences between book and Tax income); the federal income Tax Returns of the Company have been audited and closed for all tax years through April 30, 1994;

no foreign, federal, state or local tax audits or administrative or judicial proceedings are pending or being conducted with respect to the Company, no information related to Tax matters has been requested by any foreign, federal, state or local taxing authority and no written notice indicating an intent to open an audit or other review has been received by the Company from any foreign, federal, state or local taxing authority; and there are no material unresolved questions or claims concerning the Company's Tax liability.

(b)    The Company has not made an election under §341(f) of the IRC. The Company is not liable for the Taxes of another Person in a material amount under (a) Treas. Reg. § 1.1502-6 (or comparable provisions of state, local or foreign law), (b) as a transferee or successor, (c) by contract or indemnity or (d) otherwise. The Company is not a party to any tax sharing agreement. The Company has disclosed on its federal income Tax Returns any position taken for which substantial authority (within the meaning of IRC §6662(d)(2)(B)(i)) did not exist at the time the return was filed. The Company has not made any payments, is obligated to make payments or is a party to an agreement that could obligate it to make any payments that would not be deductible under IRC §280G.

4.13    Contracts and Commitments.

(a)    Except as expressly contemplated by this Agreement or as set forth on Schedule 4.13 hereto, the Company is not a party to or bound by any written or oral:

(i)    pension, profit sharing, stock option, employee stock purchase or other plan or arrangement providing for deferred or other compensation to employees or any other employee benefit plan or arrangement, or any collective bargaining agreement or any other contract with any labor union, or severance agreements, programs, policies or arrangements;

(ii)    contract for the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other basis or contract relating to loans to officers, directors or Affiliates;

(iii)    contract under which the Company has advanced or loaned any other Person amounts in the aggregate exceeding $25,000;

(iv)    agreement or indenture relating to borrowed money or other Indebtedness or the mortgaging, pledging or otherwise placing a Lien on any material asset or material group of assets of the Company or upon any of the Acquired Assets;

(v)    guarantee of any obligation in excess of $10,000;

(vi)    lease or agreement under which the Company is lessee of or holds or operates any property, real or personal, owned by any other party, except for any lease of real or personal property under which the aggregate annual rental payments do not exceed $25,000;

57483-v5                                21

(vii)    lease or agreement under which the Company is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by the Company or any of the Acquired Assets;

(viii)    contract or group of related contracts with the same party or group of Affiliated parties the performance of which involves consideration in excess of $25,000 per annum;

(ix)    assignment, license, indemnification or agreement with respect to any intangible property (including, without limitation, any Intellectual Property Rights) having a value in excess of $25,000;

(x)    express warranties with respect to its services rendered or its products sold or leased;

(xi)    sales, distribution or franchise agreements;

(xii)    contract or agreement prohibiting it from freely engaging in any business or competing anywhere in the world; or

(xiii)    any other agreement which is material to its operations and the Business and involves a consideration in excess of $25,000 annually.

(b)    Schedule 1.1(a) lists all Contracts (copies of which have heretofore been delivered to Purchaser) and describes all currently effective oral agreements and commitments, if any, to which the Company and, as may affect the Business, the Stockholders are a party and accurately lists all Consents. Except as set forth in Schedule 1.1(a) hereto, (i) all such Contracts constitute valid and binding agreements of each of the parties thereto, enforceable in accordance with their terms, except that (a) such enforcement may be limited by or subject to any bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to or limiting creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief are subject to certain equitable defenses and to the discretion of the court before which any proceeding therefor may be brought; (ii) with respect to such Contracts there are no existing defaults by the Company, nor does the Company have knowledge of any existing defaults by any of the other parties thereto, and there is no event which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a default under such Contracts by the Company, nor does the Company have knowledge of any existing event relating to any of the other parties thereto which would constitute a default, (iii) the Company is not restricted by agreement from carrying on in any geographical location the Business as conducted on the Closing Date, and (iv) there are no negotiations pending or in progress to revise, modify, terminate or extend any Contract.

57483-v5

22

4.14     Intellectual Property Rights; Inventory

(a)     Schedule 4.14(a) hereto sets forth a list of the Intellectual Property Rights of the Company and all applications for any Intellectual Property Rights running to the Company or any of the Stockholders that are material to the Business. Except as set forth on Schedule 4.14(a), (i) the Company owns, or is licensed or otherwise has the right, to use all registered Intellectual Property Rights set forth on Schedule 4.14(a), and (ii) the Intellectual Property Rights set forth on such list are free and clear of any Lien and neither the Company nor any Stockholder has received written notice of any adversely-held Intellectual Property Right of any other Person, or notice of any charge or claim of any Person relating to such Intellectual Property Rights or any process or confidential information of the Company and, to the Company's and each Stockholder's knowledge, there is no basis for any such charge or claim, and (iii) neither the Company, the Stockholders nor their respective predecessors, if any, have conducted the Business at any time during the period beginning five years prior to the date hereof under any corporate or partnership, trade or fictitious names other than as set forth on Schedule 4.14(a).

(b)     All of the inventory items relating to the Business were purchased or produced in the ordinary course of its business in a manner consistent with past practices and otherwise consistent with the representations, warranties and terms of this Agreement. All inventory items reflect write-downs to realizable values in the case of items which have become obsolete or unsalable (except at prices less than cost) through regular distribution channels in the ordinary course of the Business in a manner consistent with past practices and otherwise consistent with the representations, warranties and terms of this Agreement. The values of the inventories stated in the October Balance Sheet reflect the normal inventory valuation policies of the Company and such values were determined in accordance with generally accepted accounting principles, practices and methods consistently applied, except as described on Schedule 4.14(b). Except as set forth on Schedule 4.14(b), since the date of the October Balance Sheet, no inventory items have been sold or disposed of except through sales in the ordinary course of business and at gross margins consistent with past practices and otherwise consistent with the representations, warranties and terms of this Agreement, and all sales commitments made for the products of the Business are at prices reflecting gross margins consistent with past practices. Returns of prior year's sales, including any extraordinary or unusual discounts, have been identified in Schedule 4.14(b) attached hereto.

4.15     Accounts Receivable. Schedule 4.15 contains a complete and accurate summary by account of the amount of accounts receivable as of the date hereof for each such customer, as well as the aggregate of all accounts receivables as of the date hereof (the "Receivables"). All of the accounts receivable relating to the Business, whether shown or reflected on the October Balance Sheet (or the December Balance Sheet when delivered to Purchaser) or otherwise, represent bona fide completed sales made in the ordinary course of business in a manner consistent with past practices and otherwise consistent with the representations, warranties and terms of this Agreement, are valid and enforceable claims, are subject to no known set-offs or counterclaims, and are fully collectible in the normal course of business after deducting the reserve set forth in the October Balance Sheet (or the December Balance Sheet when delivered to Purchaser) and adjusted since that date, which reserve is a reasonable estimate of the Company's

uncollectible accounts, mark downs, returns and allowances. The Receivables do not include any accounts or loans receivable from any person, firm or corporation which is affiliated with the Company or from any stockholder, director, officer or employee of the Company or any affiliate thereof. Except as set forth in Schedule 4.15, the Receivables are free and clear of all liens, restrictions, encumbrances and other claims of any nature whatsoever.

4.16    Litigation, Etc.

(a)     Except as set forth on Schedule 4.16, there are no actions, suits, proceedings, orders, investigations or claims pending or, to the Company's or any Stockholder's knowledge, threatened against the Company, or, as it relates to the Business, any Stockholder (or to the Company's and each Stockholder's knowledge, pending or threatened against any of the Stockholders, or any of the officers, directors or key employees of the Company with respect to the Business), or pending or threatened by the Company or any Stockholder against any third party, at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality (including, without limitation, any actions, suit, proceedings or investigations with respect to the transactions contemplated by this Agreement).

(b)     Neither the Company nor, as it relates to the Business, any Stockholder is subject to any arbitration proceedings under collective bargaining agreements or otherwise or, to the best of the Company's and each Stockholder's knowledge, any governmental investigations or inquiries (including, without limitation, inquiries as to the qualification to hold or receive any license or permit), and, to the Company's and each Stockholder's knowledge, there is no basis for any of the foregoing.

(c)     Neither the Company nor, as it relates to the Business, any Stockholder is subject to any judgment, order or decree of any court or other governmental agency, and neither the Company any Stockholder has received any written opinion or memorandum from legal counsel to the effect that it is exposed, from a legal standpoint, to any liability which may be material to the Business.

4.17    Brokerage. Except as set forth on Schedule 4.17, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement binding upon the Company or any Stockholder. The Company and the Stockholders shall pay, and hold Purchaser harmless against, any liability, loss or expense (including, without limitation, reasonable attorneys' fees and out-of-pocket expenses) arising in connection with any such claim.

4.18    Insurance. Schedule 4.18 hereto contains a description of each insurance policy maintained by the Company with respect to the Business, and each such policy is in full force and effect as of the Closing. The Company is not in default with respect to its obligations under any such insurance policy maintained by it and the Company has not been denied insurance coverage. Except as set forth on Schedule 4.18, the Company has no self-insurance or co-insurance programs and the reserves set forth on the October Balance Sheet are adequate to cover all anticipated liabilities with respect to any such insurance or co-insurance programs.

57483-v5

4.19   List of Certain Employees, Suppliers and Customers.

(a)   Schedule 4.19(a) contains a list of all managers, employees and consultants and independent contractors of the Company relating to the Business who, individually, have received or are scheduled to receive compensation or payments for the fiscal year ended and ending December 31, 1997 in excess of $40,000. In each case such Schedule 4.19(a) includes the current job title and aggregate annual compensation of each such individual. Except as set forth on Schedule 4.19(a), each sales agent or representative is an independent contractor and is not an employee of the Company.

(b)   Schedule 4.19(b) sets forth a list of all suppliers to whom the Company made payments aggregating $100,000 or more during the fiscal year ended December 31, 1996 and during the current fiscal year showing, with respect to each, the name, address and dollar volume involved and length of relationship. To the knowledge of the Company and each Stockholder, no supplier has any plan or intention to terminate or reduce its business with the Business or to materially and adversely modify its relationship therewith.

4.20   Employees; Labor Matters.   The Company employs approximately 180 full-time employees and no part-time employees at the date of this Agreement. The Company is not delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed for it to the date hereof or amounts required to be reimbursed to such employees. Upon termination of the employment of any of said employees, no severance or other payments will become due, other than regular and overtime wages earned through the date of termination. The Company has no formal policy of paying any employee for vacation or sick leave accrued at the time of termination. The Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment or services. The Company are in compliance in all material respects with all applicable laws and regulations respecting labor, employment, fair employment practices, terms and conditions of employment, and wages and hours. There are no formal charges, or to the best knowledge of the Company any threatened charges, of employment discrimination or unfair labor practices, nor are there any strikes, slowdowns, stoppages of work, or any other concerted interference with normal operations existing, pending or to the best knowledge of the Company and each Stockholder threatened against the Company. Except as set forth on Schedule 4.20, none of the employees of the Company are represented by a union or subject to a collective bargaining agreement, and no question concerning representation exists or, to the best of the Company's and each Stockholder's knowledge, is threatened or asserted respecting the employees of the Company. To the best knowledge of the Company and each Stockholder, there are no grievances, complaints or charges that are pending under any dispute resolution procedure (including, but not limited to, any proceedings under any dispute resolution procedure under any collective bargaining agreement). No arbitration or similar proceeding is pending and no claim therefor has been asserted. No collective bargaining agreement is in effect or is currently being negotiated with respect to the Company. The Company is to the best knowledge of the Company and each Stockholder, and at all times since January 1, 1993 has been, in compliance in all material

57483-v5

25

respects with the requirements of the Immigration Reform Control Act of 1986. as amended. There are no changes of which the Company or any Stockholder has knowledge pending or threatened with respect to (including, without limitation. resignation of) the senior management or key supervisory personnel of the Company nor has the Company or any Stockholder received any notice or information concerning any prospective change with respect to such senior management or key supervisory personnel.

4.21    ERISA.

(a)    Schedule 4.21 (a) hereto contains a list of each employment, consulting. bonus. deferred compensation, incentive compensation, severance. termination or post-employment pay. disability, hospitalization or other medical, dental. vision. life or other insurance, stock purchase, stock option, stock appreciation, stock award, pension, profit sharing, 401(k) or retirement plan, agreement or arrangement, and each other employee benefit plan or arrangement arising out of the employment or the termination of employment of an employee. former employee, retiree or sales personnel by the Company, whether written or oral. tax-qualified under the IRC or non-qualified, whether covered ERISA, or not, maintained or contributed to by the Company covering its employees, former employees. retirees or sales personnel (collectively, "Plans"). To the best knowledge of the Company, the Company has no oral or written formal or informal plan or commitment, whether covered by ERISA or not, to create any additional plan, agreement or arrangement or to modify or change any existing Plan in any manner that would affect any of its employees, former employees, retirees or sales personnel. The Company has delivered to Purchasers annual expenses for wages, sales commissions, bonuses, group health plan, and 401(k) plan for the last three fiscal years plus the current year-to-date expenses through October 31, 1997.

