**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THOMPSON PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-11810-RGS |
| | ) | |
| GLENN THOMPSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

I. PRELIMINARY STATEMENT

Defendants, Glenn Thompson ("Glenn") and Splash Creations, Inc. ("Splash"), have filed

a motion for partial summary judgment under F.R.Civ.P. 56. Their motion is directed only to

Count III of the Amended Complaint which states a cause of action for Glenn's breach of several

covenants against competition he willingly made, for substantial consideration, but has yet to

perform, incident to the sale of his family business, Thompson Box Company, in 1997. Glenn

and Splash are not entitled to partial summary judgment on Count III. The covenants that

allegedly vanished did not. Indeed, they are in force, and they have been in force since Glenn's

termination of employment with Plaintiff, Thompson Products, Inc. ("TPI") last July. Despite a

prompt reminder of the existence of those covenants upon his departure, Glenn has flagrantly

violated every covenant he made, and he continues to do so.

This motion is unusual for its timing. At the Initial Scheduling Conference on January

18, counsel for Glenn and Splash requested permission to file this motion immediately on the

grounds that it would be based on a issue of contract interpretation , requiring only a presentation

to the Court of the contracts containing the subject covenants and argument on the meaning of

the relevant provisions. Counsel even tendered to the Court a one-page outline of the covenant provisions supporting his legal argument. At their request, the Court held all in abeyance all discovery pending resolution of the motion. Consequently, there has been no discovery, and TPI finds itself somewhat handicapped in responding to the motion as filed because Glenn/Splash's argument goes further than a mere interpretation of the words within the four corners of the pertinent contracts. The defendants have introduced into the argument by affidavit and documents facts pertaining to 2002-2005 conduct of the parties upon which they rely to support their alleged interpretation. The facts are based solely on the testimony of Glenn, and they are largely disputed.

Almost all of the personnel working on behalf of TPI at times relevant to defendants' alleged facts have left the employ of their TPI affiliated companies. Therefore, in order to support many of the disputed facts for this motion, TPI has been forced to track down some of these former employees, as well as company counsel, all of whom were involved in the conduct raised by Glenn's affidavit, and attempt to summarize relevant facts by declarations. This has proved difficult. One is now in New Zealand; another in Abu Dhubi; another is believed to be in England, and counsel for the parties involved in the asserted conduct are in New York. None of their files have been subpoenaed or reviewed; none of them has been deposed. Consequently, the record pertaining to the alleged 2002-2005 conduct is largely undeveloped for this motion. Nevertheless, TPI has been able to develop enough of a record by declaration to show that as to such conduct and its asserted support for Glenn's interpretation of the relevant contracts, there are genuine issues of material fact to be resolved by discovery and trial. See Declaration of David Jansen ("Jansen Decl.") attached as Ex. 1; Declaration of Stephen Mallet ("Mallet Decl.") attached as Ex. 2; and Declaration of Cameron Read ("Read Decl."), attached as Ex. 3.

As is more fully developed hereafter, the motion for partial summary judgment on Count III must be denied for two reasons. First, contrary to the assertions of Glenn/Splash, applicable rules of contract interpretation compel the conclusion that, within the four corners of the 1997 Asset Purchase Agreement and the January 5, 1998 Employment Agreement, the Restrictive Covenants are now in effect and binding on Glenn. Second, to the extent that 2002-2005 conduct of the parties is to be relied upon to interpret the contracts, there are genuine issues of material fact in dispute as to such conduct of the parties and the inferences to be drawn from it to support the interpretation urged by Glenn/Splash.

## II. FACTS

In November 1997, Glenn sold his family business, Thompson Box Company, to United States subsidiaries or affiliates of BIB, E.C., an international banking institution headquartered in Manama, Bahrain ("BIB"). Jansen Decl. ¶2; Mallet Decl. ¶3. Transfer was made by asset sale, and the transaction was embodied in an Asset Purchase Agreement dated as of November 24, 1997 (the "APA"). APA attached as Tab D to the exhibits filed by Glenn and Splash in support of their summary judgment motion (references to such exhibits being made hereinafter as "Plts. Exhibits Tab __"). TPI, as purchaser, and Glenn, as one of the sellers, were parties to the APA. TPI paid the sellers FORTY-FIVE MILLION DOLLARS ($45,000,000.00) and assumed identified company liabilities in exchange for the sellers' transfer of company assets and the Restrictive Covenants made by Glenn and his brother Mark, also a seller. APA ¶2.2.

Because Glenn and Mark were the highest ranking and most knowledgeable principals of the company being sold, TPI required each of them to make certain anti-competition covenants that were set out in Section 2.4 of the APA under the heading "Restrictive Covenants." The

3

buyers and sellers expressed the critical importance of the Restrictive Covenants in Section 2.4(b) of the APA:

> It is agreed and understood by and among the parties to this Agreement that the Restrictive Covenants . . . are each individually essential elements of this Agreement and that, but for the agreement of GT [Glenn] and MT [Mark] to comply with such Restrictive Covenants, Purchaser would not have agreed to enter into this Agreement.

The Restrictive Covenants to which Glenn and Mark bound themselves in Section 2.4 of the APA were the Restrictive Covenants contained in post-closing Employment Agreements between TPI and Glenn and between TPI and Mark that were attached to the APA as Exhibits 3.2(c)-1 (Glenn's Employment Agreement) and Exhibit 3.2(c)-2 (Mark's Employment Agreement). The subject Restrictive Covenants were set out in Section 9 of each Employment Agreement and the terms were identical in each document. It was those Restrictive Covenants in Section 9 of the two Employment Agreement exhibits that were incorporated into and made an integral part of the APA in Section 2.4.

