UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMPSON PRODUCTS, INC., )<br>a Delaware corporation, )<br>   Plaintiff, )<br> )<br> v. )<br> )<br>GLENN THOMPSON and )<br>THOMPSON ENTERPRISES, INC., )<br>   Defendants. )<br> ) | C.A. No. 05-11810-RGS |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON COUNT III OF THE AMENDED COMPLAINT**

Defendants submit this Reply Memorandum in support of their motion for summary judgment dismissing Count III of the Amended Complaint, in order to highlight factual and legal errors contained in the opposition papers that plaintiff, Thompson Products, Inc. ("TPI") filed. When construed in accordance with the applicable Rules and controlling precedent, TPI's filings effectively concede that there is no genuine dispute that Glenn Thompson's 1997/98 restrictive covenants have expired.[1] Accordingly, the Court should enter summary judgment in favor of defendants on Count III.

1.  TPI Should Not Be Permitted to Take Advantage of Its Non-Compliance
  With Local Rule 56.1

TPI has sought to stave off dismissal of Count III by avoiding compliance with Local Rule 56.1, which provides in pertinent part

---

[1]  Defendants based their motion primarily on the expiration of the covenants contained in Glenn's 1998 Employment Agreement, but in the alternative relied upon a fully-integrated and executed agreement entered into in 2003 that contained no such covenants. TPI's opposition papers contend that TPI withdrew its offer of the 2003 agreement before Glenn accepted it. Although TPI ultimately will lose on that issue, it cannot be resolved by way of summary judgment at this time. Accordingly, this Reply Memorandum discusses only defendants' primary contention, that the expiration of the 1998 Employment Agreement covenants (and their identical counterparts in the 1997 Asset Purchase Agreement) entitles them to summary judgment on Count III.

> Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. Copies of all referenced documentation shall be filed as exhibits to the motion or opposition. Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.

This longstanding Rule is intended to "clear away the fog that so often hangs over the early stages of litigation." Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 932 (1st Cir. 1983). It is an "anti-ferreting" rule that implements the First Circuit's "efforts over the years to enlist counsel as aides to the court." Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33-34 (1st Cir. 2001) (Puerto Rico Local Rule version). The First Circuit has "consistently upheld the enforcement of this rule . . . ." Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 45 (1st Cir. 2004). TPI has failed to comply with the Rule.

Only the first 5 paragraphs of defendants' Local Rule 56.1 Statement are pertinent to the issue of expiration of the 1998 covenants. The following table sets forth defendants' Statement and TPI's corresponding response:

| **DEFENDANTS' LOCAL RULE 56.1 STATEMENT** | **TPI'S RESPONSE** |
|---|---|
| 1. On or about November 24, 1997, Glenn Thompson and the other shareholders of Thompson Paper Box Co., Inc. entered into an Asset Purchase Agreement with a newly-formed entity named Thompson Products, Inc. (the plaintiff in this case). A true and accurate copy of that Agreement is appended as **Exhibit D**. (Glenn Aff. ¶ 4). | 1. No dispute. |
| 2. On January 5, 1998, Glenn entered into his first Employment Agreement with TPI, a true and accurate copy of which is appended as **Exhibit F**. Mr. Victor Kiarsis, a Board member, signed that agreement on behalf of TPI. (Glenn Aff. ¶ 5). | 2. No dispute. |