(b)    Except as specified on Schedule 4.21(b). any plan, including but not limited to any plan that was an "employee pension benefit plan" covered by Section 3(2) of ERISA. that the Company ever sponsored or maintained, or in which the Company ever participated or contributed, on behalf of its employees, former employees, retirees or sales personnel which was subsequently terminated was terminated in compliance with the requirements of the IRC and ERISA and the Company has not incurred any liability with respect to such plan or the termination or such plan that is due and owing and has not yet been satisfied under the terms of the plan, the IRC, ERISA or any other law or regulation pursuant to which the Purchaser may incur liability or have liability attributed to them under any federal, state or local law as a result of the consummation of the transactions contemplated by this Agreement. The Company does not maintain, nor has it ever maintained or contributed to: (i) a "multiemployer plan", as that term is defined in Section 3(37) of ERISA. No amount is due or owing from the Company on account of a "multiemployer plan" or on account of any withdrawal therefrom or (ii) a "defined benefit plan" as defined in Section 3(35) of ERISA. The Company does not have any liability under (or with respect to) any "defined benefit plan".

(c)    Retiree Welfare Plans. Except as set forth on Schedule 4.21(c) hereto, the Company does not maintain or have any obligation to contribute to (or any other liability with respect to) any plan or arrangement whether or not terminated, which provides medical, health,

life insurance or other welfare-type benefits for current or future retired or terminated employees (except for limited continued medical benefit coverage required to be provided under Section 4980B of the IRC or as required under applicable state law).

(d)     Each Plan and all related trusts, insurance contracts, and funds have been maintained, funded and administered in compliance in all respects with all applicable laws and regulations, including but not limited to ERISA and the IRC, and all required governmental filings and material participant disclosures have been made on a timely basis. None of the Company, any trustee or administrator of any Plan, or any other person has engaged in any transaction with respect to any Plan which could subject the Company, or any trustee or administrator of any Plan, or any party dealing with any Plan, or the Purchaser to any tax or penalty imposed by ERISA or the IRC including, without limitation, under Title 1 of ERISA or under Sections 4971 through 4980B (inclusive) of the IRC. No actions, suits, claims, complaints, charges, proceedings, hearings, investigations, or demands with respect to the Plans (other than routine claims for benefits) are pending or threatened and neither the Company nor any Stockholder has any knowledge of any acts which could give rise to or be expected to give rise to any actions, suits, claims, complaints charges, proceedings, hearings, investigations or demands. No Plan that is subject to the funding requirements of Section 412 of the IRC or Section 302 of ERISA has incurred any "accumulated funding deficiency" as such term is defined in such Sections of the IRC and ERISA, whether or not waived. There is no judgment, decree, injunction, ruling or order of any court, governmental body, commission, agency or arbitrator outstanding against or in favor of any Plan or any fiduciary thereof in that capacity.

(e)     Each Plan that is intended to be qualified under Section 401(a) of the IRC, and each trust forming a part thereof, has received a post Tax Reform Act of 1986 favorable determination letter from the IRS as to the qualifications under the IRC of such Plan and the tax-exempt status of such related trust and nothing has occurred since the date of such determination letter that could adversely affect the qualification of such Plan or the tax-exempt status of such related trust.

(f)     No underfunded defined benefit plan has been, during the five years preceding the Closing Date, transferred out of the controlled group of companies (as defined in Section 414 of the IRC) of which the Company is a member or was a member during such five-year period.

(g)     As of the Closing Date and as to each Plan, all required or recommended payments, premiums, contributions, reimbursements or accruals for all periods ending prior to or as of the Closing Date shall have been made or properly accrued in accordance with generally accepted accounting principles. No Plan has any material unfunded liabilities.

(h)     With respect to each Plan, the Company has provided the Purchaser with true, complete and correct copies, to the extent applicable, of (A) all documents pursuant to which the Plans are maintained, funded and administered, including, without limitation, true and complete copies of the Plans, the trusts and other contracts (including any amendments to any of the foregoing) relating to the Plans and all other relevant documents governing or relating to the

57483-v5                                      27

Plans in effect on the date hereof (including without limitation. the latest summary plan description, (B) the three most recent annual reports (Form 5500 series) filed with the IRS (with attachments), (C) the three most recent actuarial reports, (D) the three most recent financial statements, (E) all governmental rulings. determinations. and opinions (and pending request for governmental rulings, determinations and opinions) including, without limitation. the latest favorable determination letter issued by the IRS for each of the Plans as applicable and (F) the most recent valuation (but in any case at least one that has been completed within the last calendar year) of the present and future obligations under each Plan that provides post-retirement or post-employment health, life insurance. accident or other "welfare-type" benefits.

     (i)    For purposes of this Section 4.21, the term "Company" includes all organizations under common control with the Company pursuant to Section 414(b) or (c) of the IRC.

     (j)    Except as set forth in Schedule 4.21(j) hereto each Plan that is an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA may be terminated after the Closing Date upon no more than sixty (60) days notice in accordance with the terms of any underlying contract, including the termination provisions thereof. without liability to the Company other than liabilities relating to claims incurred prior to the effective date of the termination of such Plan.

     (k)    There are no agreements or arrangements between the Company and an individual consultant, former consultant, employee or former employee, director or former director obligating the Company to make any payment to or accelerate the timing of or vesting in any payment or stock based compensation for any such individual as a result of the transactions contemplated by this Agreement.

    4.22    Compliance with Laws.  Except as set forth on Schedule 4.22, the Company has not violated any law or any governmental regulation or requirement, and neither the Company nor any Stockholder has received notice of any such violation, and neither the Company nor any Stockholder has violated any health code regulations or requirements, and neither the Company nor any Stockholder has received notice of any such violation.

    4.23    Environmental and Safety Matters.  Except as set forth on Schedule 4.23:

     (a)    The operations of the Company are in full compliance with Environmental Laws;

     (b)    The Company has obtained and is in compliance with all necessary permits or authorizations that are required under Environmental Laws to operate the facilities, assets and Business of the Company;

     (c)    There has been no Release at any property included within the Leased Real Property or a predecessor in interest or any property included within the Acquired Assets, or to the knowledge of the Company and the Stockholders, at any disposal or treatment facility

Tab D
(Part 2 of 2)

which received Hazardous Materials generated by the Company or any predecessor in interest which is reasonably likely to result in Environmental Liabilities:

      (d)    No Environmental Claims have been asserted against the Company or, to the knowledge of the Company and the Stockholders, any predecessor in interest nor does the Company or any Stockholder have knowledge or notice of any threatened or pending Environmental Claim against the Company or any predecessor in interest which is reasonably likely to result in Environmental Liabilities;

      (e)    To the knowledge of the Company and the Stockholders, no Environmental Claims have been asserted against any facilities that may have received Hazardous Materials generated by the Company or any predecessor in interest which is reasonably likely to result in Environmental Liabilities;

      (f)    The Company and the Stockholders further represent that they have delivered to Purchaser true and complete copies of all environmental reports, studies, investigations or correspondence regarding any Environmental Liabilities of the Company, or any environmental conditions at any of the Leased Real Property.

    4.24    <u>Backlog</u>.  <u>Schedule 4.24</u> sets forth, as of the date hereof, the Company's backlog of firm orders for the sale or lease of products, for which revenues have not been recognized by the Company.

    4.25    <u>Customers and Distributors</u>.  <u>Schedule 4.25(a)</u> sets forth a list of the top twenty (20) customers of the Company for the year ended December 31, 1996 and during the current fiscal year, showing with respect to each the name, address and amount of sales in 1995, 1996 and for the first ten (10) months of 1997.  <u>Schedule 4.25(b)</u> sets forth each sales representative and distributor of the Company (whether pursuant to a commission, royalty or other arrangement).  No customer or distributor responsible for in excess of 0.5% of the Company's gross sales has canceled or otherwise terminated its relationship with the Company, or has during the last twelve months decreased materially its services, supplies or materials to the Company or its usage or purchases of the services or products of the Company.  No customer or distributor has, to the best knowledge of the Company and each Stockholder, any plan or intention to terminate, to cancel or otherwise materially and adversely modify its relationship with the Company to decrease materially or limit its services, supplies or materials to the Company or its usage, purchase or distribution of the services or products of the Company.  Except as set forth in <u>Schedule 4.25(b)</u>, no customer or distributor has, or currently is, requiring the payment of any fees or other amounts, the return of any portion of amounts due to the Company, or any other arrangement whereby the Company must compensate the customer or distributor for displaying the products of the Company.

    4.26    <u>Assets Conveyed</u>. The Company and each Stockholder hereby represent and warrant that the Acquired Assets comprise all of the assets, including all personal property, used in connection with the Business as presently conducted by the Company.

    4.27   Disclosure. Neither this Agreement nor any of the exhibits, schedules or attachments, written statements, documents, certificates or other items prepared or supplied to the Purchaser by or on behalf of the Company and the Stockholders with respect to the transactions contemplated hereby contain any untrue statement of a material fact or omit a material fact necessary to make each statement contained herein or therein not misleading.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

    Purchaser hereby represents and warrants to the Company and the Stockholders as follows:

    5.1   Organization. The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the corporate power and authority to enter into this Agreement and all other agreements contemplated hereby to which Purchaser, is a party, and to carry out the transactions contemplated hereby and thereby.

    5.2   Authorization. The Board of Directors of Purchaser has duly authorized the execution and delivery of this Agreement and all other agreements contemplated hereby to which Purchaser, is a party, and the consummation by Purchaser of the transactions contemplated hereby and thereby. No other corporate or other proceedings on the part of Purchaser are necessary to authorize this Agreement or any other agreements contemplated hereby to which Purchaser is a party or the transactions contemplated hereby or thereby.

    5.3   Valid and Binding Agreement. This Agreement and all other agreements contemplated hereby to which Purchaser is a party, constitutes a valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms, except that (i) such enforcement may be limited by or subject to any bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to or limiting creditors' rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief are subject to certain equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

    5.4   No Violation. Except as set forth on Schedule 5.4 hereto, the execution and delivery by Purchaser of this Agreement and all other agreements contemplated hereby to which Purchaser is a party, the purchase of the Acquired Assets, and the fulfillment of and compliance with the respective terms hereof and thereof by the Purchaser do not and shall not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in the creation of any lien, security interest, charge or encumbrance upon Purchaser's capital stock or assets pursuant to, (iv) give any third party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or governmental body or agency pursuant to, the (A) charter or bylaws of

57483-v5

30

Purchaser, or (B) any law, statute, rule or regulation to which Purchaser is subject, or (C) any agreement, instrument, order, judgment or decree to which Purchaser is subject.

5.5    **Brokerage.**  Except as set forth on Schedule 4.17, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement binding upon Purchaser.

## ARTICLE VI.

## COVENANTS OF THE PARTIES.

6.1    Covenants of the Company and the Stockholders.  The Company and the Stockholders hereby covenant and agree with Purchaser as follows:

(a)    Ordinary Conduct.  Except as expressly permitted by the terms of this Agreement or as set forth on Schedule 6.1(a) hereto, from the date hereof until the Closing, the Company will conduct and each Stockholder will cause the Company to conduct, the Business in the ordinary course in substantially the same manner as presently conducted and, without the prior written consent of Purchaser, will not take any of the actions specified in Section 4.10.  In addition, except as expressly permitted by the terms of this Agreement, neither the Company nor any Stockholder will do any of the following prior to the Closing without the prior written consent of Purchaser:

(i)    amend Certificate of Incorporation or By-laws or other comparable governing instruments of the Company;

(ii)    grant to any officer or employee any increase in or acceleration in timing of payment of vesting in any compensation or benefits;

(iii)    cancel any indebtedness owing to the Company, waive any claims or rights of substantial value or amend any material term of any of its outstanding securities;

(iv)    make any change in any method of accounting or accounting practice or policy other than those required by generally accepted accounting principles;

(v)    acquire by merging or consolidating with, by purchasing a substantial portion of the assets of, or in any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire any assets, except in the ordinary course of business consistent with past practice;

(vi)    other than pursuant to agreements in effect on the date hereof, sell, lease or otherwise dispose of any of its assets, except in the ordinary course of business consistent with past practice;

57483-v5

31

(vii)    amend, modify, terminate, extend, renew or restate any Lease or any other Contract including, without limitation, any benefit, plan or program, other than in the ordinary course of business consistent with past practice;

(viii)    pay or agree to pay any pension, retirement allowance or other employee benefit not required or permitted by any Plan, whether past or present;

(ix)    permit any of its insurance policies to be canceled or terminated or any of the coverage thereunder to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies are in full force and effect providing coverage, in form, substance and amount equal to or greater than the coverage under those canceled, terminated or lapsed for substantially similar premiums; or

(x)    agree, whether in writing or otherwise, to do any of the foregoing.