The incorporated Section 9 of the two Employment Agreement exhibits included subparagraphs (a) through (g). Important to the motion at hand here, Glenn agreed in subparagraph (d), as he did in paragraph 2.4(b) of the APA, that "this Employee covenant and non-competition provision is being entered into in connection with the Employee's [Glenn's] sale of his ownership interest in the Employer [TPI] and in the absence of this provision, Employee [Glenn] understands and has been advised by Employer [TPI] that the sale would not be consummated."

Subparagraphs (a), (b) and (c) address specifically prohibited conduct: in (a), not to use or divulge Confidential Information; in (b), not to pirate TPI's employees; and in (c), not to undertake a competitive business. Each of those covenants addressed their period of

4

effectiveness as follows: "during the Employment Term and for a period of two (2) years following termination of Employee's [Glenn's] employment hereunder."

Of great importance to the pending motion, however, the parties agreed in subparagraph (g) to the following additional provision pertinent to the effective period when Glenn would be bound by the covenants:

> (g) Notwithstanding termination of this Agreement as provided in Section 8 herein or any other termination of Employee's [Glenn's] employment with the Employer [TPI], the Employee's [Glenn's] obligations under this Section 9 shall survive any termination of the Employee's [Glenn's] employment with the Employer [TPI] at any time and for any reason.

On or after closing on the sale of Thompson Box Company, Glenn executed the Employment Agreement that was attached as Exhibit 3.2(c)-1 to the APA. It is dated January 5, 1998. Hereafter, this Employment Agreement as a stand-alone signed contract will be referred to as the "1998 Agreement." Therefore, as of January 5, 1998, Glenn had contracted to abide by the Restrictive Covenants in Section 3.2 of the APA and in Section 9 of the 1998 Agreement.

As to the Restrictive Covenants under the APA, the buyers and sellers also agreed that the "Restrictive Covenants of GT [Glenn] . . . shall be construed as agreements independent of any other provision of this Agreement and of each other." APA ¶2.4(b). Only Section 9 of the 1998 Agreement, and no other, was incorporated into the APA. While the 1998 Agreement in Section 5 provided for a three-year "Term" of that contract, expiring December 31, 2000, that section was not incorporated into the APA. Moreover, the APA contained no definite term and no provision putting a time limit on the effectiveness of its provisions; that is, unlike the 1998 Agreement, the APA did not have an agreed expiration date.

After sale of the company, Glenn continued in the employ of TPI and served as its president and a member of its board of directors until his termination of employment with TPI in

July 2005.  Jansen Decl. ¶2; Mallet Decl. ¶3; Read Decl. ¶13. Without discovery, no one

currently employed by TPI or its parents or affiliated companies can say under oath at this time

whether another employment contract was executed by Glenn prior to the 2003 Agreement that

Glenn relies upon in support of his motion.  Therefore, at this time, TPI will not address the

subject of interim contracts further, and it is not necessary to do so.  The facts concerning the

validity of the 2003 Agreement are in conflict, presenting genuine issues of material facts for

resolution at trial following discovery.

Minutes of an April 21, 2003 TPI board of directors meeting show that the then directors

– Kiarsis, Conlon and Glenn – voted to approve the 2003 Agreement between TPI and Glenn.

Plts. Exhibits, Tab K.  The 2003 Agreement is dated April 22, 2003.  It is signed by Kiarsis for

TPI and by Glenn for himself, individually.

Until August 2002 Conlon and Kiarsis were officers and employees of Dilmun

Investments, Inc. ("Dilmun") headquartered in Stamford, Connecticut.  Jansen Decl. ¶2-3. Their

duties included financial oversight in the United States of BIB's U.S. "portfolio companies," one

of which was TPI.  Id. Conlon and Kiarsis were on the board of directors of each of the

"portfolio companies."  Mallet Decl. ¶5.  They constituted the majority on the three-member

boards of TPI and its parent, TPHI. Id.

However, in August 2002, BIB/Dilmun terminated Conlon and Kiarsis not only from

their employment with Dilmun but also from all of their associations with BIB/Dilmun "portfolio

companies."  Jansen Decl. ¶3.  In that same month, the chairman of Dilmun instructed Glenn in

writing not to disclose any company information to Conlon or Kiarsis and to refer all contacts by

them to David Jansen, another executive of Dilmun.  Id.  After their termination, Conlon and

Kiarsis continued on the board of TPHI and TPI.  Jansen Decl. ¶6.  They resisted efforts by

6

BIB/Dilmun to remove them. Id. From August 2002 until their ultimate removal form the boards of TPHI and TPI on May 1, 2003, Conlon and Kiarsis were "lame ducks." Jansen Decl. ¶7. They knew that they were not to take any material action on behalf of TPHI and TPI during that period. Id.

On March 6, 2003, Cameron Read, at the request of TPHI and TPI, sent to the shareholders of TPHI a notice of a special shareholders meeting to be held on May 1, 2003. Read Decl. ¶6. The express purpose of the meeting was to remove Conlon and Kiarsis as directors of TPHI and replace them with David Jansen and Stephen Mallet, a London-based executive employee of BIB's London subsidiary. The notice was sent to Conlon and Kiarsis. Id.

On April 7, 2003, Kiarsis gave Read a proposed Employment Agreement between TPI and Glenn for Read's review. Read Decl. ¶7. It contained no restrictive covenants for Glenn. Read promptly told Glenn that TPI should not enter into that Employment Agreement because of the tenuous nature of Conlon and Kiarsis's positions as directors. Glenn told Read he would not sign it. Id.

On April 21, 2003, Read met with Conlon, Kiarsis and Glenn before the TPI board meeting. Read told them they should not approve or sign the Employment Agreement presented to him because it was not in the best interest of TPI. Read Decl. ¶8.