| | |
|---|---|
| 3. **Exhibit F** provided in paragraph 5 that its term was through December 31, 2000. In 2001 TPI proposed a new employment agreement, but Glenn rejected it as unacceptable, and he never signed it. TPI has never produced a signed copy. (Glenn Aff. ¶ 6). | 3. No dispute as to the stated term contained in Section 5 of Exhibit F. Who proposed a new employment agreement and when after December 31, 2000 are in dispute. See Declaration of David Jansen ¶ 4 and 5 and Declaration of Stephen Mallet ¶ 8. No dispute that TPI has never produced a signed copy of a 2001 proposed employment agreement. |
| 4. **Exhibit F** also provided in paragraph 9 that certain restrictive covenants were to be in effect for "two (2) years following termination of Employee's employment hereunder." On November 22, 2002, approximately six weeks before those restrictive covenants were set to expire, David Jansen, who was then a TPI Director, proposed another version of a new employment agreement, a true and accurate copy of which is appended as **Exhibit H**. That agreement would have modified paragraph 9 by extending the period of the restrictive covenants to two years after Glenn left TPI, whenever that might occur, but Glenn rejected it. That proposed agreement bears the initials "PCSF", which refers to the law firm Pryor Cashman Sherman & Flynn, the same law firm that had drafted on behalf of TPI the Asset Purchase Agreement (**Exhibit D**) and Glenn's original Employment Agreement (**Exhibit F**). (Glenn Aff. ¶ 7). | 4. No dispute as to what Exhibit F says. What proposed employment contract drafts were provided by David Jansen to Glenn Thompson and when are in dispute. TPI disputes that Exhibit H would have modified paragraph 9 of Exhibit F as recited. TPI does not dispute that new contract terms were discussed with Glenn Thompson and no new contract was executed. TPI does not dispute that the initials "PCSF" on Exhibit H refer to Pryor Cashman Sherman & Flynn. TPI disputes whether Pryor Cashman drafted Exhibit D and Exhibit F. It is believed that Exhibits D and F were the product of negotiation between counsel for the buyers and sellers. |
| 5. After **Exhibit F** expired on December 31, 2000, Glenn continued to work for TPI as an employee at will. (Glenn Aff. ¶ 8). | 5. TPI does not dispute that Exhibit F expired on December 31, 2000 or that Glenn Thompson continued as president and employee of TPI after that date. In the absence of discovery, TPI disputes that Glenn's [sic] Thompson's employment status thereafter was "at will." |

TPI admits that it has "no dispute" regarding paragraphs 1 and 2. In paragraph 3, TPI admits that Glenn's 1998 Employment Agreement expired on December 31, 2000 and that TPI knows of no executed version of the proposed 2001 agreement. TPI did not respond at all to the portion of paragraph 3 stating that Glenn never signed the proposed 2001 agreement, which

3

means that fact is deemed admitted.[2]  With respect to paragraph 4, TPI admits that the 1998 Agreement provided that the restrictive covenants were to be in effect for 2 years after that Agreement terminated -- i.e., until December 31, 2002.  TPI purports to dispute that the proposed 2002 agreement, which rewrote the critical language regarding expiration of the covenants (see defendants' opening Memorandum, at 7-8), was authored by the same lawyers who had prepared the 1998 Agreement.  But TPI provides no citation whatsoever to support that "dispute," as required by Local Rule 56.1, and accordingly it is deemed admitted.  Finally, in paragraph 5 TPI admits that after the 1998 Agreement expired on December 31, 2000, Glenn continued working for TPI.  TPI mysteriously "disputes" that Glenn was an employee at will thereafter, but again offers no citation to any basis for that "dispute."  (After all this time, TPI still has never presented to the Court or to Glenn any employment agreement that Glenn signed after 1998, so TPI necessarily must admit that Glenn was an employee at will beginning January 1, 2001.)  Instead, TPI merely recites that "[i]n the absence of discovery," TPI "disputes" that fact.

TPI apparently is suggesting, at least as to paragraph 5, that it is excused from complying with Rule 56.1 until discovery has been conducted (see also TPI's Memorandum in Opposition, at 2, 6).  TPI cites no authority for that position, and none exists.  For one thing, if any factual basis actually existed for that "dispute," TPI could have submitted affidavits from its former directors or its long-time legal counsel, Pryor Cashman,[3] but it did not do so.  Not a word, unlike the extensive affidavits that TPI procured with respect to the 2003 agreement.

---

[2]  In paragraph 3 of the Statement, TPI incredibly disputes when and who proposed the 2001 agreement (even though it bears the document identifier and the name of TPI's own counsel), but since that agreement was never signed, those "disputes" are not material.

[3]  The affidavits that TPI submitted from Messrs. Mallet, Jansen and Read deal exclusively with the purported facts surrounding the execution of the successor 2003 agreement.