Except as specifically permitted hereby, the Company and the Stockholder shall not take any action prior to the Closing that would, or that would reasonably be expected to, result in any of the representations and warranties of the Company and the Stockholder's set forth in this Agreement becoming untrue in any material respect.

(b)    Other Transactions. Each of the Company and the Stockholders agrees that prior to the Closing, they will not, and will cause the Company's directors, officers, representatives and agents not to, directly or indirectly, take any action to solicit, encourage, initiate or facilitate (including by way of making available or furnishing information) any inquiries, proposals or offers with respect to any merger or consolidation involving the Company, the acquisition of any shares of common stock or warrants to purchase common stock or the acquisition of all or substantially all the assets of the Company or the Acquired Assets by any person other than Purchaser or its permitted assignees. Stockholders and the Company each agree to notify (and to provide all material details) promptly if the Company or any Stockholder shall be approached, directly or indirectly, by any person with respect to any such inquiries, proposals or offers, or if the Company or the Stockholders shall otherwise notice that any other person shall have made any such inquiries, proposals or offers.

(c)    Notices of Certain Events. The Company and the Stockholders shall promptly notify Purchaser of:

(i)    any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the transactions contemplated by this Agreement;

(ii)    any notice or other communication from any governmental entity in connection with the transactions contemplated by this Agreement;

(iii)    any actions, suits, claims, investigations or proceedings

57483-v5

32

commenced or, to its knowledge, threatened, relating to or involving or otherwise affecting the Company that, if pending on the date of this Agreement, would have been required to have been disclosed in the Schedules hereto or that relate to the consummation of the transactions contemplated by this Agreement;

(iv)     the occurrence, or failure to occur, of any condition, event or development that (A) causes any representation or warranty of the Company or the Stockholders contained in this Agreement and qualified as to materiality to be untrue or inaccurate, or causes any representation or warranty contained in this Agreement and not so qualified to be untrue or inaccurate in any material respect, at any time from the date hereof to the Closing Date or (B) would have been required to be set forth or described in the Schedules hereto if existing or known at the date of this Agreement; and

(v)     any failure on the part of the Company or any Stockholder to comply with or perform in any respect any agreement or covenant to be complied with or performed by it hereunder; provided that the delivery of any notice pursuant to this Section 6.1(c) shall not limit or otherwise affect the remedies available hereunder to Purchaser.

(d)     Availability of Records.  After the Closing, the Company and the Stockholders shall make available to the Purchaser as reasonably requested and at Purchaser's expense or any taxing authority any and all information, records or documents relating to the Business conducted prior to the Closing Date and related personnel retained by it, in respect of periods prior to Closing Date and shall preserve all such information, records and documents until the later of six (6) years after the Closing or the expiration of all statutes of limitations or extensions thereof.  The Company and each Stockholder shall also make available to the Purchaser, as reasonably requested and at their expense, personnel responsible for preparing or maintaining information, records and documents, both in connection with Tax matters as well as litigation; provided, however, that Purchaser shall pay for all direct out of pocket expenses related to any such requests in excess of one per calendar year. The Company and each Stockholder agree to hold all information relating to the Business in strict confidence from and after the Closing Date.

(e)     Accounts Receivable.  The Company hereby appoints Purchaser, its successors and assigns, the Company's true and lawful attorney and attorneys, with full power of substitution, in the Company's name and stead, as the case may be, but on behalf and for the benefit of Purchaser, its successors and assigns, to demand and receive any and all of the Receivables, and to give receipts and releases for and in respect of the same, and any part thereof, and from time to time to institute and prosecute in the Company's name, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Receivables or for the collection and enforcement of any claim or right of any kind relating to the Receivables, and to do all acts and things relating to the Receivables which the Purchaser, its successors or assigns shall deem desirable. The Company hereby declares that the foregoing powers are coupled with an interest and are and shall be irrevocable by the Company and each Stockholder or upon its dissolution or in any manner or for any reason

57483-v5

33

whatsoever. The Company hereby covenants that, from time to time after the delivery of this instrument, at Purchaser's request and without additional consideration, the Company will execute, acknowledge and deliver such further instruments of conveyance and transfer and take such other actions as the Purchaser may be reasonably required to more effectively convey and transfer to the Purchaser any and all of the Receivables. The Company shall promptly transfer and deliver to the Purchaser any checks, notes, drafts, money orders or other evidence of payment ("Items of Payment") or other property which it may receive as payment or proceeds of Receivables. Any such Items of Payment or other property, while in the possession of the Company shall be held in trust for the Purchaser until delivered to the Purchaser or its designee.

(f)  Taxes. The Company and the Stockholders will pay all Taxes due and payable on or after the Closing and will file all returns and reports required to be filed on or after the Closing with respect to the Company and/or the Stockholders (including any predecessor entities) including, without limitation, Taxes imposed with respect to the Company, the Business or the Acquired Assets for all taxable periods (or portions thereof) ending on or prior to the Closing, for which the Purchaser could be held liable or a claim made against the Business or any of the Acquired Assets.

6.2  Mutual Covenants. Each of the parties hereto hereby covenants and agrees as follows:

(a)  Publicity. From the date hereof through the Closing Date, no public release or announcement concerning the transactions contemplated hereby shall be issued by any party without the prior consent of the other parties, except as such release or announcement shall be required by law, in which case the party required to make the release or announcement shall allow the other parties reasonable time to comment on such release or announcement in advance of such issuance.

(b)  Reasonable Commercial Efforts. Subject to the terms and conditions of this Agreement, each party will use reasonable commercial efforts to cause the conditions set forth in Article III of this Agreement to be satisfied and the Closing to occur.

6.3  Bulk Sales Laws. The parties hereto waive compliance with the "bulk sales" or similar laws of any state or other jurisdiction that may be applicable to the transactions contemplated hereby. The Company and the Stockholders jointly and severally covenant and agree to indemnify and hold harmless (as set forth in Article VII) Purchaser and each of its Affiliates from and against any and all claims made by creditors of the Company or any Stockholder relating to provisions of the "bulk sales" or similar laws of any state or other jurisdiction that may be applicable to the transactions contemplated hereby and from all out-of-pocket costs (including reasonable attorneys' fees) incurred in the defense of any claims made under such laws.

57483-v5

34

6.4    Confidentiality.

(a)    The Company and each of the Stockholders acknowledges that they have had access to certain technical, commercial and marketing information, data and material regarding the Business (including without limitation the Acquired Assets, product documentation, development work, trade secrets and other proprietary information) (the "Confidential Information"). The Company and each Stockholder agree that the Confidential Information is confidential and proprietary and that a substantial portion of the Purchase Price is being paid for such Confidential Information and that it represents a substantial investment having great economic and commercial value to the Purchaser, and constitutes a substantial part of the value to Purchaser of the Business and the Acquired Assets. The Company and each Stockholder hereby acknowledge that Purchaser would be irreparably damaged if any of the Confidential Information was disclosed to, or used or exploited on behalf of, any Person other than Purchaser, or its Affiliates. Accordingly, the Company and each Stockholder covenants and agrees that it shall not, without the prior written consent of Purchaser, disclose, use or exploit any such Confidential Information, for the benefit of any of such Stockholder or of any third party, except that Stockholder may use or exploit a particular item of Confidential Information if and to the extent (but only if and to the extent) that such item (i) is not unique to the Company, (ii) is or becomes publicly known or generally known in the industry through no act of the Company, any Stockholder or Affiliate of Stockholder, (iii) is required to be disclosed to or by order of a governmental agency or a court of law or otherwise as required by law; provided that prior to any such disclosure notice of such requirement of disclosure is provided to Purchaser and Purchaser is afforded the reasonable opportunity to object to such disclosure, or (iv) is required to be disclosed to the parties' attorneys, accountants or other agents or employees working on this transaction.

(b)    The Company and the Stockholders hereby expressly acknowledge that money damages will be impossible to calculate and may not adequately compensate Purchaser in connection with an actual or threatened breach of the provisions of this Section 6.4. Accordingly, the Company and the Stockholders hereby expressly waive all rights to raise the adequacy of Purchaser's remedies at law as a defense if Purchaser seeks to enforce by injunction or other equitable relief the due and proper performance and observance of the provisions of this Section 6.4. In addition, Purchaser shall be entitled to pursue any other available remedies at law or equity, including the recovery of money damages, in respect of the actual or threatened breach of the provisions of this Section 6.4.

(c)    The Company and the Stockholders each hereby expressly waive any right to assert inadequacy of consideration as a defense to enforcement of the confidentiality covenants in this Section 6.4 should such enforcement ever become necessary.

6.5    Employees.

(a)    As of 12:01 A.M. on the Closing Date, all employees of the Company shall cease to be employees of the Company and shall become employees of Purchaser (the "New Purchaser Employees"), unless such employees are listed on Schedule 6.5(a) as individuals

57483-v5                                     35

who will not become employees of Purchaser. The Purchaser shall not be liable to any New Purchaser Employees or to the Company for any compensation related to any employment or services performed, or otherwise, which were incurred or accrued prior to the Closing Date, except for (i) the Assumed Liabilities, (ii) the benefits accrued and payable under the Plans set forth on Schedule 6.5(b) and (iii) as set forth in this paragraph. The Purchaser shall have no liability to any current or former Company employees who are not New Purchaser Employees, including without limitation any liabilities which may arise as a result of the consummation of the transactions contemplated by this Agreement or arising under applicable federal or state law including without limitation under the Worker Adjustment and Retraining Notification Act ("WARN") and Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). Purchaser shall be responsible for any liabilities to New Purchaser Employees which may arise under WARN or COBRA after the Closing Date. The provisions of this Section 6.5 shall survive the Closing.

(b)    At Closing, the Purchaser shall become successor employer to the Company of all of the Plans listed in Schedule 6.5(b) attached hereto.

6.6    Change and Assignment of Name. At or prior to the Closing, the Company will cause an amendment to its Certificate of Incorporation to be filed with the Secretary of Commonwealth of Massachusetts changing its name to a name which does not resemble "Thompson Paper Box Co., Inc." (which amendment shall become effective as of the Closing Date) and will cause to be filed at or prior to the Closing such documents as are necessary to reflect such change in its corporate name or to terminate its qualification in each jurisdiction in which the Company is qualified to do business. The Company will not thereafter use or permit any of its Affiliates to use the name "Thompson Paper Box Co., Inc." or any variant or derivative thereof other than the names "Thompson Realty Trust" and "Thompson Realty Associates Limited Partnership." In connection with enabling Purchaser, at or as soon as practicable after the Closing, to use the name "Thompson Paper Box Co., Inc.", the Company will, at or prior to Closing, execute and deliver to Purchaser all consents related to such use of name as may be reasonably requested by Purchaser.

6.7    Investigation. The Company and each Stockholder hereby agree to cooperate fully with Purchaser and give to Purchaser, its officers, employees, auditors, legal counsel, representatives and agents reasonable access during normal business hours to all such information, documents, premises and employees as Purchaser considers necessary or advisable for purposes of their investigation of the Company, the Business and the Assumed Liabilities. Pending the Closing, Purchaser will preserve the confidentiality of any information provided to Purchaser by the Company or any Stockholder relating to the Company, the Business or the Assumed Liabilities, which is confidential in nature. In the event of termination of this Agreement, Purchaser agrees to maintain the confidentiality of such information except to the extent that such item (i) is not unique to the Company, (ii) is or becomes publicly known or generally known in the industry through no act of Purchaser, (iii) is required to be disclosed to or by order of a governmental agency or a court of law or otherwise as required by law; provided that prior to any such disclosure notice of such requirement of disclosure is provided to the Company and the Stockholders and the Company and the Stockholders are afforded the

reasonable opportunity to object to such disclosure, or (iv) is required to be disclosed to the parties' attorneys, accountants or other agents or employees working on this transaction.

6.8     Pre-Merger Notification and Other Consents.  Purchaser and the Company shall proceed, as expeditiously as possible following the execution of this Agreement, to file proper applications and notices and shall cooperate in taking all steps that may be required under the HSR Act in order to advise the Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") of the transactions described herein, and to obtain the waiver by the FTC and the DOJ of any objection to the consummation of the transactions contemplated hereby.  To the extent required by law, each of the parties shall proceed to obtain any other regulatory or government consent or waiver, and to effect any registrations or filings as may be necessary to consummate the transactions contemplated hereby.

## ARTICLE VII.

## SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION.

7.1     Survival of Representations.  All representations and warranties made by any party hereto in this Agreement or in the attached Schedules or in any Exhibit or certificate delivered pursuant hereto shall survive the Closing hereunder regardless of any investigation at any time made by or on behalf of any other party for the time periods set forth in Section 7.5(a).  No investigation by Purchaser shall relieve the Company or the Stockholders from any liability for any misrepresentation, misleading statement or omission made in this Agreement or in connection with the transactions contemplated hereby.