Read did not attend the April 21, 2003 TPI board meeting. Read Decl. ¶9. Moreover, he never told Conlon, Kiarsis or Glenn that they should approve or sign an Employment Agreement like the one he reviewed. Read Decl. ¶7-8.

The April 21, 2003 TPI board meeting was held just nine days before the May 1 TPHI special shareholders meeting where the shareholders ousted Conlon and Kiarsis as directors and replaced them with Jansen and Mallet. Jansen Decl. ¶7.

Glenn had discussions with Jansen and Mallet after May 1 about an increase in his compensation. Jansen Decl. ¶8; Mallet Decl. ¶8. Glenn did not mention the 2003 Agreement until November 17, 2003 when he faxed it to Mallet. Mallet Decl. ¶8; Jansen Decl. ¶7. At that time he told Mallet that while it had been signed by Kiarsis for TPI on or about April 22, he (Glenn) had held it unsigned pending the outcome of compensation discussions with BIB/Dilmun.

The 2003 Agreement was not in the best interest of TPI and Conlon, Kiarsis and Glenn had been so advised. Read Decl. ¶7, 8 and 12.

When Glenn terminated his employment with TPI in July 2005, Read, on behalf of TPHI and TPI, immediately wrote to Glenn reminding him of his post-termination fiduciary duties. Read Decl. ¶13; Plts. Exhibits, Tab L. Upon receipt, Glenn contacted Read and noted the absence in Read's letter to any restrictive covenants. Read told him that TPI's position was that they were in effect and binding upon Glenn. Read Decl. ¶14.

### III. SUMMARY JUDGMENT STANDARD

The parties do not disagree on the standards applicable to the Court's review of the pending motion. A party is entitled to summary judgment where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, "the court must look at the record in the light most favorable to the non-moving party and must indulge all inferences favorable to the non-moving party." Stepanischen v. Merchants Dispatch Transportation Corp., 722 F.2d 922, 928 (1st Cir. 1983). Under this stringent standard, a defendant is entitled to summary judgment only if a fair-minded jury could not return a verdict for the plaintiff on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (emphasis added.).

As the moving parties, Glenn and Splash must affirmatively demonstrate, among other

things, that there is an absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 323 (1986). "A fact is 'material' if it might affect the outcome of the suit or the

claim under the governing substantive law." <u>Sun Company, Inc. v. Cignarella</u>, 1994 WL

562590, *4 (D. Mass. 1994). On the record present here, Glenn/Splash cannot meet their heavy

burden. Accordingly, their motion must be denied.

## IV. ARGUMENT

**A.     Interpretation of the Applicable Contracts Shows, as a Matter of Law, That the Restrictive Covenants are in Effect and Binding on Glenn.**

The parties agree that under Massachusetts law, the interpretation of contracts is

generally a question of law. <u>Baybank Middlesex v. 1200 Beacon Properties, Inc.</u>, 760 F.Supp.

957 (D. Mass. 1991). In interpreting a contract, a court must give effect to the parties' intentions

and construe the language to give it reasonable meaning wherever possible. <u>Id.</u>, citing <u>Shea v.</u>

<u>Bay State Gas Co.</u>, 383 Mass. 218 at 224-25, 418 N.E.2d 597 (1981) and <u>Massachusetts</u>

<u>Turnpike Auth. V. Perini Corp.</u>, 349 Mass. 448, 452, 208 N.E.2d 807 (1965). "A contract must

be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its

overall purpose." <u>Id.</u>, citing <u>J.A. Sullivan Corp. v. Commonwealth</u>, 397 Mass. 789, 795, 494

N.E.2d 374 (1986) and <u>McMahon v. Monarch Life Insurance Co.</u>, 345 Mass. 261, 264, 186

N.E.2d 827 (1962). "In other words, a contract must not, whenever possible, be construed so as

to render any of its terms meaningless." <u>Id.</u>, citing <u>Shea v. Bay State Gas Co.</u>, 383 Mass. 218 at

225, 418 N.E.2d 597 (1981).

Subsection (g) of Section 9 of the 1998 Agreement, as incorporated into Section 2.4 of

the APA, clearly extends the trigger date for operation of the two-year post-termination

covenants to the termination of Glenn's <u>employment</u> with TPI. While subsections (a) through

(c) of Section 9 might be reasonably read to provide for commencement of the two-year period upon expiration of the three-year contract term, the plain words of subsection (g) provide for attachment of the covenants upon termination of Glenn's <u>employment</u> with TPI, regardless of whether the 1998 Agreement is still then in effect, regardless of whether any other employment contract is then in effect, regardless of the reason for Glenn's termination of employment with TPI and regardless of when it occurs. It is imminently reasonable to deduce from the plain, unambiguous words of subsection (g) that the parties (and particularly TPI) intended to protect TPI's substantial investment in Thompson Box Company by requiring Glenn to assure TPI that under no circumstances would he, as the highest ranking executive of the seller, be able to become the most dangerous competitor of TPI in five years simply by not entering into a new employment contract. Subsection (g) gives TPI a two-year period following the end of Glenn's <u>employment</u> with TPI to deal with his departure and to protect its investment. The effect of subsection (g) is to make the Restrictive Covenants applicable to the most critical period of time when they are needed – immediately following Glenn's departure from TPI. Application of the three Restrictive Covenants contained in subsections (a) through (c) of Section 9 of the 1998 Agreement, as incorporated into Section 3.2 of the APA, to a reasonable post-<u>employment</u> period accomplishes that clearly desired purpose.