And TPI's vain hope that a signed copy of the alleged 2001 agreement might exist someplace should be ignored. It is insufficient for a party opposing a motion to merely suggest "some metaphysical doubt as to the material facts." N.F.L. v. Insight Telecommunications Corp., 158 F.Supp 2d 124, 130 (D.Mass 2001) (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Local Rule 56.1 "has teeth and can be dispositive; parties ignore such rules 'at their own peril.'" Barry v. Wing Memorial Hosp., 142 F.Supp. 2d 161, 163 n.1 (D.Mass. 2001). A party who submits a Local Rule 56.1 Statement in opposition but who does not submit references to documents supporting its "disputes" is deemed to have admitted the moving party's facts. Okocha v. Brigham & Women's Hosp., 81 F.3d 147 (1st Cir. 1996).

Moreover, the "Facts" section of TPI's Memorandum in Opposition is not an acceptable substitute for a Statement in compliance with Local Rule 56.1. GE Capital Healthcare Fin. Servs. v. Fall River Walk-In Emergency Medical Office, P.C., 2004 WL 40522 at *1. (D.Mass. 2004) (facts deemed admitted, where "the memorandum supporting the opposition includes a section entitled 'Facts' . . . . [t]hat is rife with bald assertions entirely lacking in factual support."); Cosme-Rosado, 360 F.3d at 45 ("the plaintiffs' 'Factual Background' section fails to provide the allegations and citations necessary to controvert the dispositive facts set forth in [the moving party's] statement.").

In sum, TPI has admitted all of the facts that are material to this motion,[4] leaving this Court to rule upon the legal question of the interpretation of the 1998 Agreement.

---

[4]  TPI also included in its Local Rule 56.1 Statement a section entitled "Additional Facts." Not only are those "facts" unsupported by any citations at all, they also deal only with matters surrounding the 2003 agreement.

5

2.     <u>TPI Has Completely Ignored All Three Critical Terms of the 1997/1998 Agreements</u>

TPI's opposition Memorandum reads like an abstract legal treatise, rather than a presentation of the concrete contractual issues in this litigation. TPI has completely ignored all three of the determinative contract terms in the 1998 Employment Agreement[5] and the 1997 Asset Purchase Agreement.

a)    <u>"hereunder"</u>

The 1998 Employment Agreement provided that all three of the restrictive covenants would remain in effect for two years following the termination of Glenn's employment "hereunder" (**Exhibit G**, ¶¶ 9(a), 9(b) and 9(c)). Defendants have highlighted for the Court the critical importance of that term (see defendants' Memorandum, at 7, ff.). TPI's Memorandum contains no discussion whatsoever of that term. TPI chose not to take issue with defendants' argument, and therefore is now foreclosed from doing so. The "termination of [Glenn's] employment hereunder" unquestionably occurred on December 31, 2000, and the covenants expired two years after that. It is that simple.

b)    <u>"under this Section 9"</u>

TPI argues (Memorandum, at 9-11) that paragraph 9(g) of the 1998 employment agreement, the "survival" clause, "clearly extends the trigger date for operation of the two-year post-termination covenants to the termination of Glenn's <u>employment</u> with TPI" (TPI's emphasis), and argues further that "the plain words of subsection (g) provide for attachment of the covenants upon termination of Glenn's <u>employment</u> with TPI, regardless of whether the 1998

---

[5]    TPI's pending motion for preliminary injunction is based solely on the 1998 employment agreement, and TPI did not discuss these terms in those motion papers either.

Agreement is still then in effect ..." (TPI's emphasis).  But just as TPI ignored the word "hereunder" contained in all three restrictive covenants, TPI has ignored a critical term contained in paragraph 9(g): "under this Section 9" (see **Exhibit G**).  That limiting clause leaves no doubt that it was precisely the same restrictive covenants created "under this Section 9" that survived the termination of the agreement.  TPI effectively concedes, as it must, that Section 9 of the 1998 agreement provides that those restrictions were to expire 2 years after the end of the agreement.[6]  TPI's Memorandum pretends that those limiting words do not exist, and that the covenants would have remained in effect for 50 years, if that is how long Glenn continued to work as an employee at will for TPI.  TPI's argument obliterates the words "under this Section 9" from the 1998 agreement, and thereby runs afoul of the fundamental rule of construction that all words in a contract must be given meaning (see defendants' Memorandum, at 10-11).

      c)      "incorporated by reference"