7.2     Notice of Damages.  A party seeking indemnity hereunder (the "Indemnified Party") will give the party from whom indemnity is sought hereunder (the "Indemnitor") prompt notice (hereinafter, the "Indemnification Notice") of any demands, claims, actions or causes of action (collectively, "Claims") asserted against the Indemnified Party.  Failure to give such notice shall not relieve the Indemnitor of any obligations which the Indemnitor may have to the Indemnified Party under this Article VII, except to the extent that such failure has materially adversely prejudiced the Indemnitor under the provisions for indemnification contained in this Agreement.  For purposes of this Article VII, Purchaser, on the one hand, and the Company and the Stockholders, on the other hand, shall be deemed to be the "Indemnified Party" or the "Indemnitors", as the case may be.  The rights of indemnity under the Article VII shall be in addition to and not in lieu of any other rights and remedies at law or in equity.

7.3     Agreements to Indemnify.

(a)     Subject to the terms and conditions of this Article VII, the Company and the Stockholders jointly and severally covenant and agree to indemnify, defend and hold harmless Purchaser, and its Affiliates, including any officer, director, stockholder, partner, member, employee, agent or representative of any thereof (a "Purchaser Affiliate"), from and against all assessments, losses, damages, liabilities, costs and expenses, including without

57483-v5                           37

limitation interest, penalties and reasonable fees and expenses of legal counsel chosen by Purchaser or Purchaser Affiliate (collectively, "Damages"), imposed upon or incurred by Purchaser, or any Purchaser Affiliate arising out of or in connection with or resulting from (i) any breach of any representation or warranty of, or nonfulfillment of any covenant or agreement of, the Company or any Stockholder contained in or made pursuant to this Agreement or any agreement, other than the Employment Agreements, to be delivered in connection with this Agreement, or any Schedule or Exhibit hereto or thereto, or any certificate or instrument furnished or to be furnished to Purchaser hereunder or thereunder, (ii) any and all liabilities and obligations of the Company and the Stockholders, or arising out of or related to their ownership of the Acquired Assets prior to the Closing Date, other than the Assumed Liabilities, (iii) third party claims arising in breach of contract, breach of warranty, product liability, unfair competition, personal or other injury, tort or infringement of property rights of others or other third party claims, in each case which claim is with respect to any and all activities of the Company, any Stockholder or any Affiliate thereof in connection with the conduct of the Business on or before the Closing Date and (iv) any Environmental Liabilities.

(b)    Purchaser covenants and agrees to indemnify, defend and hold harmless the Company and the Stockholders and their respective Affiliates (including any successor or assigns, officer, director, stockholder, partner, member, employee, agent or representative thereof) ("Stockholder Affiliates") from and against all Damages (including reasonable fees and expenses of the Company's legal counsel) imposed upon or incurred by the Company, Stockholders or any Stockholder Affiliates arising out of or in connection with or resulting from (i) any breach of any representation or warranty of, or nonfulfillment of any covenant or agreement of, Purchaser contained in or made pursuant to this Agreement or any agreement to be delivered in connection with this Agreement, or any Schedule or Exhibit hereto or thereto, or any certificate or instrument furnished or to be furnished to the Company or the Stockholders hereunder or thereunder, (ii) any and all Assumed Liabilities, and (iii) third party claims arising in breach of contract, breach of warranty, product liability, unfair competition, personal or other injury, tort or infringement of property rights of others or other third party claims, in each case which claim is with respect to any and all activities of Purchaser or any Purchaser Affiliate in connection with the conduct of the Business on or after the Closing Date.

(c)    The Indemnitor shall reimburse an Indemnified Party promptly after delivery of an Indemnification Notice certifying that the Indemnified Party has incurred Damages after compliance with the terms of this Article VII; provided, however, that the Indemnitor shall have the right to contest any such Damages in good faith.

7.4    Conditions of Indemnification of Third Party Claims.    The obligations and liabilities of an Indemnitor under Section 7.3 hereof with respect to Damages resulting from Claims by persons not party to this Agreement shall be subject to the following terms and conditions:

(a)    Promptly after delivery of an Indemnification Notice in respect of a Claim and subject to paragraph (c) of this Section 7.4, the Indemnitor may elect, by written notice to the Indemnified Party, to undertake the defense thereof with counsel reasonably satisfactory to the

57483-v5

38

Indemnified Party, at the sole cost and expense of Indemnitor, provided such Indemnitor has unconditionally acknowledged in writing its obligation to indemnify the Indemnified Party with respect to such claim. If the Indemnitor chooses to defend any claim, the Indemnified Party shall cooperate with all reasonable requests of the Indemnitor and shall make available to the Indemnitor any books, records or other documents within its control that are necessary or appropriate for such defense.

        (b)    In the event that the Indemnitor, within a reasonable time after receipt of an Indemnification Notice, does not so elect to defend such Claim, the Indemnified Party will have the right (upon further notice to the Indemnitor) to undertake the defense, compromise or settlement of such Claim for the account of the Indemnitor, subject to the right of the Indemnitor to assume the defense of such Claim pursuant to the terms of paragraph (a) of this Section 7.4 at any time prior to settlement, compromise or final determination thereof, provided, that the Indemnitor reimburses in full all costs of the Indemnified Party (including reasonable attorney's fees) incurred by it in connection with such defense prior to such assumption.

        (c)    Anything in this Section 7.4 to the contrary notwithstanding, (i) if the Indemnified Party believes there is a reasonable probability that a Claim may materially and adversely affect the Indemnified Party, the Indemnified Party shall have the right to participate in the defense, compromise or settlement of such Claim, provided that the Indemnitor shall not be liable for expenses of separate counsel of the Indemnified Party engaged for such purpose, and (ii) no person who has undertaken to defend a Claim under Section 7.4(a) hereof shall, without written consent of all Indemnified Parties, settle or compromise any Claim or consent to entry of any judgment which does not include as an unconditional term thereof the release by the claimant or the plaintiff of all Indemnified Parties from all liability arising from events which allegedly give rise to such Claim.

        7.5    <u>Limitations on Indemnification</u>.

        (a)    Notwithstanding anything to the contrary provided elsewhere in this Agreement, the obligations of any Indemnitor under this Agreement to indemnify an Indemnified Party with respect to any Claim pursuant to Section 7.3 shall be of no force and forever barred unless such Indemnified Party has given such Indemnitor notice of such claim prior to the third anniversary of the Closing; provided, that there shall be no time limit for Claims made for a breach of the representations and warranties contained in Sections 4.1, 4.2, 4.4, 4.12, 4.23 and 4.26.

        (b)    No Claim by an Indemnified Party for indemnification pursuant to this Article VII may be made unless and until the Indemnified Party has incurred, sustained or suffered Damages in respect of which the Indemnitor would be liable under this Article VII in excess of $250,000 in the aggregate (the "Basket"); at which time all amounts of such Damages including the Basket amount may be claimed and recovered as provided in this Agreement, provided, however, that Damages resulting from the inaccuracy of any representation or warranty contained in Sections 4.1, 4.2, 4.4, 4.12, 4.23 and 4.26 shall not be subject to such limitation.

(c)     From the date of the Closing until the 16-month anniversary of the Closing (the "First Audit Date"), the maximum aggregate amount of Damages for which the Company and the Stockholders may be liable pursuant to this Article VII (the "Maximum Cap") shall be an amount equal to the cash portion of the Purchase Price. From the First Audit Date until the 28-month anniversary of the Closing Date (the "Second Audit Date") the Maximum Cap shall be $20,000,000, and, from the Second Audit Date until the third anniversary of the Closing, the Maximum Cap shall be $10,000,000; provided, however, that Damages resulting from the inaccuracy of any representation or warranty contained in Sections 4.1, 4.2, 4.4, 4.12, 4.23 and 4.26 shall not be subject to such limitation.

(d)     The maximum amount of Damages for which each Stockholder may be liable pursuant to this Article VII shall be an amount equal to that Stockholder's allocable portion of the Purchase Price.

(e)     Except as otherwise provided herein, the remedies provided herein shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against any other party hereto.

(f)     In calculating the amount of any Damages for which an Indemnified Party is entitled to indemnification under this Article VII, any tax benefit received by such Indemnified Party shall be applied against the amount of the Damages to reduce the amount payable by the Indemnitor. For purposes of this Article VII only, "tax benefit" shall mean any tax savings to the Indemnified Party (computed at the combined Federal, state and local tax rate applied to the indemnified party in the immediately preceding taxable year) resulting from any net increase in deductions, losses or credits or any net decrease in income, gains or recapture of credits attributable to inclusion of the claims or related indemnification payment, as the case may be, in any tax return of the Indemnified Party plus any interest attributable to such inclusion. In addition, in calculating the amount of any Damages for which an Indemnified Party is entitled to indemnification under this Article VII, the amount of any insurance proceeds received by the Indemnified Party relating to or in connection with such Damages shall reduce the amount of any claim.

## ARTICLE VIII.

## TERMINATION; AMENDMENT AND WAIVER.

8.1     Termination of Agreement. This Agreement may be terminated at any time prior to the Closing:

(a)     By mutual written agreement of the parties hereto;

(b)     By Purchaser if there has been a material misrepresentation, material breach of warranty or material breach of a covenant by the Company or the Stockholders in the representations and warranties or covenants set forth in this Agreement or the Schedules and

57483-v5

40

Exhibits attached hereto, which in the case of any breach of covenant has not been cured within ten days after written notification thereof by the Purchaser to the Company and the Stockholders:

      (c)      By Purchaser upon written notice delivered to the Company and the Stockholders at any time, if the Company has suffered a material adverse change in its Business, assets, financial condition or results of operations since the October Balance Sheet; or

      (d)      By Purchaser, on the one hand, or by the Company and the Stockholders, on the other hand, if the Closing shall not have occurred on or before February 28, 1998.

      8.2     <u>Effect of Termination</u>.  In the event of termination of this Agreement as provided above, this Agreement shall forthwith become void and of no further force and effect, except that the covenants and agreements set forth in Sections 6.4, 6.7, 8.2, 9.1 and 9.8 shall survive such termination indefinitely, and except that nothing in Section 8.1 or this Section 8.2 shall be deemed to release the non-terminating party from any liability for any breach by such party of the terms and provisions of this Agreement or to impair the right of any party to compel specific performance by another party of its obligations under this Agreement.

      8.3     <u>Amendment, Extension and Waiver</u>.  The parties may amend this Agreement at any time by an instrument in writing signed by the parties hereto. Any agreement on the part of a party hereto to any waiver of compliance with any of the agreements or conditions contained herein shall be valid only if set forth in an instrument in writing signed on behalf of such party.

# ARTICLE IX.

## MISCELLANEOUS.

      9.1     <u>Expenses; Taxes</u>.  If the Acquisition is consummated, Purchaser shall pay the fees and expenses incurred by the Company and the Stockholders in connection with this Agreement and the transactions contemplated hereby, including the reasonable fees and expenses of legal counsel, investment bankers, brokers, accountants or other representatives or consultants; <u>provided</u>, <u>however</u>, any payments to Peter J. Searles in excess of $100,000 shall be paid by the Stockholders. If the Acquisition is not consummated, each party shall be responsible for and pay its own expenses as described above. All sales and transfer taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Company.

      9.2     <u>Further Assurances</u>.  From time to time, at the request of any party hereto and without further consideration, the other party or parties will execute and deliver to such requesting party such documents and take such other action as such requesting party may reasonably request in order to consummate more effectively the transactions contemplated hereby.

      9.3     <u>Parties in Interest</u>.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by the respective successors and assigns of the parties hereto. Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto

57483-v5

or their respective heirs, successors, executors. administrators and assigns any rights. remedies. obligations or liabilities under or by reason of this Agreement.

9.4    Entire Agreement. This Agreement and the Schedules and Exhibits hereto and the other agreements. instruments and writings referred to herein or delivered pursuant hereto contain the entire understanding of the parties with respect to its subject matter. This Agreement supersedes all prior agreements and understandings between the parties with respect to its subject matter.

9.5    Headings. The Article and Section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

9.6    Notices. All notices, claims, requests. demands and other communications here-under will be in writing and will be deemed to have been duly given if delivered personally or by facsimile or mailed (registered or certified mail, postage prepaid, return receipt requested) or via overnight courier delivery as follows:

    (a)    If to Purchaser:

        c/o Dilmun Investments, Inc.
        Metro Center
        One Station Place
        Stamford, CT  06902
        Attention: James M. Conlon
        Facsimile: (203) 353-5726

        With a copy to:

        Pryor, Cashman, Sherman & Flynn
        410 Park Avenue
        New York, New York  10022
        Attention: Selig D. Sacks, Esq.
        Facsimile: (212) 326-0806

    (b)    If to the Company or any Stockholder:

        c/o Glenn Thompson
        Thompson Paper Box Company, Inc.
        310 Kenneth W. Welch Drive
        Lakeville, MA  02347
        Facsimile:  (508) 947-8586

57483-v5

With a copy to:

        Chace, Ruttenberg & Freedman
        One Park Row, Suite 300
        Providence, RI 02903
        Attention: Carl I. Freedman, Esq.
        Facsimile: (401) 453-6411

or to such other address as the person to whom notice is to be given may have previously furnished to the other in writing in the manner set forth above.