Glenn dismisses subsection (g) by noting, without authority, that it is "simply a standard way of providing that the mere expiration of an agreement does not render any continuing obligation unenforceable." Glenn reads subsection (g) to provide for operation of the Restrictive Covenants, upon expiration of the three-year Term, only for a two-year period thereafter, regardless of whether Glenn is still employed by TPI at that time. Under Glenn's reading of the Restrictive Covenants, they would be of little use to TPI if Glenn were still employed by TPI at

10

the end of the three-year term. They would restrict him from disclosing and using Confidential

Information, pirating employees and competing against TPI, while still employed by TPI.

However, so long as he remains employed by TPI, he has those restrictions imposed upon him

anyway by his common law duties of loyalty and good faith as an employee, officer and director

of TPI. The Restrictive Covenants are clearly most needed if and when Glenn terminates his

employment with TPI, and subsection (g) captures his obligation for a two-year post-termination

period. In subsection (g), the parties expressly keyed application of the Restrictive Covenants to

a two-year period following termination of Glenn's employment with TPI "at any time and for

any reason." TPI has already paid substantial consideration to Glenn for that commitment, and

in the absence of Glenn's voluntary compliance with his commitment, the Court must compel it.

Grizzard Communications Group v. Monk, 2005 WL 2563046 (D. Neb. 2005), relied

upon by Glenn on pages 10 and 11 of his memorandum in support of the summary judgment

motion, does not support a different interpretation. Indeed, the case readily supports the

conclusion that under subparagraph (g), the Restrictive Covenants survived expiration of the

1998 Agreement and became effective for two-years upon Glenn's July 2005 termination of

employment.

Grizzard deals with restrictive covenants made by an employee to his employer. The

case does not involve covenants made as part of the sale of a business. In Grizzard, the subject

employment contract containing the restrictive covenants in issue expired. Although the

employer did not renew the employment contract, the employee continued as an employee. A

few years later he left his employment with plaintiff employer and began competitive activities.

The employer sued him to enjoin violation of covenants made in the expired employment

contract. The employee raised several defenses, the first of which was that the covenants did not

survive his post-employment-contract/employment-at-will period to attach upon his termination

of employment.  He cited two cases – Kutter and Bennett Paper Co. – in support.  The court

rejected that defense:

> . . . to the extent that Monk [employee] relies upon Kutter and Bennett
> Paper Co. for the proposition that covenants are inherently
> unenforceable regardless of the language and terms of the contract
> whenever an employee continues to work after the contract has
> expired, his reliance is misplaced.

The court went on to hold as follows:

> Since I am not persuaded that the covenants were automatically
> rendered unenforceable by the mere fact that the agreement
> [containing them] was terminated in March 2003, I must reject Monk's
> first argument that the eighth cause of action must be dismissed.

**B.    The Restrictive Covenants Were Integral to the Sale of a Business, Not Just an
       Employment Relationship.**

Interpretation of the contracts made by TPI and Glenn should be influenced by the

context in which the Restrictive Covenants are found.  They are found in both a contract for sale

of a business and in an employment contract executed as part of the sale.

> It is important to identify at the outset to which aspect of the
> arrangement the covenants not to compete primarily related.  This is
> because there are considerations which dictate that noncompetition
> provisions arising out of the sale of a business be enforced more
> liberally than such covenants arising out of an employer-employee
> relationship. (citation omitted)  In the former situation there is more
> likely to be equal bargaining power between the parties; the proceeds
> of the sale greatly enable the seller to support himself temporarily
> without the immediate practical need to enter into competition with his
> former business; and a seller is usually paid a premium for agreeing
> not to compete with the buyer.  Where the sale of the business includes
> goodwill, as this sale did, a broad noncompetition agreement may be
> necessary to assure that the buyer receives that which he purchased.

Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 496, 488 N.E.2d 22, 28 (1986).

It is not unusual to find Restrictive Covenants like the ones in this case in an asset purchase agreement for the sale of a business and in an employment agreement executed incident to it. In that situation, Massachusetts courts examine the transaction as a whole to determine whether the covenants are primarily related to the sale of the business or to employment of the selling executive. That exercise was performed by the Court in <u>Alexander v. Alexander, Inc. v. Danahy</u>, <u>supra</u>. Finding (a) that good will was important to the business sold, (b) that there was no inequality of bargaining power between the parties in arriving at the covenants and (c) that the consideration paid for the covenants was considerable, the Court in <u>Alexander & Alexander</u> easily concluded that "... the covenants not to compete were treated as an integral part of the agreement for sale of the business . . ."

The Restrictive Covenants at issue here were also an integral part of the sale of the Thompson Box Company business because the parties clearly said so in the contract they made. In subsection (b) of Section 2.4 of the APA, they agreed that the Restrictive Covenants were "essential elements" of the sale; that the sale would not have been made without the Restrictive Covenants; that the covenants promoted the "mutual objectives" of the parties; and that they served to protect TPI's interests in the acquired business after closing. Glenn and his fellow sellers sold the goodwill of Thompson Box Company to TPI. APA ¶ 1.1. There was an equality of bargaining power between the buyers and sellers, and each was represented by counsel. APA ¶ 9.6. Last, TPI paid a substantial amount for the Thompson Box Company assets, with the Restrictive Covenants providing *sine qua non* "additional consideration" to TPI. APA ¶ 2.4.