In addition to its distortions of the 1998 agreement, TPI also has distorted the actual wording of the 1997 Asset Purchase Agreement.  Continuing its disquieting habit of misquoting contractual terms and omitting crucial, operative words from quotations of contractual language, TPI even misled the Court about the very language it relies upon from the Asset Purchase Agreement.  At page 4 of its Memorandum, TPI purports to quote the provisions of section 2.4(b) of the Asset Purchase Agreement, as a prelude to arguing that the restrictive covenants in that Agreement do not have the same expiration date as the covenants contained in the 1998

---

[6] That concession is the very reason why TPI did its abrupt about-face in its Amended Complaint, essentially abandoning its reliance on the 1998 Employment Agreement in favor of the Asset Purchase Agreement.

employment agreement. Below is the actual language of section 2.4(b), with the portion that TPI deleted highlighted in bold:

> It is agreed and understood by and among the parties to this Agreement that the Restrictive Covenants **incorporated by reference in subsection (a) above** are each individually essential elements of this Agreement and that, but for the agreement of GT and MT to comply with such Restrictive Covenants, Purchaser would not haved agreed to enter into this Agreement.

Inadvertent or not,[7] TPI's elimination of those words from its quotation of section 2.4(b) (and TPI's corresponding failure to even mention those words in the text of its Memorandum) makes a critical difference in the meaning of section 2.4(b) -- a difference that completely undermines TPI's contention.

The term "incorporation by reference" is defined as

> The method of making one document of any kind become a part of another separate document by referring to the former in the latter, and declaring that the former shall be taken and considered as a part of the latter the same as if it were fully set out therein.

Black's Law Dictionary (4th ed.).

It is well established in Massachusetts and other jurisdictions that if one contract incorporates the terms of another by reference, both writings must be construed together as a single integrated agreement. Chelsea Indus., Inc. v. Florence, 358 Mass. 50, 53 (1970); *see also* Thomas v. Christensen, 12 Mass.App.Ct. 169, 173 (1981). The result of an incorporation by reference is that the referenced writing becomes a part of the contract just as if its words were specifically set forth in the body of the contract. *See* In re C & H News Co., 133 S.W.3d 642, 643 (Texas App.

---

[7]     At least in this instance, unlike in its Complaint, TPI used ellipses to indicate that something was omitted.

8

2003); Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 435 n.5 (Mo. 2003); Blanchard Valley Farmers Coop., Inc. v. Carl Niese & Sons Farms, Inc., 758 N.E.2d 1238, 1244 (Ohio App. 2001). "Documents that are incorporated by reference into a contract are to be read as though they are restated in the contract." Blanchard, 758 N.E.2d at 1244. "[M]atters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in *haec verba*." Dunn Indus., 112 S.W.3d at 435 n.5.

TPI's entire argument, that the covenants contained in the 1998 Employment Agreement, which had a 5-year duration, suddenly became unlimited in time when incorporated into the Asset Purchase Agreement,[8] fails under all of those authorities. The restrictive covenants clearly had the same 5-year duration in both agreements, TPI's sleight of hand notwithstanding.

3.      TPI Fails to Acknowledge the Established Purpose of "Survival" Clauses

In addition to its distortion of the contract language, TPI also has grossly misinterpreted commonplace "survival" clauses such as the one here. According to TPI, subparagraph 9(g) of the 1998 Employment Agreement meant that the restrictive covenants would last indefinitely, regardless of their specified 5-year terms. One court has held that a similar survival clause in an employment contract "simply meant to clarify that the noncompete provision, although triggered at or prior to the termination of the employment agreement, would continue to be effective for its two-year term even if that term extended beyond the term of the employment agreement." Marwaha v. Woodridge Clinic, S.C., 790 N.E. 2d 974, 977 (Ill. App. Ct. 2003), appeal denied, 803 N.E. 2d 484 (Ill. 2003). The court rejected the same argument that TPI is making here, reasoning that "[w]e observe that it would be strange for parties to an employment contract to provide for a noncompete provision to exist in perpetuity." Id. at 977.

---

[8]     Under Massachusetts law, a restrictive covenant that is unreasonable in duration is unenforceable. Kroeger v. Stop & Shop Companies, Inc., 13 Mass.App.Ct. 310, 317-18 (1982), review denied, 386 Mass. 1102 (1982).