      9.7    Severability. If in any jurisdiction any provision of this Agreement or its application to any party or circumstance is restricted, prohibited or unenforceable, such provision shall, as to such jurisdiction, be ineffective only to the extent of the restriction, prohibition or unenforceability without invalidating the remaining provisions hereof and without affecting the validity or enforceability of such provision in any other jurisdiction or its application to other parties or circumstances.  In addition, if any one or more of the provisions contained in this Agreement shall for any reason in any jurisdiction be held excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law of such jurisdiction as it shall then appear.

      9.8    Governing Law; Consent to Jurisdiction and Venue. This Agreement will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts, without regard to conflicts of law principles thereof.  Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, any other agreement or document delivered pursuant hereto or any transaction contemplated hereby, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 9.6 above.

      9.9    Counterparts. This Agreement may be executed simultaneously in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

      9.10    Exhibits. All exhibits and schedules attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.

      9.11    Knowledge. For purposes of this Agreement, references to "knowledge" or "best knowledge" of the Company or any Stockholder shall be deemed to include the knowledge of the Company and any Stockholder after reasonable due inquiry.

57483-v5

43

9.12    <u>Third Parties</u>.  Except with respect to the payments due to Peter J. Searles as set forth on <u>Schedule 4.17</u>, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or corporation other than the parties hereto and their successors or assigns any rights or remedies under or by reason of this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

THOMPSON PRODUCTS, INC.

By: _____
Name: James M. Conlon
Title: Sec & Treasurer

THOMPSON PAPER BOX CO., INC.

By: _____
Name: Glenn Thompson
Title: President

STOCKHOLDERS

_____
Glenn Thompson

_____
Mark A. Thompson

_____
Frederick L. Weingeroff

_____
Gregg Weingeroff

57483-v5                                45

11/20/97 DRAFT

EXHIBIT 3.2(e) - 1

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January ___, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### WITNESSETH:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November ___, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

[SR205-v3]

### 1.    Definitions

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements, which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

### 2.    Representations and Warranties

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

- 2 -

3.    **Employment**

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

4.    **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.    **Term**

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.    **Compensation and Benefits**

(a)    As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)    Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c)    Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

- 3 -

(d)    The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.    Vacation

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.    Termination

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

9.    Restrictive Covenants

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong

-4-

to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)     During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)     During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)     Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)     If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such

- 5 -

court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.    **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

11.    **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12.    **Miscellaneous**

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability

- 6 -

shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

       (b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

       (c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

       (d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

- 7 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January ___, 1998.

THOMPSON, INC.

By:_____
  Name:
  Title:

_____
Glenn Thompson

11/20/97  DRAFT

EXHIBIT 3.2(c) - 2

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January __, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Mark A. Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

### WITNESSETH:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November __, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Glenn Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    Definitions

[60363]

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.     Representations and Warranties

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any

- 2 -

way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

### 3.     Employment

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer.  As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer.  Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

### 4.     Place of Employment

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the  Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

### 5.     Term

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

### 6.     Compensation and Benefits

(a)     As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b)     Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

- 3 -

      (c)     Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

      (d)     The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

      (e)     The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

      7.     **Vacation**

      Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

      8.     **Termination**

      (a)     Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

      (b)     If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

      (c)     If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; (iii) pay to Employee any earned but unpaid bonuses and (iv) pay to Employee $100,000 with such amount payable in equal monthly installments over a period of two (2) years following the termination of Employee's employment hereunder; provided, that

- 4 -

in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease.

(d)    If Employee's employment with the Employer is not extended by mutual agreement of the parties after the expiration of this Agreement on December 31, 2000, the Employer shall pay to Employee $100,000 with such amount payable in equal monthly installments over the period of two (2) years following the termination of Employee's employment hereunder; provided, that in the event that the restrictive covenants contained in Section 9 are violated by Employee, such payments shall cease.  In the event Employee is receiving payments pursuant to Section 8(c) above, Employee shall be precluded from receiving payments under this Section 8(d).

9.    **Restrictive Covenants**

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer.  The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement.  Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)    During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the

- 5 -

Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)     Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)     If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)     Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)     Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.     **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies,

- 6 -

upon the termination of Employee's employment or at any time as requested by the Employer.

### 11.    Binding Effect

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

### 12.    Miscellaneous

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day; or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered

- 7 -

to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January __, 1998.

THOMPSON, INC.

By:_____
Name:
Title:

_____
Mark A. Thompson

- 8 -

Tab E

## ASSET PURCHASE AGREEMENT  (excerpt)

2.4    <u>Noncompetition</u>.  (a) As additional consideration for Purchaser's agreement to purchase the Acquired Assets and pay the Purchase Price, GT and MT have agreed, severally but not jointly, to the noncompetition provisions (the "Restrictive Covenants") contained in their respective Employment Agreements, which noncompetition provisions are incorporated herein by reference and made a part hereof as if restated herein.

(b)    It is agreed and understood by and among the parties to this Agreement that the Restrictive Covenants incorporated by reference in subsection (a) above are each individually essential elements of this Agreement and that, but for the agreement of GT and MT to comply with such Restrictive Covenants, Purchaser would not have agreed to enter into this Agreement.  Further, each of GT and MT expressly acknowledges that the restrictions incorporated by reference into subsection (a) of this Section 2.4 are reasonable and necessary to accomplish the mutual objectives of the parties and to protect Purchaser's interests in the Business after the Closing.  Each of GT and MT further acknowledges that enforcement of such restrictions will not deprive him of the ability to earn a reasonable living and that any violation of such restrictions will cause irreparable injury to Purchaser.  Such Restrictive Covenants of GT and MT shall be construed as agreements independent of any other provision of this Agreement and of each other.

(c)    GT and MT hereby agree that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that the Restrictive Covenants incorporated by reference into subsection (a) of this Section 2.4 are violated and that in addition to any remedies or rights that may be available to Purchaser, all of which other remedies or rights shall be deemed to be cumulative, retained by Purchaser and not waived by the enforcement of any remedy available hereunder, including but not limited to, the right to sue for monetary damages, Purchaser shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions incorporated by reference into subsection (a) of this Section 2.4, all of which shall constitute rights and remedies to which Purchaser may be entitled.

(d)    If any court determines that the covenant not to compete incorporated by reference into subsection (a) of this Section 2.4, or any part hereof, is unenforceable because of the duration or geographic scope of such provision, such court shall reduce the duration or scope of such provisions (to the maximum duration or scope permitted by law), as the case may be, and such provision in its reduced form shall then be enforceable.

(e)    Notwithstanding anything to the contrary contained in the foregoing provisions of this Section 2.4, any other provisions of this Agreement or their respective Employment Agreements, each of GT and MT shall have liability only for his own breach of a Restrictive Covenant.

Tab F

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of January 5, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

## W I T N E S S E T H:

WHEREAS, pursuant to the terms of an Asset Purchase Agreement dated November 24, 1997 between Employer and Thompson Paper Box Co., Inc. (the "Seller"), Mark A. Thompson, Frederick L. Weingeroff, Gregg Weingeroff and Employee (the "Asset Purchase Agreement"), Employer will acquire certain assets and properties of Seller as of the consummation of the transaction (the "Closing");

WHEREAS, the Employee is the owner of certain interests in the Seller which are being conveyed to Employer as of the date hereof;

WHEREAS, as a material inducement to the Employer to enter into the Asset Purchase Agreement and all related transactions and in consideration of the Employer's covenants and agreements therein and the significant payments being made pursuant to the Asset Purchase Agreement to the Employee and other owners of the Seller and in reflection of the fact that the Employer is making a substantial investment in the Company concurrently herewith in reliance on this Agreement, the Employee has agreed to execute and deliver this Agreement;

WHEREAS, the execution and delivery by the Employee of this Agreement is a material condition of the willingness of the Employer to consummate the transaction which is described herewith;

WHEREAS, Employee was an executive officer of Seller and as part of the transactions contemplated by the Asset Purchase Agreement and concurrently with the Closing contemplated thereby, Employer and Employee shall enter into this Employment Agreement upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

[58205-v3]

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors.  For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

"Disability" shall mean the good faith determination by the Board that Employee has become physically or mentally incapable of performing his customary duties under this Agreement and such disability has disabled Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

2.    Representations and Warranties

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

3.    Employment

- 2 -

The Employer hereby employs Employee and Employee accepts such employment as President of the Employer. As its President, Employee shall render such services to the Employer consistent with those services theretofore provided by Employee to Seller and as required by the by-laws of the Employer or as reasonably directed by the Board of Directors of the Employer. Employee accepts such employment and, consistent with fiduciary standards which exist between an employer and an employee shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner.

### 4. Place of Employment

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employee's Employment Term (as hereinafter defined), the Board of Directors of the Employer reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and Employee. In conformance with the foregoing and not in limitation thereof, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

### 5. Term

The term of this Agreement shall commence on the Closing and shall expire on December 31, 2000 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

### 6. Compensation and Benefits

(a) As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, the Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $200,000 payable in accordance with the Employer's customary payroll practices;

(b) Employee shall be entitled to participate in all of the employee benefit plans and programs (including without limitation pension and bonus plans which may be adopted or maintained by the Employer) made generally available to executives of the Employer;

(c) Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit program made generally available to executives of the Employer; and

(d) The Employer agrees that the Employee is authorized to incur reasonable expenses in the performance of his duties hereunder and agrees that all reasonable

- 3 -

expenses incurred by Employee in the discharge and fulfillment of his duties for the Employer, as set forth in Section 3, will be promptly reimbursed or paid by the Employer upon written substantiation signed by Employee, itemizing said expenses in reasonable detail.

(e)    The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations.

7.    **Vacation**

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

8.    **Termination**

(a)    Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by the Employee on the one hundred twentieth (120th) day after receipt of written notice to the Employer of Employee's intent to terminate; (iii) by the Employer for Cause; (iv) by the Employer without Cause or (v) as a result of the death or Disability of the Employee.

(b)    If (i) the Employee terminates his employment pursuant to Section 8(a)(ii) hereof, (ii) the Employer terminates the employment of the Employee hereunder for Cause or (iii) employment is terminated due to death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(c)    If the Employer terminates employment of the Employee hereunder without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through December 31, 2000 payable in accordance with the Employer's normal payroll practices; (ii) continue Employee's health coverage through December 31, 2000 on the same basis as health coverage is provided by the Employer for active employees and as may be amended from time to time; and (iii) pay to Employee any earned but unpaid bonuses.

9.    **Restrictive Covenants**

(a)    Employee understands and acknowledges that during his employment with the Seller, he was, and during his employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which will rightfully belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of

- 4 -

this Agreement and for a period of two (2) years following termination of Employee's employment hereunder, the Employee divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to Employer and Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or generally available to the public and became generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement. Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

(b)      During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, the Employee will not, directly or indirectly, solicit, employ or associate in any business relationship with any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer or any business in which Employer has a material interest, direct or indirect, as an officer, partner, shareholder or beneficial owner.

(c)      During the Employment Term and for a period of two (2) years following termination of Employee's employment hereunder, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during the term of Executive's employment hereunder. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)      Employee represents and admits that (i) in the event of termination of this Agreement, Employee's experience and capabilities are such that Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood, and (ii) this Employee covenant and non-competition provision is being entered into in connection with the Employee's sale of his ownership interest in the Employer and in the absence of this provision Employee understands and has been advised by Employer that the sale would not be consummated.

(e)      If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties

- 5 -

hereto.

(f)    Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9, all of which shall constitute rights and remedies to which Employer may be entitled.

(g)    Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

10.    **Return of Documents**

Except for such items which are of a personal nature to Employee  (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by the Employer.

11.    **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors.  This Agreement is fully assignable by Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place or with or into which the Employer may consolidate or merge.  Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution.  This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12.    **Miscellaneous**

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or

- 6 -

unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)     This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law.  Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)     All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery.  Copies of all notices delivered to Employee shall also be delivered to: Carl I. Freedman, Chace, Ruttenberg & Freedman, 1 Park Row, Suite 300, Providence, R.I. 02903, telecopier no. 401-457-3732; and copies of all notices to the Employer shall be delivered to: Victor Kiarsis, Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707 and to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)     This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought.  Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of January 5, 1998.

THOMPSON PRODUCTS, INC.