As covenants made incident to and as an integral part of the sale of a business, this Court should look less critically at such covenants. <u>Id</u>. It can and should more readily read subparagraph 9(g) of the 1998 Agreement, as incorporated into Section 2.4 of the APA, to

conclude that they survived expiration of the 1998 Agreement and attached to Glenn upon his

July 2005 termination of employment with TPI. Given what TPI paid and what Glenn and his

fellow sellers pocketed for those covenants and given TPI's need to protect its substantial

investment in the business, Glenn should be made to perform his end of the bargain now and

comply with his important commitment to TPI. If the contracts of the parties are read to confine

Glenn's covenants to the three-year term of the 1998 Agreement and the two-year period

immediately following it when he was still serving as president of TPI, TPI bought very little for

its substantial investment, because Glenn became free to destroy the company by lawful

competition on January 1, 2002 and subparagraph (g) was essentially worthless. That result

cannot be what was contemplated by the parties.

Nothing in the case of <u>Chelsea Industries, Inc. v. Florence,</u> 358 Mass.50(1970), discussed

by Glenn/Splash on page 13 of their memorandum, changes that conclusion. The case dealt only

with the Court's attempt to reconcile provisions in a purchase contract and an employment

agreement. The Court's holding is that case does not support the conclusion that the Restrictive

Covenants in this case should be enforced as covenants incident to an employment relationship.

**C.    The Conduct of the Parties in Late 2002 Does Not Support the Conclusion That the Restrictive Covenants Expired on December 31, 2002.**

Glenn asserts that TPI's late 2002 efforts to arrive at a new employment contract (with

covenants) with him means that all restrictive covenants had expired at that time and TPI knew

it. Glenn points to a draft Employment Agreement submitted to him by Jansen in November

2002 containing restrictive covenants and Glenn's rejection of that proposed contract.

Jansen readily confirms that he had discussions with Glenn about a new employment

contract in late 2002 and early 2003. The process was initiated by Glenn, whose first draft of a

contract contained no covenants. Not being sure whether covenants were then in effect, not

being willing to roll the dice on whether they were or were not in effect and understanding that

no new contract for Glenn would be approved by TPI's parent without restrictive covenants, all

versions of a possible new employment contract submitted to Glenn included restrictive

covenants. Jansen's insistence on the inclusion of covenants in any new contract with Glenn was

not indicative of a belief by TPI that there were no restrictive covenants previously agreed upon

that would bind Glenn if he left TPI; it was indicative of Jansen's stated lack of certainty on the

complicated issue now consuming these briefs and BIB/Dilmun's unwillingness to roll the dice

on a contract without covenants.

**D.    The 2003 Agreement is Voidable and Does Not Supercede the Restrictive Covenants
        from the APA and the 1998 Agreement Now in Effect.**

There are genuine issues of material fact concerning the formation and validity of the

2003 Agreement. Glenn says that Cameron Read, TPI corporate counsel, attended the April 21,

2003 meeting; Read denies attending. Glenn says Read told Conlon, Kiarsis and himself at that

meeting that the 2003 Agreement, if signed, would be valid and enforceable; Read denies any

such statement. Moreover, Read says he told them not to approve or sign it. Glenn says he

signed the 2003 Agreement on April 21 or April 22; Stephen Mallet says that Glenn told him on

November 17 or 18, 2003 that he (Glenn) had held it without signing pending negotiations on

salary. The minutes of the April 21 TPI board meeting approving the 2003 Agreement for Glenn

recite that it is in the best interest of TPI; Read states that it is not and that he told all three TPI

board members so before they met and approved the 2003 Agreement. Only at trial can the

material facts surrounding approval, execution and validity of the 2003 Agreement be sorted out.

It is clear, however, that the TPI board of directors' vote on the 2003 Agreement in the

April 21, 2003 meeting was a conflict of interest or self-dealing transaction for Glenn. He was

not entitled to vote to approve the contract for himself. See <u>Cooke v. Lynn Sand & Stone Co.</u>,

37 Mass. App. Ct. 490, 497 (1994); Ellis v. Varney, 2004 WL 574827, 41-42 (Mass. Super. 2004). In order for the transaction to be free from the possibility of rescission, it must have been approved by a majority of the disinterested directors who, based on full knowledge of the circumstances, could reasonably have concluded that the transaction was fair to the corporation. Demoulos v. Demoulos Super Markets, Inc., 424 Mass. 509 (1997). While Conlon and Kiarsis might arguably have been "disinterested" in the vote regarding Glenn's employment contract, they could not have reasonably concluded that the 2003 Agreement was fair to TPI. The 2003 Agreement gutted all of the protections afforded to TPI in the 1998 Agreement. See Amended Complaint ¶19, Plts. Exhibits, Tab B. for a laundry list of the material differences, all of which were favorable to Glenn and unfavorable to TPI. Moreover, Conlon and Kiarsis had specifically been advised by TPI's corporate counsel before their vote that the 2003 Agreement was not in the best interest of TPI and that they should not approve or execute it. The 2003 Agreement is voidable by TPI, and upon learning of the April 21 vote to approve that agreement, Mallet promptly told Glenn that BIB/Dilmun would not consider it a valid contract.

Even if, however, the 2003 Agreement is not rescinded in this action, it is not necessarily inconsistent with the continuing existence of the 1997 bought-and-paid-for Restrictive Covenants from the APA and the 1998 Agreement. The 2003 Agreement does not address the subject of post-employment restrictive covenants at all. The Restrictive Covenants from the 1997 sales transaction can be read together with the 2003 Agreement without conflict or contradiction. While the 2003 Agreement does contain an integration clause reciting that it "represents the entire understanding of the parties with reference to the subject matter hereof," the Court could readily find that the "subject matter hereof" does not include post-termination covenants and that

the independent, executory contract made by Glenn in 1997 binding him to perform the stated covenants for two years after termination of his employment with TPI is still in effect.