9

As defendants explained in their opening Memorandum (at 10-11), paragraph 9(g) simply means that the restrictive covenants were to continue in effect for the specified two-year period even if the parties' other contractual obligations toward one another had ended because the employment agreement had terminated.  Survival clauses of this type are routinely included in employment and severance agreements, to make certain that the termination of an employment agreement is not construed to likewise terminate certain obligations that, by their terms, survive the termination. TPI's suggested reading, that the "survival" clause overrides other, explicit contractual limitations, would come as a shock to corporate lawyers everywhere.

4.      <u>TPI Has Otherwise Misinterpreted the Restrictive Covenants</u>

TPI argues that defendants' interpretation of the duration of the restrictive covenants is unreasonable in two respects and accordingly should be rejected.  First, TPI argues (Memorandum, at 10-11) that "under Glenn's reading of the Restrictive Covenants, they would be of little use to TPI if Glenn were still employed by TPI at the end of the three-year term." That argument is both incorrect and unduly narrow.  The restrictive covenants continued for two years after the expiration of the 1998 Employment Agreement, while his common law duties of an employee or officer would not have.  Moreover, if TPI had decided to terminate Glenn in 1999, 2000, 2001 or 2002, the two-year post-termination contractual restrictions would have limited his activities, after common law duties had expired.  It is only in hindsight, after TPI reaped the benefit of Glenn's employment contract running its full term and after Glenn chose to remain as an at-will employee, that TPI claims that the covenants were superfluous.  TPI obviously did not consider them superfluous at the time the agreements were executed.

Second, TPI advances the colorful (and erroneous) argument (Memorandum, at 14) that "[i]f the contracts of the parties are read to confine Glenn's covenants to the three-year term of

the 1998 Agreement and the two-year period immediately following it when he was still serving as president of TPI, TPI bought very little for its substantial investment, because Glenn became free to destroy the company by lawful competition on January 1, 2002 and subparagraph (g) was essentially worthless." [9] Where does the January 1, 2002 end-date for the restrictive covenants come from? Perhaps from the same place that TPI came up with the bewildering allegation in its original Complaint, carried through in each version of its Amended Complaint, that the employment contract that ran from January 1, 1998 through December 31, 2000 was for a "two-year term." (**Exhibit A**, ¶8 & **Exhibit B**, ¶12). TPI's suggested January 1, 2002 date is meaningless.

Clear and unambiguous contracts such as the 1998 Employment Agreement and the 1997 Asset Purchase Agreement are to be enforced according to their terms (see defendants' Memorandum, at 6), and the mere fact that litigants disagree about their interpretation does not make such contracts ambiguous. Bank v. IBM, 145 F. 3d 420, 424 (1st Cir. 1998). TPI's invitation (Memorandum, at 10, 14) to the Court to rewrite the covenants to provide TPI with what it now describes as "reasonable" protection from competition accordingly must be rejected.

5.   TPI Introduces a Red Herring with its "Sale of Business" Contention

TPI argues (Memorandum, at 13) that "[a]s covenants made incident to and as an integral part of the sale of a business, this Court should look less critically at such covenants." That contention is a red herring. TPI argues that in light of the court's reasoning in Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488 (1986), this Court should more readily adopt TPI's overly expansive and distorted view of the Employment Agreement's non-compete

---

[9]   TPI's carping about its lost "investment" is curious. TPI does not inform the Court of the facts, established by TPI's own records, that during the period that Glenn was President, from January 1, 1998 through July 12, 2005, TPI realized total net sales of over 275 million dollars and total EBITDA (earnings before interest, taxes, depreciation and allowances) of over 43 million dollars.

provisions. However, the Alexander case does not support such a proposition, and TPI's reliance on that case is misplaced.