By: _____
　　Name: Victor Kiarsis
　　Title:　President

_____
Glenn Thompson

- 8 -

# EXHIBIT A

## ANNUAL BONUS

### [INSERT EBITDA BASED BONUS FORMULA]

Tab G

## EMPLOYMENT AGREEMENT  (excerpts)

This Employment Agreement ("Agreement"), effective as of January 5, 1998 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 5 Assawompsett Court, Lakeville, MA 02347 ("Employee").

\*\*\*\*\*\*

5.      **Term**

The term of this Agreement shall commence on the Closing and **shall expire on December 31, 2000** unless sooner terminated pursuant to Section 8 hereof (the **"Employment Term"**).

\*\*\*\*\*\*

9.      **Restrictive Covenants**

(a)      .... The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during the Employment Term of this Agreement and *for a period of two (2) years following termination of Employee's employment* **hereunder**, the Employee divulge or use any Confidential Information ....

(b)      During the Employment Term and *for a period of two (2) years following termination of Employee's employment* **hereunder**, the Employee will not, directly or indirectly, solicit ... any person, who was employed within six (6) months prior to the termination of Employee's employment by the Employer

(c)      During the Employment Term and *for a period of two (2) years following termination of Employee's employment* **hereunder**, Employee will not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, ... any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer ....

\*\*\*\*\*\*

(g)      Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

\*\*\*\*\*\*

12.     **Miscellaneous**

\*\*\*\*\*\*

(d)      ... This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought.

Tab H

PCSF Draft 11/22/02

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of **[DATE]**, 2002 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 330 Rumstick Road, Barrington, Rhode Island 02806  ("Employee").

### W I T N E S S E T H:

WHEREAS, the Employee has served as President of the Employer for many years; and

WHEREAS, the Employer desires to continue to employ the Employee as President of the Employer and the Employee desires to continue to be employed by the Employer as its President;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Board" shall mean the Employer's Board of Directors.

"Business" means the manufacture and/or sales of photo albums, cardboard-based gift boxes, easelbacks for picture frames and related products.

"Cause" shall mean: (1) a felony conviction of the Employee (or a plea of no lo contendere in lieu thereof); (2) the unauthorized disclosure of confidential proprietary information of the Employer which disclosure the Employee knows or reasonably should have known would be reasonably likely to result in material damage to the Employer; (3) the breach by the Employee of any material provision of this Agreement, which breach, if curable, is not remedied within thirty (30) days after the Employee's receipt of written notice thereof provided, however, that the Employer need not permit the Employee to cure any breach which has been the subject of a prior written notice; (4) the engagement in self dealing in breach of fiduciary duties with respect to the Employer's assets or properties unless disclosed in writing to and approved by the Board; (5) an act of gross misconduct in connection with the Employee's duties hereunder; or (6) habitual or material neglect of the Employee's duties to the Employer (as determined in good faith by the Board, continuing after prior written notice to the Employee).

58205.8

"Change in Control" shall mean a sale of all of the stock of the Employer or all or substantially all of the Employer's assets whether by purchase, merger, consolidation or otherwise to a third party.

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements, which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by the Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity, which is controlled, directly or indirectly, by the Employer and any entity of which the Employer owns a majority of the economic interest, directly or indirectly.

"Disability" shall mean the good faith determination by the Board that the Employee has become physically or mentally incapable of performing his duties under this Agreement and such disability has disabled the Employee for a cumulative period of one hundred twenty (120) days within any twelve (12) month period.

## 2.    **Representations and Warranties**

The Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by the Employer or the performance of his duties, as contemplated herein.

## 3.    **Employment**

The Employer hereby employs the Employee as the President of the Employer. As President, the Employee shall render such services to the Employer consistent with those services heretofore provided by the Employee to the Employer and as required by the by-laws of the Employer or as reasonably directed by the Board. The Employee accepts such employment as President and, consistent with fiduciary standards which exist between an employer and an employee, shall perform and discharge the duties that may be assigned to him from time to time by the Employer in an efficient, trustworthy and businesslike manner. The Employee shall (subject to oversight by the Board) retain control over the following:

      (i)    the day to day operations of the Employer; and

      (ii)   hiring and firing of personnel; provided however the following individuals may not be hired or fired without Board approval: (i) employees who have an employment agreement with the Employer; (ii) employees whose

58205.8

- 2 -

aggregate compensation is in excess of $150,000, (iii) employees with any of the following titles: Chief Executive Officer, Chief Financial Officer, or Chief Operating Officer; (iv) consultants or advisors; or (v) auditors or attorneys.

During the Employment Term (as hereinafter defined), the Employee shall devote substantially all of his business time, energy and experience to his employment hereunder and shall not engage in any other business activities, as an employee, director, consultant or in any other capacity, whether or not he receives any compensation therefor, without the written permission of the Board.

### 4.    **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, at any time during the Employment Term (as hereinafter defined), the Board reserves the right to determine and/or change the location of such office to an alternate location within a sixty (60) mile radius of the Employer's office in Lakeville, Massachusetts or to such other location mutually acceptable to both the Employer and the Employee. In conformance with the foregoing and not in limitation thereof, the Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

### 5.    **Term**

The term of this Agreement shall commence on the Effective Date and shall expire on **[DATE]**, 2005 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term"). Upon any termination of the Employee's employment, the Employee shall resign from any position the Employee may hold as an officer or director of the Employer or any affiliate of the Employer.

### 6.    **Compensation and Benefits**

(a)    The Employer shall pay the Employee a base salary (the "Base Salary") at an annual rate of $300,000 payable in accordance with the Employer's customary payroll practices;

(b)    The Employee may be eligible to receive an annual bonus (the "Annual Bonus") in respect of each calendar year during the Employment Term based upon the attainment by the Employer of certain operating results; provided, however, that the Employee remains in the continuous employ of the Employer through December 31st of the calendar year in respect of which the bonus is being paid. The Annual Bonus shall be payable as soon as practicable following the determination of the applicable operating results. The Employee's Annual Bonus shall be determined in accordance with Exhibit A attached hereto.

58205.8

- 3 -

      (c)     The Employee shall be entitled to participate in all of the employee benefit plans and programs (including, without limitation, pension and bonus plans which may be adopted or maintained by the Employer) made generally available to employees of the Employer, as the same may be amended from time to time;

      (d)     The Employee shall be entitled to participate in any health insurance, disability insurance, group life insurance or other welfare benefit programs made generally available to employees of the Employer, as the same may be amended from time to time; and

      (e)     The Employee is authorized to incur reasonable expenses in the performance of his duties hereunder. The Employer agrees that all reasonable expenses incurred by the Employee in the performance of his duties for the Employer will be promptly reimbursed or paid by the Employer upon written substantiation signed by the Employee, itemizing said expenses in reasonable detail.

      (f)     The Employer shall deduct from the compensation described above, any Federal, state or city withholding taxes, social security contributions, deductions and any other amounts which may be required to be deducted or withheld by the Employer pursuant to any Federal, state or city laws, rules or regulations or other agreement.

### 7.    **Vacation**

      The Employee shall be entitled to an aggregate of five (5) weeks paid vacation during each year of the Employment Term to be taken at a time or times reasonably agreeable to both the Employee and the Employer, it being understood that any portion of such vacation not taken in such year shall not be available to be taken during any other year.

### 8.    **Termination/Change in Control**

      (a)     Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties on an agreed upon date; (ii) by the Employee upon one hundred twenty (120) days' notice; (iii) by the Employer for Cause; (iv) by the Employer without Cause, with or without notice or (v) immediately upon the death or Disability of the Employee.

      (b)     If (i) the Employee's employment is terminated by mutual consent, (ii) the Employee voluntarily terminates his employment pursuant to Section 8(a)(ii) hereof, or (iii) the Employer terminates the employment of the Employee hereunder for Cause, the Employer's only obligations hereunder shall be to pay to the Employee his accrued but unpaid Base Salary and accrued but unused vacation pay, each as of the date of such termination.

      (c)     If the Employee's employment is terminated due to his death or Disability, the Employer's only obligations hereunder shall be to pay to the Employee, (or in the case of Employee's death, Employee's estate) his accrued but unpaid Base Salary and accrued

58205.8

- 4 -

but unused vacation pay, each as of the date of such termination. In addition, the Employer shall continue providing the Employee and his family (or in the case of Employee's death, the Employee's family) with continuing healthcare coverage during the two year period immediately following the date of such termination on the same basis as health coverage is then provided by the Employer to its active employees, as the same may be amended from time to time.

(d)     If the Employer terminates employment of the Employee without Cause, the Employer shall: (i) continue to pay to the Employee his Base Salary through September 30, 2005 payable in accordance with the Employer's normal payroll practices; (ii) continue the Employee's and his family's health coverage through September 30, 2005 on the same basis as health coverage is then provided by the Employer to its active employees, as the same may be amended from time to time; and (iii) pay to the Employee any earned but unpaid Annual Bonus.

(e)     If the Employee's employment is terminated by the Employer for any reason other than by the Employer for Cause during the twelve (12) month period immediately following a Change in Control (as hereinafter defined), the Employer shall: (i) pay to the Employee is one lump sum his Base Salary that would have been payable during the longer of (x) the two (2) year period following the date of such termination or (y) the period beginning on the date of such termination and ending on September 30, 2005; (ii) continue the Employee's and his family's health coverage (on the same basis as health coverage is then provided by the Employer to its active employees, as the same may be amended from time to time) through the later of (x) the second anniversary of the date of such termination or (y) September 30, 2005; and (iii) pay to the Employee any earned but unpaid Annual Bonus.

### 9.     **Restrictive Covenants**

(a)     The Employee understands and acknowledges that during his employment with the Employer prior to the Effective Date, he was, and during his continuing employment with the Employer, he will be exposed to Confidential Information, all of which is proprietary and which rightfully belongs or will belong to the Employer. The Employee shall hold in a fiduciary capacity for the benefit of the Employer such Confidential Information obtained by the Employee during his employment with the Employer and shall not, directly or indirectly, at any time, during or after the Employment Term, divulge or use any Confidential Information without the prior written consent of a duly empowered officer of the Employer, except (i) as required in the performance of his duties for the Employer, (ii) as otherwise required by law; provided that prior to any such disclosure, notice of such requirement of disclosure is provided to the Employer and the Employer is afforded the reasonable opportunity to object to such disclosure, and (iii) as and to the extent such information is either not unique to the Employer or becomes generally available to the public and became generally available to the public other than as a result of a disclosure by the Employee or any other individual or entity in violation of this Agreement or any other agreement to which the Employer is a party. The Employee shall take all reasonable steps to safeguard such Confidential Information and to protect such Confidential Information against disclosure, misuse, loss or theft.

58205.8

(b)     During the Employment Term and for a period of two (2) years following a termination of the Employee's employment, the Employee shall not, in any capacity, whether directly or indirectly, with or without compensation, for his own account or for any other person (i) solicit, retain, employ, offer to employ, or entice away any person who was within six (6) months prior to the termination of the Employee's employment an officer, employee, or agent of the Employer or in any manner persuade or attempt to persuade such person to discontinue his or her relationship with the Employer or (ii) solicit or otherwise interfere with any person who was within six (6) months prior to the termination of the Employee's employment a supplier, customer or other person with a business relationship with the Employer or persuade or attempt to persuade such person to discontinue or alter his or her relationship with the Employer.

(c)     During the Employment Term and for the longer of (x) the one year period following termination of the Employee's employment hereunder or (y) the period during which Employee is receiving or has received continuation of his Base Salary (including, any period for which Base Salary was paid upon termination pursuant to Section 8(e)), the Employee shall not within the continental United States, directly or indirectly, assist in, engage in, have any financial interest in, or participate in any way in, as an owner, partner, employee, agent, officer, board member, consultant, independent contractor or shareholder, in any business that involves, in whole or in part, activities similar to, related to or competitive with (a) the Business of the Employer or (b) the business of any affiliate of the Employer as carried on during Employment Term. Nothing herein shall prohibit the Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of securities of a corporation or other entity engaged in such business which is publicly traded, so long as he has no active participation in the business of such corporation or other entity.

(d)     The Employee represents and admits that in the event of termination of this Agreement, the Employee's experience and capabilities are such that the Employee can obtain employment in a business engaged in other lines and/or of a different nature than the business of the Employer, and that the enforcement of a remedy by way of injunction will not prevent the Employee from earning a livelihood.

(e)     If, at the time of enforcement of this Section 9, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, the parties agree that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(f)     The Employee hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to the Employer in the event that the restrictive covenants contained in this Section 9 are violated and that, in addition to any remedies or rights that may be available to the Employer, all of which other remedies or rights shall be deemed to be cumulative, retained by the Employer and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, the Employer shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining

58205.8

- 6 -

order or temporary, preliminary or permanent injunction, to enforce the provisions contained in this Section 9 without the necessity of proving damages, or posting a bond or other security.