## IV. CONCLUSION

As a matter of law, Restrictive Covenants from the 1997 APA and 1998 Agreement became effective upon Glenn's termination of employment with TPI in July 2005. Glenn's asserted interpretation of Section 9 of the 1998 Agreement ignores the plain meaning of subsection (g) of that section, as well as applicable provisions of the APA. Glenn's yet-to-be performed covenants, which have been bought-and-paid-for by TPI, were an integral part of the purchase of the Thompson Box Company business. The Court should, therefore, more readily find the Restrictive Covenants to be in effect, binding and enforceable against Glenn. The 2002-2003 conduct of TPI in attempting to agree upon terms for a new employment contract with Glenn, with covenants, does not support the conclusion that the Restrictive Covenants had been extinguished as of that time or that TPI believed they had been. Last, the material facts surrounding the formation and validity of the 2003 Agreement are genuinely disputed. If Jansen, Mallet and Read are to be believed, the 2003 Agreement is subject to rescission by this Court as a conflict-of-interest transaction that was not in the best interest of TPI.

For all of these reasons, the Court should deny Glenn/Splash's motion for partial summary judgment as to Count III of the Amended Complaint.

**THOMPSON PRODUCTS, INC.**

By its attorneys,


/s/  Andrew D. Kang
Terence P. McCourt   (BBO #555784)
Andrew D. Kang       (BBO #637476)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel:  617.310.6000
Fax:  617.310.6001

and

Sandy T. Tucker
Monica McCarroll
WILLIAMS MULLEN, A PROFESSIONAL CORPORATION
1021 East Cary Street (23219)
Post Office Box 1320
Richmond, VA  23218-1320
Tel:  804.783.6418
Fax:  804.783.6507

DATED:  February 22, 2006


## CERTIFICATE OF SERVICE

I, Andrew D. Kang, hereby certify that on the 22nd day of February, 2006, I served the foregoing by U.S. Mail to the following counsel of record:

Matthew F. Medeiros, Esq.
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI  02903

Michael S. Chinitz, Esq.
Lisa A. Tenerowicz, Esq.
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA  02110

/s/ Andrew D. Kang
Andrew D. Kang

bos-fs1\kanga\183937v01\2/22/06\90594.010100

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THOMPSON PRODUCTS, INC.,   )
                                    )

         Plaintiff,    )
                                    )

v.                           )     CA No. 05-11810-RGS
                            )

GLENN THOMPSON, *et al.*,   )
                                  )

         Defendants.    )

## <u>DECLARATION OF DAVID JANSEN</u>

        I, David Jansen, on my oath, do hereby depose and say as follows:

1.    I currently reside in Auckland, New Zealand where I am employed by ING New Zealand Ltd.

2.    In 2002 and 2003, until my resignation on September 10, I was employed by Dilmun Investments, Inc. ("Dilmun"), a United States subsidiary or affiliate of BIB, EC, an international bank headquartered in Manama, Bahrain ("BIB"). One of Dilmun's primary responsibilities was the financial management and oversight of BIB's subsidiary and affiliate companies in the United States. One of those companies was Thompson Products, Inc. ("TPI"). BIB, by TPI and its parent, Thompson Products Holdings, Inc. ("TPHI"), bought the assets of Thompson Box Company in November, 1997. The law firm of Pryor Cashman Sherman & Flynn in New York represented BIB/TPHI/TPI in the acquisition.

2.    Glenn Thompson ("Glenn"), who was president and chief operating officer of Thompson Box Company before the sale in 1997, continued in that capacity after the sale, serving as a director of TPHI and TPI and as president and chief operating officer of TPI. After sale of the company, the newly constituted board of directors for TPI and TPHI were Jim Conlan ("Conlan"), Victor Kiarsis ("Kiarsis") and Glenn. Conlan and Kiarsis were Dilmun officers and employees headquartered in Stamford, Connecticut, and their job was to oversee the financial management of BIB's "portfolio companies" in the United States, one of which was TPI.

3.    In August 2002, BIB and Dilmun determined that Conlan and Kiarsis would be terminated for cause and that all of their business relationships with BIB and Dilmun subsidiaries and affiliates would be terminated also. Dilmun's Chairman, Robin McIlvenny, asked me to assume many of the duties with respect to the "portfolio companies" that had been performed by Conlan and Kiarsis, and I agreed. By letter dated August 16, 2002, the Chairman advised Glenn of Dilmun's decision and instructed him to refer all matters previously handled by Conlan and Kiarsis to me. A copy of that letter is attached as Ex. A.

4.    One of the issues that had been under discussion with Glenn at that time was an increase in his compensation and a new employment contract. In the Fall of 2002, he gave me a proposed Employment Agreement to review. It was a mark-up of his 1998 Employment Agreement. Glenn's marked-up proposed agreement was unacceptable for a number of reasons, one of which was that it had marked out the Restrictive Covenants from the 1998 Employment Agreement. I did not know then



**EXHIBIT**

**1**

whether those Restrictive Covenants or others were still in effect or whether they would continue to be in effect, but I did know that BIB/Dilmun would never approve a new contract for Glenn that did not contain restrictive covenants because he was the most knowledgeable and influential employee of TPI. Therefore, I sent the proposed contract to Pryor Cashman for review and revision to include, among other things, the same or updated restrictive covenants that were in the '98 Agreement.

5.    Thereafter, from October through January or February, 2003, I worked with Pryor Cashman on proposed revisions to Glenn's proposed Employment Agreement and discussed with Glenn several employment issues, including an increase in his salary and the revised drafts of an employment contract, but we never agreed to terms. Even so, I made it very clear to Glenn that BIB/Dilmun would never approve a new employment contract for him that did not contain restrictive covenants like those in his '98 Agreement. I was not willing to take a chance that restrictive covenants from that Agreement or any other were still in effect, even though I never made a study of that issue and never asked Pryor Cashman to do so.