  To be enforceable, any covenant restricting competition must be "reasonable in time and space, necessary to protect legitimate interests, and not an obstruction of the public interest." Alexander, 21 Mass.App.Ct. at 498; *see* Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 101 (1979). As a preliminary matter, a court ordinarily must evaluate the context of the non-compete provision and the nature of the parties' respective interests before determining whether a particular non-compete provision is overly broad or otherwise unreasonable. Thus, for purposes of determining the enforceability of a non-compete covenant, Massachusetts courts traditionally have distinguished between what is "reasonable" with respect to covenants that arise in the employer-employee context and what is "reasonable" with respect to those that arise out of the sale of a business. *See*, *e.g.*, Wells v. Wells, 9 Mass.App.Ct. 321, 322-26. In Alexander, the Massachusetts Appeals Court merely held that "noncompetition covenants arising out of the sale of a business [will] be enforced more liberally than such covenants arising out of an employer-employee relationship." Id., 21 Mass.App.Ct. at 496 (citing 2 Restatement (2d) Contracts § 188 (A.L.I. 1981)). As the Restatement explains in more detail,

> The extent to which the restraint is needed to protect the promisee's interests will vary with the nature of the transaction. Where a sale of good will is involved, for example, the buyer's interest in what he has acquired cannot be effectively realized unless the seller engages not to act so as unreasonably to diminish the value of what he has sold. . . . In the case of a post-employment restraint, however, the promisee's interest is less clear. Such a restraint, in contrast to one accompanying a sale of good will, is not necessary in order for the employer to get the full value of what he has acquired. . . . Because of this difference in the interest of the promisee, courts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts of employment.

Restatement (2d) Contracts § 188 cmt. b.

In contrast, the Court in this case is being asked to decide issues regarding the correct *construction and interpretation* of the text of a non-compete covenant, rather than to decide the issue whether a provision, as written, is *unreasonably broad*. The Alexander case does not stand for the proposition that the rules of contractual construction vary or are relaxed according to the circumstances in which the restrictive covenant was agreed to.

6.  TPI Presents a Straw Man Argument That Misses the Point About the Proposed 2002 Agreement

Defendants argued (Memorandum, at 8-12) that TPI's presentation to Glenn of a proposed contract in 2002 that contained a rewritten covenant running from the date of Glenn's departure from TPI at any time -- the very obligation that TPI now suddenly ascribes to the very different wording of the 1998 Agreement -- is legally very significant. In response, TPI argues at page 15 of its Memorandum that "Jansen's insistence on the inclusion of covenants in any new contract with Glenn was not indicative of a belief by TPI that there were no restrictive covenants previously agreed upon that would bind Glenn if he left TPI." TPI misses the point. The significance of the rewritten term in the proposed 2002 agreement is in the precise language that TPI chose, not the mere fact that restrictive covenants were included. TPI would have had no reason to change that language so materially, if the 1998 agreement already meant that the covenants were triggered whenever Glenn ceased to be employed by TPI, even if that happened decades later. TPI still has not offered the Court any explanation for why its counsel put that drastic revision into the proposed 2002 agreement.

7.  TPI Has Not Distinguished Defendants' Principal Authorities

Finally, defendants' reliance in their opening Memorandum on the Grizzard and Chelsea cases is unchallenged. TPI has no rebuttal to those authorities, beyond stating that they do not

13

support defendants' position (TPI's Memorandum, at 11, 14). But here is how TPI itself summarized Grizzard: "The employer sued [the employee] to enjoin violation of covenants made in the expired employment contract." (id. at 11). The court held (although TPI's Memorandum doesn't acknowledge it) that "hereunder" in that contract means just what defendants argue "hereunder" means in Glenn's 1998 Employment Agreement. Does TPI not see the similarity between that very characterization of Grizzard and this case?

CONCLUSION

TPI in short has presented arguments in its Memorandum that are not loyal to either the facts of this case or the applicable law. For the reasons set forth in their opening Memorandum and in this Reply, defendants urge the Court to enter summary judgment in their favor on Count III of the Amended Complaint.

Respectfully submitted,

GLENN THOMPSON and SPLASH CREATIONS, INC.

By their attorneys,

/s/ Matthew F. Medeiros
Matthew F. Medeiros (BBO #544915)
LITTLE MEDEIROS KINDER BULMAN &
  WHITNEY, PC
72 Pine Street
Providence, RI 02903
Tel:   (401) 272-8080
Fax:   (401) 272-8195


/s/ Michael L. Chinitz
Michael L. Chinitz (BBO # 552915)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, MA 02116
Tel:   (617) 536-0040
Fax:   (617) 536-4400

## Certification

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 10, 2006.

            /s/ Michael L. Chinitz_____
            Michael L. Chinitz