(g)     Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of the Employee's employment with the Employer, the Employee's obligations under this Section 9 shall survive any termination of the Employee's employment with the Employer at any time and for any reason.

(h)     For purposes of this Section 9, the Employer shall be deemed to include any entity, which is controlled, directly or indirectly, by the Employer and any entity of which the Employer owns a majority of the economic interest, directly or indirectly.

### 10.    **Return of Documents**

Except for such items which are of a personal nature to the Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the exclusive property of the Employer, shall not be copied, summarized, extracted from, or removed from the premises of the Employer, except in pursuit of the business of the Employer and at the direction of the Employer, and shall be delivered to the Employer, without retaining any copies, upon the termination of the Employee's employment or at any time as requested by the Employer. For purposes of this Section 10, the Employer shall be deemed to include any entity, which is controlled, directly or indirectly, by the Employer and any entity of which the Employer owns a majority of the economic interest, directly or indirectly.

### 11.    **Indemnification**

### **[TO BE INSERTED]**

### 12.    **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon the Employer and its successors. This Agreement is fully assignable by the Employer to its successors whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets provided each such successor expressly assumes and agrees to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place. The Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

### 13.    **Miscellaneous**

(a)     If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability

58205.8

- 7 -

shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)     This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of Massachusetts without giving effect to any rules of conflicts of law. Each of the parties hereto hereby (a) irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Massachusetts State or Federal court sitting in Suffolk County, Massachusetts in any action or proceeding arising out of or relating to this Agreement, (b) irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (c) irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process by certified mail to such party and its counsel at their respective addresses specified in Section 12(c) below.

(c)     All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery. Copies of all notices to the Employee shall be delivered to the Employee's address set forth above or if different, the Employee's address as set forth in Employer's records; and copies of all notices to the Employer shall be delivered to: Dilmun Investments, Inc., Metro Center, One Station Place, Stamford, CT, 06902, telecopier no. 203-353-5707, Attention David Jansen with a copy to Selig D. Sacks, Pryor, Cashman, Sherman & Flynn LLP, 410 Park Avenue, New York, NY 10022, telecopier no. 212-326-0806.

(d)     This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and supercedes all prior agreements related to the subject matter hereof, including, without limitation, the Employment Agreement between the Employee and the Employer dated January 5, 1998 which is null and void. Neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

58205.8

- 8 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed effective as of October 1, 2002.

THOMPSON PRODUCTS, INC.

By:_____

  Name:
  Title:

_____

Glenn Thompson

58205.8

- 9 -

## EXHIBIT A

## ANNUAL BONUS

## [INSERT EBITDA BASED BONUS FORMULA]

Tab I

# GK PARTNERS
## MANAGEMENT CONSULTANTS

GREGORY KESHISHIAN
MANAGING PARTNER
212-535-5617

**CONFIDENTIAL**
March 12, 2003

Mr. Glenn Thompson
President
Thompson Products Inc.
310 Kenneth W. Welch Drive
Lakeville, MA 02347

Dear Mr. Thompson:

You recently retained GK Partners to conduct an analytical review of competitive levels of non-employee Directors' compensation for Thompson Products Inc. ("the Company"). We conducted this review with the cooperation of the Company (which was our sole source of information related to the Company). We understand that you have commissioned this review in an effort to secure certain information that will be helpful in establishing compensation levels for your non-employee Directors. In our view, this effort is consistent with marketplace "best practices" in the administration of executive and Board-level compensation.

Enclosed you will find our report entitled *"Thompson Products Inc. CEO and Directors' Compensation Review – Proxy Compensation Analysis"*. This report summarizes our detailed analysis of compensation amounts and pay practices among a relevant comparator group of publicly-held companies (based on their respective proxy statements and annual reports). Since our work entailed a detailed analysis of proxy statement compensation disclosures, we also took it upon ourselves to provide you with an analysis of Chief Executive Officer compensation among the comparator group companies. This additional marketplace data is included in our report at no additional cost.

## Methodology

Our task was to analyze the 2001 cash and stock compensation levels of the Chief Executive Officers and non-employee Directors of twelve selected comparator companies based on their 2002 proxy statement disclosures. Please note that 2001 is the most recent year for which comprehensive proxy compensation information is currently available. (In those cases where more recent information was available, it was included with appropriate footnotes). Our analysis provides you with relevant marketplace information that can serve as a basis for comparison with the current and proposed compensation levels of Thompson Products' chief executive and external Board members.

The twelve companies included in our analysis were selected by us (after reviewing many potential comparators) from various reliable published sources of corporate financial information and from other online sources of public company information including the

# **GK** PARTNERS

Mr. Glenn Thompson                    -2-                    March 12, 2003

Securities and Exchange Commission database. The names of these selected comparator companies are provided on Page 3 of the enclosed *"Proxy Compensation Analysis"* report along with their geographical location and lines of business. We selected only publicly-traded companies for the comparator group to ensure the availability and comparability of relevant compensation data. We have also provided a chart of the comparator companies' 2001 revenues, 2001 net income, current market capitalization and number of employees on page 4 of the enclosed *"2002 Proxy Compensation Analysis"*.

We should acknowledge that the comparator group companies are not (in most cases) direct business competitors of Thompson Products. This was necessitated by the fact that there aren't a sufficient number of publicly-held photo album and photo accessory companies to comprise a useful comparator group. We have therefore utilized other companies of the appropriate size that are engaged in non-durable-goods manufacturing and related services (including companies in the photo printing, consumer products, specialty printing, decorative paper and packaging industries). Several of these companies sell through channels that are the same or similar to those used by Thompson Products.

Let me also point out that the average size of the comparator group companies (in terms of revenues and number of employees) is somewhat larger than that of Thompson Products (see page 4 of the report). However, we believe that the comparator group companies are (on average) very similar to Thompson Products in terms of profitability and market value (i.e., market capitalization). In our view, the financial sophistication, technical competency and business experience required to serve on the Board of a \$37 million revenue company is not significantly different from that required to serve in a similar capacity with a somewhat larger company. Overall, we are quite comfortable with the composition of the comparator group.

Page 5 of the enclosed *"Proxy Compensation Analysis"* presents our findings with respect to the position of Chief Executive Officer including 2001 cash compensation (salary and annual bonus) and 2001 stock option awards. We reported the average value for each element of CEO compensation. For your additional perspective in concerning cash compensation, we separately calculated the marketplace average excluding the highest and lowest cash values found among the comparator group companies.

With respect to stock compensation, we reported the so-called "face value" of stock option awards which is calculated by multiplying the number of options granted by the weighted average exercise price of each option. This method is useful in understanding the relative size of stock option grants in relation to current cash compensation. It does not, however, give any insight into the potential future compensation value of these option grants which (as recent marketplace experience has shown) is essentially unknown.

Page 6 of the enclosed *"Proxy Compensation Analysis"* presents our findings concerning non-employee Directors' compensation.

# **GK** **P**ARTNERS

Mr. Glenn Thompson                    -3-                    March 12, 2003

## Overall Pay Practices

Based on our review of their respective proxy disclosures, we found that the selected comparator companies continue to use a combination of base salary and annual cash bonuses to compensate their senior executives, and continue to use a combination of cash retainers, meeting fees and stock options to compensate their non-employee Directors. If earned, management incentive (i.e., "annual bonus") awards are typically paid in cash following the end of each fiscal year and are generally based on the financial and operational performance of the company using such criteria as revenue growth, EBITDA and net income, operational milestones and/or the achievement of longer-term strategic objectives. In some cases, the comparator companies actually establish and quantify specific performance objectives and individual bonus award opportunities, and in other cases, performance levels and annual bonuses are determined by the Board on a discretionary basis at year-end. We believe that it is one of the basic functions of the Board to establish appropriate performance standards and to hold management accountable for performing up to these standards. Directors' compensation, however, is rarely tied to corporate performance in the short term, but is often affected by stock price performance over the longer term.

## Chief Executive Officer Compensation

Based on our analysis (presented on Page 5 of the enclosed *"Proxy Compensation Analysis"* report), we found the average 2001 base salary for the position of Chief Executive Officer among the comparator group companies was $272,800. If the highest and lowest base salaries are excluded from the calculation, the average 2001 base salary was $255,800. 2001 CEO total cash compensation (i.e., salary plus bonus) among these twelve companies was $324,900 on average (and was $310,300 on average if you exclude the highest and lowest compensation values).

In 2001, ten of the twelve comparator companies also provided an award of stock options to their respective Chief Executive Officers in spite of unfavorable market conditions. The average "face value" of these option awards (i.e., the number of options granted multiplied by the option exercise price) represented approximately 36% of total cash compensation in that year. These options were typically awarded as a combination of incentive stock options (ISOs) and non-qualified stock options (NQs). As you may know, ISOs convey certain tax advantages to the executive while the company forgoes its tax deduction. In spite of (or perhaps because of) the depressed state of equity values, there continues to be an emphasis on the use of stock options in many of these companies.

## Non-Employee Directors' Compensation

With respect to non-employee Directors' compensation, we found that all twelve of our comparator companies provided some form of cash and/or stock compensation to each of its outside, non-employee Directors during 2001. Our findings in this regard are presented on Page 6 of the enclosed *"Proxy Compensation Analysis"* report. Since Directors'

# GK PARTNERS

compensation tends to be reviewed and adjusted periodically and infrequently, we are confident that the average pay practices of this group of companies did not change significantly during 2002.

From our years of experience in assisting client companies with Director pay programs, we know that companies typically utilize a mix of cash retainers, meeting fees and/or stock options to compensate their non-employee Directors. The exact proportions of these pay elements is unique to each organization based upon a number of variables including industry segment, organizational history, overall pay philosophy, the company's ability to pay, existing level of Director stock ownership and (to some degree) the Directors' personal preferences. Among the twelve comparator companies in our selected group, we found that ten companies paid annual Board cash retainers ranging from $6,000 to $26,500 per Director. The average cash retainer was $13,800. The other two companies in the group paid no fixed cash retainer.

We found that nine of the twelve companies paid Board meeting fees (eight of which paid these fees in addition to the cash retainer), and that eight companies also paid Committee meeting fees.    Board meeting fees ranged from $200 to $1,500 per meeting and Committee meeting fees ranged from $150 to $1,500 per meeting. (*When a Directors' compensation program includes both Board and Committee meeting fees, the Committee meeting fee is typically waived if the Committee meeting takes place on the same day as the Board meeting. In other words, Committee meeting fees would only be paid if the Committee meeting was held - either in person or telephonically - on a day during which no Board meeting was held*). Therefore, Committee meeting fees do not (in general) add much to the total Directors' compensation package. Board meeting fees, however, can contribute significantly to the total.    On average, the Boards of our comparator group companies met seven times during 2001 which resulted in average total Board meeting fees of $5,378.    When combined with the average cash retainer of $13,800, this resulted in total cash compensation of $19,178 (on average) per non-employee Director.

In our analysis, we also found that eight of the twelve comparator companies have a policy of granting stock options to non-employee Directors. Seven of these companies provide options in addition to cash compensation. One company (Plato Learning Inc.) provided only stock options to its non-employee Directors and in this company, the number of stock options awarded upon initial Board election was somewhat higher than the number of options awarded annually thereafter. Additional details of Board compensation practices are contained in the footnotes on page 6 of the enclosed report.

The average number of stock options awarded to each non-employee Director was 6,984 shares (as shown on page 6). If one assumes that the average option exercise (i.e., "strike") price of these 2001 Board-level options was equal to the $3.64 weighted average strike price of all CEO stock options granted during 2001 by these companies (see page 5 of the report), one could arbitrarily assign a conservative ("Black-Scholes") present value (PV) estimate for these stock options at 25% of the strike price or $0.91 per option. As you may know, Black-Scholes is a generally-accepted method of calculating option PVs.

# GK PARTNERS

Mr. Glenn Thompson                          -5-                          March 12, 2003

We could therefore assume that the "equivalent economic" compensation value of the 6,984 share (average) stock option award was $6,355. Adding this to the average total cash compensation described above would result in total annual Directors' compensation of $25,533. In our view, this figure represents a reasonable estimate of the marketplace average level of total annual compensation for non-employee Directors among this group of comparator companies.

It is important to note that the majority of the comparator companies in our analysis were found to utilize all three elements of the typical Directors' pay package (i.e., cash retainers, cash meeting fees and stock options). If Thompson Products wishes to provide fully competitive compensation to its non-employee Directors, its Board compensation policy should reflect the economic value of each of these pay elements. In other words, Thompson Products' annual Directors' compensation could certainly be set at the (approximately) $25,000 marketplace average value of the combined pay elements presented in our findings as described above. Of course, the actual amount of Directors' pay is a business decision which should also reflect the participation, involvement and contributions of Thompson Products' outside Directors. From a recordkeeping perspective, a fixed annual retainer (without meeting fees) would be the simplest program to administer. This retainer amount could be paid in one or more installments on an annual, semi-annual or quarterly basis.