6.    From August, 2002 until they were finally removed as directors of TPI and TPHI in May, 2003, Conlan and Kiarsis were antagonistic to BIB, Dilmun and all of their subsidiaries and affiliates. They made great efforts to remain on the TPI and TPHI boards and Glenn supported Kiarsis in that effort. However, in March, 2003, Cameron Read, TPHI and TPI corporate counsel and secretary, began the process of removing Conlan and Kiarsis from their final tie with TPI and TPHI. On March 6, he sent out a notice of a special shareholders meeting of TPHI to be held on May 1, 2003 for the express purpose of removing Conlan and Kiarsis as directors of TPHI. The notice also said that Stephen Mallet, a London-based BIB/Dilmun executive, and I would be nominated to replace Conlan and Kiarsis. We had been notified that this would occur and we had agreed to step into these director positions.

7.    I was completely unaware that Conlan, Kiarsis and Glenn held a meeting of the TPI board on April 21 and approved a new Employment Agreement for Glenn that provided for a huge increase in his salary and that contained no restrictive covenants. I have only learned about it since being contacted about the pending lawsuit. At that time Conlan and Kiarsis were known by all at BIB and Dilmun, and by Glenn, to be "lame duck" directors of TPI and TPHI and all knew that they were not authorized to take any material action for either company at that time, despite the fact that they had not been formally removed as directors yet. However, at the time of their vote to approve a new employment contract for Glenn on April 21, their removal was but a week or so away.

8.    I continued to serve as a director of TPI and TPHI until my resignation from Dilmun and from all officer, director and employee positions with the company and its subsidiaries and affiliates in September, 2003. During that time I continued to have discussions with Glenn about a salary increase and a new contract and he never said anything about a new contract having been approved by Kiarsis and Conlan in April.

9.    I formally resigned from the TPI and TPHI boards of directors on September 10, 2003, and was replaced by Brian Gleason. Following my resignation, I returned to my home in New Zealand where I have remained since.

10.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this _20th_ day of February, 2006.

_____
David Jansen

1253257v1



**Dilmun Investments, Inc.**

August 16, 2002

Metro Center
One Station Place
Stamford, CT 06902

Glenn Thompson
Thompson Products, Inc
310 Kenneth W. Welch Dive
Lakeville, MA 02347-1348

Dear Glenn:

This letter is to inform you that Victor Kiarsis and James M. Conlon have been terminated as employees of Dilmun Investments, Inc, and all of its subsidiaries and affiliates ("Dilmun"). In the event you are contacted by either Mr. Kiarsis or Mr. Conlon in any manner, whether it be for the request of information or otherwise, you are to refer them to David Jansen of Dilmun. Under no circumstances are you to disclose any information regarding Thompson Products, Inc to Mr. Kiarsis or Mr. Conlon other than the above-named individual they may contact. In addition, you should promptly notify Mr. Jansen at 203-353-5711 upon receiving any contact (written or oral) from Mr. Kiarsis or Mr. Conlon.

Thank you for your attention and cooperation with the foregoing matter.

Sincerely,

Robin McIlvenny
Chairman

287373v3        Telephone: (203) 353-5700      Fax: (203) 353-5719

**EXHIBIT**

_A_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THOMPSON PRODUCTS, INC.,        )
                                )
            Plaintiff,          )
                                )
                                )       CA No. 05-11810-RGS
v.                              )
                                )
GLENN THOMPSON, et al.,         )
                                )
            Defendants.         )

## DECLARATION OF STEPHEN MALLET

I, Stephen Mallet, on my oath, depose and state as follows:

1.  I currently reside in Abu Dhabi, United Arab Emirates where I am employed by the Abu Dhabi Investment Company. I am a citizen of the United Kingdom.

2.  In 2002, 2003 and until July 31, 2004, I was employed as an officer and employee of Dilmun Investments Ltd., a London-based subsidiary of BIB, E.C., an international banking institution headquartered in Manama, Bahrain. Dilmun Investments, Inc. ("Dilmun") was an equivalent United States subsidiary of BIB.

3.  In 1997 BIB, through its purchasing entities, Thompson Products Holding, Inc. ("TPHI") and Thompson Products, Inc. ("TPI"), acquired the assets of Thompson Box Company, Inc. TPHI and TPI were affiliates of BIB and Dilmun. Following the acquisition, Glenn Thompson ("Glenn") continued with TPHI and TPI as director of those companies and as president and chief operating officer of TPI.

4.  Until the Summer of 2002, Dilmun employed Victor Kiarsis ("Kiarsis") and James Conlon ("Conlon") as officers and employees, working in Dilmun's offices in Stamford, Connecticut. Their responsibilities included financial oversight of BIB's United States "portfolio companies", one of which was TPI.

5.  Conlon and Kiarsis served as members of the board of directors of all of the BIB U.S. "portfolio companies", including TPHI and TPI. Glenn was the third member of the TPHI and TPI boards who served with Conlon and Kiarsis until they were terminated by BIB/Dilmun.





6. In the Summer of 2002, BIB and Dilmun decided to terminate Conlon and Kiarsis from all business relationships with BIB, Dilmun and all of the "portfolio companies".

7. In May 2003, Conlon and Kiarsis were formally removed as directors of TPHI and David Jansen, another BIB/Dilmun executive employee, and I were elected to replace them.