Since the Company's current non-employee Directors are minority shareholders, and given that the Company is privately held, we believe that cash compensation (rather than any additional equity opportunity) would be the most effective approach to recognize these Directors' value and time commitment. It is our professional opinion that Thompson Products' payment of annual cash compensation in the range of $20,000 to $25,000 to its non-employee Directors would be reasonable and competitive.

Please feel free to call me with any questions or comments that you may have concerning any of this material. I look forward to discussing our analytical report with you and your Board in the near future.

Respectfully submitted,

Greg Kemishian

GK:dlb
Enclosure

Tab J

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective as of April 22, 2003 (the "Effective Date"), by and between Thompson Products, Inc., a corporation organized under the laws of Delaware and whose address is 310 Kenneth W. Welch Drive, Lakeville, MA 02347 ("Employer"), and Glenn Thompson, whose principal residence is 330 Rumstick Road, Barrington, Rhode Island 02806 ("Employee").

### W I T N E S S E T H:

WHEREAS, Employee has served for many years as President of Employer; and

WHEREAS, Employer desires to continue to employ Employee as its President and Employee desires to continue to be employed by Employer as its President;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein set forth and other good and valuable consideration, the receipt and adequacy of which is mutually acknowledged, it is agreed by and between the parties as follows:

1.    **Definitions**

For purposes of this Agreement, unless the context requires otherwise, the following words and phrases shall have the meanings indicated below:

"Cause" shall mean: (1) a felony conviction of Employee involving a crime of moral turpitude (or a plea of no lo contendere in lieu thereof); or (2) an act of gross misconduct not undertaken in good faith in connection with Employee's duties hereunder;.

"Confidential Information" shall mean all nonpublic information concerning the Employer's business relating, without limitation, to its products, customer lists, pricing, trade secrets, intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, the substance of agreements with customers, marketing and concession arrangements, or other confidential agreements , which was obtained from the Employer or its predecessors or which was learned, discovered, developed, conceived, originated or prepared during or as a result of the performance of any services by Employee on behalf of the Employer or its predecessors. For purposes of this definition, the Employer shall be deemed to include any entity which is controlled, directly or indirectly, by the Employer and any entity of which a majority of the economic interest is owned, directly or indirectly, by the Employer.

2.    **Representations and Warranties**

Employee represents and warrants that he is not subject to any restrictive covenants or other agreements or legal restrictions in favor of any person which would in any way preclude, inhibit, impair or limit his employment by Employer or the performance of his duties, as contemplated herein.

3.    **Employment**

Employer hereby employs Employee and Employee accepts such employment as President of Employer. As the President of Employer, Employee shall be the chief executive

officer and shall have control over the management of the business and operations of Employer. Without limiting the scope of such authority, Employee shall have the exclusive authority, in the exercise at his sole discretion, (a) to hire and fire any employees, advisors, consultants, and other independent contractors and (b) to disclose or decline to disclose to any third party any information which Employee, in his sole discretion, determines to be proprietary concerning the business and operations of Employer. Employee accepts such employment and agrees to use his reasonable efforts to perform and discharge his duties in an efficient and businesslike manner. Employer waives any claims is has or may have against Employee for poor performance, conflict of interest or breach of fiduciary duty.

4.      **Place of Employment**

During the Term, the Employee's office and base from which he performs his duties hereunder shall be located at the Employer's office in Lakeville, Massachusetts; provided, however, Employee agrees to take such trips as shall be consistent with or reasonably necessary in connection with his duties.

5.      **Term**

The term of this Agreement shall be three (3) years, shall commence on the Effective Date, and shall expire on December 30, 2005 unless sooner terminated pursuant to Section 8 hereof (the "Employment Term").

6.      **Compensation and Benefits**

(a)      As compensation for all services rendered and to be rendered by Employee hereunder and the fulfillment by Employee of all of his obligations herein, Employer shall pay Employee an annual base salary (the "Base Salary") at the rate of $280,000, payable in accordance with the Employer's customary payroll practices. Such Base Salary shall be effective January 1, 2003;

(b)      Except as specifically provided herein, Employee shall be entitled to a continuation of all of the employee benefits he currently receives and shall be entitled to participate or receive such additional benefits as may be adopted or maintained by Employer and made generally available to executives of Employer;

7.      **Vacation**

Employee shall be entitled to an aggregate of four (4) weeks paid vacation during each year of the Term at time or times reasonably agreeable to both the Employee and Employer, it being understood that any portion of such vacation not taken in such year shall be available to be taken during any other year.

8.      **Termination**

(a)      Subject to the provisions of this Agreement, this Agreement may be terminated as follows: (i) by mutual consent of the parties; (ii) by Employer for Cause; (iii) as a result of the death of Employee, (iv) by Employee after a Change in Control, as

- 2 -

hereinafter defined, in Employer or (v) or by Employee for good reason.

(b)    For purposes of this Section 8, the term "Change in Control" refers to the transfer of more than fifty (50%) percent of the issued and outstanding stock of Employer or Thompson Products Holdings, Inc., a Massachusetts corporation ("TPH"), or a merger or other reorganization pursuant to which the current holders of the issued and outstanding stock of Employer or TPH retain less than fifty (50%) percent of the issued and outstanding stock of the surviving entity, or the sale of substantially all of the assets of the Employer or TPH.

(c)    If Employer terminates the employment of Employee for Cause or Employee terminates pursuant to 8(a)(v), Employer's sole obligations hereunder shall be to pay to Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination.

(d)    If the employment of Employee is terminated due to the death of Employee, Employer's sole obligations hereunder shall be to pay to the estate of Employee his accrued but unpaid Base Salary and vacation pay as of the date of termination and to continue the health coverage for Employee's family for two (2) additional years on the same basis as health coverage is provided by Employer for active employees and as may be amended from time to time.

(e)    If Employee terminates his employment pursuant to the provisions of Section 8(a)(iv), Employer's sole obligations hereunder shall be to continue the health coverage for Employee and his family for two (2) additional years on the same basis as health coverage is provided by Employer for active employees and as may be amended from time to time and to pay to Employee, in a lump sum, an amount equal to the balance of Employee's Base Salary to which Employee would have been entitled had Employee not terminated this Agreement (the "Severance Amount"). Employer shall pay the Severance Amount required hereunder within sixty (60) days after Employee notifies Employer of the termination of this Agreement.

9.    **Release and Indemnification**

(a)    Employer and Thompson Products Holdings, Inc. ("TPH") release Employee from any claim, demand, cause of action, liability, or theory of recovery which Employer or TPH now have, ever had, or in the future may have against Employee arising out of or relating to any event or occurrence which took place prior to the Effective Date, including, without limitation, any such claim, demand, cause of action, liability, or theory of recovery against Employee relating to or arising out of the civil action brought against Employer and others by Geoffrey Lafond (the "Lafond Litigation") and the civil action brought against Employer and others by Mark Thompson (the "Thompson Litigation").

10.    **Return of Documents**

Except for such items which are of a personal nature to Employee (e.g., daily business planner), all writings, records, computer disks, databases, and other documents including, without limitation, those containing any Confidential Information shall be the

- 3 -

exclusive property of Employer, shall not be copied, summarized, extracted from, or removed from the premises of Employer, except in pursuit of the business of Employer and at the direction of Employer, and shall be delivered to Employer, without retaining any copies, upon the termination of Employee's employment or at any time as requested by Employer.

11. **Binding Effect**

This Agreement shall inure to the benefit of and be binding upon Employer and its successors. Employer shall cause any successor, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of its assets, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that Employer would be required to perform it if no such succession had taken place or with or into which Employer may consolidate or merge. Employee agrees that this Agreement is personal to him and may not be assigned by him otherwise than by will or laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Employee's legal representatives.

12. **Miscellaneous**

(a)    If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.

(b)    This Agreement, and all of the rights and obligations of the parties in connection with the employment relationship established hereby shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts without giving effect to any rules of conflicts of law.

(c)    All notices, requests, demands, and other communications provided for hereunder shall be in writing and shall be given or made when (i) delivered personally; (ii) three (3) business days following mailing by first class postage prepaid, registered or certified mail, return receipt requested, to the party to be notified at its or his address set forth herein; or (iii) sent by telecopier, if the addressee has compatible receiving equipment and provided the transmittal is made on a business day during the hours of 9:00 a.m. to 6:00 p.m. of the receiving party and if sent at other times, on the immediately succeeding business day, or (iv) on the first business day immediately succeeding delivery to an express overnight carrier for the next business day delivery.

(d)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement represents the entire understanding of the parties with reference to the subject matter hereof and neither this Agreement nor any provisions hereof may be modified, discharged or terminated except by an agreement in writing signed by the party against whom the enforcement of any waiver, charge, discharge or termination is sought. Any waiver by either party of a breach of any provision of this Agreement must be in writing and no waiver of a particular breach shall operate as or be construed as waiver of any subsequent breach thereof.

- 4 -

IN WITNESSETH WHEREOF, the parties hereto have executed and have caused this Employment Agreement to be executed as of the Effective Date.

THOMPSON PRODUCTS, INC.

By: _Viola Kiarus_ .
Name: VICTOR KIARSIS
Title: Vice President

THOMPSON PRODUCTS HOLDINGS, INC.

By: _Vita Kiarus._
Name: VICTOR KIARSIS
Title: President

_Glenn Thompson_
Glenn Thompson

- 5 -

Tab K

**Minutes of Meeting**
**Of Board of Directors of**
**Thompson Products Holdings, Inc.**
**And**
**Thompson Products, Inc.**
310 Kenneth W. Welch Drive
Lakeville, MA 02347

On April 21, 2003 at 10:00 AM the Board of Directors of Thompson Products, Inc., a Delaware corporation ("TPI"), and Thompson Products Holdings, Inc, a Massachusetts corporation ("TPH"), convened a meeting. Messrs. James M. Conlon, Victor Kiarsis, and Glenn Thompson, being all the directors of TPI, and TPH, were present and each individually waived all notice.

Pursuant to the applicable provisions of the Annotated Laws of Massachusetts and the Delaware Business Corporation Law, as amended, the undersigned, being the directors of Thompson Products, Inc., a Delaware corporation ("TPI"), and Thompson Products Holdings, Inc., a Massachusetts corporation ("TPH"), do hereby adopt the following resolutions.

The meeting opened with a discussion of the significance of Mr. Glenn Thompson to the success of the business and the necessity to insure that his services are maintained by the company. The board further determined that the interests of the company were best served by offering Mr. Thompson an employment contract.

RESOLVED: The board agrees to provide Mr. Glenn Thompson with an employment contract in the form attached and empowers Mr. Kiarsis to take all necessary steps to execute the contract.

Upon passage of the foregoing resolution, the meeting adjourned.

IN WITNESS WHEREOF, the undersigned have executed these minutes as of the date first above written.

_____
Victor Kiarsis

_____
James Conlon

_____
Glenn Thompson

Tab L

CHOATE, HALL & STEWART LLP

EXCHANGE PLACE
53 STATE STREET
BOSTON, MASSACHUSETTS 02109-2804

T (617) 248-5000     F (617) 248-4000
www.choate.com

July 19, 2005

**By Overnight Delivery**

Glenn Thompson
330 Rumstick Road
Barrington, R. I. 02806

Dear Glenn:

The Board has asked me to write to acknowledge your resignation as a member of the Board of Directors and as an officer of Thompson Product Holdings, Inc. ("TPHI") and each of its subsidiaries. In accordance with your email to the other Board members of TPHI dated May 22, 2005, your resignation as a director is effective as of that date and, in addition to TPHI, covers your membership on the Boards of Thompson Products, Inc. ("TPI") and Thompson Products Hong Kong Limited ("TPHKL") and your position as a Manager of Harvest Holdings, LLC. Your resignation as President of TPHI, TPI and TPHKL, which was given orally on July 12, 2005, is effective on that date.

The Board has also asked me to remind you of your continuing fiduciary obligations to TPHI and its subsidiaries (together, the "Company") as a TPHI shareholder and as well as your continuing obligation not to contact any customers, suppliers, employees or other businesses or individuals which have contractual or other business relationships with the Company for the purpose of interfering with those relationships. In addition, you are obligated not to disclose or use any Confidential Information (as hereinafter defined) of the Company without the prior written consent of TPHI. "Confidential Information" means all non-public information concerning the Company or its business including, without limitation, information relating to products, customers, pricing, trade secrets and other intellectual property, business methods, financial and cost data, business plans, budgets, strategies, competitive analysis, agreements with customers, marketing and concession arrangements and other agreements.

Please feel free to contact me if you have any questions.

Sincerely yours,

Cameron Read

CR:jtm

cc:     Brian Gleason
        Adeyemi Sonuga
        Tal Briddell
        Ruth Correia

3958680v1