8. In the Summer and Fall of 2003, I had some communication with Glenn concerning an increase in his compensation, specifically a bonus package for him. In the course of communications with him on that issue, he faxed to me on November 17, 2003 an Employment Agreement dated April, 2003 that Glenn said had been approved by himself, Conlon and Kiarsis on April 21 in a TPI board meeting. I had never seen or heard anything about such contract. In a telephone conversation with Glenn about it that occurred on either November 17 or 18, 2003, Glenn told me that while Kiarsis had signed the contract on behalf of TPI on April 21, he (Glenn) had not signed it then, electing to hold it pending negotiations with the company about his compensation. I told him that BIB/Dilmun would not consider that employment contract valid in light of Kiarsis's status with the BIB/Dilmun companies in April 2003.

9. Counsel for TPI has sent me a copy of an Affidavit of Glenn Thompson In Support of Defendants' Motion for Summary Judgment on Count III of the Amended Complaint, and I have read it.

10. In paragraph 10 of that Affidavit Glenn says that he signed the 2003 Employment Agreement on April 21, 2003, but that is completely different from what he told me on November 17 or 18, 2003.

11. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of February, 2006.

_____
Stephen Mallet

1253282v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THOMPSON PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  05-11810-RGS |
| | ) | |
| GLENN THOMPSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF CAMERON READ

I, Cameron Read, on my oath depose and state as follows:

1.     I am a lawyer licensed to practice in the Commonwealth of Massachusetts.  I was

admitted to the Massachusetts Bar in 1972, and am currently a partner at the law firm of

Choate, Hall & Stewart, LLP.

2.     From June 3, 2003 to the present, I have served as the Secretary and Clerk of

Thompson Products, Inc. ("TPI").

3.     From June 3, 2003 to the present, I have also served as the Secretary and Clerk of

Thompson Products Holdings, Inc. ("TPHI"), TPI's parent company.  TPI is a wholly-

owned subsidiary of TPHI.  I was elected to the positions of Secretary and Clerk by the

Board of Directors of TPHI and TPI on June 3, 2003.

4.     I have read the Affidavit of Glenn Thompson ("Glenn") in Support of Defendants'

Motion for Summary Judgment on Count III of the Amended Complaint, dated January 28,

2006 ("Glenn Affidavit"), and have personal knowledge of inaccuracies in the Glenn

Affidavit.



EXHIBIT
3

5.      It is my understanding that prior to March of 2003, Messrs. Conlon and Kiarsis

were employed by Dilmum Investments, Inc., an affiliate of BIB Holdings (Bermuda) Ltd.

BIB Holdings (Bermuda) Ltd. owns approximately 64% of the outstanding TPHI stock.

By a letter dated August 16, 2002, Glenn and TPI were informed by Dilmum that the

employment of Messrs. Conlon and Kiarsis had been terminated by Dilmum and Glenn

was instructed not to disclose any information concerning TPI to them.

6.      On March 6, 2003, I caused to be sent to all of TPHI's shareholders notice of a

special shareholders meeting, called by the Board of Directors of TPHI, including Messrs.

Conlon and Kiarsis, at the request of BIB Holdings (Bermuda) Ltd., to be held on May 1,

2003, for the sole purpose of removing Messrs. Conlon and Kiarsis as directors of TPHI

and replacing them with Stephen Mallet and David Jansen.

7.      On April 7, 2003, Kiarsis asked me to review a draft of a proposed Employment

Agreement for Glenn ("2003 Employment Agreement"). The next day, on April 8, 2003, I

told  Glenn I thought TPI should not enter into the agreement due to the tenuous nature of

Messrs. Conlon and Kiarsis' positions as directors of TPHI and TPI, and Glenn told me he

was not going to sign the 2003 Employment Agreement.

8.      On April 21, 2003, I met with Messrs. Conlon, Kiarsis and Glenn, prior to the TPI

Board Meeting apparently held later that day. We discussed, among other things, the 2003

Employment Agreement. I advised them, in their capacity as the members of the Board

and officers of TPI, that they should not approve or sign the 2003 Employment Agreement

because it was not in the best interests of TPI or TPHI, and because Conlon and Kiarsis

had ceased to represent the interest of the majority shareholder of TPHI and were expected

to be removed from the Board of TPHI in 10 days.

9.     I did not attend the April 21, 2003, TPI Board meeting later that day, and was not present when Messrs. Conlon and Kiarsis apparently voted to approve the 2003 Employment Agreement.

10.     On May 1, 2003, I attended the TPHI special shareholders' meeting at which Messrs. Conlon and Kiarsis were voted out as Directors of TPHI and replaced by Messrs. Mallet and Jansen.

11.     It was not until November 18, 2003, that Stephen Mallet faxed me the version of the 2003 Employment Agreement signed by Glenn, accompanied by a copy of the signed minutes of the April 21, 2003 Board meeting.  Mr. Mallet told me that Glenn told him he had just signed the 2003 Employment Agreement that day.  When I looked at it closely, it was different from the draft I initially reviewed on April 7, 2003.  This was the first I became aware that the 2003 Employment Agreement had been signed despite my advice and that Board minutes had been prepared without my knowledge.

12.     Neither version of the 2003 Employment Agreement I saw were in the best interests of TPI because significant provisions protecting TPI which were present in one or more prior employment contracts between Glenn and TPI, such as non-competition and non-solicitation provisions, were absent, and certain new provisions adverse to TPI, such as a release, were included.

13.     On July 19, 2005, at the request of the TPI Board, I sent Glenn a letter which, among other things, reminded him of his continuing fiduciary and other obligations to TPHI and TPI.

14.    That same day, I had a conversation with Glenn in which he noted that the letter I sent did not reference any non-compete and that in his view there was none.  I told Glenn that TPI's position was that the non-compete was in effect and binding on Glenn.

Signed under the pains and penalties of perjury this _2/st_ day of February, 2006.


_Cameron Read_
Cameron Read


bos-fs1\kanga\183083v03\2/21/06\90594.010100